### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 15 |
| JUST ENERGY GROUP INC., *et al.* | Case No. 21-30823 (MI) |
| Debtors in a Foreign Proceeding.[1] | |
| JUST ENERGY TEXAS LP, FULCRUM RETAIL ENERGY LLC, HUDSON SERVICE LLC, and JUST ENERGY GROUP, INC., | |
| Plaintiffs, | |
| v. | Adv. Proc. No. 21-04399 (MI) |
| ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC. and the PUBLIC UTILITY COMMISSION OF TEXAS, INC., | |
| Defendants. | |

## <u>MOTION OF NRG ENERGY, INC. AND CALPINE CORPORATION TO INTERVENE</u>

> **This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**
>
> **Represented parties should act through their attorney.**

---

[1] The identifying four digits of Just Energy Group Inc.'s local Canada tax identification number are 0469.  A complete list of debtor entities in these Chapter 15 cases may be obtained at www.omniagentsolutions.com/justenergy.

NRG Energy, Inc. ("NRG") and Calpine Corporation ("Calpine," and together with NRG, on behalf of themselves and certain of their respective subsidiaries, the "Generators"), file this motion (the "Motion") for entry of an order pursuant to Rule 24 of the Federal Rules of Civil Procedure, made applicable to the above-captioned adversary proceeding (the "Adversary Proceeding") by Rule 7024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), permitting Generators to intervene as defendants in the Adversary Proceeding.

## PRELIMINARY STATEMENT

1.      No existing party to this Adversary Proceeding faces the risk of economic loss. While the Public Utility Commission of Texas, Inc. ("PUCT") and Electric Reliability Council of Texas, Inc. ("ERCOT") are the nominal defendants, they are not the true economic parties in interest. ERCOT is a pass-through clearinghouse. If the transactions Plaintiffs challenge are unwound, the economic burden will be borne exclusively by market participants like the Generators. To the extent Plaintiffs recover from ERCOT in this Adversary Proceeding, ERCOT in turn will seek recovery from the Generators and similarly situated market participants through future short-payments and resettlement procedures.

2.      During a time of crisis and spiking generation costs, Generators accepted tremendous financial burdens in order to generate, sell, and/or transmit electric power and ancillary services into the ERCOT market. They did so relying on the established regulatory framework and prevailing market prices.[2] The Plaintiffs, with knowledge of the framework and prices, accepted,

---

[2] This regulatory framework is established by the Public Utility Regulatory Act ("PURA") and the PUCT's rules governing the ERCOT wholesale market. *See, e.g.*, 16 Tex. Admin. Code § 25.505. The PUCT's rules direct that the "protocols and other rules and requirements" adopted by ERCOT to "implement" the PUCT's market design "shall promote economic efficiency in the production and consumption of electricity; support wholesale and retail competition; support the reliability of electric service; and reflect the physical realities of the ERCOT electric system." *Id*. § 25.501(a). The PUC has delegated authority to ERCOT to determine market clearing prices of energy, but only where not "otherwise directed by the commission." *Id*. The rules direct ERCOT to implement the pricing mechanisms, while reserving to the PUCT the power to intervene when necessary to protect the public interest. *Id*. § 25.505(h).
(Continued)

received, and re-sold this power to their customers.  Months after these transactions settled,[3] the Plaintiffs now seek to unwind them.  As ERCOT is a revenue-neutral clearinghouse, it is the Generators that ultimately would bear the economic cost if Plaintiffs are successful here.

3.      Plaintiffs boldly ask this Court to review and invalidate regulatory decisions that were made to maintain the functioning of the Texas grid during a crisis.  The PUCT's orders and ERCOT's related actions are already the subject of litigation pending in several forums.  Any finding or ruling by this Court invalidating a PUCT order[4] relating to the winter storm that occurred in Texas during the week of February 14, 2021 (the "Winter Storm"), would reverberate across the State of Texas and have implications for Generators and other market participants.

4.      Recognizing this, Judge Jones recently allowed Generators to intervene as defendants in *Brazos Electric Power Cooperative, Inc. v. Electric Reliability Council of Texas, Inc.*,[5] an adversary proceeding involving many of the same facts, parties and issues as this Adversary Proceeding.[6]  Seeing the value of a commercial perspective, Judge Jones reasoned that "having the commercial parties involved in this actually makes sense . . . it gives you someone to talk to that actually . . . is going to be driven by economic rules instead, as opposed to something that

_____

ERCOT has adopted Nodal Protocols (the "Protocols") implementing the market pricing mechanisms and other policies, subject to the PUC's direction and oversight.

