# EXHIBIT 1

1                IN THE UNITED STATES BANKRUPTCY COURT

2               FOR THE SOUTHERN DISTRICT OF TEXAS

3                       HOUSTON DIVISION

4  BRAZOS POWER COOPERATIVE        §      CASE NO. 21-03863-ADV
   INC., ET AL                     §      HOUSTON, TEXAS
5                                  §
   VS.                             §      MONDAY,
6                                  §      OCTOBER 18, 2021
   ELECTRIC RELIABILITY COUNCIL    §
7  OF TEXAS, INC.                  §      12:00 P.M. TO 6:18 P.M.

8       <u>MOTIONS TO DISMISS AND MOTIONS TO INTERVENE (VIA ZOOM)</u>

9                BEFORE THE HONORABLE DAVID JONES
                 UNITED STATES BANKRUPTCY JUDGE

10

11

12

           APPEARANCES:                    SEE NEXT PAGE
13

14       (Recorded via CourtSpeak)

15

16

17

18

19

20                  <u>TRANSCRIPTION SERVICE BY:</u>

21            JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                  935 Eldridge Road, #144
22                Sugar Land, TX 77478
                     281-277-5325
23             www.judicialtranscribers.com

24
       Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.

```
 1                    APPEARANCES (VIA ZOOM):

 2


 3   FOR THE BRAZOS ELECTRIC
     POWER COOPERATIVE, INC:        EVERSHEDS SUTHERLAND
 4                                  Lino Mendiola, III Esq.
                                    600 Congress Avenue
 5                                  Suite 2000
                                    Austin, TX  78701
 6                                  512-721-2720

 7                                  O'MELVENY & MYERS, LLP
                                    Louis Strubeck, Esq.
 8                                  2501 North Harwood Street
                                    Suite 1700
 9                                  Dallas, TX  75201
                                    972-630-1943
10

11   FOR ELECTRIC RELIABILITY
     COUNCIL OF TEXAS:              MUNSCH HARDT
12                                  Jamil N. Alibhai, Esq.
                                    Ross Parker, Esq.
13                                  500 N. Akard Street
                                    Suite 3800
14                                  Dallas, TX  75201
                                    214-855-7500
15   FOR PUBLIC UTILITY
     COMMISSION OF TEXAS:           THE ATTORNEY GENERAL OF
16                                  TEXAS
                                    Jason B. Binford, Esq.
17                                  300 W. 15th Street
                                    Mail MC-008
18                                  Austin, TX  78701
                                    512-475-4936
19

20   FOR OFFICIAL COMMITTEE OF
     UNSECURED CREDITORS:           KRAMER LEVIN NAFTAILS &
                                    FRANKEL, LLP
21                                  Thomas Mayer, Esq.
                                    1177 Avenue of Americas
22                                  New York, NY  10036
                                    212-715-9169
23

24

25
```

```
 1              APPEARANCES (CONT'D - VIA ZOOM):

 2

 3  FOR TENASKA POWER SERVICES:    ROSS & SMITH, PC
                                   Judith Ross, Esq.
 4                                 700 North Pearl Street
                                   Suite 1610
 5                                 Dallas, TX  75201
                                   214-377-7879
 6

 7  FOR LOWER COLORADO RIVER
    AUTHORITY:                     JACKSON WALKER, LLP
 8                                 Bruce Ruzinsky, Esq.
                                   1401 McKinney Street
 9                                 Suite 1900
                                   Houston, TX  77010
10                                 713-752-4200

11

12

13

14  (Please also see Electronic Appearances.)

15

16

17

18

19

20

21

22

23

24

25
```

 1              THE COURT:  All right.  Can we move on to the

 2    Motions to Intervene?

 3              MR. ALIBHAI:  Your Honor, is there any way we

 4    could take an even five-minute break?

 5              THE COURT:  Mr. Alibhai, of course.  All you have

 6    to do is ask.  It is 4:04.  Do you want to say 4:15?

 7              MR. ALIBHAI:  Sure.

 8              THE COURT:  All right.  Then we'll reconvene at

 9    4:15 with the Motions to Intervene.

10              MR. ALIBHAI:  Thank you, Your Honor.

11              THE COURT:  Of course.

12         (Recess taken from 4:04 p.m. to 4:15 p.m.)

13                          AFTER RECESS

14              THE COURT:  All right.  Good afternoon, everyone.

15    Again the time is 4:15.

16              Let's see.  We don't have Mr. Alibhai yet.

17              MR. PARKER:  Hi, Your Honor.  This is Ross Parker

18    here on behalf of ERCOT.  I'm probably not going to do as

19    good a job as he did, sir.

20              THE COURT:  Oh, no, my apologies, sorry.  Just I

21    didn't know we affected the transition yet.  All right.

22              Then all right, then with that, again, I didn't

23    know that there was pre-existing agreement.  Is there an

24    agreement as to how we are to proceed on the Motions to

25    Intervene?

1          MR. PARKER:  Yes, Your Honor.  The parties have
2   conferred and we agree that market participants will go
3   first.  That'll be Calpine, Exelon and the co-ops.
4          THE COURT:  Sure.  And so let me ask this,
5   Mr. Parker, I assume that you have seen the Agreed Order
6   with the member co-ops that was uploaded this afternoon,
7   with the restrictions that have been agreed to, does ERCOT
8   still oppose the intervention request by the member co-ops?
9          MR. PARKER:  Yes, Your Honor.  It does.
10          THE COURT:  Okay.  Fair enough.  I just wanted to
11   understand.
12          All right.  Then, I'm sorry, Mr. Strubeck, were
13   you leaning forward to speak?
14          MR. STRUBECK:  I was, Your Honor.  Are you able to
15   hear me?
16          THE COURT:  Loud and clear.
17          MR. STRUBECK:  All right, great.  Your Honor, for
18   the Record, Louis Strubeck of O'Melveny Myers on behalf of
19   the Debtor.
20          I was just going to mention that I had agreed with
21   the sequencing that you just heard.  I intended to do that
22   at the very beginning of the proceedings today and didn't
23   really have a chance 'cause -- but that's acceptable and so
24   I think that what we'll do, Judge, is just, as it has been
25   outlined, we'll go forward with the market participants and

1   that group and let them make their arguments, then we'll

2   have our opposition to it and then we can get into the

3   member piece of it, but as Your Honor mentioned, we did file

4   a stipulation earlier in the day and that has the support of

5   the Committee in addition to the Debtor insofar as allowing

6   the intervention with the restrictions of the member co-ops.

7           THE COURT:  Got it.

8           All right.  Then as between the market

9   participants, is there an agreement as to who's going first

10  or second or third or fourth?  Mr. McKane?

11          MR. MCKANE:  Your Honor, it's Mark McKane of

12  Kirkland and Ellis.  Can you hear me okay?

13          THE COURT:  Loud and clear, thank you.  Good

14  afternoon.

15          MR. MCKANE:  Fantastic.

16          Your Honor, for the Defendant Intervenors, I would

17  be prepared to handle the bulk of the argument.  I know

18  Ms. Ross may have a point or two to make, as well.  And so

19  we're prepared -- consistent with the Amended Agenda as was

20  filed, I believe, this morning, we're prepared to go first

21  presenting our arguments, if that's all right?

22          THE COURT:  Of course.  Do you need presented

23  control?

24          MR. MCKANE:  I do for one demonstrative, Your

25  Honor, and you know me well enough to know that I'm probaby

1    not going to be taking control of that, so if you can find

2    Mr. Ester (phonetic), Mr. Michael Ester, he's going to put

3    forward one demonstrative for you.  Then we're going to get

4    that off the screen and keep going.

5          THE COURT:  All right.  Let me fine Mr. Ester.

6       (Pause in the proceedings.)

7          THE COURT:  All right.  Evidently we've had that

8    flicker again.  Let's wait just a moment to see if it comes

9    back.

10      (Pause in the proceedings.)

11         THE COURT:  And it does.  Very curious as to

12   what's causing that.

13         All right.  Mr. Ester, you should have control.

14         You do.  There's the demonstrative, Mr. Ester.

15         MR. MCKANE:  And then before we get there with

16   that demonstrative -- you've got to take that off the screen

17   -- just for the Record, Your Honor, it's Mark McKane of

18   Kirkland & Ellis and I'm appearing on behalf of a

19   coordinated group of Defendant Intervenors.  That includes

20   Calpine Corporation, Tenaska Power Services, NRG Energy,

21   MG Energy Marketing, Talen Energy Supply, Golds (phonetic)

22   for Elective Cooperative, the South Texas Electric

23   Cooperative, and NextEra Energy Market.

24         Your Honor, before we get into the heart of the

25   substance of the argument, I think it's appropriate for us

1  to establish the evidentiary record for the basis of our

2  exhibits.

3           Mr. Ester has led that charge for the Defendant

4  Intervenors and so I'll give the podium to him to move into

5  evidence the underlying materials.

6           THE COURT:  Certainly.

7           Mr. Ester, good afternoon.

8           MR. ESTER:  Good afternoon, Your Honor.  Can you

9  hear me all right?

10           THE COURT:  Loud and clear.

11           MR. ESTER:  Thank you.

12           Your Honor, so we did file at Docket No. 94, a

13  Witness and Exhibit List on behalf of all of the Defendant

14  Intervenors.  We did file that on Thursday, the 14th.  We

15  met and conferred with the Debtors on Friday, the 15th, and

16  have reached agreement with respect to certain of these

17  exhibits.  And we did coordinate with counsel for the

18  Committee over the weekend.

19           So with that, Your Honor, we would move into the

20  Record Dockets 94-1 through 94-16, which are Exhibits 1

21  through 16, respectively, with the following understanding

22  read into the Record, Your Honor, that the Exhibits 1

23  through 11, which is 94-1 through 94-11, are the Movant's

24  Proofs of Claim and these Proofs of Claim would be admitted

25  into the Record to establish that the claim was filed and

1  contend the claims asserted therein that the Court's

2  admission is not a concession by any party as to the

3  validity of the claim.

4         Your Honor, we would move 1 to 16 in.  We also

5  then would move 94-23 through 94-32 into the Record, as

6  well.

7         THE COURT:  All right.  And who's taking the lead

8  for the Debtors?

9         MR. STRUBECK:  I am, Your Honor, Louis Strubeck.

10        THE COURT:  Ah, thank you, Mr. Strubeck.

11        And who is taking the lead for the Committee?

12        MR. MAYER:  That would be me, Your Honor.  I'm

13 sorry.  My screen is off, but Tom Mayer will take the lead.

14        THE COURT:  All right.  Thank you.

15        Any objection to the admission as stated by

16 Mr. Ester?

17        MR. STRUBECK:  None from the Debtor, Your Honor.

18        MS. ROSS:  Your Honor, this is Judith Ross on

19 behalf of TPS, Tenaska Power Services Company.

20        THE COURT:  Yes, ma'am.

21        MS. ROSS:  The result of the declaration of a Mark

22 Holler (phonetic) that was submitted to this Court this

23 morning under Docket No. -- well, I had it here, Docket 114.

24        THE COURT:  Yes, ma'am.

25        MS. ROSS:  Mr. Holler was listed as a witness by

1  Tenaska Power Services.  The Debtors asked that we put his

2  testimony into a declaration, which we have done.  And

3  accordingly I'd ask that the Court accept his declaration at

4  this time.

5          THE COURT:  All right.  So I won't forget that,

6  but let me -- any -- Ms. Ross, any objection to the

7  admission of the Debtors -- I'm sorry, the -- what we'll

8  call the "market participants' exhibits"?

9          MS. ROSS:  Absolutely not.  I'm a market

10 participant.

11         THE COURT:  I know.  That's why I struggled with

12 that, so I was -- I couldn't figure out another name on the

13 spur of the moment.

14         Then without objection, I will exhibits identified

15 pursuant to the protocol at 94-1 through 94-16 with the

16 caveat put on the Record by Mr. Ester with respect to 94-1

17 through 94-11, also admit 94-23 through 94-32 without

18 objection.

19         Now with respect, Ms. Ross has moved to admit the

20 Declaration of Mr. Holler at 114.  Any objection to the

21 admission of Mr. Holler's declaration?

22         MR. STRUBECK:  No objection, Your Honor, on behalf

23 of the Debtors --

24         THE COURT:  All right.

25         MR. STRUBECK:  -- or the Debtor.

1            THE COURT:  And the Committee?

2            MR. MAYER:  No objection, Your Honor.

3            THE COURT:  All right.  Thank you.

4            Then Ms. Ross, it's --

5            MR. RUZINSKY:  Your Honor?

6            THE COURT:  Yes.

7            MR. RUZINSKY:  Your Honor, this is Bruce Ruzinsky

8    for LCRA.  We are a market participant, but I have -- but

9    not part of this group now.  I do have a statement to make

10   after Mr. Ester's presentation and Ms. Ross' statement, but

11   I would like to ask at this time for the admission of our

12   single exhibits, which is LCRA's Amended Proof of Claim.  It

13   appears at 97-1 and I'd ask that it be admitted for the same

14   purpose as the other Proofs of Claim.

15           THE COURT:  All right.  Any objection to the

16   admission of -- again, pursuant to the protocol, the exhibit

17   filed by the Lower Colorado River Authority, as 97-1?

18           MR. STRUBECK:  No objection.

19           THE COURT:  With the caveat that it's subject to

20   the limitation of 94-1 through 94-11.

21           All right.  With that, Mr. Ruzinsky, it's

22   admitted.

23        (Exhibit 97-1 received in evidence.)

