**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>JUST ENERGY GROUP INC., <u>et al.</u>,<br><br>Debtors in a Foreign Proceeding.[1] | Chapter 15<br><br>Case No. 21-30823 (MI) |
| JUST ENERGY TEXAS LP, FULCRUM RETAIL ENERGY LLC, HUDSON ENERGY SERVICES LLC, and JUST ENERGY GROUP, INC.,<br><br><div align="center">Plaintiffs,</div><br><div align="center">v.</div><br>ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.,<br><br><div align="center">Defendant.</div> | <br><br><br><br><br><br><br><br>Adv. Pro. 21-4399 (MI) |

### <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs are Just Energy Texas LP, Fulcrum Retail Energy, LLC, Hudson Energy Services LLC ("**<u>Hudson</u>**"), and the foreign representative (the "**<u>Foreign Representative</u>**") in the above-captioned chapter 15 cases (the "**<u>Chapter 15 Cases</u>**"), Just Energy Group, Inc. (collectively, "**<u>Plaintiffs</u>**" or "**<u>Just Energy</u>**," and, with their affiliated debtors in the Chapter 15 Cases, the "**<u>Company</u>**" or the "**<u>Debtors</u>**").  The Debtors are the subject of proceedings (the "**<u>Canadian Proceedings</u>**") under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "**<u>CCAA</u>**") in the Ontario Superior Court of Justice, Commercial List (the "**<u>Canadian Court</u>**").  Plaintiffs bring this action by and through the Foreign Representative against Defendant Electric Reliability Council of Texas, Inc. ("**<u>ERCOT</u>**" or "**<u>Defendant</u>**"), and allege as follows:

---

[1]     The identifying four digits of Just Energy Group Inc.'s local Canada tax identification number are 0469.  A complete list of debtor entities in these chapter 15 cases may be obtained at www.omniagentsolutions.com/justenergy.

## <u>PRELIMINARY STATEMENT</u>

1.      In February 2021, Texas experienced a historically severe winter storm ("**<u>Winter</u>**

**<u>Storm Uri</u>**") that incapacitated most of its power-generating facilities.  As demand for electricity

outpaced supply, ERCOT—the private entity that manages Texas's grid and wholesale electricity

market—ordered deep cuts in electricity consumption in the form of forced outages.  In industry

parlance, ERCOT ordered "load" to be "shed" to reduce strain on the power grid.  At the same

time, ERCOT and its state regulator the PUCT also stunningly intervened in the market for

wholesale electricity by setting prices *orders of magnitude* higher than what market forces

ordinarily would produce.

2.      On February 15 and February 16, with little discussion and without prior notice or

any opportunity for public comment, the PUCT issued its key Orders Directing ERCOT To Take

Action And Granting Exception To Commission Rules (the "**<u>PUCT Orders</u>**") directing ERCOT

to "ensure that firm load that is being shed in [Energy Emergency Alert ("**<u>EEA</u>**") Level 3] is being

accounted for in ERCOT's scarcity pricing signals."  The PUCT did not tie the PUCT Orders to a

fact-based analysis of the current market conditions or otherwise explain the reasoning behind its

determination that energy prices should be set at the high-system-wide offer cap (the "**<u>HCAP</u>**").

Instead, it merely stated the economic truism that "[e]nergy prices should reflect scarcity of the

supply" and opined without evidence that "[i]f customer load is being shed, scarcity is at its

maximum, and the market price for the energy needed to serve that load should also be at its

highest."  In reality, scarcity was at its maximum because the storm had forced power generators

offline—not because they were waiting for a higher market price.

3.      Nonetheless, following the PUCT's directive, ERCOT manually adjusted one of

the input values to the Real-Time On-Line Reliability Deployment Price Adder—part of ERCOT's

scarcity pricing mechanism—to impose a Real Time Settlement Point Price on February 15 at the

HCAP of $9,000 per megawatt hour ("**<u>MWh</u>**") for more than eighty consecutive hours.  ERCOT

also improperly calculated charges associated with various grid functions that support the

continuous flow of electricity, including for reserves.  The cost of these "ancillary services" as they are known in the power industry reached the unprecedented price of $25,000/MWh during the storm.

4.    The actions of the PUCT and ERCOT not only failed to solve the electricity shortage, but they also violated Texas law.  Neither the PUCT nor ERCOT possesses the substantive authority to set prices in the wholesale electricity market in this manner; the PUCT did not follow the statutorily-prescribed rule-making procedures; and the PUCT's actions were not supported by evidence as required by law.  The PUCT violated the Texas Administrative Procedure Act (the "**APA**") by setting prices without proper notice or making an evidentiary showing that the market's scarcity pricing signals were not working and that the inflated prices would accomplish their apparent intended purpose of stimulating power generation.  The PUCT also violated the Public Utility Regulatory Act (the "**PURA**"), which mandates that pricing must be the function of competitive forces—not regulatory fiat.

5.    Similarly, ERCOT's actions found no support under, and were inconsistent with its Standard Form Market Participant Agreement with each Plaintiff (collectively, the "**SFA**"), which incorporates by reference, and requires compliance with ERCOT's nodal protocols (the "**ERCOT Protocols**").  At the time of the storm, the ERCOT Protocols did not include firm load shed among the considerations relevant to determining whether scarcity pricing would be appropriate.  Yet, the PUCT and ERCOT impermissibly set the HCAP at $9,000/MWh based on firm load shed; charged prices for ancillary services that exceeded the HCAP of $9,000/MWh; and failed to allow prices to fall below $9,000/MWh when firm load shed ended.

6.    The economic consequences of the PUCT's and ERCOT's decisions were staggering.  Over only seven days in February, due to the prices that ERCOT set, the state's wholesale market consummated $55 billion in transactions—a level of volume it ordinarily would

take the market four years to realize.  The $9,000/MWh price was over four hundred times the average MWh price for 2020 of $22.00/MWh.[2]

7.      What is more, ERCOT left that price in place for 32 hours after it had rescinded all load shed instructions early in the morning of February 18—even though during that period, the asserted justification for the price intervention no longer applied.  After ordinary market forces were permitted to take over at 9:00 a.m. on February 19, the price per MWh dropped precipitously.

8.      The PUCT's and ERCOT's decision making during the storm has been met with widespread criticism as economically unsound and legally invalid.  On March 5, Potomac Economics, the PUCT's Independent Market Monitor ("**IMM**"), concluded that ERCOT's pricing intervention should have ended immediately at 12:00 a.m. on February 18 after load shed stopped and recommended that ERCOT correct real-time prices from that date and time until 9:00 a.m. on February 19.  According to the IMM, the "mistake" of keeping the inflated prices in place resulted in billions of additional, improper costs to the ERCOT market.  Then, on March 8, the Lieutenant Governor of Texas called on the PUCT and ERCOT to follow the IMM's recommendation, stating that correcting the "mistake will require an adjustment, but it is the right thing to do.  It will ultimately benefit consumers and is one important step we can take now to begin to fix what went wrong with the storm."  With respect to ancillary charges, Arthur D'Andrea, former Chair of the PUCT, remarked:  "I haven't talked to anyone yet who thought [ancillary costs] could get above $9,000.  That was surprising—I think, shocking—to a lot of us."  The IMM also has indicated ERCOT did not properly calculate ancillary charges.  The imprudence of the regulators' decisions is confirmed by the wave of lawsuits that have been filed and by laws passed by the Texas legislature designed to remedy the consequences of those decisions and to reform the way the PUCT and ERCOT function going forward.

---

[2]      U.S. Energy Information Administration, May 7, 2021 ("Average Texas electricity prices were higher in February 2021 due to severe weather storm") available at https://www.eia.gov/todayinenergy/detail.php?id=47876.

9.      The regulatory missteps of the PUCT and ERCOT also severely harmed the Texas energy market's participants—few more so than Just Energy.  Just six months earlier, Just Energy had completed a successful balance-sheet restructuring.  In February and March 2021, ERCOT floored Just Energy with invoices relating to the Winter Storm Uri weather event (the "**Invoices**") that its recently de-levered balance sheet could not withstand.  ERCOT's Invoices required payment of approximately $336 million relating to the week of February 13, 2021 through February 20, 2021 (the "**Invoice Obligations**").  An implied threat accompanied ERCOT's Invoices:  if Just Energy failed to satisfy them, ERCOT and the PUCT would shutter Just Energy's business in Texas by exercising regulatory, contractual, and statutory remedies to transfer Just Energy's customers in Texas to a Provider Of Last Resort ("**POLR**") for no consideration.

10.     In order to protect against a forced eviction from Texas's retail electricity market, the loss of meaningful assets to a competitor, and the devastating impact on its creditors, employees, sureties, public shareholders, and customers, Just Energy had no choice but to pay the Invoices under protest.  Those payments followed exhaustive efforts to mitigate the consequences of Defendant's actions, including submitting filings to ERCOT and the PUCT both individually and through the Texas Energy Association of Marketers; lobbying the Texas state legislature; commencing restructuring proceedings for the second time in six months, i.e., the Canadian Proceedings and Chapter 15 Cases; obtaining approval from both the Canadian Court and this Court to enter into a $125 million financing facility; and using a significant portion of the facility proceeds to pay ERCOT.[3]

11.     Just Energy paid ERCOT with a full reservation of rights as recognized by this Court that this lawsuit seeks to vindicate.[4]  Plaintiffs challenge no less than approximately $274

---

[3]     With respect to Plaintiff Hudson, ERCOT invoiced its qualified service entity (or "**QSE**") BP Energy Company ("**BP**").  BP satisfied those invoices and seeks reimbursement from Hudson pursuant to the parties Independent Electricity System Operating Scheduling Agreement.