[3] Plaintiffs filed their *Complaint* (the "Complaint") (Adv. Docket No. 1) on November 12, 2021, more than eight months after seeking bankruptcy protection on March 9, 2021 (the "Petition Date").

[4] Plaintiffs assert that the PUCT orders they challenge violated the APA and PURA and that this Court should determine that such orders were invalid and illegal.  Complaint ¶ 91.

[5] See *Brazos Electric Power Cooperative, Inc. v. Electric Reliability Council of Texas, Inc.*, (*In re Brazos Electric Power Cooperative, Inc.*), Adv. Proc. No. 21-03863, Case No. 21-30725 [Docket No. 140] (Bankr. S.D. Tex. Oct. 22, 2021).

[6] Contrary to Plaintiffs' representation on page 13 of the *Joint Discovery/Case Management Plan* [Adv. Docket No. 19], counsel to Generators did not assert that Generators' intervention in the *Brazos* case was by stipulation. In *Brazos*, Judge Jones overruled the debtor's objection and granted the Generators' intervention motion following a contested hearing.

none of us will ever understand." *Brazos* Tr., Hr'g Oct. 18, 2021 at 217:10-14.[7]  Because ERCOT is a revenue-neutral entity that will allocate any liability it incurs in this action among market participants in accordance with the Protocols, the Generators are the true economic parties in interest here, just as they are in *Brazos*.  Here, Generators are situated similarly to insurance carriers.  In the Fifth Circuit, insurers of underlying liability being adjudicated are entitled to intervene by right in that adjudication.  *Ross v. Marshall*, 456 F.3d 442, 444 (5th Cir. 2006).

5.      Generators also have a direct interest in this litigation because of their role in other proceedings, including *Brazos* and state court litigation seeking retroactive repricing of the ERCOT market during the Winter Storm.  This direct interest is especially acute due to the sweeping relief sought by Plaintiffs, which by expressly challenging the *validity* of the PUCT's Orders goes beyond that which Brazos purports to seek in its adversary proceeding.  Findings and rulings made by this Court concerning the actions of the PUCT and ERCOT, or the imposition of retroactive repricing, could significantly impact Generators' legal position in these other cases.[8]  The Generators should not suffer prejudice *there*, because they are not permitted to participate and defend their interests *here*.  Because of their direct economic and legal interests in the outcome of this Adversary Proceeding, the Court should allow Generators to intervene as defendants.[9]

---

[7] Relevant portions of the transcript from the hearing on Generators' motion to intervene in the Brazos Adversary Proceeding are attached as Exhibit 1.

[8] *See infra* note 13.

[9] Unlike in *Brazos*, Generators have not asserted claims under section 503(b)(9) in this case.  But in no way does this lessen the direct legal and economic interest Generators have in this Adversary Proceeding. Moreover, this distinction is irrelevant to Judge Jones' reasoning in *Brazos*, which was predicated on the Generators being the economic parties in interest, given ERCOT's revenue neutrality, rather than the nature of claims they asserted against Brazos. Indeed, certain of the intervenors in *Brazos* did not assert section 503(b)(9) claims, and yet they were permitted to intervene. Furthermore, here the Generators have not asserted section 503(b)(9) claims in part because Plaintiffs paid for the electricity Generators delivered.  Plaintiffs now seek to disgorge these payments, which would ultimately be borne by market participants like the Generators.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The basis for the relief requested herein is Rule 24 of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7024.

## BACKGROUND

### A.      Generators Are Wholesale Power Providers

#### (1).      *NRG Energy, Inc.*

7.      NRG is a leading integrated power company headquartered in Houston, Texas. NRG's electricity generation portfolio includes natural gas, coal, oil, nuclear, wind, utility scale solar, and distributed solar generation.  NRG's generation assets have approximately 22,000 MW of capacity, serving more than 6 million retail customers across 24 states and the District of Columbia, including the largest share of competitively served residential customers in Texas. Through certain of its subsidiaries, NRG generated and sold material electricity into the ERCOT market during the Winter Storm.

#### (2).      *Calpine Corporation*

8.      Calpine, headquartered in Houston, is America's largest generator of electricity from natural gas and geothermal resources, with operations in competitive power markets with nearly 26,000 megawatts of generation capacity, enough to power approximately 20 million homes. Through wholesale power operations and retail businesses, Calpine serves customers in 22 states, Canada, and Mexico, including customers that are responsible for serving their own retail load.  In Texas, Calpine owns and operates 12 power plants.  It also owns and operates retail electric providers who serve over 168,000 residential, commercial, and industrial end-use customers throughout Texas.  Calpine generated material electricity for the ERCOT market during the Winter

Storm.