24           MR. RUZINSKY:  Thank you, Your Honor.

25           MS. ROSS:  Your Honor, can I let Mr. Holler go?

1   He's available if you want to swear him.

2           THE COURT:  There was no objection to it, so no, I

3   only do that if somebody objects.  So Mr. Holler is free to

4   go.

5           MS. ROSS:  Thank you, Your Honor.

6           THE COURT:  Thank you.

7           All right.  Mr. McKane?

8           MR. MCKANE:  Thank you again, Your Honor.

9           Your Honor, if Mr. Ester could put up that one

10  demonstrative, I do want to address -- I am not going to

11  belabor and reiterate everything that we put in our papers,

12  which were extensive and those are at Docket No. 2861 and

13  89.  I know you've read them, and I know you know this

14  issue, but there has been frankly a false negative put

15  forward in this case about who the Defendant Intervenors

16  are, who the market participants are, and that somehow we

17  are lottery ticket winners, that we are here profiteering in

18  some way.

19          No, we are a group of for-profit and non-for-

20  profit entities that have come forward, and the two I wanted

21  to highlight in particular were the Golden Spread Electric

22  Cooperative, which is a tax exempt consumer owned public

23  utility that was organized in 1994.  As you can see from the

24  demonstrative, they are in a northern part of the State.

25          Golden Spread serves over 310,000 customers and it

1   in and of itself covers 24 percent of the land mass of the

2   State of Texas.

3           In addition to that, I also wanted to call out and

4   highlight the Southern Texas Electric Cooperative or "STEC"

5   as we friendly refer to it.  It is a non-profit generation

6   and transmission cooperative.  It was incorporated in 1944.

7   It has 301,000 retail customers across 47 South Texas

8   Countries -- excuse me, "Counties" -- Texas is its own

9   country, but it doesn't have countries within its country.

10          The point here, Your Honor, is really, really

11  straightforward, which is these are non-profits, these are

12  cooperatives.  This is not a one-sided issue between some

13  type of big market industry player and retail customers.

14          There are millions of retail customers that will

15  be impacted by the result of the ERCOT claims.  And there

16  are frankly, Your Honor, three points that I really want to

17  highlight today, with regards to why these market

18  participants should be allowed to intervene, and it's, one,

19  that we've got a right to intervene under 24(a)(2) that we

20  should be permitted to intervene because we will not cause

21  undue delay or burden.

22          And three, I want to address the limitations that

23  the Debtor is trying to impose on our participation in the

24  case, as opposed to the member co-ops.

25          THE COURT:  So if I could, let me try and give you

1    a couple of points of reference, just so you have them and

2    it may help your presentation.

3            Number one, the whole argument about somehow --

4    the profiteering argument as you made it, it went in one eye

5    and out the other ear.  If -- I don't know how to make that

6    -- that sounded awful.

7            But it just -- it carried zero weight.  I mean,

8    you're either entitled to do it or not, and the reasons for

9    it -- I mean, obviously there are limits, but the reasons

10   for the requested intervention are -- I don't want to say

11   "wholly irrelevant," but they're pretty close in my mind.

12           Second of all, I wanted to put this concept out

13   because it's been talked about a lot about the whole issue

14   about the issue about is electricity a "good" and it's

15   something that is -- I have been focused on for a long time.

16   I think it's a fascinating issue.

17           What I do want to tell you -- in my mind, and I've

18   read every case that's been written -- at least that I know

19   of, is I actually think that you have to look at where you

20   are in the supply chain that it can be both.  And so I think

21   that it is a factually intensive inquiry and so I think at

22   one point in the chain, it can be a "good," and at another

23   point in the chain, it can be a "service."

24           And the only reason I tell you that is in terms of

25   sort of sorting through the issue of having something be

1   *res judicata* or collateral estoppel with respect to that

2   issue.  I don't see how that's really possible, but in my

3   mind it was a really important issue and it's going to --

4   when we get to the Motions for Leave to File Summary Judge,

5   you know, I find for a different reason, but I find some

6   concern the issue raised by ERCOT is that this is simply too

7   soon to take up that issue because I do think that it is a

8   factually intensive issue.

9          But I give you that only because I thought it

10  might be helpful.

11         And then finally with respect to the conditions, I

12  read them and what's been agreed to -- again, not -- ERCOT

13  still objecting to the intervention just in any shape, way

14  or form, but the fact that parties have agreed to certain

15  restrictions is great.  You know, I try not to disturb

16  agreements, but it's not something I would say, well, if it

17  was good for them, it should be good for you.  I'm just not

18  wired that way.

19         If I'm going to let you in, I do have the right,

20  the ability to impose conditions, but what is in that

21  Stipulation and Agreed Order is not in any shape, way, or

22  form a roadmap.  And I don't know if that's helpful or not,

23  but I thought I'd tell you.

24         MR. MCKANE:  All of it is very helpful, and I

25  would just -- regarding the stipulation point, Your Honor, I

1  just want to make clear that that was not even offered to

2  us.  I'll highlight what's been offered to our group.

3          THE COURT:  Okay.

4          MR. MCKANE:  And I would be succinct on this.  I

5  think these are relatively straightforward issues.  I know

6  you were tackling some really thorny stuff in the last few

7  hours, but when you look at the issue of intervention -- and

8  there's a wealth of Fifth Circuit law on this issue and in

9  particular with regard to the relationship that we would

10  have that covers this.

11          Rule 24 is to be liberally construed.  You know

12  that.  That's the *Walmart* decision and others, and no one

13  has argued that our intervention motion is untimely.  It

14  undeniably is.

15          THE COURT:  Right.

16          MR. MCKANE:  With regards to intervention as a

17  matter of right, you know, the real issue is:  Do we have an

18  interest in relating to the property or the transaction

19  that's the subject of the adversary proceeding and will we

20  be practically impacted in a material way or will we be

21  impeded in our ability to protect our interest.  That's

22  24(A)(2).

23          We have two primary basis for why we are impacted,

24  you know, with relations to what property or the transaction

25  in dispute.  The first is, members of our group have

1   parallel 503(b)(9) claims.  All the elements.  Those claims

2   would be -- there would be series written.  It doesn't have

3   to be *res judicata*.  It doesn't have to be collateral

4   estoppel.  The Fifth Circuit has taken a more liberal view

5   on those issues, but an adverse ruling on some of the

6   503(b)(9) issues may impair the ability of the Defendant

7   Intervenors who filed 503(b)(9) claims to pursue them.

8           For example, whether their ability -- whether they

9   are delivered in the ordinary course.  Those are fundamental

10  issues for which there could be some concern, and that's the

11  *Sierra Club v. Lexington* (phonetic) decision.

12          THE COURT:  All right.  So let me ask --

13          MR. MCKANE:  Now the other one, I think is

14  actually more potentially informative is what's at issue?

15  The property or the transaction?  The market participant is

16  particularly Defendant Intervenors and I draw that

17  distinction for a reason that the Defendant Intervenors that

18  we represent directly stand dollar-for-dollar to recover the

19  net recovery of the ERCOT claim.  These are not contingent

20  economic interests.

21          The electron came from the Defendant Intervenors,

22  but more importantly the fact that ERCOT is revenue neutral

23  makes it some unique.  Not only is it revenue neutral, it is

24  bound by the protocol that are in evidence, Your Honor,

25  specifically Exhibit 14.

1          They are bound to turn over to the market

2    participants that never covered of these claims.  And what

3    that means, Your Honor, is that our client are in many ways

4    akin to the insured situation in *Roth v. Marshall.*  In the

5    *Roth* case, the insurer, Allstate, had agreed to defend

6    subject to some limited obligations.  That's exactly where

7    the insured was here with regard to ERCOT.  ERCOT has to

8    turn it over and that they've agreed to it, they're bound to

9    it by the protocol to turn over the net recovery of this

10   claim.

11         The Fifth Circuit said in *Ross*:  Reversing a

12   denial of an intervention that the fact that the insured has

13   that direct interest to, in that case, keep the liability

14   maintained.  In our case, to make certain that they're in

15   the recovery, what the size of the recovery is, was

16   absolutely a deficient direct interest in the State that

17   they should be allowed to participate. That's the decision

18   from 2006, incredibly instructive on that exact issue.

19         And when you get into what are they arguing about,

20   like contingent economic interests, that's simply not who we

21   are. That's not the situation ERCOT is in.  ERCOT is the

22   clearinghouse, but the true parties-in-interest in this

23   claim are the Defendant Intervenors because they will

24   receive net of administrative expense that ERCOT incurs in

25   pursuing the claim 100 percent of the recovery.  That's

1   what's going to be distributed to the marketplace.

2          Now, turning to whether that right is adequately

3   represented in this situation, Your Honor, I would start by

4   reminding you this is the minimum burden.  It's a minimal

5   burden as recognized by the Fifth Circuit.  And at this time

6   in the intervention, as opposed to a post-judgment case,

7   it's a question of whether it may be inadequately

8   represented.

9          And here, Your Honor, our relationship to ERCOT,

10  right, it's very much akin to market participant's

11  relationship with a governmental entity like the Texas

12  Alcohol and Beverage Commission, and in particular, our

13  interests don't exactly overlap.  Their interests aren't

14  exactly ours.  They want to make it a clearinghouse

15  relationship.  They want to ensure that they can be the ISO

16  designated by the PUCT.  Ultimately if they don't get the

17  money from Brazos, they'll turn and through the procedures,

18  collect it from the marketplace or somewhere else.  That's

19  what the protocols say.

20         As industry participants, our clients are focused

21  on getting the proper recovery for the goods and services

22  that they provide.  They've already provided them.  They're

23  already gone out of pocket.  They've already spent the money

24  on the gas.  They've already dealt with the hedging

25  relationships.  They just need to get the recovery.

1           That situation where the market participants are

2   focused, the industry participants are focused on their

3   economic interests as opposed to some type of regulatory or

4   industry oversight, has been recognized by the Fifth Circuit

5   as being sufficiently distinct or different.

6           And in particular, what I'm talking about is the

7   *Walmart* decision.  In 2016 in *Walmart*, Walmart challenged

8   the entire alcohol beverage licensing structure of Texas,

9   the Texas Alcohol Beverage Commission.

10          A group of industry participants moved to

11  intervene.  They were denied by the District Court.  Up on

12  appeal, the Fifth Circuit again reversed and remanded saying

13  their interest is not exactly the same.  The TABC is

14  interested in getting a procedural result saying that they

15  didn't do anything wrong, that the structure doesn't

16  violation the commerce clause of the Constitution.  Whereas,

17  the industry participants are focused on the substance.

18          Here, Your Honor, we are focused on the substance.

19  ERCOT may not have any question about whether our interests

20  are distinct or different from ERCOT.  You can look no

21  further than their position with regard to this intervention

22  because they have taken a position that some of it should be

23  in and some of it should not be in.

24          And so when you're evaluating the minimum burden,

25  there would be -- you know, for adequate representation, at

1   this stage there's no question given where we are.  We are

2   far more attuned to the industry participants in the *Walmart*

3   case or in the *Sierra Club vs. (indiscernible)* decision.

4   Again, we're industry participants.  They are logging groups

5   who were allowed to participate.  Again, reversing the

6   decision from the trial court to deny intervention.

7           So what do we bring to the table?  What value is

8   added?  The thing you hire as, Your Honor, with regards to

9   goods and you know, what is -- whether electricity is a

10  good, our clients, right, and our experts can ease

11  materially in that issue.  We can provide that we are the

12  people who have been generating power, dealing with

13  transmission, understanding the insulary power.

14          This is what we would bring to the table.  This is

15  not just a purely legal issue.  But when you look at what

16  Mr. Strubeck and the Debtor wants to put forward, they want

17  to let a substantive group in only on 503(b) issues, only to

18  file a legal brief.  We know this is far more complicated

19  than that, that's there's fact and expert testimony that we

20  can provide that would aid the Court in evaluating the

21  fundamental issues in this case.  Not just goods.  It's for

22  how was the ERCOT market design and did it function as it

23  was designed to do?

24          And with regard to Winter Storm Uri, it did

25  function that way.  It is designed to have price spikes and

1   those price spikes are capped at $9,000.  And so when you

2   get into how it functions, this Court has to evaluate what

3   is the ordinary course or how the ERCOT market functions.

4          Our client and our experts could come forward and

5   aide the Court in evaluating that issue.  And if you have

6   any question about whether that may be an issue in this

7   case, the Debtors filed a motion and a draft complaint -- a

8   consolidated draft complaint against certain gas suppliers

9   where they took on exactly the issue of whether it was

10  ordinary course.  We fully expect that to be an issue in

11  this case.

12         Now Your Honor, with regard to the remaining

13  issues on permissive intervention with regards to whether we

14  would unduly delay or prejudice the procedure.

15         Your Honor, I first want to note that issue only

16  applies permissive, not intervention as a matter of right.

17  And we know Your Honor's free to impose the existing

18  Scheduling Order on all intervening parties.  When we're a

19  party to the case, we're a party to your Orders.  We know

20  what the schedule is.  We've seen the dates.

21         But with regards to issues like expert testimony

22  and expert reports that are due in December, we understand

23  what we could bring to the table, how we could aid the

24  Court, how we can protect our own interests, and how we will

25  comply with those.  That's not undue delay.  If we are bound

1   to this to the same Scheduling Order as everybody else.

2              And with regards to the undue prejudice, Your

3   Honor, they're going to have to litigate with the Defendant

4   Intervenors at some point in time.  We have filed Proofs of

5   Claim, 503(b)(9) and others.  The question is whether it's

6   now or later.