[4]     See Order Granting Provisional Relief Pursuant To Section 1519 Of Bankruptcy Code [ECF No. 23] dated March 9, 2021 at p. 11 ("Additionally, the Court finds that any payments made to

million paid in response to the Invoices (hereinafter, the "**Transfers**") because, among other things, the Invoices are based on the PUCT Orders, which themselves are unlawful under the APA and the PURA, and otherwise are inconsistent with the ERCOT Protocols and the SFA. *Alternatively*, even if the PUCT Orders are valid, Just Energy still has valid claims because ERCOT had no basis to apply the $9,000/MWh price after 1:05 a.m. on February 18. Accordingly, Just Energy is entitled to (a) declaratory judgment that the Invoice Obligations and/or the Transfers paid in response to the Invoices are void as preferences and/or transfers at undervalue under section 36.1 of the CCAA and sections 95, 96, and 98 of the Bankruptcy and Insolvency Act (the "**BIA**"); (b) turnover under section 542(a) of the Bankruptcy Code of either the Transfers or the value of the Transfers; and (c) declaratory judgment that Plaintiffs currently are entitled to set off, counterclaim and recoup no less than the amount of the Transfers against any obligation owed to ERCOT.

## JURISDICTION AND VENUE

12.     This proceeding involves the Debtors' assets located in the United States. Section 1521(a)(4) of the Bankruptcy Code provides that the Court may entrust the Foreign Representative with the "administration and realization of all or part of the debtors' assets within the territorial jurisdiction of the United States." Section 1507(a) of the Bankruptcy Code says in part that "the court, if recognition is granted, may provide additional assistance to a Foreign Representative under this title or other laws of the United States." Section 1521(a)(7) of the Bankruptcy Code provides that the Foreign Representative may be granted "any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)." 11 U.S.C. § 1521(a)(7).

13.     The prosecution of this lawsuit also comports squarely with the objectives of chapter 15 as outlined in the Bankruptcy Code, including the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities,

---

ERCOT are made subject to all of the Debtors' rights to contest those payments, and all rights to receive a refund or credit as allowed by applicable law.").

including the debtor" and the "protection and maximization of the value of the debtor's assets." 11 U.S.C. §§ 1501(a)(3), (a)(4).

14.     Plaintiffs bring claims against ERCOT under section 542(a) of the Bankruptcy Code, 28 U.S.C. § 2201, Federal Rule of Bankruptcy Procedure 7001, section 36.1 of the CCAA, and sections 95, 96, and 98 of the BIA.  These causes of action are "core" pursuant to 28 U.S.C. § 157(b) and include, among other things, the "recognition of foreign proceedings and other matters under chapter 15 of title 11," 28 U.S.C. § 157(b)(2)(P) and "requests for other relief covered under the provisions of chapter 15."[5]  They also are "core" because they involve "matters concerning the administration of the estate," 28 U.S.C. § 157(b)(2)(A); "proceedings to determine, avoid, or recover preferences," 28 U.S.C. § 157(b)(2)(F); "proceedings to determine, avoid, or recover fraudulent conveyances," 28 U.S.C. § 157(b)(2)(H); "orders to turn over property of the estate," 28 U.S.C. § 157(b)(2)(E); and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or equity security holder relationship," 28 U.S.C. § 157(b)(2)(O).

15.     At a minimum, this Court has "related to" jurisdiction over this entire proceeding given its potential impact on the Canadian Proceedings, the Chapter 15 Cases, and Just Energy's liquidity and ability to implement a going-concern restructuring.  See In re British Am. Ins. Co. Ltd., 488 B.R. 205, 223-24 (Bankr. S.D. Fla. 2013) (observing a chapter 15 case necessarily requires a court "to substitute the chapter 15 case itself for the concept of the estate…. The court may also define the extent of related-to jurisdiction in the chapter 15 case by the potential effect of the action on the estate administered in the foreign proceeding"); SPV Osus Ltd. v. UBS AG, 882 F.3d 333, 339-40 (2d Cir. 2018) (claim is "related to" bankruptcy case "if the action's outcome might have any conceivable effect on the [foreign] estate."); In re Fairfield Sentry Ltd., 2018 WL 3756343, at *7 (Bankr. S.D.N.Y. Aug. 6, 2018) ("When the debtor is an entity involved in a foreign

---

[5]     In re British Am. Ins. Co. Ltd., 488 B.R. 205, 223 n.31 (Bankr. S.D. Fla. 2013).

insolvency proceeding, the 'estate,' for purposes of determining whether 'related to' jurisdiction exists, is the foreign estate").

16.     Pursuant to Federal Bankruptcy Rule 7008, Plaintiffs consent to the entry of final orders or judgment by the Court.

17.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

18.     Plaintiff Just Energy Texas LP is a Texas limited partnership with its headquarters in Harris County, Texas.  Plaintiff Fulcrum Retail Energy LLC is a Texas company with its headquarters in Harris County, Texas.  Plaintiff Hudson is a New Jersey company with its headquarters in Harris County, Texas.  Plaintiff Just Energy Group, Inc. is a Canadian company with its headquarters in Toronto, Canada that has been appointed the Debtors' "foreign representative" as that term is defined under 101(24) of the Bankruptcy Code by both the Canadian Court and this Court.

19.     Defendant ERCOT is a membership-based § 501(c)(4) nonprofit corporation governed by its Board of Directors and subject to the oversight of the PUCT and the Texas Legislature.  It is the independent system operator for all the transmission and generation facilities in the ERCOT market, which is located entirely within Texas.  It may be served with process at its principal place of business, 7620 Metro Center Drive, Austin, Texas 78744.

20.     Plaintiffs (along with the other Debtors) commenced the Chapter 15 Cases and the CCAA Proceedings in the Canadian Court on March 9, 2021.  On the same date, the Canadian Court appointed FTI Consulting Canada Inc. as Monitor (the "**Monitor**").  The Monitor has been advised that the Foreign Representative is bringing claims against ERCOT relating to the Invoices and Transfers and has no objection.

## FACTUAL ALLEGATIONS

I.   **BACKGROUND**

   A.   **THE COMPANY**

21.    The Company is a natural gas and electricity retailer currently operating in the United States and Canada.  Its principal line of business consists of purchasing electricity and natural gas commodities from certain large energy suppliers and re-selling them to residential and commercial customers.  The Company services more than 936,000 customers and provides employment to approximately 1,100 employees.  Texas is the Company's single largest market, representing 47% of its revenues in fiscal year 2020.

22.    Retailers like Just Energy fulfill a vital role in the ERCOT ecosystem.  Retail electricity providers purchase wholesale power from power-generating companies, trading companies, and wholesalers and re-sell that power to customers.  Retailers generally purchase most of their power in large, wholesale blocks—well in advance.  They then compete with other retailers to sell that power to consumers at a low cost, typically under fixed-price contracts.  Customers in locations within Texas where there is robust price competition benefit from the role played by retailers like the Company in the market.[6]

23.    In September 2020, Just Energy completed a balance sheet recapitalization (the "**Recapitalization**") in Canada.  The Recapitalization was the culmination of a 15-month-long strategic review process and comprehensive plan to strengthen Just Energy's business.  The Recapitalization improved the Company's overall capital structure by:  (a) reducing its debt and obligations under preferred shares by approximately CAD $780 million; (b) raising over CAD $100 million of new equity; (c) reducing annual cash interest costs by approximately CAD $45 million; and (d) extending debt maturity dates.

---

[6]      See Peter R. Hartley, Kenneth B. Medlock III & Olivera Jankovska, Electricity Reform And Retail Pricing In Texas, Center for Energy Studies (June 2017), https://www.bakerinstitute.org/media/files/files/55857030/ces-pub-txelectricity-060717_O6fiwZA.pdf.

24.     The Recapitalization was executed through a plan of arrangement under section 192 of the Canada Business Corporations Act, which was approved by the Canadian Court on September 3, 2020.  The Recapitalization also was recognized by this Court by the Honorable David R. Jones in the chapter 15 case styled <u>In re Just Energy Group Inc.</u>, Case No. 20-34442 (DRJ) (Bankr. S.D. Tex.) on September 10, 2020.  Upon the consummation of the Recapitalization, the Company had CAD $138 million of total available liquidity.

B.     THE PUCT, ERCOT, AND THE TEXAS ELECTRICITY MARKET

25.     The Texas Interconnection is one of the three main electricity grids in the United States that, for the most part, operates independently and with limited export and import capabilities.  The PUCT and ERCOT are solely responsible for managing the Texas Interconnection and wholesale electricity transactions that occur within the grid.

26.     ERCOT functions both as the technical operator for the Texas grid and a decision-making organization that creates rules for the wholesale electricity market.  ERCOT is responsible for scheduling power for more than 26 million people on a grid that connects over 46,500 miles of transmission lines and more than 680 generation units, accounting for 84,500 megawatts of installed generation capacity.

27.     Prices within the grid ordinarily are set by market forces.  ERCOT manages the flow of electricity by continually ordering generators to ramp-up or ramp-down production to constantly match the amount of power demanded by consumers and maintain overall grid stability and reliability.  ERCOT also performs financial settlements for the competitive wholesale electricity market and enforces certain credit requirements.