### B.    The ERCOT Wholesale Market And Winter Storm

9.    The impact of the Winter Storm is well known.   Sub-freezing temperatures precipitated customer demand that pushed the grid to a new winter peak.   While demand soared, supply plummeted as power plants went offline, in many cases because their natural gas supply failed.   As a result, the cost to generate electricity from gas-fueled power plants increased dramatically.   At one point, Texas had lost *nearly half* of all electric generation in the ERCOT market, and electricity demand soared, creating the most severe scarcity event in the market's history and requiring blackouts to prevent total system collapse. At the same time, ERCOT's systems failed to price the market to reflect that total demand vastly exceeded available supply. To address the emergency, the PUCT issued orders to ERCOT on February 15 and 16 to ensure market prices reflected the actual scarcity of supply, and to mitigate the risk of complete failure of the grid (collectively, the "Orders").[10]   To implement the Orders, ERCOT made an administrative adjustment in its scarcity pricing mechanism to account for the load that had been shed, which had the effect of pricing electricity at the proper level: the "value of lost load" or VOLL, which is by regulation $9,000 per MWh. 16 Tex. Admin. Code 25.505(g)(6)(B) (setting VOLL at $9,000/MWh, the maximum offer price, also known as the "high system-wide offer cap" or "HCAP").

10.    Generators relied on these market price points under the Orders and made business decisions accordingly.  As the Winter Storm moved across Texas, natural gas prices jumped nearly from $4.50/MMBtu the Wednesday before the Storm all the way to $1,000/MMBtu on February

---

[10] These Orders properly implemented the "scarcity pricing mechanism" rule.  *See* 31 Tex. Reg. 7317 (2006).  This rule, "provides generation with strong incentives to be available on short notice," and "provides load with strong incentives to voluntarily curtail on short notice to save money." 31 Tex. Reg. 7335 (2006).  ERCOT has the authority to set prices unless it is "otherwise directed by the [PUCT]."  16 TEX. ADMIN. CODE § 25.501(a).

17, and gas suppliers cut deliveries to gas-powered generation facilities.  Generators procured gas at extremely high prices, put strain on their equipment, called in personnel, and took every feasible step to get generation online, all in reliance on the $9,000/MWh market price. At the same time, commercial and industrial customers decreased or shut down operations where possible to avoid the $9,000/MWh prices. Thus, the Orders reflected the actual severity of the scarcity in ERCOT's real-time market, and they incentivized increased supply and decreased demand to balance the grid.

### C.      Plaintiffs' Claims Expose Generators To Liability

11.    Plaintiffs acknowledge ERCOT acts as a clearinghouse through which funds are exchanged between buyers and sellers in the ERCOT market.  Compl. ¶ 30 (noting that ERCOT performs financial settlements).  ERCOT acts as the central counterparty for transactions in the ERCOT market, and ERCOT must maintain revenue neutrality fulling this function. *See* Protocols § 6.6.10 ("ERCOT must be revenue neutral in each Settlement Interval.").

12.    The Protocols provide ERCOT with various mechanisms to maintain revenue neutrality.  When a participant with a payment obligation defaults, ERCOT short-pays on a pro-rata basis the invoices of market participants who sold into the ERCOT market during the applicable period.[11]  Similarly, the Protocols in certain circumstances provide a mechanism for ERCOT to issue revised "Settlement Invoices" to those participating in the market when a previous invoice was issued.  Protocols § 9.5.6 (outlining the resettlement process).  Consequently, whether it be via revised Settlement Invoices, short-payments via setoff, or otherwise, ERCOT may look to the Generators and those similarly situated to the extent of its nominal liability in this Adversary

---

[11] In such circumstances ERCOT may also initiate a "default uplift" process.  *See* Protocols § 9.19.1.  Because of the massive impact of the Winter Storm on various market participants, it is unclear as a practical matter whether uplift would be effective for ERCOT to satisfy an immediate judgment in this adversary proceeding.

Proceeding.

### D. This Adversary Presents Identical Issues As Other Ongoing Litigation Involving Generators

13.     The Plaintiffs assert facts and legal arguments that are subject to active litigation in this district, Texas state courts, and certain administrative proceedings, several of which involve Generators. For example, many of the issues in this Adversary Proceeding mirror those in *Brazos*. There, the debtor seeks disallowance of ERCOT's claim for amounts owed on account of electricity purchased during the Winter Storm. Just as Plaintiffs do, Brazos argues that ERCOT, by abiding by the orders of the PUCT, somehow contravened Texas law, the SFA, and the Protocols. In both cases, the plaintiffs argue ERCOT should have removed the $9,000/MWh price sooner. Generators' participation in the *Brazos* litigation could be for naught if these issues are first decided in this Adversary Proceeding. Unlike *Brazos*, however, in which the debtor carefully disclaims challenging the validity of the Orders,[12] here Plaintiffs expressly seek the sweeping relief of invalidation of the Orders, asking this Court to second-guess the PUCT's regulatory decisions in the midst of the emergency and retroactively reprice ERCOT market transactions. The validity of the Orders is also being litigated in Texas state court actions to which Calpine and other generators are parties and have an interest.[13] Retroactive repricing of the market would serve only to transfer potentially billions of dollars from those market participants whose operational and