7              And it's not a question of whether other

8   intervenors in the case are better resourced or better able

9   to put forth the arguments.  The bigger -- whether an

10  opponent is more vigorous or not is not undue prejudice at

11  all, and further, Your Honor, we believe consistent with the

12  *Babcock* and *Wilcox* decision that we -- our intervention

13  would aid the interest of justice by having the Court

14  litigate it once, as opposed to twice, some of these

15  fundamental issues.

16             So Your Honor, when we're going to what has been

17  -- lasted what are (indiscernible), if any would be imposed

18  on the intervening parties?  And here, Your Honor, we

19  recognize what the Fifth Circuit has said.  We recognize the

20  decision in *Beauregard,* which is there can be restrictions

21  applied.  They need to be reasonable.

22             All right.  That's what the *Beauregard* court said.

23  It was an admiralty in rem case and the restrictions that --

24  the restrictions that were applied on the intervening party

25  were opposed because they were being applied to everyone, to

1   all of the parties, right?

2          And with regards to what is reasonable in this

3   case?  And that's really the question.  What are the

4   touchstones here as to reasonableness?  What the Debtor has

5   put forward to our group is the following:

6          No propounding discovery, no noticing depositions,

7   no filing dispositive motions, no arguing at hearings, no

8   examining witnesses at trial, no ability to engage in

9   settlement discussions, and no appeal.

10          I don't know how you could be allowed to

11   intervene, right?  That doesn't even intervene in name only.

12   That violates due process.

13          Now we are prepared to work as a group.  We have

14   evidence that by working as a group to date, we are prepared

15   to work with ERCOT.  We are prepared to live with Your

16   Honor's schedule and do the best we can to present the

17   evidence consistent with the Scheduling Order and trial

18   dates.

19          But the limitations that the Debtor wants to put

20   forward on us which ultimately reduces to having a

21   substantive of our group in to file a legal brief on certain

22   issues dealing with 503(b)(9) cannot be consistent with what

23   is our right to issue, what that risk is in these cases,

24   what's at risk to our clients, given their direct interest

25   in these cases.  It's not consistent with due process or

1   required under Rule 24.

2           So ultimately, Your Honor, and I'll respond to

3   Mr. Strubeck's arguments and others, so I'll reserve an

4   opportunity to do that later.  What we're focusing on here

5   is simply the opportunity to intervene and address and

6   address an interest that we felt is directly at risk in

7   these cases.

8           What the Fifth Circuit has said, that Federal

9   Courts should allow intervention when no one would be hurt,

10  and the greater justice could be attained with the

11  participation of the intervening parties.

12          Your Honor, back on August 4th at a status

13  conference, had an engagement in a colloquy when you were

14  talking to ERCOT and you asked:  When am I going to hear

15  from the real parties-in-interest?  The real parties-in-

16  interest are right here.  We want to participate.  We'll do

17  so reasonably and we ask that we be allowed to intervene.

18          THE COURT:  All right.  Mr. Parker, let me just

19  ask:  Do you agree that Mr. McKane's group represents

20  100 percent of the net recovery out of this Proof of Claim

21  dispute?

22          MR. PARKER:  No, Your Honor, we don't believe

23  that.

24          MR. MCKANE:  Your Honor, I apologize if you were

25  left with that impression.  We are not 100 percent -- and I

1   don't mean to suggest that we're all 100 percent.

2           When ERCOT gets its net recovery, it must be

3   construed into all market participants.  This is the group

4   of market participants have chosen to intervene.

5           THE COURT:  Ah, then it may have been my

6   misunderstanding.

7           MR. MCKANE:  I might have spoken too broadly.  And

8   I want to correct the Record to the extent there's any

9   confusion.

10          THE COURT:  I was just surprised.  That one caught

11  me off guard.  All right.

12          MR. MCKANE:  I would be impressed if I had a

13  circle of that many people.

14          THE COURT:  So let me ask you -- because I need to

15  understand logistically what you're asking me to sign up

16  for.

17          So your group -- or within your group, how many

18  parties and how many of those parties have separate counsel

19  as we sit here today?

20          MR. MCKANE:  Sure, and I have a chart if it helps.

21  See, I represent Calpine.

22          Sherman & Sterling represents NRG Energy, NG,

23  Howlin, and Exterra and Energy Marketing.

24          Ms. Ross and the Ross Smith firm represents

25  Tenaska Power Services.

1          Holland & Knight represent Gold Spread Electric

2     Cooperative.

3          And Haynes and Boone represents the Southern Texas

4     Electric Cooperative.

5          THE COURT:  All right.  So let me ask you this,

6     and if you need to have somebody get emails and texts,

7     that's certainly fine.

8          As part of this, given what I've said about the

9     issue of electricity being a good, if we're going to try

10    this issue, we try the issue.  And if you're going

11    intervene, you're going to be bound, and I would want that

12    agreement that you don't get a second shot at it whatever

13    the decision is out of this adversary, you live by with

14    respect to Proofs of Claim that you have filed, which I have

15    so many questions about the Proofs of Claim, but today is

16    not the day.

17         MR. MCKANE:  I understand that, Your Honor.  I can

18    only speak for Calpine.  You know, I understand that we do

19    not get two bites at the apple, but if we're going to

20    address goods and intervene and protect our interests here,

21    that that could apply to our separate 503(b)(9) claim that

22    has been filed.

23         THE COURT:  Okay.  And perhaps --

24         MR. MCKANE:  I'd ask for two claims.

25         THE COURT:  No, perhaps you can get somebody on

1   your team to send a text or an email around while we're

2   talking.  Just because that's going to be an important

3   issue.  I'm not going to create -- if I'm going to do this,

4   I'm not going to create an opportunity where I go through

5   what is going to be one of the most interesting and in my

6   mind the hardest decisions that I've ever been presented

7   with.  And then do it all over again, you know, eight or

8   nine different times.

9          If we're going to do it and you folks are going to

10  be there, then we're only going to do it once.

11         Second question that I have -- and this is one

12  where I need -- this is going to be a tough one to achieve.

13  That if I were to agree to this, can you-all live with the

14  issue that with respect to the group, you get one lawyer per

15  issue.  Doesn't mean you can't divide it up between

16  yourselves, but if you get up and argue, you know, ordinary

17  course, I don't hear nine different arguments.

18         You guys can select your champion and that's the

19  argument that I get presented with.

20         MR. MCKANE:  Your Honor, we'd have to discuss the

21  scope of issue, but I understand that.  I mean, like the way

22  I was thinking is it's akin to one lawyer per witness?

23         THE COURT:  Yeah.

24         MR. MCKANE:  You know, to be fair, like, there is

25  no power of attorney.  I cannot speak for the entire group

1  unless they agree to designate me to do so and I agree to

2  take the bulk of this argument.

3          THE COURT:  No, I got it, but you-all are

4  experienced enough -- and obviously it may involve a

5  conversation with clients, and I got that.  But I am -- this

6  is one of those and I'm going to hear Mr. Strubeck's

7  arguments, but as I think through this, the argument that

8  ERCOT -- you know, I mean, if you remember way back when, I

9  was surprised about how ownership went because it just made

10  no sense to me, but it is what it is and with that, it's a

11  tough argument for me to accept that ERCOT doesn't

12  adequately represent your interest and that if they don't,

13  then you may have issues with ERCOT.

14          But I also understand the differences between

15  governmental fiscal reality and commercial fiscal reality.

16  But if I'm going to do this, 'cause it's going to strain

17  everybody, I'm not going to give you -- and I'm open to

18  talking about how, but I'm not going to give you nine

19  different shots, you know, to just complicate this even more

20  than it already is.

21          And so if after Mr. Strubeck makes his argument,

22  if you-all need to step off and have a conversation, I'll

23  certainly provide you that opportunity, but that and the

24  issue to be bound by the -- you know, by the issues

25  regarding the 503(b)(9) are going to be really important to

1  me because those are efficiencies that I gain with the extra

2  burden.  I'm not inclined to incur the extra burden unless I

3  see a benefit to the process in the estate, and with the two

4  things I've outlined, I see that because those will have

5  implications with respect to the other Proofs of Claim, and

6  whether or not they stand -- and I know the Proofs of Claim,

7  different people are in different positions, but there's

8  some common threads to all of that.

9          And I just see the efficiency that kind of matches

10 the burden, if you will, if I can -- if we can find a way

11 that everybody can live with, with moving that forward.

12         And again, I'm going to hear what Mr. Strubeck, as

13 well as the Committee, have to say about that, but I'm just

14 -- I'm trying to give you some sort of -- just a view into

15 my head as I came out for this arguments.

16         MR. MCKANE:  Hopefully, Your Honor, we may take

17 you up on that quick opportunity to circle the group and do

18 that check-in with our clients after Mr. Strubeck and after

19 the Committee.

20         THE COURT: Certainly.  Let me ask:  Any of the

21 other market participants want to -- that are in

22 Mr. McKane's group, want to jump in and just add something

23 or a reaction to what I've said or any comments?  Or you

24 want to save those until you have your conversation?

25         MS. ROSS:  Your Honor, this is Ms. Ross.  I would

1    like to speak, if I may?

2            THE COURT:  Of course.

3            MS. ROSS:  Again, on behalf of TPS, I may leave

4    the bulk of my argument as rebuttal, if the Court will

5    permit me to do that?

6            THE COURT: Sure.

7            MS. ROSS:  I think I want to clarify two things as

8    the Court is thinking about these issues.

9            My client, TPS, entity LCRA, NexTerra and Calpine,

10   they are different than many of the market participant

11   represented by Mr. McKane.

12           Let me briefly explain that they are direct --

13   they have a direct threshold with the Debtor.

14           THE COURT:  Right.

15           MS. ROSS:  That's how this is.

16           THE COURT:  But those don't -- but do they -- but

17   I'm going to look at this from the viewpoint of what's

18   actually being tried in this adversary.

19           MS. ROSS:  Right.  I agree.

20           THE COURT:  Okay?

21           MS. ROSS:  And like, for example, Your Honor, my

22   client has a claim for IRS services or what's called

23   "ancillary services."

24           THE COURT:  Sure.

25           MS. ROSS:  Which is different than some of the

1    others.  I think LCRA and NexTerra and Calpine all provided

2    electricity.  My client sold IRS ancillary services.  So I

3    want to make sure that you understand there is a difference

4    between us.

5          THE COURT:  does that mean -- if I could ask a

6    question and I'm sorry, but it's like your video is a little

7    muted so I tell -- I can't see when you stop talking.  So my

8    fault.

9          MS. ROSS:  I'm sorry.

10         THE COURT: No, no, no, no.  It's the world in

11   which we live.  Although I do like the blue painting.  My

12   eyes have been draw to it.

13       (Laughter.)

14         THE COURT:  Are you telling me that with respect

15   to the issues that are going to be tried in the claim

16   objection proceeding that you could have different views

17   than other folks in the group, because again, we're not

18   trying your claims.  The only thing that would -- that I

19   reference with respect to your claims are issues, to the

20   extent that you've made a 503(b)(9) claim is that I simply

21   want folks bound if we're going to come in and try the

22   issues with respect -- again, if you didn't provide

23   electricity, you know, I got it a that you may have a

24   separate issue that are ancillary services, goods, for

25   purposes of 503(b)(9).  I got all of that.

1          But all I want is if we try that issue, that

2    you're bound.  That you don't then come back and say, "Well,

3    no, I get to do this over in a subsequent claim objection

4    hearing.  That's --

5          MS. ROSS:  Your Honor, I am not saying that TPC,

6    LCRA and NexTerra, Calpine would have different views than

7    the other market participants on those issues.

8          THE COURT: Okay.

9          MS. ROSS:  We are aligned, ultimately, on the

10   issue.  We all believe very affirmatively and strongly that

11   electricity is a good and that our RRS Services, ancillary

12   services are goods.

13         And so Your Honor, my line on this is that I was

14   just trying to make sure you understood we are not in the

15   same legal position.

16         THE COURT:  I got it.

17         MS. ROSS:  But we do share -- we do share a

18   willingness to be bound on that -- on those issues.

19         THE COURT:  Got it.

20         MS. ROSS:  And I think I will talk to my client.

21   I'm probably going to recommend, even with this Court's

22   restriction -- if there are no further restrictions, then I

23   think my client is going to be willing to proceed with

24   intervention, if the Court's inclined.

25         THE COURT:  Sure.  We're going to have some

1  interesting conversations about that goods issue.  I started

2  asking questions of my new law clerk and he threatened to

3  quit.

4       (Laughter.)

5       MS. ROSS:  I'll finish up at the end here.  I just

6  have one little piece of evidence I need to talk about, as

7  well.

8       THE COURT:  Sure.

9       MS. ROSS:  But I think that we should let the

10  other side proceed.

11       THE COURT:  All right.  Let me just ask.  Are

12  there any other -- are there any other market participants?

13  Mr. McDowell, I saw you leaning forward.  Did you want to

14  weigh in?

15       MR. MCDOWELL:  Yes.  Yes, thank you, Your Honor.

16       I did just want to react to your request.  As I

17  understand it, is the idea of having once counsel speak per

18  issue will not be problematic with any of my clients.  We

19  approached this similarly today.  Mr. McKane and I did a

20  similar intervention in the PG&E bankruptcy case.  We've run

21  this gauntlet before and frankly, we don't want lawyers

22  stepping on each other's arguments either.  So I think

23  that's probably we would have approached it, with or without

24  the restrictions that the Court is suggesting.