28.     ERCOT is subject to regulation by the PUCT, a state agency that regulates the state's electric, water, and telecommunication utilities, implements respective legislation, and offers customer assistance in resolving consumer complaints.

29.     Each of the Plaintiffs (excluding the Foreign Representative) has a "Retail Electric Provider" certificate in Texas, is registered as a "Market Participant" in the ERCOT Market, and is party to a SFA with ERCOT.  To participate in the ERCOT market, each Plaintiff must be a party to an SFA and comply with the ERCOT's Protocols.

30.     If Plaintiffs are unable to pay ERCOT's invoices when due, ERCOT can suspend their market participation in as little as two days and transfer their customers to another energy provider, i.e., a POLR.  Failure to pay timely an ERCOT invoice also would give the PUCT grounds to initiate a proceeding to amend, suspend, or revoke Plaintiffs' Retail Electric Provider certificates.

C.      WINTER STORM URI

31.     In February 2021, Winter Storm Uri brought extremely cold weather conditions to Texas.  Customer demand for electricity surged on February 13 and 14, pushing Texas's power grid to a new winter peak demand record, topping 69,000 megawatts.  This was more than 3,200 megawatts higher than the previous winter peak set in January 2018.

32.     While demand soared, supply plummeted as power plants were forced offline by the storm's impact.  As a result, demand threatened to exceed supply.  In the early hours of February 15, ERCOT declared an EEA Level 1, urging consumers to conserve power.  Within an hour, ERCOT elevated to an EEA Level 2, and only 13 minutes later, at 1:25 a.m., ERCOT elevated to an EEA Level 3.  With the grid stressed, ERCOT ordered forced outages to reduce strain.

D.      THE PUCT AND ERCOT RESPOND BY ARTIFICIALLY INFLATING PRICING

33.     The PUCT and ERCOT responded to the storm by intervening in the wholesale electricity market to impose draconian pricing on existing supply.  The PUCT Orders were issued on February 15 and February 16 and resulted in electricity prices being raised to the regulatory

maximum of $9,000/MWh, a spike of as much as 30,000% above average market prices for that time of year.[7]

34.    By regulation, ERCOT power prices were ***capped*** during the relevant period at the HCAP of $9,000/MWh, but no regulation provides that the PUCT and ERCOT may ***set*** prices at this rate if ordinary market forces would produce a lower price.  The amount is a cap—not a rate that can be set artificially.[8]  The PUCT directed ERCOT to apply the system-wide offer cap of $9,000/MWh to ***set*** prices while firm load was being shed in an EEA3 load shed event.

35.    Similarly, firm load shed was not a scarcity-pricing trigger at the time under ERCOT Protocol 6.5.3.7.1 that could be used to justify the decision to set the real-time market price at $9,000/MWh.  Notwithstanding, the PUCT Orders capriciously concluded "[i]f customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest," prompting ERCOT to improperly set the price at the HCAP of $9,000/MWh.

36.    Mandating the market pricing at these levels by order was unprecedented.  For historical comparison, ERCOT real time prices averaged just $22.00 per MWh for February 2020.[9] If any for-profit entity had increased prices on the scale of what ERCOT did during a declared state of emergency, it would be widely recognized as price gouging under the law.  In point of fact,

---

[7]    Russell Gold & Katherine Blunt, <u>Texas Grapples with Crushing Power Bills After Freeze</u>, Wall. St. J. (Feb. 23, 2021, 10:59 AM), https://www.wsj.com/articles/texas-grapples-with-crushing-power-bills-after-freeze-11614095953.  Tim McGlaughlin, <u>Texas Wholesale Electric Prices Spike More Than 10,000% Amid Outages</u>, Reuters (Feb. 15, 2021, 9:17 AM), https://www.reuters.com/article/us-electricity-texas-prices/texas-wholesale-electric-prices-spike-more-than-10000-amid-outages-idUSKBN2AF19A.

[8]    16 T.A.C. §§ 25.505(g)(B)-(C).

[9]    U.S. Energy Information Administration, May 7, 2021 ("Average Texas electricity prices were higher in February 2021 due to severe weather storm") ("Wholesale electricity prices in the Electric Reliability Council of Texas (ERCOT), Texas's primary grid operator, averaged $22 per megawatthour (MWh) in 2020") available at https://www.eia.gov/todayinenergy/detail.php?id=47876.

the Texas Attorney General sued another retailer, Griddy, for price gouging because Griddy passed through the $9,000/MWh price to consumers.

37.    The duration of the ERCOT-set price was equally unprecedented.  In ERCOT's history, prices had never before remained at the cap for anything close to eighty hours.  As depicted in the chart below, January 2018 was the first time in ERCOT history that prices ever even reached the $9,000/MWh cap—for a total of only ten minutes.[10]  In 2019, prices hit the cap, but only for a little more than two hours.[11]

38.    Historically, prices only ever hit the cap for a fraction of the more than eighty hours that the $9,000/MWh price was in place.  As reflected in the chart below, in 2012, 2013, and 2014 (when the cap ranged from $3,000/MWh at the beginning of 2012 to $7,000/MWh at the end of 2014), prices were at the cap for less than two hours each year.[12]



---

[10]    Potomac Economics, Ltd., 2018 State of the Market Report for the ERCOT Electricity Markets 23 (June 2019), https://www.potomaceconomics.com/wp-content/uploads/2019/06/2018-State-of-the-Market-Report.pdf.

[11]    Potomac Economics, Ltd., 2019 State of the Market Report for the ERCOT Electricity Markets 18 (May 2020), https://www.potomaceconomics.com/wp-content/uploads/2020/06/2019-State-of-the-Market-Report.pdf.

[12]    Potomac Economics, Ltd., 2014 State of the Market Report for the ERCOT Wholesale Electricity Markets 16 (July 2015), https://www.potomaceconomics.com/wp-content/uploads/2017/01/2014-ERCOT-State-of-the-Market-Report.pdf.

39.     Although the February 2021 winter storm has prompted comparisons to another winter storm that hit Texas ten years ago, in February 2011, the events of 2021 were different.  The chart above illustrates that eighty hours were spent at the cap in February 2021 versus 28.44 hours in 2011.[13]  And, the cap was only $3,000/MWh at the time, a third of 2021.  Critically, the 2011 prices were determined by the actual scarcity conditions in the market, rather than under orders issued by regulators, and as illustrated below, load shed lasted less than 8 hours—versus nearly 80 hours in 2021.



E.     **FEBRUARY 18:  LOAD SHEDDING STOPS, BUT $9,000/MWH PRICE CONTINUES**

40.     Temperatures warmed on February 17.  With that development, ERCOT was able to stop shedding load just after midnight on February 18—a fact about which market participants were notified.  No load shed directive under ERCOT Protocol 6.5.8.4.2(3) was in place after 1:05 a.m. on February 18.  After lifting load shed instructions, the ERCOT grid had ample resources online, and there was no justification for continuing to impose an artificial price of $9,000/MWh through administrative adjustments to the Real Time-Reliability Deployment Price Adder.[14]

---

[13]     ERCOT News Release November 20, 2021 ("Winter power plant assessment under way, CREZ development on track for 2013 completion) available at http://www.ercot.com/news/releases/show/26348.

[14]     ERCOT Market Notice M-C021521-03 Legal (Feb. 17, 2021) ("Once ERCOT is no longer instructing firm Load shed, the adjustment will be set to 0, as it would be in the previous implementation."), http://www.ercot.com/services/comm/mkt_notices/archives/5224.

41.     Despite a sufficient level of reserves, ERCOT failed to simultaneously return to the pricing mechanisms prescribed by the PUCT's Orders and the ERCOT Protocols.  Instead, it left the $9,000/MWh scarcity price in place for an additional 32 hours.[15]  When ERCOT finally allowed normal supply and demand forces to set the price of power on February 19, the trading price plummeted within one hour from $9,000/MWh to $27/MWh, later falling to less than $5/MWh.[16]

42.     On February 21, the PUCT issued an "Order Directing ERCOT to Take Action and Granting Exception to ERCOT Protocols" (the "**February 21 Order**").  The February 21 Order, among other things, authorized ERCOT to "[d]eviate from protocol deadlines and timing related to settlements, collateral obligations, and invoice payments."  That same day, ERCOT issued a notice stating:  "ERCOT is temporarily deviating from Protocol deadlines and timing related to settlements, collateral obligations, and invoice payments while prices are under review."[17]  But, the next day, without explanation, ERCOT issued a second notice saying "ERCOT has ended its temporary deviation from protocol deadlines and timing related to settlements, collateral obligations, and invoice payments.  Invoices and settlement will be executed in accordance with Protocol language."[18]

---

[15]     Posting of ERCOT, to Legal Notifications (Feb. 16, 2021, 6:04 PM), http://www.ercot. com/services/comm/mkt_notices/archives/5221; Posting of ERCOT, to Legal Notifications; Operations (Feb. 19, 2021, 9:27 AM), http://www.ercot.com/services/comm/mkt_notices/ archives/5228; Letter from Carrie Bivens, Vice President, ERCOT Indep. Mkt. Monitor Dir., Potomac Econs., Ltd. to Chairman Arthur C. D'Andrea & Commissioner Shelly Botkin, Pub. Util. Comm'n of Texas, at 1 (Mar. 4, 2021) [hereinafter IMM Letter], https://interchange.puc. texas.gov/Documents/51812_61_1114183.PDF.