---

[12] Although Brazos purports to not be mounting a challenge to the validity of the PUCT Orders, but rather only one as to their applicability, the substance of Brazos' claims still put the Orders and the PUCT's authority squarely at issue, creating numerous jurisdictional defects and establishing grounds for dismissal or abstention. Plaintiffs here do not even attempt to avoid such issues, and ERCOT and the PUCT are accordingly expected to move for dismissal or abstention in this case.

[13] *Luminant Energy Company LLC v. Public Utility Commission of Texas*, No. 03-21-00098-CV, in the Court of Appeals for the Third Judicial District, Austin, Texas (filed Mar. 2, 2021) ("Luminant Appeal"); *Exelon Generation Co. LLC et al. v. Public Utility Commission of Texas*, No. D-1-GN-21-001772, petition filed, (Travis Cty. Dist. Ct. Apr. 19, 2021); and *RWE Renewables Americas LLC, et al. v. Arthur D'Andrea and Public Utility Commission of Texas, et al.*, No. D-1-GN-21-001839 (Travis Cty. Dist. Ct. Apr. 21, 2021), among others.

financial decisions before and during the emergency (and in reliance on the PUCT's Orders and ERCOT's pricing) mitigated their exposure to high electricity prices, to other market participants whose efforts to mitigate those risks were unsuccessful.

## ARGUMENT

## I.  MOVANTS MAY INTERVENE AS A MATTER OF RIGHT

14.   Federal Rule of Civil Procedure 24(a), applicable here via Bankruptcy Rule 7024, governs intervention as a matter of right.  Intervention must be permitted if:

> (1) the motion to intervene is timely; (2) the potential intervener asserts an interest that is related to the property or transaction that forms the basis of the controversy in the case into which she seeks to intervene; (3) the disposition of that case may impair or impede the potential intervener's ability to protect her interest; and (4) the existing parties do not adequately represent the potential intervener's interest.

*John Doe No. 1 v. Glickman*, 256 F.3d 371, 375 (5th Cir. 2001).  In assessing these elements, "[f]ederal courts should allow intervention where no one would be hurt and the greater justice could be attained."  *Id.*  (quoting *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994)).  Each of the required elements is satisfied here.

### A.  The Motion Is Timely

15.   The Motion is timely.[14]  This litigation is in its infancy—an answer has not even been filed and discovery has not yet commenced.[15]  The timing of Generators' request to intervene does not prejudice any party.[16]  Finally, as described below, Generators are not adequately represented

---

[14] Four factors inform whether a motion to intervene is timely: (i) the length of time the movant waited to file, (ii) the prejudice to the existing parties from any delay in seeking to intervene, (iii) the prejudice to the movant if intervention is denied, and (iv) any unusual circumstances.  *Rotstain v. Mendez*, 986 F.3d 931, 936–37 (5th Cir. 2021).

[15] Courts routinely grant intervention in spite of much longer delays.  *See Espy*, 18 F.3d at 1205 (finding a motion to intervene to be timely where the motion was made within two months of the issuance of a preliminary injunction that affected the interest of the proposed intervenors); *Smith Petroleum Serv. Inc. v. Monsanto Chem. Co.*, 420 F.2d 1103, 1115 (5th Cir. 1970) (finding intervention to be timely 19 months after the action was filed).

[16] "[P]rejudice must be measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation." *Espy*, 18 F.3d at 1206.

by ERCOT or PUCT and have direct interests in this litigation; accordingly, the prejudice resulting from the Generators' non-participation would far outweigh any claim of prejudice based on the timing of their intervention.

### B. Generators Have A Substantial And Direct Interest In This Litigation

16.     In the Fifth Circuit, "an interest that is concrete, personalized, and legally protectable is sufficient to support intervention." *Texas v. United States*, 805 F.3d 653, 658 (5th Cir. 2015). The relevant inquiry is whether the party has a significant "stake in the outcome" of the proceeding. *Fuel Oil Supply & Terminaling v. Gulf Oil Corp.*, 762 F.2d 1283, 1287 (5th Cir. 1985); *see also Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 566 (5th Cir. 2016) ("[A]n interest is sufficient if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim."). And "although an asserted interest must be 'legally protectable,' it need not be legally *enforceable*." *Texas*, 805 F.3d at 659.