25       The second restriction I think is probably an

1   acknowledgement of the law of the case or *res judicata*.  I

2   don't understand how we could intervene, litigate over an

3   issue about whether electricity is a good, for example, and

4   come back to you a month later with straight face and try to

5   relitigate the issue and somehow hope for a different

6   result.  This does seem to be in the realm of life.  But I

7   appreciate the opportunity during the balance of the hearing

8   to confirm those positions with our client.

9           THE COURT:  All right.  Thank you.

10          Anyone else before I go to Mr. Strubeck?

11          MR. RUZINSKY:  Your Honor?

12          THE COURT:  Yes, Mr. Ruzinsky.

13          MR. RUZINSKY:  Thank you, Your Honor.  Bruce

14  Ruzinsky for LCRA.

15          Your Honor, LCRA is a non-profit political

16  subdivision of the State of Texas that provides wholesale

17  power to small rural cities and electric co-ops in Central

18  Texas.  LCRA sold electricity to Brazos under an EEI

19  Agreement and LCRA also generates power sold in the ERCOT

20  market.

21          LCRA was included in the original group

22  intervention motion, Docket No. 28, but we've concluded that

23  the only aspect of this adversary proceeding that LCRA seeks

24  to intervene and participate in is the 503(b)(9) issue.

25  LCRA's 503(b)(9) claim is set forth in its Amended Proof of

1   Claim, Claim No. 119.  LCRA takes no position on any other

2   issue in this case, including repricing.  And LCRA does not

3   oppose any intervention by any party seeking intervention in

4   this adversary proceeding.

5           While Mr. Strubeck is presenting, I'm going to

6   check with my client to cover the two points that Your Honor

7   mentioned and I'll be prepared to respond to the Court on

8   those.

9           THE COURT:  So let me -- and as you go through

10  this, and I want to make this pertain to everyone.  If your

11  issue is just the 503(b)(9) issue, again, because I think

12  that it is very fact-intensive as to where you are in the

13  process and you're relationship into the Debtor, I -- to the

14  extent that -- and I think it's actually a cheaper way for

15  your client -- I am perfectly happy to give you comfort by

16  simply saying that you aren't bound by any determination in

17  the 503(b)(9) adversary if that's your only issue.

18          And if, as, and when there's an objection filed to

19  your claim, it seems to me that that is a much more

20  efficient, direct proceeding to have that determination

21  because otherwise -- and again, you know, I respect you more

22  than almost anyone in terms of your legal acumen.  I mean,

23  if you feel a need to be in this, then you should have that

24  conversation, but I'm telling you if all you're working on

25  for or trying to protect is a 503(b)(9) claim, I will

1  certainly give you the protection of making it very clear

2  that you are not bound by the determination in the

3  adversary.

4         You know, obviously you're free to watch.  You may

5  learn something.  You may learn my predispositions, my view

6  of the law, you may learn a lot and you may figure out that

7  I don't know what I'm talking about.  You know, you have all

8  those options.

9         But it just -- you know, if that's your only

10  issue, I can give you a lot of comfort that will save your

11  client a lot of money.

12         MR. RUZINSKY:  I appreciate that, Your Honor.  I'm

13  going to go confirm with our client and circle back with the

14  Court here before we conclude.

15         THE COURT:  All right.

16         MR. RUZINSKY:  Very helpful.

17         THE COURT:  Thank you.

18         MR. RUZINSKY:  Thank you, Judge.

19         THE COURT:  Anyone else before I go to

20  Mr. Strubeck?

21      (No audible response.)

22         THE COURT:  All right.  Mr. Strubeck?

23         MR. STRUBECK:  Yes, thank you, Judge.  Again for

24  the Record Louis Strubeck of O'Melveny & Myers on behalf fo

25  the Debtor.

1          Judge, I wanted to take this opportunity to

2  welcome you back from vacation.  I'm sure that this is the

3  first think that you wanted to do on your first day back.

4          THE COURT:  Been thinking about it all --

5          MR. STRUBECK:  So thank you for giving us all this

6  time.

7          THE COURT:  No, been thinking about it all

8  weekend, so -- and vacation was fun.

9          THE COURT:  So just a couple of things, Judge.  I

10  think -- I appreciate Mr. McKane's brevity and I appreciate

11  your comments, and so I think I'm going to adjust my

12  argument a bit here on the fly and see if I can be equally

13  succinct and maybe just focus on the things that I think

14  you're focused on, and address a couple of things that

15  Mr. McKane grazed as well.

16          As I think you know, Judge, we had provided to

17  Mr. Alonzo early this morning a deck that you heard

18  Mr. Mendiola go through in terms of his part of his

19  presentation.  I have frankly intended to spend a good

20  amount of time going through the rest of that deck, with

21  respect to the intervention issues, but I'm not going to do

22  that right now, I don't think, Judge.

23          But what I was going to suggest is that -- and

24  this doesn't need to be put up onto the screen, but we had a

25  nice summary in our demonstrative package of the different

1  parties who were moving for intervention today, and we had

2  broken them down mostly so the Court could appreciate the

3  difference between the market participants on the one hand

4  and all the different market participants who were involved,

5  and then the members on the other.

6          So I'll just make a reference to page 21.  To the

7  extent, Judge, that you find that helpful.  And I won't get

8  into it.  I will say that one of the things that I was going

9  to say initially here, Judge, was I don't know that I've

10  ever been involved in a situation where there is many

11  potential intervenors as here.  And when I tried to tally

12  them up, I think I got to 23 and that didn't even include

13  some of the affiliates that weren't disclosed in the group

14  of market participants that Mr. McKane and others represent.

15          So -- and that's going to be relevant.  You know,

16  I kind of want to get into the permissive intervention part

17  of, I guess, is going to be a combined opening statement and

18  closing argument just in the interest of time here.

19          THE COURT:  Sure.

20          MR. STRUBECK:  So I'll start off by saying, Judge,

21  two things that while I wasn't an active participant in the

22  first part of the proceedings today, I paid very close

23  attention to what was going on and I heard you reiterate a

24  point that we have been trying to make repeatedly since we

25  responded to the ERCOT Proof of Claim, and that point is

1   that this objection is very narrowly crafted to be specific

2   to ERCOT and the ERCOT standard form agreement and that's

3   it.  And you know, had I set the table as I usually do in

4   the beginning of these hearings, you would have heard me say

5   that and I didn't have to because you picked up on it.

6            So I want to make that point because I think

7   that's a pervasive point when it comes to whether it's a

8   mandatory or intervention by right or permissive

9   intervention.

10           And the second thing I want to point out, which

11   I'm going to come back to when I talk about permissive

12   intervention is there is a need for speed here in this case,

13   as I have repeatedly said.  And the right sizing of the

14   ERCOT claim were maybe better stated that the appropriate

15   determination of the ERCOT claim is the central gate-keeping

16   item here.

17           And so to the extent that there's any delay that

18   is occasioned in connection with having that claim

19   adjudicated, it creates severe prejudice -- not just to

20   Brazos, but to all the other parties-in-interest here

21   because the sooner we connect this bankruptcy, the better

22   for a variety of reasons, not the least of which is the

23   administrative burn here.  This is a really complex case, as

24   Your Honor knows, and so that makes the second part, the

25   permissive intervention part a little bit different of an

1  analogy maybe or a look than you typically see when that

2  argument is being made

3         So let me start by talking very briefly about the

4  intervention of right piece of it under Rule 24(a)(2).  I

5  don't agree with what Mr. McKane said, as eloquent as he is

6  and as well as he argued that piece of it, we don't believe

7  that there is a right to intervene here.  And you know,

8  first and foremost, Judge, I wouldn't use the phrase a

9  "lottery winner" here, but I think what we used in our

10 pleadings and our papers were more of a "rooting group" in

11 terms of as a group in terms of the attempts by the market

12 participants intervene.

13        And we should lose track of the fact that all of

14 the market participants -- we also break this down, Judge,

15 and so our material is a good portion of the market

16 participants seeking to intervene has short-pay claims.  And

17 those are all subsumed within the ERCOT claim.

18        So it's not a situation where there are

19 duplicative claims that are being asserted here or treated

20 claims that are being asserted here.  Those claims are

21 really duplicative of in terms of being subsumed within what

22 is being sought by ERCOT in its Proof of Claim.

23        So we don't think that there is a direct, but is a

24 substantial or legally protectable interest, which is the

25 standard under intervening by right, and so we don't think

1  that there is in that first component of Rule 24(a)(2) a

2  right to intervene.

3          Now what I want to point out, though -- and I

4  think more of a focus should be spent on this -- and you

5  even alluded to it earlier, Judge, is whether there is an

6  adequate representation of the interests that the market

7  participants are asserting here, and I would submit that

8  there is.  And I would say that it's here in spades this

9  time.  I mean, I heard Mr. Alibhai's presentation today, and

10  I don't think there's any question about any question about

11  what a good lawyer he is.

12          THE COURT:  Right.

13          MR. STRUBECK:  I know the Munsch firm very, very

14  well, and the arguments that they're going to be making in

15  connection with defending this adversary proceeding that

16  objects to the claim are going to be the same kind of

17  arguments that you're going to hear, if you let all these

18  other people intervene.  In fact, to my knowledge, nobody in

19  their intervention pleadings have asserted anything other

20  than what we've already heard or seen from what ERCOT has

21  said.

22          So I think in this case more so than maybe any

23  other intervention case that I've seen, there is an adequate

24  representation based upon the existing parties and there's a

25  flip side of that in terms of the members, which I won't

1  spend as much time with now because we have an agreement

2  with them from a stipulation standpoint.

3          But, Judge, the parties that are involved

4  representing the main combatants in the ERCOT litigation are

5  going to address every single issue as fully and as

6  completely and as well as anybody else can.

7          And when you were asking Mr. McKane to go through

8  the list of other law firms that were involved here, to the

9  extent that you allowed intervention by at least part of

10  them, that was a list of some really prominent, really good

11  law firms, all of whom I think will want to be heard at some

12  level.  And again, I just don't think that's necessary here

13  because given the lawyers that are already involved, there

14  is an adequate representation.

15          I want to turn very briefly to the permissive

16  intervention portion of this and I don't think it's quite as

17  cut and dry as Mr. McKane suggested.  And part of that,

18  Judge, goes back again to the notion of the specific

19  contract that is at issue here in terms of the objection to

20  the ERCOT claim.

21          And there's a couple of different components when

22  it comes to permissive intervention.  It's not just whether

23  this is going to result in undue prejudice and delay -- and

24  I'll talk about that in just a second, but there's also the

25  component of whether there's a claim or defense that shares

1  with the main action, a common question of law or facts.

2  And frankly, Your Honor, I don't know they satisfy that

3  requirement either.

4          But as I said at the get-go, here because the

5  resolution of this claim is so critical to the case, and

6  especially getting it resolved as expeditiously as possible,

7  the last factor in the permissive intervention rule, which

8  involves undue delay and prejudice is specifically relevant

9  here because no one can manage their docket as well as you

10  can, Judge, and I have every reason to believe that if you

11  allow intervention by some or all of these parties, you're

12  going to impose, as you're authorized to do, restrictions

13  that are going to allow you to manage this the best you can.

14          But the sheer number of additional parties who are

15  trying to intervene here, and all the different law firms

16  that are going to want to be heard.  And again, no one has

17  raised any separate issues here.  When I read all the

18  intervention and there's a bunch of intervention pleadings

19  to read, no one is coming up with anything that ERCOT hasn't

20  already asserted.

21          And so there's just not a need to expand what is

22  already a very big group of attorneys in this group and let

23  other people come in and make arguments in connection with

24  these other claims and the market participants are met.

25          I wanted to mention, Judge, that Ms. Ross and

1   Mr. Ruzinsky had mentioned specifically that their claims

2   are little bit different than the claims that Mr. McKane was

3   referencing earlier.  As Your Honor probably have noted,

4   that was one of the groups that would be intervenors who we

5   had said we didn't have an opposition for them to come in

6   and the reason for that was we thought that there were very

7   specific issues because they had direct contracts with us,

8   unlike all the other market participants.

9         Mr. Ruzinsky's client and Ms. Ross's client had

10  direct contracts with us, direct power purchase agreements

11  with us.  And so because of the issue that was involved

12  under -- or issues under 503(b)(9), we thought that with

13  respect to their intervention there was a -- in fairness and

14  equity, they should be entitled to intervene and we had made

15  that concession as part of our response.

16        There was another point that I wanted to make,

17  Judge, because back at I think it was in June, you were

18  mentioning that you were hearing a lot from your friends in

19  Austin and they were asking you, you know, kind of what you

20  were doing with this case and what you were thinking about

21  with this case.  And again, as I think Mr. Mendiola made

22  clear early this morning, we're not in connection with this

23  adversary proceeding trying to do anything that has to do

24  with repricing the market.  We're just not.

25        This is a very specific contractual claim that was

1  initiated by ERCOT that we chose to respond to an adversary

2  proceeding.  And I kind of wonder just as a practical

3  matter, not that this is a direct consideration of yours,

4  when you're considering who to let in and who not to, what

5  the perception in Austin would be when 20 or 23 market

6  participants all of a sudden are allowed to get in this

7  lawsuit.

8          And to me, although I know how careful you will be

9  when it comes to your ruling here, and keeping it

10  specifically tailored to your jurisdiction, you have the

11  optics around that were initiated in Austin are going to

12  suggest that maybe your jurisdictional approach to this

13  mindset is a little bit broader than I think the specific

14  issues, which we tried to focus the Court on.