[16]     Mark Watson, ERCOT Prices Plunge, but 34 GW Remain Offline, 166,000 Are Still Without Power, S&P Glob. (Feb. 19, 2021, 10:46 PM), https://www.spglobal.com/platts/en/market-insights/latest-news/electric-power/021921-ercot-prices-plunge-but-34-gw-remain-offline-166000-are-still-without-power.

[17]     ERCOT Market Notice M-A022221-01 (Feb. 22, 2021).

[18]     ERCOT Notice M-A022221-02 (Feb. 23, 2021).

### F.    ERCOT INCORRECTLY CALCULATED ANCILLARY CHARGES

43.    Just Energy has hedges in place to cover its ancillary services costs based on its normal share of electricity load in ERCOT.  But during the weather event, Just Energy's load share disproportionately increased.  The load share increase, combined with the much higher charges for ancillary services, resulted in significant additional costs.  On operating days February 15 to 20, ancillary services prices consistently exceeded the HCAP, at times approaching $25,000/MWh.  That hourly rate was a dramatic departure from ERCOT's historical prices for ancillary services.

44.    These excessive prices for ancillary services violated both ERCOT's preexisting rules and the PUCT Orders.  Nothing in the PUCT Orders suggests that the system-wide offer cap applies only to energy prices.  As noted by the IMM's March 1 recommendation, given that ancillary services reserves are procured to reduce the probability of losing load, the value of such reserves should not exceed the value of lost load ("**VOLL**"), which was $9,000 for the February 15 to February 20 operating days due to the PUCT's Orders.  Indeed, in its March 1 letter to the PUCT the IMM confirmed that the manner in which the ancillary service charges were calculated and assessed does not conform to past practice and noted that capping ancillary services prices at the system-wide offer cap would be more consistent with economic market design principles.[19]

### G.    THE PUCT AND ERCOT ELEVATE SUPPLY SCARCITY INTO MARKET FAILURE

45.    The $9,000/MWh price triggered an energy market failure that massively harmed market participants with little or no offsetting benefits for consumers or the reliability of the grid.  The artificial price did not result in additional power production.  Generators were still burdened by frozen equipment and other weather-related issues, making substantial generation impossible, irrespective of price.

46.    On March 5, the IMM concluded, after investigation, that the $9,000/MWh price was improperly maintained for a full 32 hours after the load-shed events ended, resulting in billions

---

[19]    Comments From IMM, PUC Project No. 51812 (Mar. 1, 2021).

in overcharges on February 18 and 19 alone.  These overcharges exceed the total cost of power traded in real-time for the entire year in 2020.[20]  The IMM recommended that the billions in overcharges for February 18 and 19 be reversed.[21]  Lieutenant Governor Dan Patrick has publicly called for the PUCT to follow the IMM's recommendation and correct the unlawfully set prices.[22]

47.     On June 2, 2021, Vistra Corp. filed with the PUCT in connection with Project No. 51812 a study it commissioned from London Economics International LLC ("**LEI**").  LEI examined what real time energy prices would have been in the absence of the PUCT Orders and ERCOT's execution of those Orders.  LEI found that between 22:15 on February 15th and 9:00 on February 19th, energy prices would have averaged $2,404/MWh if not for the PUCT Orders— significantly lower than the $9,000/MWh HCAP price.

48.     The PUCT's and ERCOT's failed response also has spawned significant litigation. More than 150 individual lawsuits against ERCOT and other parties (as of June 10, 2021) were transferred to an MDL pretrial court.[23]  At least one court has found ERCOT's "massive errors" caused debts for "failed market participants" and rejected ERCOT's claims of sovereign

---

[20]  Naureen S. Malik, Texas Watchdog Says Grid Operator Made $16 Billion Error, Bloomberg (Mar. 4, 2021, 1:07 PM), https://www.bloomberg.com/news/articles/2021-03-04/texas-watchdog-says-power-grid-operator-made-16-billion-error.

[21]  IMM March 4, 2021 Letter at 2 ("ERCOT recalled the last of the firm load shed instructions at 23:55 on February 17, 2021. Therefore, in order to comply with the Commission Order, the pricing intervention that raised prices to VOLL should have ended immediately at that time. However, ERCOT continued to hold prices at VOLL by inflating the Real-Time On-Line Reliability Deployment Price Adder for an additional 32 hours through the morning of February 19."). See also IMM Letter dated March 11, 2021 (following up on March 4 letter).

[22]  Russell Gold, Texas Lt. Governor Calls for Reversal of $16 Billion Blackout Overcharges, Wall St. J. (Mar. 8, 2021, 7:07 PM), https://www.wsj.com/articles/texas-lt-governor-calls-for-reversal-of-16-billion-blackout-overcharges-11615240985?mod=searchresults_pos2&page =1.

[23]  See Order of Multidistrict Litigation Panel, In re Winter Storm Uri Litig., No. 21-0313 (Tex. June 10, 2021), https://search.txcourts.gov/SearchMedia.aspx?MediaVersionID=e0e2a6dc-b8fa-4e74-8f56-4fefd281e972&coa=cossup&DT=DISPOSITION&MediaID=d3384293-5fb5-4d66-9803-bc4081572d8f.

immunity.[24]  There also have been several major bankruptcy filings in the wake of the storm, including the state's largest and oldest cooperative, Brazos River Electric, which filed for chapter 11 protection after receiving $1.9 billion of invoices—which it now is challenging in litigation against ERCOT[25]—as well as retailers Entrust Energy, Inc. (chapter 11), Griddy Energy (chapter 11), Liberty Power Holdings (chapter 11), and Brilliant Energy LLC (chapter 7).

    **H.**    **LEGISLATIVE RESPONSE AND UPLIFT BALANCE FINANCING SETTLEMENT**

    49.    Several significant pieces of legislation have been passed aimed at regulatory reform and redress that underscore the extent of the shortcomings in the PUCT's and ERCOT's response to the storm.  On June 8, 2021, Texas Governor Greg Abbott signed Senate Bill 2 and Senate Bill 3 into law which provide for changes to the governance of the PUCT and ERCOT and "relat[e] to preparing for, preventing, and responding to weather emergencies and power outages."[26]  Other bills have been signed into law to expand the membership of and change the eligibility requirements for the PUCT[27]; require an independent annual audit of ERCOT with published results[28]; allow for the use of electric energy storage facilities by transmission and

---

[24]   See <u>CPS Energy v. Elec. Reliability Council of Texas</u>, Cause No. 2021CI04574 (288th District Court) (Temporary Restraining Order dated April 28, 2021); decision dated May 26, 2021.

[25]   See <u>Brazos Elec. Power Cooperative, Inc., et al. v. Electric Reliability Council Of Texas, Inc.</u>, Adv. Proc. No. 21-03863 (DRJ) (Bankr. S.D. Tex.), ECF No. 173 (Debtors' First Amended Complaint Objecting To Electric Reliability Council Of Texas, Inc.'s Proof Of Claim And Other Relief).

[26]   S. 2, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/SB 00002F.pdf#navpanes=0; S. 3, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/ tlodocs/87R/billtext/pdf/SB00003F.pdf#navpanes=0; <u>see, e.g.</u>, Tex. Util. Code § 39.1513; Tex. Gov't Code § 411.301.

[27]   S. 2154, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/ SB02154F.pdf#navpanes=0; <u>see, e.g.</u>, Tex. Util. Code § 12.051(a) (changing composition of the PUCT from three commissioners to five).

[28]   H.R. 2586, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/ pdf/HB02586F.pdf#navpanes=0.

distribution utilities[29]; provide securitization financing for gas utilities[30]; and provide additional means for facilities to restore power during widespread outages.[31]  On June 16, 2021, Governor Abbot signed House Bill 4492 (the "**Securitization Bill**") which may provide for up to $2.1 billion of financing for certain uplift charges in excess of $9,000/MWh.[32]  On June 18, 2021, Governor Abbott signed Senate Bill 1580 which "enable[s] electric cooperatives to use securitization financing to recover extraordinary costs and expenses incurred" due to Winter Storm Uri.[33]

50.     Certain load service entities ("**LSEs**") recently reached a settlement with the PUCT and ERCOT relating to financing for the $2.1 billion designated by the Securitization Bill for uplift charges.  On July 16, 2021, ERCOT filed an application with the PUCT for "approval of a Debt Obligation Order authorizing the financing of up to $2.1 billion for the Uplift Balance, plus reasonable costs."[34]  On September 20, 2021, certain LSEs, including Just Energy, reached agreement with the PUCT and ERCOT on both an opt-out process for LSEs, e.g., certain municipalities, and on a methodology (attached as Schedule C to the Settlement Stipulation) to allocate financing proceeds on a load-ratio share basis among participating LSEs.  On October 13, 2021, the PUCT adopted a final debt obligation order approving the ERCOT Securitization Application.  **Note**, to the extent Plaintiffs ultimately receive funds under the Securitization Bill

---

29   S. 415, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/SB00415F.pdf#navpanes=0.

30   H.R. 1520, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/HB01520F.pdf#navpanes=0; see Tex. Gov't Code § 1232.1072.