17.     Generators have a legally protectable interest in the outcome of the Adversary Proceeding, for at least two reasons. *First*, as explained above, to the extent of any disgorgement of the Plaintiffs' payments to ERCOT (the "Transfers"), Generators face legal and economic exposure under the Protocols. Stated differently, while ERCOT is required by law to try to collect from market buyers, it will not bear any economic consequences if the Transfers are avoided. But much like an insurer, the Generators will.[17] *Second*, if the Court were to grant Plaintiffs' requested relief of invalidation of the Orders and other matters concerning the implementation of the Texas

---

[17] NRG and Calpine are among the very largest of power generators that sold into the ERCOT market during the Winter Storm. As such, they stand to lose more than almost any other generators if the Transfers are avoided, and accordingly are well situated and properly incentivized to advance the interests of other commercial parties that sold into the ERCOT market during the Winter Storm.

regulatory regime, such a ruling may impact Generators' interest in other proceedings.  This creates a legally protectable interest.

### (1).   *Like An Insurer, Generators Bear The Economic Risk Here*

18.    The Generators may intervene as of right because they have a direct interest in the liability being adjudicated.  ERCOT's settlement procedures are designed to keep it revenue neutral.  *See e.g.*, Protocols § 9.11.3(d) ("The reductions shall be . . .  to the extent necessary to clear ERCOT's accounts on the payment due date to achieve revenue neutrality for ERCOT.").  Here, ERCOT could take several different steps to achieve revenue neutrality.  If this Court were to declare the Orders invalid, ERCOT may reprice the transactions at issue and to which Generators were a party during the Winter Storm.  *See* Protocols § 9.5.6(1) ("ERCOT shall issue a RTM Resettlement Statement using corrected Settlement data due to resolution of Settlement and billing disputes.").  The Generators, who relied on the PUCT's Orders and ERCOT's market pricing, assumed significant liabilities to bring electricity to market during the Winter Storm. They stand to lose vast sums as a result of such repricing, with funds potentially being transferred to other market participants, including some that did not mitigate their financial risk or generate as much power during the Winter Storm.  Alternatively, ERCOT may seek to short-pay Generators on future invoices.  In any case, ERCOT has no ability to violate its fundamental precept of revenue neutrality.  *See* Protocols § 6.6.10 ("ERCOT must be revenue neutral in each Settlement Interval.")

19.    Accordingly, much like an insurance carrier, the Generators are directly exposed in relation to any losses ERCOT nominally sustains from an adverse judgment in this action.  In the Fifth Circuit, an insurance company in such position has a direct relationship warranting intervention as of right.  *See Ross v. Marshall*, 456 F.3d 442, 444 (5th Cir. 2006) ("Once Allstate accepted coverage over any negligence liability on the part of [the insured], they had a direct interest in the liability lawsuit.").  As in *Ross*, Generators will bear the costs of the liability asserted

in this Adversary Proceeding.   As a matter of law, this constitutes a sufficient interest for intervention by right.  *Ross*, 456 F.3d at 444.

> ### (2).   *Generators Have An Interest In The Adversary Proceeding Because Of Their Role In Other Related Litigation*

20.   The outcome of this Adversary Proceeding implicates the Generators' rights in litigation pending in other forums.  This is particularly so if a ruling in this Adversary Proceeding were held to have a preclusive effect on ERCOT and/or the PUCT, or even Generators, in such other actions.   This gives Generators an interest "that is concrete, personalized, and legally protectable" in the outcome of the Adversary Proceeding.  *See Texas*, 805 F.3d at 658.   The disputed issues in this Adversary Proceeding include: (i) whether ERCOT was bound by valid PUCT Orders under the SFA and Protocols (being litigated in *Brazos*); (ii) whether the Orders were validly issued (being litigated in the *Luminant* appeal); and (iii) whether ERCOT properly maintained scarcity pricing at $9,000/MWh for the 33-hour period after ERCOT-directed firm load shed ceased (being litigated in *Brazos* and the *Luminant* appeal).   Generators have expended substantial resources in *Brazos* and the *Luminant* appeal.   They should not be shut out of this Adversary Proceeding and forced to stand by as one buyer seeks to vacate the Orders, reprice all or a portion of the ERCOT market, and reallocate substantial sums from Generators to other market participants.   If the Generators are not allowed to intervene, their ongoing effort to protect their rights and interests in these other proceedings may be prejudiced.