15          So I know I've gone very quickly.  I've tried to

16  follow suit, with what Mr. McKane did and tried to respond

17  to some of the things that you had raise.  I guess the last

18  thing that I'll say is what Mr. McKane mentioned that I

19  didn't or we didn't made a proposal to him in terms if you

20  were going to allow intervention, you know, what

21  restrictions might be appropriate.

22          We did, however, indicate that to the extent you

23  were going to allow it, we thought that restrictions would

24  be appropriate and I know we're not yet to the part of this

25  that talks about members, but I would say that the

1  stipulation that we reached with the members is a pretty

2  good template as to if you were to allow others to

3  intervene, what the restrictions should be.

4          So with that, I'll stop and see if you have any

5  questions that you'd like for me to address.

6          THE COURT:  So I actually do, and this will give

7  you some insight as to why I'm thinking what I'm thinking.

8          Mr. Parker, if I could ask you a question?

9          MR. PARKER:  Yes, Your Honor.

10          THE COURT:  So the claim -- and I'm not trying to

11  drive anything.  I just want to understand the dynamics.  So

12  you're asserting a claim of $2 billion.  If the Debtor came

13  and said, we would settle for an unsecured claim of a

14  billion dollars -- and I'm just picking numbers.  I don't

15  mean anything by the numbers.  Do you have the ability to

16  resolve the claim or do you have to go to all of the

17  affected members and say, you know, your portion of this

18  would be X, do you agree that that satisfies your claim?

19  How does that work?

20          MR. PARKER:  Your Honor, I'm not sure it's either,

21  frankly.  I don't think it's as easy as saying we'll take

22  half the claim and I guess go to the market to upload the

23  rest after the --

24          THE COURT:  So let me ask it in reverse and now

25  you'll see why I'm asking the question.  If Mr. McKane and

1   Mr. Strubeck have a conversation, as I know that they would,

2   and Mr. McKane says we've looked at all this and Calpine

3   would adjust its claim to Z.  I'm assuming that that -- and

4   as part of it we agree not to do one, two, three, and four.

5   And I go only go one, two, three, and four 'cause I don't

6   know what ERCOT would want.

7           But if Mr. McKane's client reached a resolution

8   with the Debtor, wouldn't that by definition adjust your

9   claim?

10          MR. PARKER:  It could, Your Honor, depending on

11  how it's structured.

12          THE COURT:  Okay.  And so clearly Mr. McKane's

13  client has the ability to negotiate its own claim.  I mean,

14  you would have to agree with that, right?

15          MR. PARKER:  Yes, Your Honor.

16          THE COURT:  And what I was trying to figure out

17  was do you have the ability to effectively negotiate

18  somebody else's claim 'cause that was why -- that was one of

19  the reasons that I went down this path because I don't see

20  how you do.

21          MR. PARKER:  Your Honor --

22          THE COURT:  And if you do, you do.

23          MR. PARKER:  Yeah, we don't, Your Honor.  It's our

24  claim to negotiate.

25          THE COURT:  Well, it's your claim to negotiate,

1  but -- and hold on.

2      (Court confers with staff.)

3         THE COURT:  Sorry, I got a mom and two little

4  girls, so that's more important than anything.

5         So what I was coming back to and again, I want to

6  understand it.  Mr. Parker, as I look at this and of course,

7  I'm going down all of the different branches of the decision

8  tree trying to sort of figure out where they end up, because

9  that's just what I do.  And so what I was really focused on

10 was do you have the ability to actually recognize risk in

11 litigation in terms of fixing your claim, or do you have to

12 go get -- as a lot of governmental agencies do, you have to

13 go get an answer -- you have to go get an answer by a Court

14 with the final word and then that's what you live with.

15        And so what I was trying to figure out is, at

16 least in my view, and I want to give people an opportunity

17 to respond to this, is I've got a group ably represented

18 that have control over their own destiny because, again,

19 that's the difference between, you know, governmental fiscal

20 and commercial fiscal, is that I've got folks who could then

21 sit down and, again, with the right structure and you

22 obviously would have to provide some guidance on this, but

23 could have a negotiation that would effectively reduce the

24 ERCOT exposure and the ERCOT claim and in a way that quite

25 frankly could be good for everyone.

1          But you know, again, I don't understand.  I was

2     wrong from the very beginning with what ERCOT could and

3     couldn't do and so I'm trying to learn, as well.

4          MR. PARKER:  Well, Your Honor, ERCOT is a

5     counterpart to these transactions so it would be our claim

6     to negotiate.  If a party to which we owe money wants to ask

7     for that money, there could be a resolution there.

8          But it would be our responsibility to negotiate

9     and not be able to help them.

10          THE COURT:  So you think that if you owe Calpine a

11     dollar, it's your belief that you could go to the Debtor and

12     say, I'll take 50 cents from you, and Calpine, you don't get

13     a voice in that?

14          MR. PARKER:  No.  I'm not saying that, Your Honor.

15          THE COURT:  Okay.  What are you saying?

16          MR. PARKER:  I'm saying that Calpine comes to us

17     and say they owe us $100, you only owe us 50.

18          THE COURT:  But that conversation is much better

19     had between the person that's paying and the person that's

20     benefits from it, right?  Because you don't take -- you

21     don't take any money out of that -- at least that's what

22     everybody said that you're revenue neutral.

23          I mean, you -- and I don't mean this in any way

24     disrespectful, but you don't really care what the outcome is

25     so long as you comply with your rules, right?

1          MR. PARKER:  Well, let me listen to it.  Sure we

2   care, Your Honor.  I mean, yes, we're neutral, but the

3   providence by which we'd have to go back to the market to

4   make up for any short pays is a lengthy one and it does

5   impact everyone.  And so there is a concern that if we

6   negotiate money on one end and we're also owed money on the

7   other, somebody has to pay for that and frankly it's not

8   going to be ERCOT as far as the market.

9          THE COURT:  Yeah.  See, this is exactly the reason

10  why I think having the commercial parties involved in this

11  actually makes sense 'cause Mr. Strubeck, it gives you

12  someone to talk to that actually has -- is going to be

13  driven by economic rules, as opposed to something that none

14  of us will ever understand.

15         And I only tell you that again because I ask --

16  the questions I ask were very specific.  I mean, one, I do

17  want the 503(b)(9) issue teed up the right way so we don't

18  do it multiple times.  I also think there's a tremendous

19  amount of risk in all of this for everyone.  I also think

20  that there's a lot of latitude.  And different people are

21  going to have different sensitivities to be able to sit down

22  and have a real conversation about the right outcome for

23  their particular client.  And ERCOT can't possibly be able

24  to recognize everybody's particular situations and there's a

25  way in my mind in that negotiation that ERCOT has no choice

1  but to say, yeah, that's a fair outcome because you've taken

2  care of all of my issues for which I'm responsible.

3        And Mr. Strubeck, I'm only telling you this

4  because it is driving part of my decision.  I will tell you

5  I agree with you.  I don't think it's intervention as a

6  matter of right, but I've been focused on intervention as a

7  matter of being smart and practical.  And that's where I've

8  been focused.

9        MR. STRUBECK:  Judge, may I respond just very

10 briefly?

11        THE COURT:  I want you to.

12        MR. STRUBECK:  Yes.  Thank you, Judge.

13        And I appreciate everything that you said and you

14 might recall that at one of the earlier hearings, you know,

15 we talked about whether a mediation here might be

16 appropriate to a point.  And I think one of the challenges

17 that we had is what you're thinking about right now.  So we

18 didn't kind of get anywhere with that motion.

19        What makes this a little bit more challenging is

20 you're focusing in on exactly what the big issue is here, in

21 terms of some of the economic interests that some of these

22 parties have.  But it's one step removed, right?  Because --

23 not to steal Mr. Mayer's thunder, I know he's waiting to

24 weigh on this, too.  But the market participants are

25 creditors of a creditor, with ERCOT being the creditor, and

1   so, you know, they're one step removed from it.

2           And I know you want to find a solution to this,

3   and I understand the way you're thinking.  But I believe

4   that it is going to be much more difficult to manage this

5   litigation if these parties are allowed to come in.

6           And before I stop, Judge -- and you may have other

7   questions -- I realize that Mr. Mendiola, when he went

8   earlier this morning, did not introduce all of the exhibits

9   that we got.  And there were just four of them that involved

10  my piece of this.  And so, if there's no opposition, just so

11  I can make sure the Record is complete, if it's okay --

12          THE COURT:  Sure.

13          MR. STRUBECK:  -- I'll just tell you what those

14  four exhibits are, and then I'll be quiet, unless you have

15  any other questions.

16          THE COURT:  No, go ahead.

17          MR. STRUBECK:  So, Judge, they're Docket Numbers

18  112-1, which is ERCOT's Proof of Claim.  That would come in

19  pursuant to the same (indiscernible) you heard Mr. Esser

20  outline when it came to the proofs of claim of the other

21  parties here.

22          And then 112-2, the ERCOT (indiscernible)

23  protocols.  And then 112-6, actually.  There are several

24  subparts to 112-2.  And then 112-6, which is the debtor's

25  schedules of assets and liabilities.  And finally, 112-20,

1  which is the ERCOT market notice.

2           There is no objection to any of those, Judge, that

3  I just moved for their admission, subject to the same

4  conditions that Mr. Esser went through with the proofs of

5  claim with the other parties.

6           THE COURT:  All right.  Thank you.

7           Any objections?

8           UNIDENTIFIED:  Your Honor --

9           MS. HARRISON:  Your Honor --

10          UNIDENTIFIED:  -- I believe the last two exhibits

11 and -- with what I'll (indiscernible) 3 and 17, I think it's

12 -- I think the assets are Debtor's Exhibit 3, which is

13 112-6.  Oh, I think that (indiscernible) that's right.

14 Mr. Strubeck is correct.  It's 112-6, which is Debtor's

15 Exhibit 3.  I see now.  Yeah, no objection to that.

16          MR. STRUBECK:  Okay.  I'm sorry.  I was referring

17 to them as docket numbers.

18          THE COURT:  No, it's -- I've got it.

19          And I think there was someone else that had --

20          MS. HARRISON:  Yes, Your Honor.  Julie Harrison on

21 behalf of the debtor.

22          I just want to clarify, Debtor's Exhibit 2 is

23 Docket 112-2 through 112-5.  We had to break it up because

24 it's large.

25          THE COURT:  Got it.  So the offer is 112-1 through

1    112-6 and 112-20.  Any objection?

2              MR. STRUBECK:  Yes.

3              THE COURT:  All right.  Then they are admitted

4    without objection.

5         (ECF 112-1 through 112-6 received in evidence.)

6              THE COURT:  Mr. Strubeck, did you have anything

7    else?  Ms. Ross had wanted to speak.

8              MR. STRUBECK:  I didn't, Your Honor, unless you

9    had any other questions you wanted to ask me.

10             THE COURT:  I may.

11             MR. MAYER:  Your Honor?

12             THE COURT:  Yes.  Oh, Mr. Mayer, of course.

13             MR. MAYER:  This is Tom Mayer.

14             THE COURT:  Yes.

15             MR. MAYER:  And I realize the -- your -- you have

16   indicated which way you think you want to go, and it's

17   always very difficult and perhaps terribly unwise to --

18             THE COURT:  No, not at all, not on this one.

19             MR. MAYER:  -- (indiscernible)

20             Your Honor, as Mr. Strubeck said, we view these

21   people, not Ms. Ross' clients, they're different

22   (indiscernible)

23             THE COURT:  So --

24             MR. MAYER:  Mr. McKane and his group are creditors

25   of creditors.

1          THE COURT:  Right.  So can I -- before you go on,

2     Mr. Mayer, if I could because I want to understand because

3     everybody said that, and I don't understand it.  The fact

4     that --

5          MR. MAYER:  Okay.

6          THE COURT:  -- Ms. Ross' client is in privity, how

7     does that make -- how does that really have any impact on

8     whether or not she should be allowed to intervene in a claim

9     objection adversary?

10          MR. MAYER:  Because, Your Honor, she has a

11     contract --

12          THE COURT:  Right.

13          MR. MAYER:  -- directly with the debtor, and the

14     ruling that you make will affect the enforcement of her

15     contract.

16          But with respect to Mr. McKane's clients, they

17     have a contract with ERCOT.  ERCOT has a contract with the

18     debtors.  If you take a look at the Enron case that we cited

19     in our papers --

20          THE COURT:  Sure.

21          MR. MAYER:  -- it looks like the same issue came

22     up.  Now it's not binding, it's the Southern District of New

23     York.  I don't expect this Court to view that as a binding

24     precedent, but almost exactly the same issue came up.  And

25     Enron cut a -- strike that.  ERCOT cut a deal with Enron

1  (indiscernible)

2          THE COURT:  Okay.

3          MR. MAYER:  And a market participant came in and

4  said you can't do that, those are my electrons.  And ERCOT

5  said, no, no, no, you have an agreement with me --

6          THE COURT:  Right.

7          MR. MAYER:  -- I have an agreement with the

8  debtor, it's my agreement to administer, and I get to do

9  this without talking to you.

10          Now, in terms of whether this is a good idea or

11  not, I would urge that you think about, in my view, what

12  you're setting up the case to do because I think this is

13  going to end up being terribly unfortunate.  There is no way

14  for majorities to bind creditors of a creditor.  You're

15  going to have 20 individual voices.  When you say these

16  people should be involved in settlement discussions, what do

17  we need to cut a deal?  Do we need 1 person?  Do we need 20

18  persons?  Do we need a majority?  What about the people

19  whose claims against ERCOT haven't been established?  Some

20  of these people have claims for services, or more

21  accurately, have received payment for services that they

22  didn't actually render, and ERCOT is seeking to get the

23  money back from them.