31   H.R. 2483, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/HB02483F.pdf#navpanes=0.

32   H.R. 4492, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/HB04492F.pdf#navpanes=0; see also Tex. Util. Code § 39.651; Tex. Util. Code § 39.652(4).

33   S. 1580, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/SB01580F.pdf#navpanes=0; see also Tex. Util. Code § 41.151(a).

34   Unopposed Partial Stipulation And Settlement Agreement dated September 20, 2021, Item 293 (the "**Settlement Stipulation**"), at 1 filed before PUCT  in connection with Application Of ERCOT For A Debt Obligation Order To Finance Uplift Balances Under PURA Chapter 39, Subchapter N, For An Order Initiating A Parallel Docket, And For Good Cause Exception, Docket No. 52322 (the "**ERCOT Securitization Application**").

from the $2.1 billion securitization facility that duplicate amounts requested in this lawsuit, they will take the necessary steps to avoid a double recovery, e.g., amending this complaint.

## I.      ERCOT INVOICES BURY JUST ENERGY

51.     Just Energy's most valuable assets are its customers.  Under Texas law, if a Retail Electricity Provider fails to make payments when due, ERCOT can revoke the provider's right to conduct activities in the ERCOT market and transfer their customers to a POLR (often at a higher rate for customers).  See 16 Tex. Admin. Code § 25.43; ERCOT Market Guide § 7.11.1.a.  Once that happens, the customers are lost.

52.     On March 3, 2021, Just Energy filed a Petition for Emergency Relief with the PUCT (the "**Petition**").[35]  In the Petition, Just Energy requested that the PUCT direct ERCOT to deviate from the deadlines and timing in its Protocols and Market Guides (as defined therein) related to settlements, collateral obligations, and invoice payments and to suspend the execution or issuance of invoices or settlements for intervals during the dates of February 13 through February 20, until issues raised by executive and legislative branches of Texas are resolved. Alternatively, Just Energy requested that the PUCT waive certain ERCOT Protocols to allow Just Energy to delay payment while exercising its rights under the ERCOT Protocols to dispute the invoiced payment amounts.

53.     For the period between February 13 and February 20, Just Energy has received Invoices from ERCOT demanding payment of approximately $336 million.  Just Energy disputes no less than $274 million of the invoiced amounts.

54.     Lacking sufficient liquidity to satisfy the grossly overstated Invoices, the Debtors commenced the Canadian Proceedings under the CCAA in the Canadian Court on March 9, 2021. That same day, the Canadian Court approved a $125 million financing facility and authorized the

---

[35]   Just Energy's petition is attached to the Recognition Order as Exhibit A.

payment of the disputed Invoices to ERCOT.  The Debtors also filed the Chapter 15 Cases in this Court.  ERCOT had actual notice of, and formally appeared in the Debtors' bankruptcy cases.[36]

55.     On March 9, the Court entered an order granting the Debtors' provisional relief that makes clear "any payments made to ERCOT are made subject to [Just Energy's] rights to contest those payments, and all rights to receive a refund or credit as allowed by applicable law."  The order also states "[a]lthough the Court recognizes the authority to make payments to ERCOT as granted by the Canadian Order, this Court neither adds nor subtracts from any such authorization." The Court entered an order of recognition on April 2, 2021, incorporating the same reservations set forth above.

56.     In total, the Transfers consist of payments made by Just Energy (and in the case of Hudson, BP) to ERCOT of no less than approximately $274 million relating to both the imposition of a system-wide offer cap of $9,000/MWh and ancillary charges in response to the Invoices Plaintiffs received relating to the week of February 13 through February 20.

## II.    LEGALITY OF THE PUCT'S AND ERCOT'S ACTIONS

57.     The PUCT Orders are not consistent with, and find no support under the ERCOT Protocols or the SFA, which incorporates the ERCOT Protocols by reference.  They also are unlawful under, inter alia, (a) Texas' APA, Tex. Gov't Code §§ 2001.024, 2001.029, 2001.033, 2001.035, 2001.038, 2001.171, 2001.174, and 2001.176 and (b) PURA, Tex. Util. Code §§ 15.001, 39.001(c), 39.001(d), 39.151(d).

### A.    ERCOT PROTOCOLS AND THE SFA

58.     The ERCOT Protocols are incorporated by reference into the SFA.  The $9,000/MWh price finds no support in the ERCOT Protocols or the SFA.  Had the PUCT and

---

[36]   See, e.g., Notice Of Appearance And Request For Service Of All Notices, Pleadings, Orders And Other Papers [ECF No. 30] dated March 9, 2021 at 1 (filed by the law firm of Munsch Hardt Kopf & Harr, P.C. "on behalf of [ERCOT], a creditor and party-in-interest").

ERCOT followed the ERCOT Protocols, a different and lower energy price would have been in effect.

59.     ERCOT Protocols in effect at the time of Winter Strom Uri did not consider firm load shed a valid consideration with respect to scarcity pricing.  ERCOT Protocol 6.5.7.3.1 (Determination Of Real-Time On-Line Reliability Deployment Price Adder) lists factors relevant to determining whether ERCOT's scarcity pricing mechanism is triggered and whether prices should be increased toward the HCAP of $9,000/MWh.  The version of ERCOT Protocol 6.5.7.3.1 in effect during Winter Storm Uri did ***not*** list firm load shed as a consideration for invoking scarcity pricing.  Notwithstanding ERCOT Protocol 6.5.3.7.1, the PUCT and ERCOT deemed firm load shed to be a scarcity-pricing trigger and increased the price to $9,000/MWh on that basis.

### B.     PUCT ORDERS ARE "RULES" UNDER TEXAS' APA

60.     The APA defines "rule" to mean: "(A) a state agency statement of general applicability that: (i) implements, interprets, or prescribes law or policy; or (ii) describes the procedure or practice requirements of a state agency; (B) includes the amendment or repeal of a prior rule; and (C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures."  Tex. Gov't Code § 2001.003(6).  The PUCT is a "state agency" for the purposes of the APA.  See Tex. Gov't Code § 2001.003(7) (definition includes state commissions).  The PUCT Orders purport to speak for the PUCT and utilize its authority.  The PUCT Orders are more than a restatement of a formally promulgated rule.  They are a new directive to ERCOT, and they effectively amend the ERCOT scarcity pricing mechanism, promulgated at Tex. Admin. Code § 25.505(g) by forcing ERCOT to apply the system-wide offer ***cap*** of $9,000 per MWh to ***set*** prices in a load-shed situation.  An agency's interpretation or application of existing promulgated rules themselves constitute "rules" under the APA when they have the effect of amending the existing rules or creating new rules.

### C.   PUCT ORDERS ARE GENERALLY APPLICABLE STATEMENTS

61.     The PUCT Orders are generally applicable statements that implemented, interpreted, or prescribed law or policy, i.e., new scarcity pricing considerations for ERCOT.  See Tex. Gov't Code § 2001.003(6)(A)(i).  General applicability for the purposes of Tex. Gov't Code § 2001.003(6)(A) refers to "statements that affect the interest of the public at large such that they cannot be given the effect of law without public input."[37]  The PUCT Orders affected the interests of the public in practice, e.g., electricity prices available to market participants and, by extension, many electricity consumers.

62.     An agency statement "implements, interprets, or prescribes law or policy" when it reflects "[the agency's] construction and application" of existing regulations and "implements a broader policy judgment" by the agency.[38]  The PUCT has authority to overrule ERCOT's determination of market clearing prices.  See 16 Tex. Admin. Code § 25.501(a).  The PUCT Orders are a specific construction and application of that authority to address scarcity issues surrounding Winter Storm Uri that implemented its broader policy judgment that "adjustments are needed to ERCOT prices to ensure they accurately reflect the scarcity conditions in the market."

### D.   PUCT ORDERS INCLUDE AMENDMENT OF PRIOR RULE

63.     The PUCT Orders "amen[d] or repea[l] a prior rule."  Tex. Gov't Code § 2001.003(6)(A).  An agency's interpretation or application of existing promulgated rules themselves constitute "rules" under the APA when they have "the effect of amending the existing rules, or of creating new rules, and the other requirements of the APA's 'rule' definition are met."  Here, the PUCT Orders are "more than a restatement of a formally promulgated rule."  They are a distinct prescription to ERCOT and effectively amend the ERCOT scarcity pricing

---

[37]     El Paso Hosp. Dist. v. Tex. Health & Hum. Servs. Comm'n, 247 S.W.3d 709, 714 (Tex. 2008).

[38]     Teladoc, Inc. v. Med. Bd., 453 S.W.3d 606, 614 (Tex. App—Austin 2014).

mechanism, promulgated at Tex. Admin. Code § 25.505(g), by forcing ERCOT to consider load shed in its scarcity pricing determination and set energy prices at $9,000/MWh.[39]

64.     It is immaterial whether the PUCT issued the PUCT Orders in an emergency or intended to temporarily override ERCOT's scarcity pricing mechanism.  There is no requirement that rules under the APA permanently amend or repeal a prior rule.  On the contrary, the Court of Appeals has previously recognized ad hoc agency actions based on novel and exigent circumstances as "rules" for APA purposes.