### C.   Generators' Interests Will Be Impaired Absent Intervention

21.   If successful, the Plaintiffs' suit will inevitably and directly impair the Generators' legal and economic interests.   This easily meets the relaxed standard that a movant "must demonstrate only that the disposition of the action 'may' impair or impede [its] ability to protect [its] interests," which is "a great liberalization of the prior rule."  *Brumfield v. Dodd*, 749 F.3d 339,

344 (5th Cir. 2014).

22.    With respect to Generators' legal interests that may be impaired, the Complaint asks the Court to rule on legal questions that may subsequently be addressed in *Brazos* and other proceedings in which Generators are parties.   Plaintiffs ask the Court to invalidate the Orders and interpret provisions of the Protocols.   The Court may decide legal issues of first impression in this Adversary Proceeding.   "The Fifth Circuit has held that the *stare decisis* effect of an adverse judgment constitutes sufficient impairment to compel intervention."   *Glickman*, 82 F.3d at 109-10.   Depending on the timeline, any ruling in this Adversary Proceeding would almost certainly be cited in the *Brazos* and *Luminant* cases.   Regardless of whether any ruling by this Court would ultimately be deemed binding on or have preclusive effect in the *state* court proceedings, the potential precedential effect of rulings in this case and any attendant appeals on *Brazos* alone is sufficient to support intervention.   *See Heaton v. Monogram Credit Card Bank of Georgia*, 297 F.3d 416, 424 (5th Cir. 2002) (reversing a district court's denial of an intervention motion by the FDIC in part because "[t]he district court's ruling . . . will undoubtedly, unless changed, be relied upon as precedent in future actions involving the FDIC"); *Espy*, 18 F.3d at 1207 ("because of the precedential effect of the district court's decision, an adverse resolution of the action would impair [the intervenors] ability to protect their interest").

23.    While a ruling in this adversary may not be binding on the Generators absent their intervention, such ruling may have preclusive (or persuasive) effects on the PUCT and ERCOT in other litigation to which Generators are party.   Courts have consistently found such preclusion *concerns* justify intervention.[18]   *Atlantis Dev. Corp. v. United States*, 379 F.2d 818, 829 (5th Cir.

_____

[18] The Generators do not concede preclusion would apply to any case to which they are a party.  But they don't need to.  All that is required for intervention is a showing that an adverse decision "may" impair their interests.  Given the plethora of litigation involving identical issues with many of the same parties, these concerns are substantial, and
(Continued)

1967) (possibility of judgment with preclusive effect may satisfy this element where intervenor has "claim to and interest in the very property and the very transaction which is the subject of the main action"); *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1247 (6th Cir. 1997) (intervenor sufficiently established impairment of interest in adversary proceeding where "an adverse ruling in the district court could hinder its own efforts to litigate . . . both in currently ongoing cases and in future challenges"); *In re Nitschke*, No. 05-74861, 2008 WL 141510, at *2 (Bankr. N.D. Ohio Jan. 11, 2008) (potential impairment of intervenor's ability to re-litigate adverse findings in adversary proceeding due to collateral estoppel was sufficient to satisfy third prong of intervention test).

24.    With respect to Generators' economic interests that may be impaired absent intervention, as described above, Generators and other market participants effectively backstop any loss ERCOT nominally suffers in this Adversary Proceeding.  The Protocols allow for allocating losses among market participants like Generators, without their consent.  Settlement invoices must be paid or Generators risk their status as a market participant.  Protocols § 9.7.1(1). Denying intervention will impair the Generators' ability to protect their direct economic interest that will be determined in the Adversary Proceeding.  *See Brumfield*, 749 F.3d at 344.

**D.    Regulatory Authorities Cannot Adequately Represent the Interests of Commercial Parties Like the Generators**

25.    A movant's burden to show that its interests are not adequately protected is "minimal" and "satisfied if the applicant shows that representation of his interest 'may be' inadequate." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972); *see also Brumfield*, 749 F.3d at 345 (an intervenor "need not show that the representation by existing parties

---

opposing litigants in other cases seeking invalidation of the Orders would undoubtedly cite to any rulings by this Court that might support their legal positions.

will be, for certain, inadequate" (quotations and citations omitted)).  The only showing required to meet this minimal burden is that the intervenor's and original party's interests do "not align **precisely**."  *Brumfield*, 749 F.3d at 345 (emphasis added).

26.   ERCOT and the PUCT are non-profit governmental units answerable to a different and broader set of stakeholders than the Generators.  *Espy* is instructive on applying the applicable standard for governmental units.  There, plaintiffs challenged the United States Forest Service's management of certain national forests.  Pursuant to a plaintiff's request, the district court entered an injunction barring certain timber sales.  Two timber logging associations sought to intervene.  The district court denied the motion to intervene, but the Fifth Circuit reversed.  *Espy*, 18 F.3d at 1204.  It reasoned that "[t]he government must represent the broad public interest, not just the economic concerns of the timber industry."  *Id.*  Thus, for purposes of the intervention standard, the government did not adequately represent the interest of commercial parties.