24          The fact that these people even show up and say,

25  hi, I have a claim, they have a contract with ERCOT, they

1    say.  They have performed under that contract with ERCOT,

2    they say.  But all of this is one step removed from this

3    Court.  And there is no way -- if you'll pardon my saying

4    so, creditors of a creditor, with respect to their claims

5    against ERCOT, I don't think you have jurisdiction over

6    that.

7                THE COURT:  Sure.  But they filed --

8                MR. MAYER:  And what then --

9                THE COURT:  They filed proofs of claim in this

10   court, and no one has objected to them.

11               MR. MAYER:  Yet, Your Honor.  I think we've been a

12   little busy.  But if the question is we need to have

13   objections to claims filed by creditors of creditors, the

14   committee will stand ready to file such objections.

15               THE COURT:  So, Mr. Mayer, let me step back

16   because I'm not sure you understand where I'm headed.

17               MR. MAYER:  Okay.

18               THE COURT:  So, one, let me go back and, I think,

19   address what you -- what your sort of preeminent question

20   was:  How many people do you need to negotiate a settlement.

21   If Mr. Parker tells you that he can cut a deal on behalf of

22   ERCOT, then you only need one.

23               But if, as I believe, he has far less latitude

24   than perhaps you think he does because of a whole host of

25   issues that really haven't shown up yet, what you do have

1  the ability to do, in my mind, is to pick off creditors of a

2  creditor and have ERCOT acknowledge the reduction of that

3  liability, so it starts to narrow the ERCOT exposure.  Now

4  it does require ERCOT to say, you know, okay, I agree.  But

5  it's awfully hard to say, if someone reaches a deal that

6  says that deals with our liability, ERCOT, I don't know how

7  ERCOT says no to that because it's better off for the entire

8  system.  That's all I was saying.

9         It's not that you have to include anybody in a

10 settlement discussion.  You don't even have to negotiate, if

11 you don't want to.

12         MR. MAYER:  Let me try this again, Your Honor.

13         THE COURT:  Okay.

14         MR. MAYER:  And again, the folks from ERCOT can

15 correct me if I'm wrong.  But let us assume Mr. McKane comes

16 to the debtor and he says have I got a deal for you, I'm

17 going to cut my claim in half.

18         THE COURT:  Uh-huh.

19         MR. MAYER:  Does that affect ERCOT's claim in the

20 slightest?  My understanding is that it does not, not at

21 all.

22         THE COURT:  No.  But if they --

23         MR. MAYER:  All that's happened is that somebody

24 who didn't have a claim at all just got paid 50 cent.

25         THE COURT:  No.  See, I think that you're wrong

1  because part of the deal would necessarily involve ERCOT

2  acknowledging -- or part of the deal would be Mr. McKane

3  acknowledging that ERCOT had no further liability to it for

4  that claim, so ERCOT's exposure goes down by the full amount

5  of Mr. McKane's claim.

6          MR. MAYER:  I can't -- I cannot obviously say with

7  certainty that that won't happen.  But it is not my

8  understanding that, when these folks seek to intervene, they

9  are contemplating reducing their claims against ERCOT, and

10  I'll leave it at that.

11          THE COURT:  I'm sure that's on the table.

12          UNIDENTIFIED:  Your Honor?

13          THE COURT:  Yes.  If I don't get to Ms. Ross,

14  she's going to explode.  So, Ms. Ross, go ahead, please.

15          MS. ROSS:  Oh, I'm sorry, Your Honor.  I did

16  voluntarily keep my remarks brief, so that I could just try

17  to follow up after I heard the argument.

18          Your Honor, with all due respect to Mr. Mayer and

19  to Mr. Strubeck, I think the big problem in this case is

20  that we have a committee that does not contain market

21  participants.  It doesn't even contain people like me, when

22  my poor client tried to get on the committee and couldn't.

23  That's the first problem.  And therefore, there's nobody for

24  them to talk to.  The case has been sitting for six months,

25  with all due respect.  That's what the problem in this case

1    is.

2            We need to get the people who have -- whose oxes

3    are going to be gored in this case.  And it's seeming that

4    my client agrees to the conditions the Court has suggested.

5    My suggestion would be that the intervention be permitted.

6            With respect to Mr. Strubeck, I've known Mr.

7    Strubeck for 30 years, but I didn't know he couldn't count

8    because he says there were 24 people trying to intervene.

9    Now (indiscernible) I want to -- I want to count for a

10   minute because here's the thing:  There were 14 co-op

11   members who asked to intervene, and they've been allowed in,

12   so that's 14 --

13           THE COURT:  Well, they haven't been allowed in

14   yet.

15           MS. ROSS:  Well, they're -- the debtors agreed to

16   them.  And let's look how that's going to look on appeal.

17   They let them in, they let the committee in, and they let

18   Mr. Strubeck assert his claim.  And the Fifth Circuit is

19   going to say, well, wait a minute, I don't understand this

20   (indiscernible) that is standing in the way of all of this

21   is ERCOT.  And you just heard, Judge, that ERCOT cannot

22   settle this matter.

23           So it's a risk of snatching defeat from the jaws

24   of victory.  I would strongly recommend that the

25   intervention be permitted, where I do still have to speak to

1  my client.  And I don't -- one of the questions I've got for

2  the Court is:  Are you going to impose the other

3  restrictions that the debtor tried to impose on us?

4            THE COURT:  No.

5            MS. ROSS:  Because that (indiscernible) that's a

6  huge --

7            THE COURT:  Well, no, I'm not because what I'm

8  going to tell you is, under -- it would take -- it would

9  take something that I can't think of to change the

10  scheduling order.  And you know, you're going to live with

11  what's there.  That's the --

12            MS. ROSS:  Yes, we are.

13            THE COURT:  That's the decision you made.

14            MS. ROSS:  (Indiscernible) allowed in.

15            THE COURT:  Uh-huh.

16            MS. ROSS:  I get it.

17            THE COURT:  Let me first -- Mr. Ruzinsky, you're

18  back on just because I -- so that I know where your -- I

19  know where your client is.  Where would your client like to

20  be?

21            MR. RUZINSKY:  Your Honor, I appreciate the Court

22  giving me an opportunity to visit with my client.  I did so

23  and we heard the Court, and my client did, too, loud and

24  clear.  And with our single issue, we're going to take the

25  Court up on its invitation not to intervene.  So we will

1    pass on the intervention and appreciate the input from the

2    Court.

3            THE COURT:  So if you would simply do a very short

4    order that just says that your request to intervene is

5    withdrawn and that you need determination in the adversary

6    regarding the applicability of 503(b)(9) is not binding on

7    your client.

8            MR. RUZINSKY:  I will do so, Your Honor.  Thank

9    you.

10           THE COURT:  All right.  Obviously, pass that by

11   the committee and the debtor just to approve as to form

12   only.

13           MR. RUZINSKY:  Yes, sir.

14           THE COURT:  All right.  And if you wish to go,

15   you're certainly welcome to go, but you can also stay if

16   you'd like.

17           MR. RUZINSKY:  (Indiscernible)

18           THE COURT:  All right.

19           MR. RUZINSKY:  Thank you, Judge.

20           THE COURT:  All right.

21           MR. ROSENTHAL:  Your Honor?

22           THE COURT:  Yes.

23           MR. ROSENTHAL:  Can you hear me?

24           THE COURT:  Yes.

25           MR. ROSENTHAL:  Michael Rosenthal on behalf of

1  Luminant Energy and Exelon.

2          Your Honor, I think you were going to take up our

3  motion next.  But we do have an interest in what you're

4  discussing right now --

5          THE COURT:  Uh-huh.

6          MR. ROSENTHAL:  -- because we're the other side of

7  the argument that you just made and that Ms. Ross just made,

8  we're the -- we're one of the parties whose ox may be gored

9  by the Court's decision, for example, to disallow a portion

10 of the ERCOT claim, in the event that they come back with a

11 default (indiscernible) so all the arguments that you have

12 been -- you know, you have been discussing with the parties

13 about why intervention may be appropriate under -- I

14 understand you're talking about a permissive intervention

15 standard -- would apply, I think, to Luminant and Exelon, as

16 well.  So we can either discuss that now or we can discuss

17 it when you get to our motion.

18          THE COURT:  If you want to throw something out --

19 because, number one, Mr. Parker is in a position that I'm

20 not sure he anticipated, and so he's got a lot to process

21 through, and so knowing what you're going to say will help

22 him decide how he wants to react when I get to him.

23          MR. PARKER:  Your Honor, this is Mr. Parker.  I'm

24 happy to let counsel continue and I'll respond to everybody.

25          THE COURT:  Sure.  All right.  Go ahead.

1          MR. ROSENTHAL:  So, Your Honor, we actually think

2     we have a -- we have a mandatory right to intervene, just

3     sticking with your permissive intervention.  You know, our

4     issues relate --

5          OPERATOR:  Our system will end this conference in

6     five minutes.  To extend this call for one hour, please

7     enter the moderator PIN now.

8          MR. ROSENTHAL:  (Indiscernible)

9          OPERATOR:  Your conference has been extended for

10    60 minutes.

11         MR. ROSENTHAL:  (Indiscernible) as to whether, in

12    fact, the disallowance of the claim would still entitle

13    ERCOT to issue default notices to parties such as Luminant

14    and Exelon --

15         THE COURT:  Uh-huh.

16         MR. ROSENTHAL:  -- notwithstanding the fact that

17    you would have said in your ruling that they have no --

18    ERCOT has no claims against Brazos.  How then to have a

19    claim against other market participants?

20         THE COURT:  And just so --

21         MR. ROSENTHAL:  So (indiscernible)

22         THE COURT:  And just so we're clear, Mr. Rosenthal

23    -- because I wanted to make this point earlier -- is that

24    the answer that comes out of the claim objection and the

25    adversary is that the claim against the estate is X, and

1    that can be different.

2              MR. ROSENTHAL:  Correct.

3              THE COURT:  Okay.

4              MR. ROSENTHAL:  But the claim against the -- we've

5    asserted a claim against the estate based the potential

6    default (indiscernible) so one of our arguments as to

7    intervention is that it would lead to -- you know, it would

8    actually simplify the process because the Court would be

9    deciding.

10             Your second condition, I think, was:  Will we be

11   bound as to our claims?  And I think the answer is yes,

12   where we could intervene, that you would be deciding whether

13   (indiscernible) in the same time, whether ERCOT has a claim

14   and whether there is any claim over by Luminant and Exelon.

15             And I will say to Your Honor -- I will say to Your

16   Honor that, if we are allowed to intervene, the discussions

17   that you were talking about -- if, for example, Calpine and

18   NRG and ERCOT related to whether there's a deal, whether

19   they will agree that some portion of the amounts they are

20   owed will not -- will -- could be reduced, it seems to me

21   that Luminant and Exelon should be part of those

22   discussions.  They're the other side of the same coin.

23             THE COURT:  All right.  Thank you.

24             Anyone else before I get to Mr. Parker?  Mr.

25   Haitz, I see you talking, but -- oh, okay.  So it wasn't for

1   me.  Got it.  All right.

2              All right.  Mr. Parker?

3              MR. MCKANE:  Your Honor, can I just do one quick

4   record correction?

5              THE COURT:  Of course.

6              MR. MCKANE:  Your Honor, both Mr. Strubeck and Mr.

7   Mayer went out of their way to kind of position us as just a

8   short-pay claimant; in other words, in Mr. Mayer's role, a

9   creditor of a creditor; and, therefore, not a claim against

10  the estate.  Calpine is both.

11             THE COURT:  I --

12             MR. MCKANE:  Calpine has asserted a Proof of Claim

13  on the short pay, and Calpine has a direct claim against the

14  debtor under a contract that did not flow through ERCOT.  I

15  mean, it's just -- you know, like we're in either way.  I

16  don't think privity is the dividing line here.  I understand

17  exactly where Your Honor is.  And you know, the way you've

18  characterized some of the discussions and the ability to

19  have people who actually have an economic interest here I

20  think is the driver to -- you know, I do (indiscernible)

21  including Mr. Strubeck.  This is the key to the case.  I

22  think it's critical and we're prepared to move forward.

23             THE COURT:  All right.

24             MR. MCKANE:  At least Calpine is prepared to move

25  forward with those conditions.

1          THE COURT:  I got it.  All right.

2          Mr. Parker?

3          MR. PARKER:  Yes, Your Honor.  My turn?

4          THE COURT:  Yes, sir.

5          MR. PARKER:  Excellent.  Thank you.

6          I'm going to do my best to keep this brief, Your

7  Honor.  We've all been here for five and a half hours now.

8  So I'm not going to show the 30 slides I had prepared, I've

9  pared it down quite a bit.

10         THE COURT:  Did you --

11         MR. PARKER:  (Indiscernible) in terms of market --

12  oh, I'm sorry.  Yes, Your Honor.

13         THE COURT:  Do you want presenter control to

14  someone?

15         MR. PARKER:  Yes, please, Judge.  Caitlin Roberts

16  (phonetic).

17         THE COURT:  Caitlin Roberts.

18         MR. PARKER:  Thank you.

19         THE COURT:  Caitlin -- Caitlin with a C?

20         MR. PARKER:  Yes, sir.

21         THE COURT:  All right.  Let me just -- so I can

22  pay full attention, let me find her.  Caitlin Roberts, there

23  she is.  All right.  She has controls.  My apologies.