### E.     PUCT ORDERS AFFECT PRIVATE RIGHTS

65.     The PUCT Orders do not include a statement regarding only the internal management or organization of the PUCT and instead directly affected private rights of ERCOT market participants and, by extension, electric consumers, _e.g._, rates at which electricity was available.  Notably, the PUCT Orders were not issued as part of a contested matter before the PUCT.  Nor were they an adjudication of the rights of particular parties.  Rather, ERCOT market participants had a right to purchase electricity at rates determined under the scarcity pricing mechanism set out in the PUCT's rules at Tex. Admin. Code § 25.505(g).  By substantially altering that mechanism, the PUCT impacted private rights.

### F.     $9,000/MWH PRICE VIOLATED THE APA

66.     The APA requires that agency orders adopting rules contain "reasoned justification" for the agency's decision on each rulemaking issue.  Tex. Gov't Code § 2001.033(1).  That justification must include "a summary of the factual basis of the rule as adopted which demonstrates a rational connection between the factual basis for the rule and the rule as adopted."  Id. § 2001.033(1)(B).  Lack of substantial compliance with the reasoned justification requirement renders a rule "voidable" under Tex. Gov't Code § 2001.035(a).  If the Court in its discretion finds

---

[39]     See Teladoc, 453 S.W.3d at 616; Tex. Dept. of Transp. v. Sunset Transp., Inc., 357 S.W.3d 691, 703 (Tex. App.—Austin 2011, no pet.).

"good cause" to do so, it may "invalidate the rule or a portion of the rule, effective as of the date of the court's order." Id. § 20010.40.

67. The PUCT Orders are legally invalid because they interfere with or impair, or threaten to interfere with or impair, a legal right or privilege belonging to Plaintiffs. Tex. Gov't Code § 2001.038(a).

68. The PUCT violated the APA, including, without limitation, sections 2001.023, 2001.024, 2001.029, 2001.033, and 2001.035, and 16 Tex. Admin. Code § 25.362(c) by, among other things, failing to provide proper notice of its intent to adopt the PUCT Orders; disclose information required by the APA, e.g., an explanation of the order, rule, or proposed text; afford interested parties an opportunity to comment; articulate a reasoned justification or satisfactory evidentiary basis for its decision; or furnish information required in connection with emergency rulemaking.

69. The PUCT Orders violate the APA because they lack any reasoned justification. The one reason given by the PUCT was its belief that prices being at less than the HCAP was "inconsistent with fundamental market design" because "[i]f customer load is being shed, scarcity is at its maximum, and the market price to serve that load should also be at its highest." The PUCT provided no evidence to support its assertion that market's scarcity pricing signals were not working as intended, such as evidence that generators were not deploying because prices were too low, or that consumers were not curtailing use in response to the already objectively high prices of more than $1,200/MWh that were in effect on February 15, 2021 at the time of the PUCT Orders.

### G.    $9,000/MWh PRICE VIOLATED PURA

70. The PURA prohibits the PUCT from making rules "regulating competitive electric services, prices, or competitors or restricting or conditioning competition except as authorized by this title …," PURA § 39.001(c), and requires that the PUCT's rules "authorize or order

25

competitive rather than regulatory methods … to the greatest extent feasible" and to be "practical and limited so as to impose the least impact on competition."  PURA § 39.001(d).

71.     The PUCT violated its substantive authority under the PURA and any substantive authority and procedural limitations of the Governor's Disaster Declaration in issuing the PUCT Orders.  It acted both outside of its authority and contrary to legally-required procedures.  The PUCT Orders violated the PURA, including sections 39.001(c) and 39.001(d), because they lacked any reasoned justification and displaced the forces of market competition.

72.     The PUCT Orders also violated the PURA because they set prices by regulatory fiat instead of market forces and without regard to actual scarcity conditions in the market.  The PUCT Orders directly contradict the PURA's mandate that prices should be a function of competition and not regulatory action.  Once ERCOT set pricing at $9,000/MWh, Just Energy had no feasible option but to buy electricity at prices that were unlawful, unjustifiable, and unrelated to ordinary market forces.  And, ERCOT's Invoices include amounts for ancillary services that are either erroneously calculated or unreasonably applied in violation of ERCOT protocols.

## H.     ALTERNATIVELY, PUCT ORDERS EXPIRED ON FEBRUARY 18

73.     Even if the PUCT Orders were a valid exercise of the PUCT's authority, they expired by their own terms as soon as firm load was no longer being shed.  The imposition of the $9,000/MWh cap after 1:05 a.m. on February 18, 2021 was illegal because it did not properly implement the PUCT Orders.

74.     The factual justification for the PUCT Orders was that: "*[i]f customer load is being shed*, scarcity is at its maximum, and the market price for the energy need to serve that load should also be at its highest."  There is no rational connection between that factual justification and a rule that would direct ERCOT to continue scarcity pricing *in the absence of the load being shed*.  And, indeed, the plain language of the PUCT Orders commanded ERCOT only to ensure "*that firm load that is being shed* … is accounted for in ERCOT's scarcity pricing signals" (emphasis added).

75.     Absent load shed, ERCOT had no authority to set the price at $9,000/MWh after 1:05 a.m. on February 18—even assuming the PUCT Orders were valid.

76.     ERCOT continued imposing $9,000/MWh prices even after load shed ended. ERCOT ceased firm load shed at 11:55 p.m. on February 17, 2021, but refused to take any action to review or change the prices and instead continued imposing $9,000/MWh prices until 9 a.m. on Friday, February 19.  From and after 1:05 a.m. on February 18, continued imposition of the $9,000/MWh price was improper.

## III.    ERCOT IS NOT PROTECTED BY SOVEREIGN IMMUNITY

77.     ERCOT cannot sustain a sovereign-immunity defense because it is a private, membership-based corporation (certified and regulated by the PUCT) and not a governmental regulator.  In point of fact, ERCOT argued in 2014 that it was not a "governmental unit" and that the statutory scheme governing its oversight does not suggest any legislative intention to make ERCOT part of the government.[40]  ERCOT has since taken a contrary position in another case.[41]

78.     ERCOT is not a "state actor" when, among other things, (a) ERCOT does not receive funding directly from the State; (b) the Texas Legislature designated ERCOT as an "independent organization," see Tex. Util. Code § 39.151(a)-(c); and (c) the PURA implicitly recognizes ERCOT is not an arm of the state because it imposes certain open meeting requirements on ERCOT that would be redundant of obligations imposed by the Texas Open Meetings Act, see Tex. Util. Code. § 39.1511 Tex. Gov't Code §§ 551.001- .146.

79.     Even if ERCOT is a government entity, any sovereign immunity has been waived pursuant to the Constitution's Bankruptcy Clause.  See, e.g., Central Virginia Community College v. Katz, 546 U.S. 356, 371-72, 378 (2006) ("Insofar as orders ancillary to the bankruptcy court's

---

[40]     See ERCOT Brief, HWY 3 MHP, LLC v. Elec. Reliability Council of Tex., Inc., No. 03-14-00303-CV at 24 (July 30, 2014).

[41]     Electric Reliability Council of Texas Inc. v. Panda Power Generation Infrastructure Fund LLC, No. 18-0781, 18-0792 (Tex. 2021).

in rem jurisdiction, like orders directing turnover of preferential transfers, implicate State's sovereign immunity from suit, the States agreed in the plan of Convention not to assert that immunity …. In ratifying the Bankruptcy Clause, the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the in rem jurisdiction of the bankruptcy courts"); 11 U.S.C. § 106(c) ("Notwithstanding any assertion of sovereign immunity by a governmental unit, there shall be offset against a claim or interest of a governmental unit any claim against such governmental unit that is property of the estate").

80.    ERCOT also has participated fully in the Chapter 15 Cases and, to that end, has submitted itself to the Court's jurisdiction.  See ECF No. 30 (ERCOT Notice of Appearance); Dep't of Army v. Fed. Lab. Rels. Auth., 56 F.3d 273, 275 (D.C. Cir. 1995) ("[T]he sovereign immunity of a State is waived by appearance in a federal court ....") (citing Clark v. Barnard, 108 U.S. 436, 447 (1883)); Securities Inv. Protection Ass'n v. Madoff, 460 B.R. 106, 119 (Bankr. S.D.N.Y 2011) ("[T]here are also participatory factors indicating Defendants consent to personal jurisdiction in this adversary proceeding.   In Deak & Co., Inc., 63 B.R. 422, 431 (Bankr.S.D.N.Y.1986), this Court found that the defendants effectively consented to personal jurisdiction by purposefully availing themselves of the protections afforded by United States bankruptcy law …. [and participating in] the bankruptcy case by filing a notice of appearance and attending court hearings through their New York counsel"); In re Paques, 277 B.R. 615, 636 (Bankr. E.D. Pa. 2000) (noting creditors' attorney entered appearance and Deak "suggest this entry of appearance may be sufficient to justify the assertion of personal jurisdiction").

## CAUSES OF ACTION

### COUNT 1
### (28 U.S.C. §§ 2201:  Declaration Of Preference Under CCAA (§ 36.1),
### BIA (§ 95)—Invoice Obligations)

81.      Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

82.      On March 9, 2021, Plaintiffs filed for protection under the CCAA.  Just Energy incurred the Invoice Obligations prepetition.  They relate to alleged amounts owing to ERCOT in connection with the Winter Storm Uri weather event during the week of February 13, 2021 through February 20, 2021.

83.      The provisions involving the preferential and reviewable transactions under the BIA have been incorporated into the CCAA.  Section 36.1(1) of the CCAA provides that "sections … 95 to 101 of the [BIA] apply, with any modifications that the circumstances require, in respect of a compromise or arrangement unless the compromise or arrangement provides otherwise."