27.   *Espy* is on all fours with the case at bar.  The PUCT is undoubtedly an instrument of government that "has the general power to regulate and supervise the business of each public utility within its jurisdiction."  Tex. Util. Code § 14.001; *see also* Compl. ¶ 23 (Plaintiffs noting that "PUCT is an agency of the State of Texas" and a "'State Commission' within the meaning provided in 47 U.S.C. §§ 153(41), 251 and 252").  Similarly, a recent opinion of a Texas appellate court has found ERCOT to be "an institution, agency or organ of government" because it "operates as part of a larger governmental system."  *Electric Reliability Council of Texas, Inc. v. CPS Energy*, No. 04-21-00242-CV, 2021 WL 5879183 at *5 (Tex. App. – San Antonio Dec. 13, 2021).  The Plaintiffs acknowledge these governmental roles played by ERCOT, noting that ERCOT "functions both as the technical operator for the Texas grid and a decision-making organization that creates rules for the wholesale electricity market"; "manages the flow of electricity"; and "is

subject to regulation by the PUCT."  Compl. ¶¶ 29-31.  ERCOT and the PUCT are non-profit governmental or quasi-governmental actors with a range of interests related to the public interest at large, whereas Generators are for-profit, integrated power companies.  Under the reasoning of *Espy*, ERCOT and PUCT cannot adequately represent the interests of commercial actors like Generators.

28.    Indeed, in the state court Luminant Appeal seeking invalidation of the Orders, the arguments advanced by the PUCT and by intervening generators supporting the Orders have not been identical.  For example, intervening generators, including Calpine, argue that the PUCT lacks the legal authority to retroactively reprice the ERCOT market and that such repricing would violate the state Constitution, and such a remedy therefore is legally barred.  *See* Brief of Intervenors Calpine Corporation and Talen Energy Corporation at 31-39, *Luminant Energy Co. v. PUCT*, No. 03-21-00098-CV (Tex. App.—Austin).  Although the PUCT in its briefing asserted numerous jurisdictional arguments that the court cannot provide the relief requested and that the "ship has sailed" on retroactive repricing of the market, it did not undertake the same constitutional and statutory analysis of the issue.  Similarly, intervening generators provided significant briefing on the "commercial perspective" and potential commercial consequences of the relief sought by appellants. Without the participation of the Generators as intervenors, that analysis and others in support of the Orders (*e.g.*, that the Orders merely restated existing PUCT policy regarding the design and proper function of the market) never would have been presented to the court of appeals.  The Generators' inclination to present different legal theories shows their interests are not adequately represented.  *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 569 (5th Cir. 2016) ("[The intervenor] highlights arguments that the [governmental unit] cannot make given the differences in the objectives of the [governmental unit] and the [intervenor].

Given the broad policy favoring intervention in our precedent, we are satisfied that the Association has demonstrated that it may be inadequately represented in the lawsuit.").  It is concrete proof that it *is* inadequate.

29.    And even if ERCOT were not a governmental entity, it still does not bear economic risk and has different incentives than Generators.  In *Brazos*, Judge Jones specifically noted this divergence between ERCOT and Generators, remarking that the Generators are a group "that have control over their own destiny because, again, that's the difference between, you know, governmental fiscal and commercial fiscal[.]"  *Brazos* Tr., Hr'g Oct. 18, 2021 at 215:18-20. ERCOT's Protocols themselves make this contrast starkly clear: "ERCOT may not profit financially from its activities as the Independent Organization in the ERCOT Region."  Protocols §1.2(8).  Ultimately, ERCOT's interests lie in ensuring that its authority and administrative decision making are upheld, it is not decertified, and it is not subject to other enforcement action by the PUCT.  In contrast, Generators face the risk of actual economic loss and are corporations with duties for the benefit of shareholders.  Generators are not adequately represented here by a public utility commission and non-profit clearinghouse.