24         MR. PARKER:  Thank you, sir.

25         I'm going to take everybody in turn.  I'll talk

1   about market participants, first (indiscernible) the Calpine

2   Group, as well as Luminant and Exelon, then I'll move on to

3   the co-ops.

4            THE COURT:  So can --

5            MR. PARKER:  Then I'll probably --

6            THE COURT:  Can you -- I'm sorry.  Can you flip

7   back to that?  Because I've got the slide that Mr. Strubeck

8   was referencing.  So you do not oppose intervening --

9   intervention from Calpine, NG, Lower Colorado, NRG.  All

10  right.  Thank you.  I'm up with you.

11           MR. PARKER:  Thank you, sir.  I'll point out that,

12  as far as LCRA goes, we inadvertently omitted them in our

13  papers, but I guess we just heard they're withdrawing their

14  intervention, so this is of no moment anymore.

15           These five market participants fall into three

16  categories of folks who have a direct 503(b)(9) claim.  And

17  while trying to parse through all of these potential

18  intervenors and trying to intellectually honest with

19  ourselves and with the Court about who we would agree to

20  allow in and who we didn't think had the right to be allowed

21  in, we had to figure out what separated them out.

22           With regard to these five, they have their direct

23  503(b)(9) claims.  We think they have a right, under

24  mandatory intervention, to be in this case.  When we talk

25  about permissive intervention later, we believe that the

1   intervenors or the potential intervenors all suffer from the

2   same issue, which is the undue prejudice that will occur as

3   a result of bringing them all in.  However, as to these

4   five, ERCOT is not opposing them to be allowed in as a

5   right.  I want to make that clear as we proceed.

6           MR. ROSENTHAL:  Your Honor, it's Michael

7   Rosenthal.  Can I just interject one second?  We also -- NRG

8   -- I'm sorry.  Luminant also filed a 503(b)(9) claim as a

9   portion of its claim.  Does the same hold true for Luminant?

10          MR. PARKER:  I'm going to get to that.

11          MR. ROSENTHAL:  (Indiscernible) --

12          MR. PARKER:  (Indiscernible)

13          MR. ROSENTHAL:  -- talking about 503(b)(9), yeah.

14          MR. PARKER:  Let's talk about Luminant and Exelon.

15  No, the -- we -- ERCOT does not believe that Luminant and

16  Exelon have the right to intervene as a right for several

17  reasons.  They're only protecting their interests in a

18  number of other parallel proceedings, where a lot of these

19  same issues they seek to resolve in this case, in the his

20  adversary proceeding, are already being litigated.

21          The 503(b)(9) claim that was just referred to that

22  Luminant has, and Exelon does not, is not the subject of

23  their motion to intervene or the complaint that they have on

24  file.  So they drew a line in the sand when they started

25  talking about (indiscernible) procedures (indiscernible) the

1   market.  That's the issue on which they want to intervene.

2   So there is a clear distinction between Luminant and Exelon

3   and the other five that were on the other slide.

4          And with regard to the co-ops, let's talk about

5   them next.  The co-ops' objective is the same as the

6   debtor's objective in this case.  And just to frame the

7   issue, when it comes to the co-ops, you've got Tri-County,

8   United, CoServ, Mid-South, and the ad hoc group

9   (indiscernible) thank you.  So this -- these are the groups

10  -- these are the co-ops that have sought to intervene.

11         We have the ad hoc group, which is comprised of

12  eight.  They filed their one motion to intervene.  Then you

13  have these four on top that filed their own intervention

14  motions.  And the fact that you saw this flurry of filing

15  with these five separate motions to intervene, as well as

16  the eight (indiscernible) witness list that we saw on

17  Thursday, really highlights one of the issues we'll talk

18  about later.  This notion of cooperation amongst the

19  intervenes ERCOT fears will just not happen.

20         And I'll draw a distinction.  The Calpine group

21  filed one motion, they filed on exhibit list.  These folks

22  filed eight exhibits lists and five motions.  And so we are

23  concerned that, as this proceeds, there will be this undue

24  prejudice that the cases talk about regarding permissive

25  intervention.

1        We don't think delay is going to be a concern.  I

2   think Your Honor is going to keep this all (indiscernible)

3   so there will be delay.  But the undue prejudice will be the

4   real issue as we proceed.  I want to talk about that a

5   little bit more.

6        Let's go to Slide 7, please.

7        The other issue is that, as I said earlier, the

8   co-ops are already represented.  The co-ops own Brazos.

9   They admit that in the stipulation that was filed.  The co-

10  ops are the (indiscernible) owners of Brazos, and they all

11  have a seat on the board of directors.  And so this notion

12  that they won't have a seat at the table isn't true.  They

13  have a seat at the table.  They have a seat at the adults'

14  table, not even the kids' table.  They get to dictate what's

15  going to happen here.

16       And frankly, it's Brazos' job to make sure their

17  co-op constituents are taken care of in this regard.  And

18  you know, the 45 minutes that we've now spent hearing from

19  everybody on these various issues, again, highlights the

20  problem.  There won't be one voice by the co-ops; it's going

21  to be a number of people jockeying for different positions,

22  and in a matter where they already have the relief they're

23  trying to seek.

24       If we can look at Slide 8, please, Ms. Roberts.

25       The co-ops have adopted all the same

1  (indiscernible) complaint as this claim against ERCOT.  If

2  we look at the -- if we can go to 8.  The member co-ops that

3  make up the ad hoc group, they adopt and incorporate each

4  cause of action and the related allegations set out in the

5  debtor's complaint.  Tri-County (indiscernible) such count,

6  they rely on the factual allegations (indiscernible)

7  complaint and do not propose to add additional factual

8  allegations at this time.  And then Mid-South, United, and

9  CoServ, they all say the same stuff that Brazos is saying.

10  They're already adequately represented (indiscernible)

11  jurisdiction standpoint.

12          And they also only have an economic interest.  If

13  you look at Slide 9, this was the (indiscernible) case cited

14  in our papers.  We hold that an economic interest alone is

15  insufficient as a legally protectable interest and

16  intervention is improper where the intervenor

17  (indiscernible) possess (indiscernible) substantive right it

18  seeks to assert in the action.  And so they do have a purely

19  economic interest.  They're already protected by Brazos.

20          And we talk about permissive, there's another

21  problem that they are all going to have with the way this

22  matter is going to proceed for the next six weeks, during

23  fact discovery, and thereafter.

24          Let's look at Slide 11, please.

25          Another issue that we argued in our papers and I

1  will now bring up briefly is the co-ops' lack of standing.

2  Their claims are all derivative through Brazos.  There is no

3  direct privity of contract between them and ERCOT.  Brazos

4  has those contracts.  And if they haven't proven a contract,

5  the question is:  How can they move on certain counts in the

6  complaint that are based on breach of contract?  And so they

7  wholesale adopted the complaint against ERCOT without

8  parsing out which claims arguably they could bring when they

9  don't require privity.  But if they just adopt those -- that

10 complaint, they have a problem on standing.

11         Let's talk about permissive intervention very

12 briefly.

13         Go to Slide 12, please.

14         This is (indiscernible) 24(b) and the United

15 States v. Texas Education case cited in our case, talking

16 about judicial economy.  We brought this up and briefed it

17 quite a bit in our papers, I've raised it today several

18 times, and I think it's really the critical issue, it's

19 (b)(3), delay or prejudice.

20         In exercising its discretion, this Court

21 (indiscernible) when the intervention will unduly delay or

22 prejudice the adjudication of the original party's rights.

23 And so the original parties are Brazos and ERCOT.  How will

24 allowing these parties in prejudice or delay our rights?

25 And I understand (indiscernible) the debtor (indiscernible)

1  these folks (indiscernible) from a litigation strategy

2  standpoint (indiscernible) standpoint or (indiscernible)

3  both.  But there is an effect of doing that, that's going to

4  prejudice ERCOT.

5           Let's look at Slide 14, please.

6           This is what we have coming up (indiscernible)

7  laid awake thinking about it.  This Friday is the parties'

8  deadline to serve any additional discovery.  That's all

9  coming due on the (indiscernible) respond to it on the 23rd.

10  So we've got 5 weeks to conduct potentially 30 or more

11  depositions, depending on our agreements that we're trying

12  to work through with the debtor and the UCC.  Then you've

13  got experts, rebuttal, and trial in February.  This is

14  something we're trying to live and die by and meet all the

15  deadlines, and we're doing a good job of it so far.  But

16  adding a whole host of intervenors could negatively impact

17  that, especially with the prejudice that will befall ERCOT.

18           And I want to briefly point out some of the issues

19  that I focused in on, on the stipulation that was entered

20  into between the debtor and the UCC and the co-ops this

21  morning at Docket 117.  I'm looking at Page 5 of 11,

22  depositions, for instance.  If the stipulation

23  (indiscernible) and all the intervening co-ops come in, they

24  may attend any deposition and shall have the right to

25  examine witnesses at such deposition.

1              The right to propose discovery, they're going to

2    be bound by the existing discovery and try to coordinate

3    efforts.

4              Right to file dispositive motions and briefs, it's

5    Paragraph (d) on Page 6 of 11.  And this one is of great

6    concern to ERCOT.  The intervening co-op members shall have

7    the right to submit briefs, including with respect to case

8    dispositive motions, to the fullest extent possible under

9    the Bankruptcy Rules, and submit joinders and other non-

10   case-dispositive (indiscernible)

11             So does that mean ERCOT is going to have to

12   respond to nine different motions for summary judgment, nine

13   different trial briefs?  How is that going to play out?  The

14   Court can absolutely set up guardrails to prevent that.  But

15   I pleaded this issue because it's of grave concern to the

16   existing -- to -- at least from our standpoint as an

17   original party, to its ability to litigate this case without

18   undue prejudice.

19             And as I mentioned earlier, that permissive

20   intervention issue affects all of the potential intervenors.

21   But when it comes to mandatory, as I said earlier, there are

22   five discrete categories that are (indiscernible) agree to

23   allow in.

24             That's all I have, Your Honor.

25             THE COURT:  Oh, I --

1          MR. PARKER:  (Indiscernible)

2          THE COURT:  No, thank you.  I got it.

3          Let me ask.  Mr. McKane, have you made any

4    progress?  Are you able to give me a status report?

5          MR. MCKANE:  Making a lot of progress, Your Honor.

6    You know, and I'm recognizing there are folks that are able

7    to speak with their clients.  My client is on the line.  I

8    have Calpine's answer.  I also recognize there are other

9    folks whose clients are in transit, and so I hate to give

10   you an incomplete answer.  But it may be that like we need

11   to pick this up with just a quick report in the morning.

12   And I say that just because I -- you know, the

13   (indiscernible) this hearing, the time of the day.  I do

14   think that we'll have answers from every participant by

15   then.  But I'll other folks (indiscernible)

16          THE COURT:  Actually, here's what I'm going to do.

17   And I should have added this in.  And it's -- and it -- in

18   my mind, it kind of goes without saying, but I now realized

19   I should have addressed it.  There will be no intervention

20   complaints.  You adopt the debtor's complaint and you are

21   bound by the debtor's complaint.  We're not starting that

22   process again.  And so here is what I'm going to do with

23   respect to the motions to intervene:

24          With respect to the member agreements, you know,

25   with respect to the members who have sought intervention,

 1  I'm going to accept the stipulation and agreed order.  It's

 2  been negotiated by the debtors as -- and it's my view that

 3  that has been negotiated at arm's length and is the

 4  byproduct of negotiation by lawyers that I have a lot of

 5  confidence in and that I respect, and so I'm going to honor

 6  that agreement.

 7           I am going to tell you that anybody can bring to

 8  my attention that people are -- I'm going to use

 9  colloquialisms -- piling on, simply talking because they

10  want to be heard.  I'm expecting each of you to -- if you're

11  going to participate, that you're going to do this in an

12  efficient manner.  And you certainly want to cover all the

13  issues, but fight the urge to be heard just for the sake of

14  being heard.  Let's be productive and respect everyone's

15  time.

16           With respect to the other motions, Mr. Strubeck,

17  here is what I'm going to do.  I am going to grant the

18  motions to intervene, to the extent that the parties that

19  are allowed to intervene agree that they will be bound by

20  any 503(b)(9) determination; that they agree that, with

21  respect to the intervening group, they are only allowed one

22  counsel per issue, in terms of being heard; and that they

23  adopt and are bound by the complaint.  I don't know the

24  impact of anything else, and so I will take that up by

25  emergency motion.  I would hope that I don't have to and

1    that I don't have to, you know, rethink what I've done.

2            I remain convinced that this is an opportunity to

3    actually make some progress for, again, the people who are

4    affected by this most, and those are the folks who pay their

5    electric bills every month.  That's the focus, we're not

6    going to forget that.  The fact that we, as legal

7    professionals -- me, included -- have to work a little bit

8    harder, that's just something we're all going to accept for

9    the greater good.