84.      The Foreign Representative can bring avoidance claims under Canadian law in the Chapter 15 Cases.  See In re Condor Ins. Ltd., 601 F.3d 319, 329 (5th Cir. 2010) ("As Chapter 15 was intended to facilitate cooperation between U.S. courts and foreign bankruptcy proceedings, we read section 1521(a)(7) in that light and hold that a court has authority to permit relief under foreign avoidance law under that section.").

85.      Section 95(1) of the BIA provides that "[a] transfer of property made, a provision of services made, a charge on property made, a payment made, *an obligation incurred* or a judicial proceeding taken or suffered by an insolvent person (a) in favour of a creditor who is dealing at arm's length with the insolvent person, or a person in trust for that creditor, with a view to giving that creditor a preference over another creditor *is void* as against … the trustee if it is made, *incurred*, taken or suffered, as the case may be, during the period beginning on the day that is three

months before the date of the initial bankruptcy event and ending on the date of the bankruptcy ...."
(emphasis added).

86.     Under section 95(2) of the BIA, "[i]f the transfer, charge, payment, *obligation* or
judicial proceeding referred to in paragraph (1)(a) has the effect of giving the creditor a preference,
it is, in the absence of evidence to the contrary, presumed to have been made, *incurred*, taken or
suffered with a view to giving the creditor the preference — even if it was made, *incurred*, taken
or suffered, as the case may be, under pressure — and evidence of pressure is not admissible to
support the transaction."  (emphasis added).

87.     The Invoice Obligations were incurred in the days leading up to the filing of
Plaintiffs' Canadian Proceedings and Chapter 11 Cases with a view toward—and/or with the effect
of—preferring ERCOT over Plaintiffs' other creditors.  Plaintiffs were insolvent on the dates that
the Invoice Obligations were incurred, or became insolvent as a result of the Invoice Obligations.

88.     There is a justiciable controversy because ERCOT disputes that the Invoice
Obligations are void.

89.     Accordingly, an Order declaring that the Invoice Obligations are void in their full
amount (approximately $336 million) and that the Transfers made on account of those void
obligations should be returned is warranted.

**COUNT 2**
**(28 U.S.C. §§ 2201:  Declaration Of Preference Under CCAA (§ 36.1),**
**BIA (§ 95)—Prepetition Transfers)**

90.     Plaintiffs repeat and reallege the foregoing allegations as though they were fully set
forth in this paragraph.

91.     On March 9, 2021, Plaintiffs filed for protection under the CCAA.  Just Energy
(and in the case of Hudson, BP) made certain of the Transfers prepetition in response to the
Invoices.

92.     The provisions involving the preferential and reviewable transactions under the BIA have been incorporated into the CCAA.  Section 36.1(1) of the CCAA provides that "sections … 95 to 101 of the [BIA] apply, with any modifications that the circumstances require, in respect of a compromise or arrangement unless the compromise or arrangement provides otherwise."

93.     The Foreign Representative can bring avoidance claims under Canadian law in the Chapter 15 Cases.  See In re Condor Ins. Ltd., 601 F.3d 319, 329 (5th Cir. 2010) ("As Chapter 15 was intended to facilitate cooperation between U.S. courts and foreign bankruptcy proceedings, we read section 1521(a)(7) in that light and hold that a court has authority to permit relief under foreign avoidance law under that section.").

94.     Section 95(1) of the BIA provides that "*[a] transfer of property made*, a provision of services made, a charge on property made, *a payment made*, an obligation incurred or a judicial proceeding taken or suffered by an insolvent person (a) in favour of a creditor who is dealing at arm's length with the insolvent person, or a person in trust for that creditor, with a view to giving that creditor a preference over another creditor *is void* as against … the trustee if it is *made*, incurred, taken or suffered, as the case may be, during the period beginning on the day that is three months before the date of the initial bankruptcy event and ending on the date of the bankruptcy …" (emphasis added).

95.     Under section 95(2) of the BIA, "[i]f the *transfer*, charge, payment, obligation or judicial proceeding referred to in paragraph (1)(a) has the effect of giving the creditor a preference, it is, in the absence of evidence to the contrary, presumed to have been *made*, incurred, taken or suffered with a view to giving the creditor the preference — even if it was *made*, incurred, taken or suffered, as the case may be, under pressure — and evidence of pressure is not admissible to support the transaction." (emphasis added).

31

96. The prepetition Transfers were made in the days leading up to Plaintiffs' Canadian Proceedings and Chapter 11 Cases with a view toward—and/or with the effect of—preferring ERCOT over Plaintiffs' other creditors. Plaintiffs were insolvent on the date that the prepetition Transfers were made, or became insolvent as a result of the pre-petition Transfers.

97. There is a justiciable controversy because ERCOT disputes that the pre-petition Transfers are void or should be returned.

98. Accordingly, an Order declaring the prepetition Transfers are void and should be returned in the amount of no less than approximately $81 million is warranted.

**COUNT 3**
**(Declaration 28 U.S.C. § 2201:  Transfer At Undervalue Under CCAA (§ 36.1),**
**BIA (§ 96)—Prepetition Transfers)**

99. Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

100. On March 9, 2021, Plaintiffs filed for protection under the CCAA. Just Energy (and in the case of Hudson, BP) made certain of the Transfers prepetition in response to the Invoices.

101. The provisions involving the preferential and reviewable transactions under the BIA have been incorporated into the CCAA. Section 36.1(1) of the CCAA provides that "sections … 95 to 101 of the [BIA] apply, with any modifications that the circumstances require, in respect of a compromise or arrangement unless the compromise or arrangement provides otherwise."

102. The Foreign Representative can bring avoidance claims under Canadian law in the Chapter 15 Cases. See In re Condor Ins. Ltd., 601 F.3d 319, 329 (5th Cir. 2010) ("As Chapter 15 was intended to facilitate cooperation between U.S. courts and foreign bankruptcy proceedings, we read section 1521(a)(7) in that light and hold that a court has authority to permit relief under foreign avoidance law under that section.").

103.     Under section 96(1) of the BIA, "a court may declare that a ***transfer at undervalue*** is void as against ... the trustee — ***or order that a party to the transfer*** or any other person who is privy to the transfer, or all of those persons, pay to the estate the difference between the value of the consideration received by the debtor and the value of the consideration given by the debtor — if (a) the party was dealing at arm's length with the debtor and (i) the transfer occurred during the period that begins on the day that is one year before the date of the initial bankruptcy event and that ends on the date of the bankruptcy, (ii) the debtor was insolvent at the time of the transfer or was rendered insolvent by it, and (iii) the debtor intended to defraud, defeat or delay a creditor." (emphasis added).

104.     Section 2 of the BIA defines the term "transfer at undervalue" as "a disposition of property or provision of services for which no consideration is received by the debtor or for which the consideration received by the debtor is conspicuously less than the fair market value of the consideration given by the debtor."

105.     In the wake of the Winter Storm Uri weather event, Just Energy staved off eviction from the Texas market by ERCOT and liquidation by commencing the Canadian Proceedings, obtaining access to DIP financing, commencing the Chapter 15 Cases ancillary to those proceedings, and using a significant portion of the DIP-Financing to pay ERCOT's Invoices.  It took those actions even though it disputed ERCOT's Invoices.  Just Energy paid the Invoices under protest, preserving the ability to revoke the Transfers.

106.     The prepetition Transfers were made in the days leading up to Plaintiffs' Canadian Proceedings and Chapter 11 Cases only to avoid losing Plaintiffs' customers and participant status in the ERCOT market.  Plaintiffs were insolvent on the dates that the prepetition Transfers were made or became insolvent as a result of the prepetition Transfers.

107.     Plaintiffs did not receive valuable or good consideration in exchange for the Transfers because the Invoices were grossly inflated and included charges for energy based on the

artificial $9,000/MWh price set by ERCOT during Winter Storm Uri and ancillary services charges that were illegally and erroneously calculated under the APA and the PURA and find no support in the ERCOT Protocols or the SFA.

108.    The prepetition Transfers were made with the intent to prefer ERCOT over other creditors and to that end hindered and delayed the collection efforts of those other creditors. C.f., In re Tronox, 503 B.R. 239, 278 (Bankr. S.D.N.Y. 2014) ("The intent to defraud is something distinct from the mere intent to delay or hinder .... The [US] Supreme Court did not take issue with the contention … that [a] debtor believed he could satisfy all creditors if given more time, nor with the fact that his scheme was widely disclosed, nor with the fact that most of his creditors went along …. [It] concluded that the defendant's conveyance of assets to a corporation was made 'to divest the debtor of his title and put it in such a form and place that levies would be averted, and thus was avoidable as an actual fraudulent conveyance.'") (citing Shapiro v. Wilgus, 287 US 348 (1932)); In re Sentinel Mgmt. Grp., Inc., 728 F.3d 660, 667-69 (7th Cir. 2013) ("Sentinel's pledge of segregated funds as collateral for loans with the Bank of New York was driven by a desire to stay in business …. [and is sufficient legally] to constitute actual intent to hinder, delay, or defraud Sentinel's FCM clients …. When Sentinel pledged the funds that were supposed to remain segregated for its FCM clients, Sentinel's primary purpose may not have been to render the funds permanently unavailable to these clients …. But Sentinel certainly should have seen this result as a natural consequence of its actions.  In our legal system, 'every person is presumed to intend the natural consequences of his act'"); In re Am. Props., Inc., 14 B.R. 637, 643 (Bankr. D. Kan. 1981) ("With a well-founded belief that extending repayment of the debt of Coleman Nebraska would help weather the storm, and with full knowledge that the transaction as proposed would be detrimental to the creditors of American, nevertheless James Coleman on behalf of the Coleman Companies intentionally entered into the transaction and transferred a mortgage from American to FNB.  There was no element of malice towards the creditors of American because James Coleman

genuinely hoped the storm would pass.  The transaction was not entered into in an attempt to harm American's creditors but the transaction was entered into intentionally to satisfy a Coleman Nebraska debt and with full knowledge harm would come to the creditors of American, hindering or delaying the ability of these creditors to receive satisfaction of debts owed to them by American."); Shapiro v. Wilgus, 287 U.S. 348, 354 (1932) ("Many an embarrassed debtor holds the genuine belief that if suits can be staved off for a season, he will weather the financial storm, and pay his debts in full … The belief, even though well founded, does not clothe him with a privilege to build up obstructions that will hold his creditors at bay").