## II.    PERMISSIVE INTERVENTION IS ALSO WARRANTED

30.    In the alternative, Generators respectfully request that the Court grant permissive intervention.  Even if a party cannot intervene by right, "courts are given broad discretion in granting motions to intervene [by permission] under Rule 24(b)[(1)(B)]."  *See League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 884 F.2d 185, 189 (5th Cir. 1989); FED. R. CIV. P. 24(b)(1).  Permissive intervention is "within a court's discretion," *Newby v. Enron Corp.*, 443 F.3d 416, 424 (5th Cir. 2006), when an intervenor, upon a timely motion, presents "a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  The common "'claim or defense' portion of Rule 24(b)(2)[(1)(B)] has been construed

liberally." *Newby*, 443 F.3d at 422 (affirming permissive intervention). In exercising this discretion, courts consider whether permissive intervention will "promote the efficient and orderly use of judicial resources." *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 840 (8th Cir. 2009); *see also Bible Way Church of Our Lord Jesus Christ World Wide, Inc. v. Showell*, 260 F.R.D. 1, 4 (D.D.C. 2009) (allowing permissive intervention where it would "promote judicial efficiency and consistency").

31.    Permitting intervention here will further the efficient use of judicial resources and aid this litigation. As this Court recognized in *Brazos*, Generators offer relevant commercial perspective that the existing defendants do not. Unlike the Plaintiffs, who seek to reprice February electricity irrespective of potential consequences within the ERCOT market, Generators will fully develop the underlying issues in the Adversary Proceeding as parties who generated and sold electricity during the Winter Storm, and will continue to generate power for Texas consumers.

32.    The Generators have a track record of effectively coordinating with each other and ERCOT to advance litigation as efficiently as possible. This was demonstrated prior to intervention in *Brazos* and has continued to be the case. In *Brazos,* Generators (together with five other intervenors) did not expand the number of depositions and have sought to join ERCOT's papers in lieu of filing their own where the parties' interests align. Notwithstanding intervention by more than seven different parties, the *Brazos* adversary is on track for trial in accordance with the scheduling order put in place prior to Generators' intervention. In addition to *Brazos*, the Generators also successfully coordinated with each other as intervenors in an adversary proceeding in the PG&E bankruptcy involving the Federal Energy Regulatory Commission. *See In re PG&E Corp. and Pacific Gas and Elec. Co.*, No. BR 3:19-ap-03003, ECF No. 85 (Bankr. N.D. Cal. Feb.

14, 2019).

33.    This coordination has continued into this Adversary Proceeding.  The Generators jointly conferred with ERCOT, PUCT and Plaintiffs regarding intervention, and jointly prepared this Motion.  If the Court permits intervention, Generators will continue to coordinate in all respects to avoid duplication and minimize expenditure of resources.[19]

## RESERVATION OF RIGHTS

34.    Nothing contained herein is intended to or should be construed as: (i) an admission of the validity of any claim asserted by the Plaintiffs in the Adversary Proceeding or any related claim of ERCOT; (ii) a waiver or forfeiture of any right or defense of any Generator; or (iii) consent by any Generator to the jurisdiction of the Bankruptcy Court with respect to the subject matter of the Adversary Proceeding, or any other proceeding commenced in connection with the subject matter hereof.

---

[19] To that end, Generators filed this Motion prior to ERCOT or the PUCT filing an answer or other responsive pleading.  For purposes of Rule 24(c), Generators intend to file a joinder to the responsive pleadings filed by ERCOT and PUCT as soon as they are filed with the Court.  Courts in this district have recognized the ability of parties to intervene without filing a proposed pleading as an exhibit.  *See Liberty Surplus Ins. Cos. v. Slick Willies of America, Inc.*, Civil Action No. H-07-0706, 2007 WL 2330294, at *2 (S.D. Tex. Aug. 15, 2007) ("The  failure to comply with Rule 24(c) is not a sufficient basis to deny the motion to intervene").

**SHEARMAN & STERLING LLP**

By: */s/ Ian E. Roberts*
Luckey McDowell (SBT 24034565)
Ian E. Roberts (SBT 24056217)
2828 N. Harwood Street, Suite 1800
Dallas, Texas 75201
Telephone:   (214) 271-5777
Email: luckey.mcdowell@shearman.com
          ian.roberts@shearman.com

-and-

Jonathan M. Dunworth
(*pro hac vice* application forthcoming)
599 Lexington Avenue
New York, NY 10022
Telephone:   (212) 848-4000
Email: jonathan.dunworth@shearman.com

*Counsel to NRG Energy, Inc.*

**BAKER BOTTS L.L.P.**

By: */s/ George H. Fibbe*
George H. Fibbe (SBT 24036559)
David R. Eastlake (SBT 24074365)
910 Louisiana Street
Houston, Texas 77002
Telephone:   (713) 229-1234
Email: david.eastlake@bakerbotts.com
          george.fibbe@bakerbotts.com

*Counsel to Calpine Corporation*

## CERTIFICATE OF SERVICE

I certify that on January 6, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Jonathan M. Dunworth
Jonathan M. Dunworth