10            So, to the extent, Mr. Strubeck, that anyone who

11   filed a motion to intervene will sign on to those

12   requirements, then you can stick them in the order or you

13   can draft the order by saying, you know, anyone within the

14   next couple of days -- actually, what I'd like to do is just

15   hold that order.  And if you're going to -- if you're going

16   to participate in the "intervening group," as I've defined

17   the term, you have to do that by, let's say noon on

18   Wednesday.

19            MR. MCKANE:  Your Honor --

20            THE COURT:  Mister -- yes?

21            MR. MCKANE:  -- can I get one clarification?

22            THE COURT:  Hold on just for one second.  Mr.

23   Gibbs would making motions that he could not hear.  Mr.

24   Gibbs?  I've learned to read hand signals.

25            UNIDENTIFIED:  I still can't hear.

1          THE COURT:  Mr. Gibbs, are you back with us?

2     (No verbal response)

3          THE COURT:  Let's assume that he's re-dialing.

4     (Pause in proceedings)

5          MR. ROSENTHAL:  While he's doing that, Your Honor,

6  Michael Rosenthal for Luminant and Exelon.

7          So we would sign on to an order that Mr. Strubeck

8  would prepare, agreeing to those conditions?  I think it

9  will be fine with our clients.

10         THE COURT:  Okay.  I'm giving you the opportunity

11 to talk through the implications because I -- and look, I

12 don't mind people being strategic about this, I've thought

13 through those issues.  There will be limits to my ability to

14 tolerate manipulation and strategery -- it's a legal term --

15 so do it wisely.  And remember, at the end of they day, my

16 focus is on those people who pay their electric bills every

17 month, and do not get in my way with respect to that issue.

18 That -- those people mean everything to this process, and

19 we're going to protect those folks to the extent that the

20 law says that we should.

21         All right.  Mr. Gibbs, are you back with us?

22         MR. GIBBS:  I am, Your Honor.  I apologize.  Can

23 you hear me?

24         THE COURT:  I can now, and I appreciate the hand

25 signals.  Mister -- I stopped Mr. McKane asking for a point

1  of clarification.

2         So, Mr. McKane, if you could, go ahead, please.

3         MR. MCKANE:  Thank you, Your Honor.

4         I just wanted to confirm, since Exelon and

5  Luminant were intervening on the plaintiff's side of the V

6  and the other market participants were intervening on the

7  defendant's side of the V, that they wouldn't be compiled

8  into the same group because it's going to be pretty hard for

9  people to speak on two different sides of the V.

10        THE COURT:  Yeah.  Well, it's -- you'd be surprise

11 what you see.  But no, you're right.

12        UNIDENTIFIED:  Your Honor, we were assuming it was

13 Luminant and Exelon, and we would participate with one

14 counsel only (indiscernible) the issue.

15        THE COURT:  Yeah, that wasn't --

16        MS. ROSS:  (Indiscernible)

17        THE COURT:  That was not -- and so we're going to

18 come back around to that.  That was -- that had escaped me

19 and I should have taken better notes.  So let me carve out

20 Exelon and Luminant for just a second.

21        So, Ms. Ross, did you have -- so, as I deal with

22 Mr. McKane's issue, did you have a question or comment with

23 respect to that issue?

24        MS. ROSS:  Your Honor, no.  I had one additional

25 issue that I was trying to understand the -- I was trying to

1  understand what the Court meant by being aligned.  There --

2  for example, among our group, we're all going to be aligned

3  on all issues, but I'm the only one that's probably going to

4  care about the ancillary services.  So I'm assuming that one

5  person per legal issue.

6       THE COURT:  So is there an ancillary service -- is

7  there an ancillary service component of the ERCOT claim?

8       MS. ROSS:  Yes.

9       THE COURT:  And you've been able to pull that out

10  and quantify it.

11       UNIDENTIFIED:  Yes, Your Honor.

12       MS. ROSS:  They told me it wasn't very much, but

13  they had quantified it, yes.

14       THE COURT:  All right.  Then my view is, is that,

15  on that particular issue, no one else is going to

16  particularly care, at least in this group, except for you.

17  So my guess is you would probably be the person on that

18  issue.

19       THE COURT:  Look, here's -- and I want to make

20  this very clear.  We're all going to have to be a bit

21  flexible, is --

22       MS. ROSS:  Okay.

23       THE COURT:  The goal is not to have eight lawyers

24  all take a shot on the same issue because we're not going to

25  -- we're not going to repeat this.  We're going to -- I'm

249

1  giving you the opportunity, quite frankly, probably against

2  my better judgment because, again, I'm focused on dollars

3  and who's actually affected.  I understand what the statute

4  says, but I also understand the dynamics of the case that

5  we've got.  And you know, don't abuse that privilege.  I --

6  for -- on issues, I want to see good presentation of

7  evidence and testimony, but -- and I don't want people

8  coming behind, again, lining up, just to take -- just to

9  take and repeat the things that have already been asked.  So

10 I know most of you well enough to know that you understand

11 how this should be conducted.

12         All right.  So anything else, except for Mr.

13 Rosenthal's issues?  Mr. Gibbs.

14         MR. GIBBS:  Your Honor, thank you.  While I was

15 muted or I lost my phone, I was going to ask Your Honor or

16 just raise one issue for Your Honor to consider and think

17 about how to resolve.

18         We fully expect and are willing to, obviously,

19 abide by the stipulated order in this case, including the

20 pretrial deadlines and the trial setting.  (Indiscernible)

21 the stipulation, which Your Honor has approved, it would be

22 (indiscernible) for our intervention because (indiscernible)

23         There is one concern that I want to flag.  The

24 deadline (indiscernible) pointed out for certain written

25 discovery is this Friday.  Under the stipulation -- I think

1    it's in Paragraph 2(c) -- the member co-ops cannot propound

2    written discovery unless we've either gotten the consent of

3    all parties, or we've asked for permission (indiscernible)

4    seek it on an expedited basis.  We haven't seen what written

5    discovery has been propounded by the existing plaintiffs

6    against ERCOT, so we have no reason yet to have an opinion

7    whether that was sufficient or whether we think we need to

8    add any addition written discovery requests.

9           I highly doubt that all existing parties, which

10   would include ERCOT, will agree with us that today is

11   Monday, so I'm fully expecting that, once we see this and if

12   we decide we may need to ask Your Honor to consider our

13   request to be allowed to propound additional written

14   discovery.  We may need a few minutes of your time on

15   Friday, so that we can get a ruling.  And if we're allowed

16   to do that and we can be in compliance with discovery

17   (indiscernible) scheduling order.

18          I don't think it's the case that we're going to be

19   asking Your Honor.  I just wanted to flag it that

20   (indiscernible) request to come in on the time line that

21   this train is running on, we may need to ask for a little

22   bit of your time.  And we'd ask Your Honor to encourage --

23          THE COURT:  I --

24          MR. GIBBS:  -- the debtor to (indiscernible) a

25   list of the topics that they've asked for written discovery

1    on, so we can make a quick decision.

2           THE COURT:  So, Mr. Gibbs, I will certainly give

3    you time on Friday.  The only requirement is whatever

4    pleading you file, you attach the discovery that you want

5    because that's -- I'm going to want to see it and I'm going

6    to want to read it and understand why.

7           MR. GIBBS:  And as I said, I think it's fair more

8    likely that you won't see us, won't see anything from us, or

9    have us in your court on Friday.  But we do need to see what

10   the debtor has propounded (indiscernible) so that we can

11   make an independent decision if we need to ask for anything

12   else.

13          THE COURT:  I got it.  All right.

14          So anything --

15          MR. EPPICH:  Your Honor --

16          THE COURT:  -- before I go back to Mr. Rosenthal.

17          MR. EPPICH:  Your Honor, this is Josh Eppich for

18   United.

19          THE COURT:  Yes.

20          MR. EPPICH:  (indiscernible) on behalf of Mr.

21   Gibbs comment.  As far as United is concerned, obviously

22   (indiscernible) Mr. Gibbs' request.  But so the Court

23   understands, from United's perspective, part of that issue

24   stems from the fact that we were subpoenaed by ERCOT with a

25   fairly large discovery request just the end of last week.

1  And so, as we're going through those documents, that all

2  sort of depends whether or not we want to propound any

3  written discovery on that issue -- on those issues raised.

4          THE COURT:  Okay.  So no more piggybacking on

5  anybody.  If you've got an issue, you raise it.  And

6  otherwise, you know you go do your thing.

7          MR. PARKER:  (Indiscernible) Your Honor.

8          THE COURT:  Mr. Parker?

9          MR. PARKER:  I've got an issue, sir.  Initial

10  disclosures on -- to be filed by all the new intervenors, do

11  we need to set a deadline for those?

12          THE COURT:  I'm going to let you all talk through

13  all of those issues.  And you know, the more I have to

14  become involved, the more -- just the harder I'm going to

15  be.  So I'm going to let you all talk about those things.

16  And if you decide that I need to be involved, then I will be

17  involved.  Okay?

18          MR. PARKER:  Yes, sir.

19          THE COURT:  All right.  Anything else before we

20  come back to Mr. Rosenthal's issues?

21      (No verbal response)

22          THE COURT:  All right.  Mr. Rosenthal, number one,

23  my apologies to you for not recognizing that you were

24  different -- that you were situated very differently.  As I

25  think about this, I need to understand why you ought to be

1  involved in this at all.  This is a claim objection.  This

2  claim is not asserted against you.  Tell me why.

3          MR. ROSENTHAL:  Your Honor, we think that we have,

4  to the extent that this claim is disallowed and ERCOT

5  continues to assert (indiscernible) charges based on the

6  amount that you've disallowed, that we have potential claims

7  against Brazos for the portion of that that relates to

8  Brazos that we pay.

9          THE COURT:  All right.  Is that --

10          MR. ROSENTHAL:  We are, in that case, the money,

11  if you will, for the payment of an amount that you had told

12  ERCOT that Brazos doesn't have to pay it.  And we think that

13  that is -- that that is something that you need to decide

14  and it's simpler for you to decide it -- you know, to decide

15  it now.

16          We also think, Your Honor, that some of the

17  arguments that are going to be made here are the same

18  arguments that have been made in other courts.  We want you

19  to hear what those arguments are, so that we can try to

20  ensure that there is some consistency in the presentation

21  and in your decision and we're not -- you know, we're not

22  left with inconsistent positions.  So those are the two

23  basic reasons.

24          I will tell you, Your Honor, I think your -- sorry

25  I was off camera when I made my original speech.  But I

1   think, Your Honor, that, if you're inclined to let us in,

2   your conditions, they need to be modified a little bit for

3   Luminant and Exelon because we would not intend to pursue

4   and raise the 503(b)(9) issues.

5           THE COURT:  All right.

6           MR. ROSENTHAL:  Those are issues that could be

7   covered by the market participant group and by ERCOT.  But

8   you know, we would agree that we would be bound -- as I said

9   before, that we would be bound by your decision with respect

10  to what claims we might have over against Brazos.  So you

11  wouldn't have to litigate those issues.

12          THE COURT:  All right.  All right.  On that basis,

13  the motion to intervene filed by Luminant Energy and Exelon

14  Generation Company, LLC is denied.

15          Mr. Strubeck, I'm going to look to you to provide

16  a series of orders that accomplish everything we've done.

17  My guess is -- I had hoped to have this all in one order.

18  It's clear to me now that that's not possible, so I will

19  look for a series of orders.  If you would simply let

20  chambers know as they are uploaded.  No need to hold them

21  all until you get them all done, just upload them as they

22  are completed.

23          And Mr. Strubeck, you've got me muted.

24          MR. STRUBECK:  Thank you, Judge.  You're also a

25  pretty food lip-reader, in addition to being hand signal

1  interpreter.

2      Judge, I think that I may want to see the

3  transcript on a portion of what you had to say before I

4  prepare the order.  And I'll tell you, one of the reasons

5  for that is that -- you may have noticed, and I'm going to

6  refer to Docket Number 117 now, which is the stipulation we

7  had with the members.

8      THE COURT:  Right.

9      MR. STRUBECK:  We had what I'll refer to as a --

10  kind of a most favored nations clause in that, so that, if

11  you let other parties intervene on less restrictive terms

12  than what we had negotiated in the stipulation, then the

13  members had the ability to be involved without those

14  restrictions, as well.  I just am going to have to kind of

15  think through it and sort through it.  And we may -- we'll

16  do our best not to have to come back to you with -- for

17  additional guidance, but that's one of the things that I

18  want to make sure I've thought through and properly

19  addressed.

20      THE COURT:  Certainly.  I would be very happy if

21  the members wanted to accept that they would have one

22  representative only with respect to each issue, and that,

23  along with the two other conditions, be the limitation.

24  That would be just fine with me.  But I'll leave you to work

25  your way through that.

1          MR. STRUBECK:  Well, I was actually going to

2   suggest that, but I'm going to have to have a discussion

3   with the members around that.  And I will, and hopefully we

4   won't need to come back to you with that at least.

5          THE COURT:  So let me ask.  Mr. Gibbs, if you are

6   unable to work your way through the issues that you've got

7   with respect to discovery, if I could ask you to sort of say

8   let's set Thursday at noon as a deadline; and, if you don't

9   have a consensus, then if you would talk to everyone and

10  then reach out to Mr. Alonzo for some time on Friday, with

11  everybody's schedule and be as respectful as you can, then I

12  will -- you know, I'll do my best to accommodate that Friday

13  request.  I will find time for you on Friday.  I just -- you

14  know, I don't know what you're going to -- what you're going

15  to ask for.

16         MR. GIBBS:  Will do, Your Honor.

17         THE COURT:  All right.  Thank you.

18         Anything else, folks, that we need to talk about?

19         MR. STRUBECK:  We do, very briefly, Your Honor.

20  And I'm trying to get through this just as quickly as

21  everybody else is.  We actually had two other matters on the

22  docket.  And one of them is now moot, in connection to how -

23  - the debtors' requested, also, that the committee's request

24  for leave for filing a summary judgment motion on Count 1 --

25         THE COURT:  Oh, totally --