109.    There is a justiciable controversy because ERCOT disputes that the prepetition Transfers are void or should be returned.

110.    Accordingly, an Order declaring that the prepetition Transfers are void and that they should be returned in the amount of no less than approximately $81 million is warranted.

### COUNT 4
### (Recovering Proceeds If Transferred—CCAA (§ 36.1), BIA (§ 98))

111.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

112.    The Foreign Representative can bring avoidance claims under Canadian law in the Chapter 15 Cases.  See In re Condor Ins. Ltd., 601 F.3d 319, 329 (5th Cir. 2010) ("As Chapter 15 was intended to facilitate cooperation between U.S. courts and foreign bankruptcy proceedings, we read section 1521(a)(7) in that light and hold that a court has authority to permit relief under foreign avoidance law under that section.").

113.    On March 9, 2021, Plaintiffs filed for protection under the CCAA.  The provisions involving the preferential and reviewable transactions under the BIA have been incorporated into the CCAA.  Section 36.1(1) of the CCAA provides that "sections … 95 to 101 of the [BIA] apply, with any modifications that the circumstances require, in respect of a compromise or arrangement unless the compromise or arrangement provides otherwise."

114.    Section 98 (1) of the BIA provides that "[i]f a person has acquired property of a bankrupt under a transaction that is void or voidable and set aside … and has sold, disposed of, realized or collected the property or any part of it, the money or other proceeds, whether further disposed of or not, shall be deemed the property of the trustee."

115.    Section 98(2) of the BIA provides that "[t]he trustee may recover the property or the value thereof or the money or proceeds therefrom from the person who acquired it from the bankrupt or from any other person to whom he may have resold, transferred or paid over the proceeds of the property as fully and effectually as the trustee could have recovered the property if it had not been so sold, disposed of, realized or collected."

116.    Under the BIA, the Transfers should be recovered in their full amount because they relate to Invoice Obligations that are void as preferences under section 95 of the BIA.

117.    Under the BIA, the prepetition Transfers should be recovered because they (a) are void as preferences under section 95 of the BIA; and (b) constitute void transfers at undervalue under section 96 of the BIA.

118.    Plaintiffs are entitled to the entry of an Order directing ERCOT to return the Transfers, either (a) in the amount of not less than approximately $274 million or, (b) *alternatively*, in the amount of not less than approximately $220 million relating to the period after 1:05 a.m. on February 18, 2021.

## COUNT 5
### (Turnover—11 U.S.C. § 542(a))

119.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

120.    Section 542(a) of the Bankruptcy Code requires an entity in possession, custody, or control of property that may be used, leased, or sold under section 363 of the Bankruptcy Code to turn over such property or its value to the trustee.

121.     Section 1507(a) of the Bankruptcy Code says in part that "the court, if recognition is granted, may provide additional assistance to a Foreign Representative under this title or other laws of the United States."   Section 1521(a)(5) of the Bankruptcy Code entrusts the Foreign Representative with "the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States."   Section 1521(a)(7) of the Bankruptcy Code authorizes the Court to grant "any additional relief that may be available to trustee, except for relief available under section 522, 544, 545, 547, 548, 550 and 724(a)."   Authorizing the Foreign Representative to bring claims under section 542(a) of the Bankruptcy Code is appropriate when the lawsuit is consistent with the purposes of the chapter 15, including those identified in section 1501(a)(3) and (a)(4).

122.     Under the Bankruptcy Code, the Transfers should be turned over in their full amount or their value should be provided because they relate to Invoice Obligations that (a) are void as preferences under section 95 of the BIA and (b) relate to Invoices that were illegally and erroneously calculated under the APA and the PURA and find no support in the ERCOT Protocols or the SFA.

123.     Under the Bankruptcy Code, the prepetition Transfers should be turned over because they (a) are void as preferences under section 95 of the BIA; (b) constitute void transfers at undervalue under section 96 of the BIA; (c) are recoverable under section 98 of the BIA; and (d) otherwise relate to Invoices that were illegally and erroneously calculated under the APA and the PURA and find no support in the ERCOT Protocols or the SFA

124.     Under the Bankruptcy Code, the Transfers constitute property that the Debtors, and specifically the Foreign Representative, Plaintiff Just Energy Group, Inc., may use, sell, or lease under section 363 of the Bankruptcy Code.

125.     Plaintiffs are entitled to the entry of an Order directing ERCOT to turn over the Transfers, either (a) in the amount of not less than approximately $274 million or, (b) *alternatively*,

in the amount of not less than approximately $220 million relating to the period after 1:05 a.m. on February 18, 2021.

## COUNT 6
### (28 U.S.C. § 2201:  Declaration Of Entitlement To Setoff, Recoupment, Counterclaim)

126.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

127.    The Transfers (a) relate to Invoice Obligations that (i) are subject to avoidance as preferences under section 95 of the BIA—making the Transfers recoverable in their full amount; or (ii) relate to Invoices that were illegally and erroneously calculated under the APA and the PURA and find no support in the ERCOT Protocols or the SFA.

128.    The prepetition Transfers (a) are subject to avoidance as preferences under section 95 of the BIA; (b) constitute transfers for undervalue under section 96 of the BIA; or (c) otherwise relate to Invoices that were illegally and erroneously calculated under the APA and the PURA and find no support in the ERCOT Protocols or the SFA

129.    Plaintiffs currently have rights of setoff, recoupment, or counterclaim against ERCOT in an amount not less than approximately $274 million.  Since making the Transfers, Plaintiffs have continued to participate in the ERCOT market and to incur obligations to ERCOT.

130.    There is a justiciable controversy because ERCOT disputes that the Invoices were legally unsupportable, that Plaintiffs are entitled to a return of the Transfers, or that Plaintiffs have any rights to setoff, recoupment, or counterclaim against ERCOT relating to the Transfers, the Invoices, or the Invoice Obligations.

131.    Section 1507(a) of the Bankruptcy Code says in part that "the court, if recognition is granted, may provide additional assistance to a Foreign Representative under this title or other laws of the United States."  Section 1521(a)(5) of the Bankruptcy Code entrusts the Foreign Representative with "the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States."  Section 1521(a)(7) of the Bankruptcy Code

authorizes the Court to grant "any additional relief that may be available to trustee, except for relief available under section 522, 544, 545, 547, 548, 550 and 724(a)."  Authorizing the Foreign Representative to assert rights of setoff, recoupment, and counterclaim is appropriate and consistent with the purposes of the chapter 15, including those identified in section 1501(a)(3) and (a)(4).

132.    Accordingly, an Order declaring Plaintiffs are entitled to set off, recoup, or counterclaim ERCOT with respect to  the amounts of the Transfers against any and all obligations Plaintiffs owe to ERCOT either (a) in the amount of not less than approximately $274 million or, (b) *alternatively*, in the amount of not less than approximately $220 million relating to the period after 1:05 a.m. on February 18, 2021, is warranted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendant and:

A.    Grant relief under sections 542(a), 1507(a), and 1521(a)(7) of the Bankruptcy Code; 28 U.S.C. §§ 2201; section 36.1 of the CCAA; and sections 95, 96, and 98 of the BIA;

B.    Declare the Invoice Obligations and prepetition Transfers void;

C.    Award recovery of all Transfers in an amount not less than approximately $274 million; or alternatively, award recovery of Transfers relating to periods from and after 1:05 am. on February 18, 2021 in an amount not less than approximately $220 million;

D.    Award such other and further relief, in law and equity, as this Court deems just and proper; and

E.      Award damages to Plaintiffs in an amount to be proven at trial, including pre-judgment and post-judgment interest and attorneys' fees to the extent awardable.

Dated:  February 11, 2022                    QUINN EMANUEL URQUHART &
        New York, New York                       SULLIVAN, LLP

_____

James C. Tecce (admitted pro hac vice)
Lindsay M. Weber (admitted pro hac vice)
51 Madison Avenue, 22nd Floor
New York, New York 10010

-and-

_____

Kate Kaufmann Shih
   Texas Bar No. 24066056
John Bash
Pennzoil Place
711 Louisiana St., Suite 500
Houston, TX 77002
Telephone: (713) 221-7000
Facsimile: (713) 221-7100

*Counsel to Plaintiffs*