**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>JUST ENERGY GROUP INC., <u>et al.</u>,<br><br>Debtors in a Foreign Proceeding.[1] | Chapter 15<br><br>Case No. 21-30823 (MI) |
| JUST ENERGY TEXAS LP, FULCRUM RETAIL ENERGY LLC, HUDSON ENERGY SERVICES LLC, and JUST ENERGY GROUP, INC.,<br><br>        Plaintiffs,<br><br>   v.<br><br>ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC. and the PUBLIC UTILITY COMMISSION OF TEXAS, INC.,<br><br>        Defendants. | <br><br><br><br><br><br><br><br>Adv. Pro. 21-04399 (DRJ) |

**OBJECTION OF JUST ENERGY TEXAS LP, FULCRUM RETAIL ENERGY LLC, HUDSON ENERGY SERVICES LLC, AND JUST ENERGY GROUP INC. TO ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC'S MOTION TO DISMISS FIRST AMENDED COMPLAINT AND FOR ABSTENTION AND ERCOT INTERVENOR'S JOINDER THEREIN**

[Relates to ECF No. 95 (First Am. Complaint), ECF No. 127 (ERCOT Mot.), and ECF No. 128 (ERCOT Def. Joinder)]

---

[1] The identifying four digits of Just Energy Group Inc.'s local Canada tax identification number are 0469.  A complete list of debtor entities in these chapter 15 cases may be obtained at www.omniagentsolutions.com/justenergy.

**TABLE OF CONTENTS**

**Page**

I.     PRELIMINARY STATEMENT ...........................................................................................1

    A.     COURT HAS SUBJECT-MATTER JURISDICTION ...........................................................2

    B.     PROPER PARTIES ARE PRESENT ..................................................................................3

    C.     COUNTS ARE PROPERLY PLED ....................................................................................5

    D.     THERE IS NO BASIS TO ABSTAIN .................................................................................8

    E.     ERCOT IS NOT IMMUNE FROM SUIT ........................................................................10

II.    RELEVANT FACTUAL BACKGROUND.....................................................................11

    A.     COMPANY AND MARKET ...........................................................................................11

    B.     WINTER STORM URI ..................................................................................................12

    C.     PUCT ORDERS—HCAP OF $9,000/MWH................................................................12

    D.     ANCILLARY SERVICE CHARGES ................................................................................14

    E.     CANADIAN PROCEEDINGS AND CHAPTER 15 CASES ................................................14

    F.     INVOICE CALCULATION FINDS NO SUPPORT UNDER STATE LAW OR
        PROTOCOLS.................................................................................................................15

    G.     INITIAL COMPLAINT AND MOTIONS TO DISMISS ......................................................16

III.   ARGUMENT.....................................................................................................................19

    A.     COURT HAS SUBJECT-MATTER JURISDICTION .........................................................19

    B.     PUCT DOES NOT HAVE EXCLUSIVE JURISDICTION .................................................27

    C.     FILED-RATE DOCTRINE IS INAPPLICABLE ................................................................29

    D.     PUCT IS NOT AN INDISPENSABLE PARTY ................................................................30

    E.     MONITOR IS NOT ONLY PARTY THAT CAN BRING CANADIAN LAW CLAIMS .........33

    F.     COUNT 1-COUNT 4: CANADIAN LAW CLAIMS........................................................36

    G.     COUNT 5: TURNOVER CLAIM ...................................................................................51

    H.     COUNT 6: SETOFF CLAIM .........................................................................................54

    I.     PERMISSIVE ABSTENTION DOES NOT APPLY IN CHAPTER 15 CASES .....................57

    J.     EVEN IF PERMISSIVE ABSTENTION IS RELEVANT, IT IS INAPPROPRIATE ...............60

    K.     MANDATORY ABSTENTION IS NOT APPLICABLE.......................................................64

    L.     ERCOT IS NOT IMMUNE FROM SUIT ........................................................................68

    M.     ERCOT IS NOT A STATE ACTOR...............................................................................74

III.   CONCLUSION..................................................................................................................78

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

**Cases**

In re ABC-NACO, Inc.,
  294 B.R. 832 (Bankr. N.D Ill. 2003) ................................................................. 55

In re Abell,
  549 B.R. 631 (Bankr. D. Md. 2016) ................................................................. 52

Ackerley Media Grp., Inc. v. Sharp Elecs. Corp.,
  170 F. Supp. 2d 445 (S.D.N.Y. 2001)................................................................ 41

Ad Hoc Group of Vitro Noteholders v. Vitro SAB (In re Vitro SAB de CV),
  701 F.3d 1031 (5th Cir. 2012) ................................................................. 21, 23

In re Adelphia Comm'n Corp,
  365 B.R. 24 (Bankr. S.D.N.Y. 2011)................................................................ 43

Advanced Tech. Incubator, Inc. v. Sharp Corp.,
  2009 WL 2460985 (E.D. Tex. Aug. 10, 2009) ................................................ 36

In re AJW Offshore, Ltd.,
  488 B.R. 551 (Bankr. E.D.N.Y. 2013)................................................................ 22

In re Alta Mesa Resources, Inc.,
  613 B.R. 90 (Bankr. S.D. Tex. 2019) ................................................................ 24

In re Am. Home Mortg. Hold., Inc.,
  388 B.R. 69 (Bankr. D. Del. 2008) ................................................................ 53

Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.),
  714 F.2d 1266 (5th Cir. 1983) ................................................................ 51

Am. Pegasus SPC v. Clear Skies Holding Co., LLC,
  2015 WL 10891937 (N.D. Ga. Sept. 22, 2015)................................................ 23

Angul v. Kedzep, Ltd.,
  29 B.R. 417 (S.D. Tex. 1983) ................................................................ 22

In re AOG Entertainment, Inc.,
  569 B.R. 563 (Bankr. S.D.N.Y. 2017)................................................................ 68

In re Apex Long Term Acute Care—Katy L.P.,
  465 B.R. 452 (Bankr. S.D. Tex. 2011) ................................................................ 71

Armstrong v. Cumberland Acad.,
    549 F. Supp. 3d 543 (E.D. Tex. 2021) ................................................................ 78

In re ATP Oil & Gas Corp.,
    553 B.R. 577 (Bankr. S.D. Tex. 2016) ........................................................... 25, 73

In re Auto. Pros., Inc.,
    370 B.R. 161 (Bankr. N.D. Ill. 2007) .................................................................. 73

In re B.C.I. Finances Pty Ltd.,
    583 B.R. 288 (Bankr. S.D.N.Y. 2018) ................................................................ 38

Banner Life Ins. Co. v. Bonney,
    2011 WL 5027498 (E.D. Va. Oct. 21, 2011) ...................................................... 40

Bass v. Denney (In re Bass),
    171 F.3d 1016 (5th Cir. 1999) ............................................................................ 25

Baumgart v. Fairchild Aircraft Corp.,
    981 F.2d 824 (5th Cir. 1993) ......................................................................... 10, 59

Begier v. Internal Revenue Serv.,
    496 U.S. 53 (1990) ............................................................................................. 39

Matter of Benjamin,
    932 F.3d 293 (5th Cir. 2019) .............................................................................. 28

Black Sea Inv. Ltd. v. United Heritage Corp.,
    204 F.3d 647 (5th Cir. 2000) ................................................................................ 8

In re British Am. Ins. Co. Ltd.,
    488 B.R. 205 (Bankr. S.D. Fla. 2013) ........................................................... 20, 25

Bruce v. Jim Walters Homes,
    943 S.W.2d 121 (Tex. Civ. App.—San Antonio 1997)...................................... 56

In re Bryco Funding, Inc.,
    2009 WL 3271309 (Bankr. N.D. Cal. Oct. 2, 2009)........................................... 29

Burford v. Sun Oil Co.,
    319 U.S. 315 (1943)........................................................................................ 8, 63

Cathedral of the Incarnation v. Garden City Co. (In re Cathedral of the Incarnation),
    99 F.3d 66 (2d Cir. 1996)............................................................................... 10, 59

Central Virginia Community College v. Katz,
    546 U.S. 356 (2006)........................................................... 11, 70, 71, 72, 73

City of Corpus Christi v. Pub. Util. Comm'n of Texas,
    51 S.W.3d 231 (Tex. 2001).............................................................. 27

Clark v. Tarrant County, Tex.,
    798 F.2d 736 (5th Cir. 1986) ...................................................... 77, 79

In re Condor Ins. Ltd.,
    601 F.3d 319 (5th Cir. 2010) ..................................... 21, 22, 24, 38, 39

In re Consol. Med. Transp., Inc.,
    300 B.R. 435 (Bankr. N.D. Ill. 2003) ................................................ 62

In re Contractor Tech. Ltd.,
    343 B.R. 573 (Bankr. S.D. Tex. 2006) ............................................... 25

Crow-Billingsley Stover Creek Ltd. v. SLC McKinney Partners, L.P.,
    2011 WL 3278520 (Tex. Civ. App.—Dallas Aug. 2, 2011)................... 57

CSFB1998-C2 TX Facilities, LLC v. Rector,
    2016 WL 631923 (N.D. Tex. Feb. 16, 2016)..................................... 56

In re DBSI, Inc.,
    468 B.R. 663 (Bankr. D. Del. 2011) ................................................. 53

In re Deak & Co. Inc.,
    63 B.R. 422 (Bankr. S.D.N.Y. 1986).................................................. 75

In re Denton County Elec. Coop.,
    281 B.R. 876 (Bankr. N.D. Tex. 2002)............................................... 68

DZ Bank AG Deutsche Zentral-Genossenschaft Bank v. Meyer,
    869 F.3d 839, 843 (9th Cir. 2017) ............................................... 44, 47

Elec. Reliability Council of Texas, Inc. v. CPS Energy,
    2021 WL 5879183 (Tex. App.—San Antonio Dec. 13, 2021, pet. filed)............ 76

Elgin Sweeper Co. v. Melson Inc.,
    884 F. Supp. 641 (N.D.N.Y. 1995)..................................................... 36

Emp'rs Mut. Cas. Co. v. Key Pharm., Inc.,
    1992 WL 8712 (S.D.N.Y. Jan. 16, 1992) ........................................... 40

In re Entergy,
    142 S.W.3d 316 (Tex. 2004)........................................................ 27, 29

In re Extended Stay,
    466 B.R. 188 (S.D.N.Y. 2011)............................................................ 26

In re Fairfield Sentry Ltd.,
   2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ............................................. 26

In re Fairfield Sentry Ltd.,
   458 B.R. 665 (S.D.N.Y. 2011).................................................................... 22, 24

Fed. Ins. Co. v. Singing River Health Sys.,
   850 F.3d 187 (5th Cir. 2017) .............................................................................. 32

Fed. Nat'l Mortg. Ass'n v. Pinter,
   2006 WL 2802092 (E.D.N.Y. Sept. 28, 2006) ...................................................... 42

In re Fernandez,
   123 F.3d 241 (5th Cir. 1997) .............................................................................. 71

FIMBANK PLC v. Discover Inv. Corp.,
   2020 WL 3519159 (S.D. Tex. May 21, 2020), report and recommendation adopted,
   2020 WL 3504179 (S.D. Tex. June 29, 2020) ....................................................... 66

Firefighters' Ret. Sys. v. Citco Grp. Ltd.,
   796 F.3d 520 (5th Cir. 2015) ........................................................... 20, 21, 58, 59

In re First Protection, Inc.,
   440 B.R. 821 (9th Cir. B.A.P. 2010)..................................................... 25, 56, 66

Gaetano Assocs Ltd. v. Artee Collections, Inc.,
   2006 WL 330322 (S.D.N.Y. Feb. 14, 2006)......................................................... 40

Gala Homes, Inc. v. Fritz,
   393 S.W.2d 409 (Tex. Civ. App.—Waco 1965)..................................................... 57

Gat Engrs., Ltd. v. Antigua Int'l Bank,
   659 F.2d 234 (D.C.Cir. 1981) ............................................................................. 32

Gonzalez v. Trevino,
   2021 WL 7184963 (S.D. Tex. Nov. 12, 2021) ...................................................... 66

Grede v. MBF Clearing Corp.,
   2018 WL 306668 (N.D. Ill. Jan. 5, 2018) ............................................................ 50

Hardy v. Johns-Manville Sales Corp.,
   681 F.2d 334 (5th Cir. 1982) .............................................................................. 62

HBE Leasing Corp. v. Frank,
   48 F.3d 623 (2d Cir. 1995)................................................................................. 44

In re Healthback LLC,
   226 B.R. 464 (Bankr. W.D. Okl. 1998) ................................................................ 29

Holt Cargo Systems Inc v. ABC Containerline NV, 2001 SCC 90 ................................................ 40

Matter of Horace,
    54 B.R. 671 (Bankr. D.N.J. 1985) .................................................................... 68

HWY 3 MHP, LLC v. Elec. Reliability Council of Texas,
    462 S.W.3d 204 (Tex. App.—Austin 2015, no pet.) ....................................... 77, 78

Jacintoport Corp. v. Greater Baton Rouge Port Comm'n,
    762 F.2d 435 (5th Cir. 1985) ........................................................................... 76

James Construction Group, LLC v. Westlake Chem. Corp.,
    594 S.W.3d 722 (Tex. Civ. App.—Houston 2019) .......................................... 56

In re Jones,
    618 B.R. 757 (Bankr. D.S.C. 2020) ................................................................ 28

In re Keller,
    185 B.R. 796 (9th Cir. BAP 1995) ................................................................. 44

In re Kids World of Am., Inc.,
    349 B.R. 152 (Bankr. W.D. Ky. 2006) ............................................................ 73

Kirschner v. Grant Thornton LLP (In re Refco Sec. Litig.),
    628 F. Supp. 2d 432 (S.D.N.Y. 2008) ............................................................ 62

Koreag, Controle et Revision, S.A. v. Refco F/X Assocs. (In re Koreag, Controle et Revision, S.A.),
    961 F.2d 341 (2d Cir. 1992) ............................................................................ 37

In re Life Fund 5.1 LLC,
    2010 WL 2650024 (Bankr. N.D. Ill. June 30, 2010) .................................. 50, 59

Liquidating Trustee v. Granite Fin. Solutions, Inc. (In re MPC Computers LLC),
    465 B.R. 384 (Bankr. D. Del. 2012) ................................................................ 26

Loumar, Inc. v. Smith,
    698 F.2d 759 (5th Cir. 1983) ........................................................................... 31

In re Lovelace,
    443 B.R. 494 (Bankr. W.D. Tex. 2011) ........................................................... 25

Luminant v. PUC,
    03-21-00098-CV (Tex. App.—Austin 2021) .................................................. 69

In re Luongo,
    259 F.3d 323 (5th Cir. 2001) ................................................................. 3, 24, 62

In re Maxim Truck Co., Inc.,
  415 B.R. 346 (Bankr. S.D. Ind. 2009) ................................................................ 53

In re Maxwell Commc'n Corp. plc by Homan,
  93 F.3d 1036 (2d Cir. 1996) ............................................................................... 38

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Flanders-Borden,
  11 F.4th 12 (1st Cir. 2021) .................................................................................. 32

In re Microage Corp.,
  288 B.R. 842 (Bankr. D. Az. 2003) ..................................................................... 72

In re Mirant Corp.,
  378 F.3d 511 (5th Cir. 2004) ............................................................................... 30

In re Mirant Corp.,
  675 F.3d 530 (5th Cir. 2012) ............................................................................... 37

Nat'l Ass'n of Home Builders v. Defenders of Wildlife,
  551 U.S. 644 (2007) ............................................................................................. 79

New Orleans Public Service, Inc. v. Council of City of New Orleans,
  491 U.S. 350 (1989) ............................................................ 59, 61, 63, 64, 65, 76

In re Newton,
  1996 WL 33401177 (Bankr. S.D. Ga. Dec. 19, 1996) ........................................ 52

In re Noram Resources, Inc.,
  2011 WL 5357895 at *5 (Bankr. S.D. Tex. Nov. 7, 2011) .................................. 42

Oncor Elec. Delivery Co. LLC v. Chaparral Energy, LLC,
  546 S.W.3d 133 (Tex. 2018) ............................................................................... 29

In re Orion Refining Corp.,
  2004 WL 3244578 (Bankr. M.D. La. May 28, 2004) .......................................... 72

Orr v. Kinderhill Corp.,
  991 F.2d 31 (2d Cir. 1993) .................................................................................. 44

In re Ortega T.,
  562 B.R. 538 (Bankr. S.D. Fla. 2016) ................................................................ 53

In re Our Alchemy, LLC,
  2019 WL 4447545 (Bankr. D. Del. Sept. 16, 2019) ........................................... 42

Pacor, Inc. v. Higgins (In re Pacor),
  743 F.2d 984 (3d Cir. 1984) ............................................................................... 25

In re Pan Am Corp.,
  950 F.2d 839 (2d Cir. 1991)................................................................. 10, 11, 59, 76, 77, 78, 79

Panda Power Generation Infrastructure Fund, LLC v. Elec. Reliability Council of Texas,
  Inc.,
  No. 05-18-00611-CV, 2022 WL 537708 (Tex. App.—Dallas Feb. 23, 2022)..................... 76

In re Paques,
  277 B.R. 615 (Bankr. E.D. Pa. 2000) ..................................................................... 75

In re Patriot Nat'l, Inc.,
  623 B.R. 696 (D. Del. 2020)................................................................................. 65

Pendergrass v. Greater New Orleans Expressway Comm'n,
  144 F.3d 342 (5th Cir. 1998) .............................................................................. 78

Perforaciones Martímas Mexicanas S.A de C.V. v. Grupo TMM S.A. de C.V,
  2007 WL 1428654 (S.D. Tex. 2007) .................................................................... 40

Pepper v. Litton,
  308 U.S. 295 (1939)................................................................................... 24, 43

Personette v. Kennedy (In re Midgard Corp.),
  204 B.R. 764 (B.A.P. 10th Cir. 1997) ............................................................ 10, 59

Matter of PFO Glob., Inc.,
  26 F.4th 245 (5th Cir. 2022) ............................................................................... 66

In re Powerburst Corp.,
  154 B.R. 307 (Bankr. E.D. Cal. 1993)................................................................... 25

Principal Growth Strategies v. AGH Parent LLC,
  615 B.R. 529 (Bankr. D. Del. 2020) ..................................................................... 67

In re Process America, Inc.,
  588 B.R. 82 (Bankr. C.D. Cal. 2018).................................................................... 53

In re PSA, Inc.,
  277 B.R. 51 (Bankr. D. Del. 2002) ...................................................................... 55

Pub. Serv. Co. of New Hampshire v. Patch,
  167 F.3d 15 (1st Cir. 1998)................................................................................. 64

Pub. Util. Dist. No. 1 of Grays Harbor Cty. Wash. v. IDACORP Inc.,
  379 F.3d 641 (9th Cir. 2004) .............................................................................. 29

Quackenbush v. Allstate Ins. Co.,
  517 U.S. 706 (1996)........................................................................................... 67

In re Rancher's Legacy Meat Co.,
    630 B.R. 308 (Bankr. D. Minn. 2021) ................................................................. 55

In re Ravenwood Healthcare, Inc.,
    No. 02 5 9516 JS, 2006 WL 4481985 (Bankr. D. Md. Oct. 12, 2006) ................................. 74

In re Reuter,
    499 B.R. 655 (Bankr. W.D. Mo. 2013) ................................................................. 52

In re Rice,
    311 B.R. 450 (Bankr. N.D. Tex. 2004) ................................................................. 25

Rothstein v. Balboa Ins. Co.,
    794 F.3d 256 (2d Cir. 2015) ................................................................. 30

In re Roussos,
    541 B.R. 721 (Bankr. C.D. Cal. 2015) ................................................................. 52

Matter of Rustic Mfg., Inc.,
    55 B.R. 25 (Bankr. W.D. Wis. 1985) ................................................................. 68

Second Pa. Real Estate Corp. v. Papercraft Corp. (In re Papercraft Corp.),
    127 B.R. 346 (Bankr. W.D. Pa. 1991) ................................................................. 55, 56, 67

In re Shree Mahalaxmi, Inc.,
    505 B.R. 794 (Bankr. W.D. Tex. 2014) ................................................................. 24

SIPA v. Madoff,
    460 B.R. 106 (Bankr. S.D.N.Y 2011) ................................................................. 75

In re SkyPort Glob. Commc'ns, Inc.,
    2013 WL 4046397 (Bankr. S.D. Tex. Aug. 7, 2013) ................................................................. 37

In re Soileau,
    488 F.3d 302 (5th Cir. 2007) ................................................................. 70, 71

SPV Osus Ltd. v. UBS AG,
    882 F.3d 333 (2d Cir. 2018) ................................................................. 25, 26

State Office of Risk Mgmt. v. Tex. Dep't of Public Safety,
    733 F.3d 550 (5th Cir. 2013) ................................................................. 74, 76

Stern v. Marshall,
    564 U.S. 462 (2011) ................................................................. 3, 26, 27

Sullivan v. Kodsi,
    373 F. Supp. 2d 302 (S.D.N.Y. 2005) ................................................................. 42

In re Super Van, Inc.,
    161 B.R. 184 (Bankr. W.D. Tex. 1993) ................................................................ 10, 60, 64

Tennessee Student Assistance Corp. v. Hood,
    541 U.S. 440 (2004) ........................................................ 11, 69, 70, 71, 72, 73, 74

In re Thadikamalla,
    481 B.R. 232 (Bankr. N.D. Ga. 2012) ................................................................ 53

In re Today's Destiny,
    388 B.R. 737 (Bankr. S.D. Tex. 2008) ................................................................ 61

Tow v. Rafizadeh (In re Cyrus II P'ship),
    413 B.R. 609 (Bankr. S.D. Tex. 2008) ................................................................ 39

In re Tri-Cont'l Ex. Ltd.,
    349 B.R. 627 (Bankr. E.D. Cal. 2006) ................................................................ 22

In re Tri-Union Dev. Corp.,
    2015 WL 5730745 (Bankr. S.D. Tex. Sept. 28, 2015) ................................................ 29

Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.),
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) ................................................................ 44

In re Tronox, Inc.,
    429 B.R. 73 (Bankr. S.D.N.Y. 2010) ................................................................ 42

In re Tyler,
    493 B.R. 905 (Bankr. N.D. Ga. 2013) ................................................................ 23

U.S. Bank Nat. Assn' v. Verizon Communications Inc.,
    2012 WL 3100778 (N.D. Tex. July 31, 2012) ................................................................ 44

In re Ultra Petroleum Corp.,
    2017 WL 4863015 (Bankr. S.D. Tex. Oct. 26, 2017) ................................................ 24

In re Ultra Petroleum Corp.,
    2022 WL 763836 (5th Cir. Mar. 14, 2022) ................................................................ 30

In re Univ. of Wisconsin Oshkosh Found., Inc.,
    586 B.R. 458 (Bankr. E.D. Wis. 2018) ................................................................ 73

Util. Choice, L.P. v. TXU Corp.,
    2005 WL 3307524 (S.D. Tex. Dec. 6, 2005) ................................................................ 30

Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.),
    288 B.R. 189 (Bankr. D. Del. 2003) ................................................................ 42

Vandergriff Chevrolet Co., Inc. v. Forum Bank,
    613 S.W.2d 68 (Tex. Civ. App.—Fort Worth 1981) ............................................. 57

Vanston Bondholders Protective Comm. v. Green,
    329 U.S. 156 (1946) ............................................................................................... 37

Vt. Dept. of Taxes v. Quality Stores, Inc. (In re Quality Stores, Inc.),
    354 B.R. 840 (W.D. Mich. 2006) .......................................................................... 74

United States v. Ware,
    2022 WL 135818 (5th Cir. Jan. 13, 2022) ............................................................ 32

Wellness Int'l Network, Ltd v. Sharif,
    135 S.Ct. 1932 (2015) ............................................................................................ 26

Williams v. Dallas Area Rapid Transit,
    242 F.3d 315 (5th Cir. 2001) ........................................................................... 77, 79

Wilson v. Valley Elec. Membership Corp.,
    1992 WL 233769 (E.D. La. Aug. 24, 1992) .......................................................... 65

Wilson v. Valley Elec. Membership Corp.,
    8 F.3d 311 (5th Cir. 1993) ............................................................................... 65, 66

Winn v. Alamo Title Ins. Co.,
    2009 WL 7099484 (W.D. Tex. May 13, 2009) ..................................................... 29

In re Wood,
    825 F.2d 90 (5th Cir. 1987) ............................................................................. 23, 24

Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-Ingram Dev. Co.,
    642 F.2d 744 (5th Cir. 1981) ................................................................................. 37

In re Wright,
    231 B.R. 597 (Bankr. W.D. Tex. 1999) ........................................................... 10, 60

WRT Creditors Liquidation Trust v. C.I.B.C. Oppenheimer Corp.,
    75 F. Supp. 2d 596 (S.D. Tex. 1999) ..................................................................... 68

Zablocki v. Redhail,
    434 U.S. 374 (1978) ............................................................................................... 65

### Statutory Authorities

11 U.S.C. § 106(a) ........................................................................................... 71, 72

11 U.S.C. § 502 ...................................................................................................... 16

11 U.S.C. § 542 ............................................................................................. 2, 16, 19

11 U.S.C. § 549 ............................................................................................................... 16

11 U.S.C. § 553 ............................................................................................................... 17

11 U.S.C. § 558 ............................................................................................................... 54

11 U.S.C. § 1501(a)(3) ..................................................................................................... 23

11 U.S.C. § 1507(b) .................................................................................................... 21, 22

11 U.S.C. § 1509(b)(1) ................................................................................................. 4, 34

11 U.S.C. § 1521(a)(5) ..................................................................................................... 21

11 U.S.C. § 1525(b) .......................................................................................................... 35

11 U.S.C. 1520(a)(2) ........................................................................................................ 52

16 Tex. Admin. Code § 25.200(d) .................................................................................... 79

16 Tex. Admin. Code § 25.363(b) .................................................................................... 77

28 U.S.C. § 157(b)(2)(A) ................................................................................................. 19

28 U.S.C. § 157(b)(2)(E) .................................................................................................. 19

28 U.S.C. § 157(b)(2)(F) .................................................................................................. 19

28 U.S.C. § 157(b)(2)(H) ................................................................................................. 19

28 U.S.C. § 157(b)(2)(O) ............................................................................................ 20, 67

28 U.S.C. § 157(b)(2)(P) ......................................................................................... 2, 19, 67

28 U.S.C. § 157(b)(3) .................................................................................................... 3, 25

28 U.S.C. § 1334(c)(1) ........................................................................................... 9, 58, 59

28 U.S.C. § 2201 ................................................................................................................ 2

Tex. Gov't Code § 551.001 .............................................................................................. 78

Tex. Util. Code § 32.001 .................................................................................................. 28

Tex. Util. Code § 39.151 ..................................................................................... 28, 77, 78

Tex. Util. Code § 39.651 .................................................................................................. 50

Tex. Util. Code § 39.652 .................................................................................................. 50

**Rules and Regulations**

Fed. R. Bankr. P. 9017 ................................................................................................... 5

Fed. R. Civ. P. 5.1 ........................................................................................................ 33

Fed. R. Civ. P. 12(g)(2) ............................................................................................... 66

Fed. R. Civ. P. 12(h)(2) ............................................................................................... 66

Fed. R. Civ. P. 15(a)(3) ................................................................................................. 2

Fed. R. Civ. P. 19 ........................................................................................................ 32

Fed. R. Civ. P. 44.1 ....................................................................................................... 5

**Additional Authorities**

H. Rep. 109-31, 2005 U.S.C.C.A.N. 88, 173, 2005 WL 832198 ................................. 59

Just Energy Texas LP ("**JE Texas LP**"), Fulcrum Retail Energy, LLC ("**Fulcrum**"), Hudson Energy Services LLC ("**Hudson**", and the foreign representative in the above-captioned chapter 15 cases (the "**Chapter 15 Cases**"), Just Energy Group, Inc. (the "**Foreign Representative**" and collectively, "**Plaintiffs**" or "**Just Energy**," and, with their affiliated debtors in the Chapter 15 Cases, the "**Company**" or the "**Debtors**")[2] object (the "**Objection**") to ERCOT's Motion To Dismiss And For Abstention [ECF No. 127] (the "**ERCOT Mot.**") and the Joinder of NRG Energy, Inc. and Calpine Corporation (the "**ERCOT Intervenors**") [ECF No. 128] (the "**ERCOT Intervenors' Joinder**") and respectfully represent as follows.

## I.    PRELIMINARY STATEMENT

1.    ERCOT drove Just Energy into bankruptcy through illegal billing for energy during Winter Storm Uri.  Now, it is desperate to escape the very court that facilitated those payments by acting in an ancillary capacity to a Canadian foreign proceeding.  It was ERCOT's Winter-Storm-Uri invoices that forced Just Energy to commence the Canadian Proceedings and Chapter 15 Cases, access debtor-in-possession financing, obtain permission from the Canadian Court to use a significant portion of the DIP facility to pay ERCOT, and get the Canadian Court's order recognized in the Chapter 15 Cases.  Just Energy was responding to the implied threat that non-payment would lead ERCOT to transfer Just Energy's most valuable assets—its customers—to a Provider of Last Resort ("**POLR**") and drive Just Energy from the Texas market.  Even though Just Energy disputes the invoices, it paid them under protest with a full reservation of rights recognized by both courts that this lawsuit seeks to vindicate.

---

[2]    Capitalized terms not defined herein have their meanings in the First Amended Complaint [ECF No. 95] (the "**Complaint**" or "**First Am. Compl.**").

2.      After ERCOT clamored for additional time to respond to the First Amended Complaint,[3] Just Energy expected novel challenges and instead finds a retread of the same tired arguments that appeared in ERCOT's First Motion.[4]  Its renewed motion is thinly supported with relatively little legal authority and instead relies on distortions of the relief Just Energy seeks, misstatements of applicable law, and summary-judgment style arguments not relevant in the Rule-12 context to make its points.  ERCOT's first motion failed to convince the Court that this lawsuit should be dismissed.  Its sophomore effort falls even further short.

## A.      COURT HAS SUBJECT-MATTER JURISDICTION

3.      The Complaint's six Counts are statutorily core.[5]  Chapter 15 debtors and a foreign representative brought this suit before a federal court acting in an ancillary capacity to a CCAA case to recover illegally-transferred property totaling no less than $274 million[6] so it can be used to facilitate a Canadian restructuring.  ERCOT takes offense to the fact that incident to deciding Just Energy's claims, the Court will interpret state law and particularly the APA and the PURA as they relate to the PUCT Orders.  But, Congress makes clear:  "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected

---

[3]     See ECF No. 99 (ERCOT's Emergency Motion To Continue Response Deadline Under Fed. R. Civ. P. 15(a)(3) (requesting five weeks to respond to First Amended Complaint)).

[4]     ERCOT's Motion To Dismiss And For Abstention [ECF No. 30] (the "**ERCOT's First Motion**").

[5]     **Count 1** (28 U.S.C. § 2201:  Declaration Of Preference Under CCAA (§ 36.1), BIA (§ 95)—Invoice Obligations)); **Count 2** (28 U.S.C. § 2201:  Declaration Of Preference Under CCAA (§ 36.1), BIA (§ 95)—Prepetition Transfers); **Count 3** (28 U.S.C. § 2201:  Transfer At Undervalue Under CCAA (§ 36.1), BIA (§ 96)—Prepetition Transfers); **Count 4** (Recovering Proceedings If Transferred—CCAA (§ 36.1), BIA (§ 98)); **Count 5** (Turnover—11 U.S.C. § 542(a)); **Count 6**:  (Declaration Of Entitlement To Setoff, Recoupment, Counterclaim), brought by the Foreign Representative through an adversary proceeding connected to the Chapter 15 Cases and are "core" matters pursuant to, inter alia, 28 U.S.C. **§ 157(b)(2)(P)**; **§ 157 (b)(2)(A)**; **§ 157(b)(2)(E)**; **§ 157(b)(2)(F)**; **§ 157(b)(2)(H)**; and **§ 157(b)(2)(O)**.

[6]     The total amount of the Invoiced Obligations (defined below) is $336 million.  The $274 million calculation assumes the PUCT Orders are not valid.  If the PUCT Orders are proven valid, but Just Energy proves alternatively that ERCOT failed to comply with them and/or acted ultra vires by failing to take down the $9,000/MWh price on February 18, then the damage calculation changes.  In that case, Just Energy alleges damages of $220 million. See Compl. ¶¶ 118, 125, 132.

by State law."[7]  As the Fifth Circuit observes, "[b]ankruptcy courts routinely interpret state law in order to resolve disputes in bankruptcy cases."[8]  Performing that function is particularly appropriate when the state-law issues do not predominate and are not complicated.

4.       ERCOT also tries to suggest Stern v. Marshall, 564 U.S. 462 (2011), renders the claims non-core and limits jurisdiction.  But, Stern  is not a "jurisdiction" case.  Instead, it deals with the narrower issue of whether the Court can enter final orders with respect to claims that are statutorily core, but are not Constitutionally core.  Stern has no bearing on the Court's ability to exercise subject-matter jurisdiction over Just Energy's claims.

## B.       PROPER PARTIES ARE PRESENT

5.       ERCOT's post hoc position that the PUCT is an indispensable party not only contradicts the law of the case that the PUCT is not such a party, but it is audacious considering ERCOT tacitly consented to that ruling when the Court dismissed the PUCT as a defendant.  It also wrongly claims Just Energy "conceded the PUCT is an indispensable party" by naming the PUCT as a defendant.[9]  Just Energy never took that position.  It candidly (and repeatedly) told the Court it named the PUCT in response to ERCOT's argument in the Brazos Proceeding[10] that the PUCT is an indispensable party.  The Court, the PUCT, and Just Energy debated extensively whether the PUCT should be a party at four separate hearings on January 6, January 11, January 15 and February 2.  ERCOT attended each hearing, but said nothing until after the Court dismissed the PUCT on February 2.  Nor did ERCOT oppose the PUCT Motion to Dismiss[11] on the grounds

---

[7]    28 U.S.C. § 157(b)(3).

[8]    In re Luongo, 259 F.3d 323, 331 & n. 5 (5th Cir. 2001).

[9]    ERCOT Mot. p. 35, ¶ 65.

[10]   See, e.g., Brazos Elec. Power Cooperative, Inc. v. Electric Reliability Council of Texas, Inc. (In re Brazos Elec. Power Cooperative, Inc.), Adv. Proc. 21-03863 (DRJ) (Bankr. S.D. Tex.) ("**Brazos Proceeding**").

[11]   PUCT's Motion To Dismiss Complaint, Or, Alternatively, For Abstention And Memorandum In Support Thereof [ECF No. 28] (the "**PUCT Motion To Dismiss**").

that it is an indispensable party or otherwise.  At this point, ERCOT has waived the argument.

Regardless, the PUCT is not an indispensable party when, among other things. Just Energy does

not seek any relief against the PUCT, and a judgment against ERCOT affords complete relief.

6.    ERCOT also argues the Monitor is the only party with standing to bring the

Canadian claims.  While the Monitor may have the right to bring the Canadian claims, that does

foreclose other representative parties from doing so.  Sections 95 and 96 of the BIA authorize "the

trustee in bankruptcy," as an estate representative in a bankruptcy, to bring claims.  The CCAA

authorizes the Monitor, as an estate representative in a CCAA case, to do so.  Here, an estate

fiduciary entrusted with the administration of the company's assets, i.e., the Foreign

Representative, is bringing estate claims with the express support of the Monitor.  That is exactly

what section 1509(b) contemplates a foreign representative like Just Energy will do by giving it

"the capacity to sue and be sued in a court in the United States" and ability to "apply directly to a

court in the United States for appropriate relief in that court."[12]  And, ERCOT does not identify

any case holding a foreign representative acting on behalf of an estate cannot bring such claims or

that the right belongs to the Monitor to the exclusion of another estate representative.  This issue

is sui generis.  That may be because the court-appointed monitor typically acts as the foreign

representative, which is not the case here; Just Energy Group, Inc. is the Foreign Representative.

For greater certainty, the Monitor's Declaration submitted herewith signals support for the Foreign

Representative to continue prosecuting this lawsuit; agrees if the Court considers it necessary to

seek advice and directions from the Canadian Court to permit the Foreign Representative to

proceed and/or to allow the Monitor to become more directly involved in prosecuting these claims;

---

[12]    11 U.S.C. § 1509(b)(1), (b)(2).

and requests that in the interest of efficiency, the proceeding simply continue as is.[13]  In no event

is this technical issue a basis to dismiss the lawsuit.

## C.   COUNTS ARE PROPERLY PLED

7.      The six Counts in the First Amended Complaint have been pled with painstaking

particularity.  They satisfy any procedural or legal standard applicable at this stage.

- *Canadian-Law Counts (One-Four)*.  ERCOT appears rattled by the Canadian claims even though they have been a fixture in this proceeding since it was filed in November.  As set forth below and in the McElchran Declaration, properly considered pursuant to Federal Rule 44.1,[14] the Complaint satisfies the relatively low legal hurdle of alleging the statutory elements of CCAA § 36.1(1) and BIA §§ 95, 96, and 98.

  - *Choice Of Law*.  ERCOT concludes cursorily that Canadian law does not apply given the various connections to Texas.  The choice-of-law rules in this forum confirm Canadian law applies.  That is not extraordinary considering this proceeding has been brought in connection with a Canadian restructuring.  And, if there is a question of which law applies, it should be resolved after discovery.  Courts believe the issue is fact-intensive and take that approach frequently.

  - *Particularity Requirements*.  The notice-pleading requirements of Federal Rule 8(a) govern nearly all aspects of the Complaint.  ERCOT argues incredibly that the Complaint does not identify the challenged transfers, obligations, or bases for alleging insolvency.

    - The Complaint is clear that Just Energy disputes ERCOT invoices relating to the February 13 through February 20, 2021 period.  ERCOT issued those invoices and accepted the $336 million Just Energy paid in response to them.

    - ERCOT claims it is confused because only the QSEs transact with ERCOT, and only JE Texas LP is a QSE.  The detail of its argument reveals that ERCOT understands exactly which transfers, parties, and obligations are at issue.[15]  JE Texas LP acts as Fulcrum's QSE.  While BP Energy Company ("**BP**") acts as Hudson's QSE, that means Hudson acts through BP as intermediary with respect to

---

[13]   Declaration of James C. Tecce in Support of Plaintiffs Opposition (the "**Tecce Decl.**") filed concurrently herewith, Exhibit 1 (Declaration Of Paul Bishop (the "**Monitor Decl.**")).

[14]   Tecce Decl. Exhibit 2 (Declaration Of Kevin P. McElchran (the "**McElchran Decl.**")).  See Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination may be treated as a ruling on a question of law."), made applicable to this proceeding pursuant to Bankruptcy Rule 9017.

[15]   See ERCOT Mot. pp. 2, 4, 21, ¶¶ 1 & n. 2, 6, 7 & n. 12, n. 13, n. 15, 39 & n. 104 (detailing relationship among QSEs, each Plaintiff, and ERCOT).

ERCOT, but (a) BP is obligated to Hudson to procure energy and ancillary services on Hudson's behalf and (b) Hudson is liable to BP on a fully-secured basis for payments BP makes to ERCOT on its behalf.  BP's claim against Hudson is a direct function of BP's payments to ERCOT made on Hudson's behalf.  These factual issues are inappropriate for disposition at the motion-to-dismiss stage and are more properly examined with a developed record.

- ERCOT also is wrong in contending the heightened-pleading standard of Federal Rule 9(b) applies to the insolvency allegations.  It does not.  ERCOT's confusion on insolvency is itself perplexing considering ERCOT caused Just Energy's insolvency—forcing a CCAA filing after it buried Just Energy with Invoice Obligations totaling $336 million.  ERCOT also forgets the issue of insolvency is scheduled for submission to the Court through summary judgment motions on April 9 under the Scheduling Order ¶ 2(c) [ECF No. 115], i.e., "whether the Canadian Court's determination of insolvency is binding in this adversary proceeding."

- The one assertion that arguably requires more particularity, i.e., the intent allegations relevant to the "transfer at undervalue" claim (Count 3), satisfies Federal Rule 9(b) to the extent it applies.  The Complaint explains in paying ERCOT, Just Energy necessarily intended to "delay" or potentially "defeat" its other creditors' collection prospects because it resulted in an insolvency filing where their claims are impaired.  That is actionable under Canadian law.

- ***Court Approval***.  ERCOT's assertion that the Canadian Court's approval of Just Energy's paying ERCOT bars this lawsuit is wrong.  Neither this Court nor the Canadian Court confined Just Energy to challenging the payments before the PUCT as ERCOT contends.  Indeed, ERCOT consented to the entry of the Recognition Order and its broad reservation of rights.[16]

- ***Count 1 And Count 2 (Preferences)***.  Just Energy properly alleges obligations incurred, and transfers made within 90 days of the CCAA filing are void preferences.  They had the effect of preferring ERCOT over other creditors, paying it in full even though ERCOT is nothing more than a general pre-petition unsecured creditor with outsized leverage.  The statute presumes a preference and precludes evidence of "pressure."  ERCOT's "rendered insolvent" distinction does not defeat the claim, and the disposition of its "necessary to stay in business" and "ordinary course" defenses is premature, though they will be defeated.  Indeed, its ordinary-course defense, which points to language in Just Energy's Chief Financial Officer's declaration filed in the Canadian Court to obtain approval to pay ERCOT, is too clever by half.  The declaration simply states the obvious, i.e., that Just Energy pays ERCOT in the "ordinary course."  But, Just Energy never conceded it pays ERCOT in the ordinary

---

[16] Tecce Decl. Exhibit 7 (Order Granting Provisional Relief Pursuant To Section 1519 Of Bankruptcy Code [ECF No. 23], March 9, 2021 ("**Recognition Order**") ("[T]he Court finds any payments made to ERCOT are made subject to all of the Debtors' rights to contest those payments, and all rights to receive a refund or credit as allowed by applicable law.  Although the Court recognizes the authority to make payments to ERCOT as granted by the Canadian Order, this Court neither adds nor subtracts from any such authorization.")).

course $9,000/MWh for energy for 88 hours under compulsion of impermissible regulatory fiat—a point made clear by Just Energy paying under protest.

- ***Count 3 (Transfer At Undervalue)***.  The Complaint makes out the elements of BIA section 96 in alleging the invoices were grossly outsized and paid with the "intent to delay" Just Energy's creditors.  While ERCOT is "flummoxed" by the Complaint's citation to U.S. case law, that was done to respond to the Court's question of whether an "actual intent" claim has been alleged and, if so, what its basis was.[17]  Just Energy pointed to U.S. law illustratively to explain the intent alleged is not "to defraud."  But, Plaintiffs are not relying on U.S. law as Canadian law recognizes the claim.  ERCOT also argues that Plaintiffs have not identified a present creditor against whom intent was directed, but that is an incorrect statement of the law.  There is no such requirement.

- ***Count 4 (Recovery)***.  Section 98 of the BIA authorizes the recovery of property transferred in violation of sections 95 and 96 of the BIA.

- ***Count 5:  Turnover***.  ERCOT is in possession Just Energy's property that should be turned over for use under section 363 of the Bankruptcy Code.  In the First Amended Complaint, the turnover count is pled in tandem with the other declaratory requests for relief.  Even if construed as a stand-alone claim, however, the turnover count survives regardless of whether it is "premature."  Just Energy seeks a ruling that property was transferred illegally and should be returned in its full amount under section 542(a).

- ***Count 6:  Setoff, Recoupment, Counterclaim***.  ERCOT mischaracterizes this Count as derivative, but it stands on its own, claiming ***either*** ERCOT invoices and payments were illegal because they were based on the PUCT Orders that themselves are illegal ***or*** they violate Canadian law.  Regardless, the Court already recognized Just Energy has properly pled a claim because it disputes the legality of the invoiced obligations and transfers.  It also declined to sustain ERCOT's challenge that the SFA and Protocols waived Just Energy's setoff rights in the context of a Rule-12 motion.[18]  In any event, Just Energy did not waive its rights to pursue remedies through this lawsuit, under the SFA or otherwise.

---

17   Tecce Decl. Exhibit 3 (Tr., Hr'g Feb. 2, 2022 at 79:8-20 ("I am unaware of any allegation that is presently being made that this was an actual fraudulent conveyance …. I want to know what I'm doing in the case, and so I am requiring repleading.  I think I have a right to have the pleading be in a position where I can better understand it.")).

18   See Tecce Decl. Exhibit 3 (Tr., Hr'g Feb. 2, 2022 at 33:17-34:4 ("[ERCOT COUNSEL:]  Because it is spelled out under the SFA and the protocols how such a judgment would get paid.  But I believe that it would in appropriate to set off in that situation when the parties have already agreed how that would work.  And so we'd come back to Your Honor let's say there was a judgment and they said I want to do set off, we'd have to go through the contract provisions and the protocol provision and see whether that's a remedy available.  Because it is a remedy that the parties have agreed to, it should not be available.  THE COURT:  I'm not sure how that's failure to state a claim, though")).

**D.    THERE IS NO BASIS TO ABSTAIN**

8.    ERCOT insists the Court must abstain from its virtually unflagging obligation[19] to exercise jurisdiction and instead abstain under the principles of <u>Burford v. Sun Oil Co.</u>, 319 U.S. 315 (1943).  ERCOT is wrong.

9.    As a factual matter, ERCOT's abstention request is based on an exaggeration of the relief Just Energy requests.  According to ERCOT, Just Energy wants to challenge "filed rates;" to invalidate Texas' regulatory scheme concerning electric utilities; and to compel a repricing of the Texas electricity market in a way that intervenes into the free market.  Not correct.  The Complaint takes issue with the legality of the PUCT Orders.  They were bespoke; applied for less than one week in February 2021; and have no further force and effect.  Just Energy does not ask the Court to interfere with, or pass on the wisdom of the PUCT's or ERCOT's regulation of electric utilities or any other comprehensive state policy.  (Just Energy is not an "electric utility" and instead is a retail electricity provider).  And, Just Energy does not challenge "filed rates" approved by a state agency as much as it argues that the rates required by the Protocols and lawful PUCT orders were different than those in the illegal PUCT Orders.  In any event, ERCOT has cited no precedent in which the filed-rate doctrine was invoked to bar a party from arguing that an agency's order was entered unlawfully, as where the agency failed to adhere to procedural requirements.  Rather, in the typical case the doctrine is invoked to prohibit a ratepayer from challenging a utility's lawfully filed rates on some other ground, <u>e.g.</u>, that they are the product of an antitrust violation.  Nor is Just Energy trying to "retroactively reprice the entire market for the days of the

---

[19]    <u>C.f.</u>, <u>Black Sea Inv. Ltd. v. United Heritage Corp.</u>, 204 F.3d 647, 650 (5ᵗʰ Cir. 2000) (noting <u>Colorado River</u> abstention is an "extraordinarily narrow exception to the virtually unflagging obligation of the federal courts to exercise the jurisdiction given to them").

storm"[20]—a notion that was dispelled after it was discussed extensively with the Court. Just Energy made clear it was not asking the Court to tell ERCOT how to satisfy any judgment it might obtain, and the Court clarified it had no intention of entering any such judgment.[21] The reality is this lawsuit seeks much narrower relief than ERCOT represents, that is, to avoid illegal and inflated obligations incurred over a one-week period, to recover transfers made on behalf of those obligations, and to otherwise declare that Just Energy can exercise its setoff rights against ERCOT without suffering the POLR event.

10. As a legal matter, ERCOT's abstention request fails to grapple with the clear edict from Congress in 28 U.S.C. § 1334(c)(1) that permissive abstention has no application in a chapter 15 case. Congress eliminated the possibility that a federal court acting in an ancillary capacity to a foreign proceeding in the chapter 15 context would abstain from exercising subject-matter jurisdiction. Instead, all interaction between the foreign court and the United States must take place through a centralized court system. Stated differently, inserting "except with respect to a case under chapter 15" into section 1334(c) ensured foreign courts' orders will only be recognized and enforced, and ancillary relief will only be provided by companion bankruptcy courts in the federal system.

11. Moreover, Congress established a different framework for abstention in bankruptcy cases with section 1334(c) that subsumes all common-law forms of abstention, e.g., Burford,

---

[20] ERCOT Mot. p. 42, ¶ 80.

[21] See Tecce Decl. Exhibit 4 (Tr., Hr'g Jan. 6, 2022 at pp. 85:10-88:2); Exhibit 5 (Tr., Hr'g Jan. 14 at pp. 8:18-22 ("[COURT:] I don't intend today or a month from now or in a final judgment in this case to tell—well first of all, if the judgment is in favor of ERCOT, this becomes irrelevant. If the judgment is against ERCOT, I have no intention of telling them what to do to pay that judgment"); at pp. 41:12-15 ("[JUST ENERGY COUNSEL:] [W]e [are] looking for a judgment here. We're not looking for you to direct the remedy. I think you've picked up on that"); at pp. 43:14-25 ("[ERCOT COUNSEL:] [W]e had a discussion when we were [here] on Tuesday about what Luminant's position was, but then in its reply … it brought up this issue again about how ERCOT can or should pass on any liability. And I heard your honor loud and clear that you don't intend to do that")).

Colorado River, etc.  Case law,[22] the legislative history, and the statute's text referring to Burford considerations like "respect for State law" confirm this.  ERCOT cannot remove its abstention request from the ambit of section 1334(c)(1)—and its chapter 15 limitations—by simply affixing the "Burford" label to it.

12.     Assuming solely for the purposes of argument that permissive abstention applies notwithstanding the plain text of section 1334(c)(1), a balancing of the relevant factors tips decidedly against either section-1334(c)(1) or Burford abstention.  Just Energy does not ask the Court to displace a Texas' regulatory regime for electricity or set policy, as ERCOT argues.  Just Energy only raises a narrow, case-specific argument that two extraordinary orders of limited duration find no support under state law or the Protocols.  And, the issues of state law are not uniquely difficult.  The Court is more than capable of ascertaining whether the PUCT Orders were uninformed, arbitrary, and entered without the explanation or the prudence that the law requires.

13.     ERCOT also cannot show that mandatory abstention under section 1334(c)(2) applies.  At this point in the proceeding, ERCOT's application is untimely; Just Energy's claims are "core;" they are not "State law claims" as required by § 1334(c)(2); there is no pending state-court action—Just Energy's administrative challenges are irrelevant; and a state court cannot afford Just Energy relief in time to facilitate its Canadian restructuring efforts.

E.     **ERCOT IS NOT IMMUNE FROM SUIT**

14.     Assuming for the sake of argument that ERCOT is a "state actor," in the bankruptcy context, a State does not enjoy immunity from claims based on in rem jurisdiction over a debtor's

---

[22]  See Personette v. Kennedy (In re Midgard Corp.), 204 B.R. 764, 774 (B.A.P. 10th Cir. 1997); Cathedral of the Incarnation v. Garden City Co. (In re Cathedral of the Incarnation), 99 F.3d 66, 68-69 (2d Cir. 1996); Life Flight of Puerto Rico, 2009 WL 2885109, at *1 (Bankr. D.P.R. Aug. 18, 2009); In re Super Van, Inc., 161 B.R. 184, 189-191 (Bankr. W.D. Tex. 1993); Baumgart v. Fairchild Aircraft Corp., 981 F.2d 824, 833 (5th Cir. 1993); In re Pan Am Corp., 950 F.2d 839, 845-46 (2d Cir. 1991) (citing Legislative History); In re Wright, 231 B.R. 597, 600 (Bankr. W.D. Tex. 1999).

property.[23]  A State's immunity is waived for proceedings ancillary to, or necessary to effectuate the bankruptcy court's in rem jurisdiction.[24]  The claims here all either invoke the Court's in rem jurisdiction or are necessary to effectuate that jurisdiction.  And, ERCOT waived whatever immunity defense it might have had by willingly submitting itself to the Court's jurisdiction and accepting funds for pre-petition charges from a company it knew was under the Court's supervision.  It made a calculated decision to appear in the Chapter 15 Cases to get the Canadian Court's order authorizing payment recognized regardless of the jurisdictional consequences.  Separately, ERCOT is not a state actor.[25]  It is a member-based association.

15.     Accordingly, the Court can exercise subject-matter jurisdiction; neither abstention nor sovereign immunity require that it decline to do so; and, the Complaint states claims upon which relief can be granted.  The ERCOT Motion should be denied.

## II.     RELEVANT FACTUAL BACKGROUND

### A.     COMPANY AND MARKET

16.     The Company purchases electricity and natural gas commodities from certain large energy suppliers and re-sells them to residential and commercial customers.  It does not own generating assets.  Texas is the Company's single largest market, representing 47% of its revenues in fiscal year 2020.[26]

17.     Just Energy's most valuable assets are its customers.  If Just Energy does not pay ERCOT's invoices when due, ERCOT can suspend its market participation in as little as two days

---

[23]   See Tennessee Student Assistance Corp. v. Hood, 541 U.S. 440 (2004).

[24]   See Central Virginia Community College v. Katz, 546 U.S. 356 (2006).

[25]   See Panda Power Generation Infrastructure Fund, LLC d/b/a Panda Power Funds, et al. v. Electric Reliability Council Of Texas, Inc., No. 05-18-00611-CV (Tex. Ct. App.—Fifth Dist. of Texas at Dallas) (Opinion) February 23, 2022 at 2 ("ERCOT is not entitled to sovereign immunity and the Legislature did not grant exclusive jurisdiction over Panda's claims to the PUC").

[26]   Compl. ¶ 21.

and transfer its customers to another energy provider, i.e., a "Provider of Last Resort" or "POLR" (often at a higher rate for customers). Once that happens, customers are lost. ERCOT mandates that parties like Just Energy must pay an invoice in full even if it disputes the invoiced amounts. Failure to pay an ERCOT invoice timely also gives the PUCT grounds to initiate a proceeding to amend, suspend, or revoke Plaintiffs' Retail Electric Provider certificates.[27]

## B.  WINTER STORM URI

18.     In February 2021, the historically severe Winter Storm Uri incapacitated most of Texas' power-generating facilities. When demand threatened to exceed supply, ERCOT ordered deep cuts in electricity consumption in the form of forced outages. In industry parlance, ERCOT ordered residential "load" to be "shed" to reduce strain on the power grid and prevent systemic failure.[28]

## C.  PUCT ORDERS—HCAP Of $9,000/MWh

19.     On February 15 and February 16, with little discussion and without prior notice or any opportunity for public comment, the PUCT issued its key Orders Directing ERCOT To Take Action And Granting Exception To Commission Rules (the "**PUCT Orders**"). The PUCT Orders directed ERCOT to "ensure that firm load that is being shed in [Energy Emergency Alert ("**EEA**") Level 3] is being accounted for in ERCOT's scarcity pricing signals." Critically, the PUCT did not justify the PUCT Orders through a fact-based analysis of the current market conditions or otherwise explain the reasoning behind its determination that energy prices should be set at the HCAP. Instead, it merely stated the economic truism that "[e]nergy prices should reflect scarcity of the supply" and opined without evidence that "[i]f customer load is being shed, scarcity is at its

---

[27]     Compl. ¶¶ 29, 30, 51. See ERCOT Protocol 9.6(2).

[28]     Compl. ¶¶ 1, 31-33.

maximum, and the market price for the energy needed to serve that load should also be at its highest." In reality, scarcity was at its maximum because the storm had forced power generators offline—not because they were waiting for a higher market price.[29]  The PUCT's Orders therefore misconceived the problem affecting the market and directed an unprecedented remedy that had no chance of correcting the actual problem (offline generators).  It was unreasoned decision making.

20.     It was also illegal.  The PUCT has no authority to *set* prices.  Yet it directed ERCOT to apply the system-wide offer cap of $9,000/MWh to *set* prices while firm load was being shed. By regulation, ERCOT power prices were *capped* during the relevant period at the HCAP of $9,000/MWh, but no regulation provides that the PUCT and ERCOT may actively *set* prices at this rate if ordinary market forces would produce a lower price.  The amount is a cap—not a rate that can be set artificially.[30]

21.     Following the PUCT's directive, ERCOT manually adjusted one of the input values to a price component called the Real-Time On-Line Reliability Deployment Price Adder—part of ERCOT's scarcity pricing mechanism—to impose a Real Time Settlement Point Price on February 15 at the HCAP of $9,000/MWh.   ERCOT then left that price in place for eighty-eight consecutive hours.[31]  For approximately 33 of those hours, the PUCT and ERCOT left the $9,000/MWh price in place *after* it had rescinded all residential load shed instructions early in the morning of February 18—and, therefore, the PUCT's asserted justification for the price intervention no longer applied. Potomac Economics, the PUCT's Independent Market Monitor, concluded that ERCOT's pricing intervention should have ended immediately on February 18 after load shed stopped, finding the "mistake" of keeping the inflated prices in place resulted in billions of additional, improper costs

---

[29]   Compl. ¶¶ 1, 2, 33, 34, 35.

[30]   Compl. ¶ 34.

[31]   Compl. ¶ 3.

to the ERCOT market.  When normal supply and demand forces were allowed to set the price of power on February 19, the trading price plummeted within one hour from $9,000/MWh to $27/MWh—a decline of 99.7%.[32]

22.     Mandating the market pricing at these levels by order was unprecedented.  For historical comparison, ERCOT real time prices averaged just $22/MWh for February 2020.[33] Equally unprecedented was the duration of the set price.  Prices had never before remained at the cap for anything close to eighty-eight hours.  January 2018 was the first time prices ever even reached the $9,000/MWh cap—for a total of only ten minutes.  In 2019, prices hit the cap, but only for a little more than two hours, in total.[34]

**D.     ANCILLARY SERVICE CHARGES**

23.     ERCOT also improperly calculated charges associated with various grid functions that support the continuous flow of electricity, including for reserves.  The cost of these "ancillary services" (as they are known in the power industry) reached the record price of $25,000/MWh during the storm.  These excessive prices represented a dramatic departure from ERCOT's historical prices for ancillary services.[35]

**E.     CANADIAN PROCEEDINGS AND CHAPTER 15 CASES**

24.     In February and March 2021, ERCOT floored Just Energy with invoices demanding approximately $336 million for the week of February 13 through February 20.[36]  Lacking sufficient liquidity to satisfy the invoices, the Debtors took immediate steps to raise a $125 million financing

---

[32]   Compl. ¶¶ 7, 41-42, 73-77.

[33]   Compl. ¶ 38.

[34]   Compl. ¶ 39.

[35]   Compl. ¶¶ 3, 43, 44.

[36]   Compl. ¶¶ 9, 53.

facility, which it secured over a matter of days, and commenced the Canadian Proceedings under the CCAA in the Canadian Court on March 9.  That same day, the Canadian Court approved the financing facility and authorized the payment of the disputed invoices to ERCOT.  Also on that day, the Debtors filed the Chapter 15 Cases in this Court seeking provisional recognition of the Canadian Court order.  ERCOT representatives appeared at the first-day hearing in the Chapter 15 Cases on March 9.[37]

25.    At the conclusion of the first-day hearing, the Court entered the Recognition Order granting Debtors' provisional relief that makes clear "any payments made to ERCOT are made subject to [Just Energy's] rights to contest those payments, and all rights to receive a refund or credit as allowed by applicable law."  The Court entered a final order of recognition on April 2, 2021, incorporating the same reservations.[38]

F.    **INVOICE CALCULATION FINDS NO SUPPORT UNDER STATE LAW OR PROTOCOLS**

26.    Neither the PUCT nor ERCOT possesses the substantive authority to set prices in the wholesale market in the way they did; they did not follow the statutorily-prescribed rule-making procedures; their actions were not supported by evidence as required by law; and the PUCT inserted itself into an area where it has no authority.  The PUCT Orders violated the Texas APA by setting prices without proper notice or making an evidentiary showing that the market's scarcity pricing signals were not working and that the inflated prices would accomplish their apparent intended purpose of stimulating power generation.  The PUCT Orders also violated the PURA, which mandates that pricing must be the function of competitive forces—not regulatory fiat.[39]

---

[37]    Compl. ¶¶ 10, 54, 55.  With respect to Plaintiff Hudson, ERCOT invoiced its QSE, BP.  BP satisfied those invoices and seeks reimbursement from Hudson pursuant to the parties Independent Electricity System Operating Scheduling Agreement (the "**ISO Agreement**").  See Compl. ¶¶ 10, 56, 91, 100 & n. 3.

[38]    Compl. ¶¶ 54, 55.

[39]    Compl. ¶¶ 4, 11, 57, 66-69, 70-72, 107, 128.

27.     Similarly, ERCOT's invoices find no support under, and are inconsistent with the ERCOT Protocols, incorporated by reference through the SFA.  At the time of the storm, the ERCOT Protocols did not include firm load shed among the considerations relevant to determining whether scarcity pricing would be appropriate.  Yet, the PUCT Orders impermissibly set the HCAP at $9,000/MWh based on firm load shed; charged prices for ancillary services that exceeded the HCAP of $9,000/MWh; and failed to allow prices to fall below $9,000/MWh when firm load shed ended.[40]

## G.     INITIAL COMPLAINT AND MOTIONS TO DISMISS

28.     Just Energy filed its first complaint on November 12, 2021, naming both the PUCT and ERCOT as defendants.  The complaint contained five counts alleging that:  (1) a portion of the $274 million in challenged transfers, that is, $193 million, was paid post-petition and subject to avoidance as an unauthorized post-petition transfer (11 U.S.C. § 549) because the Court never "approved" the transfer in the manner contemplated under sections 549 and 363 of the Bankruptcy Code; (2) any claim ERCOT has relating to the Invoiced Amounts should be disallowed (11 U.S.C. §§ 502(b), 502(d)); (3) the transferred amounts should be turned over to Just Energy (11 U.S.C. § 542); (4) Just Energy is entitled to set off the transferred amounts against obligations it owes ERCOT (11 U.S.C. §§ 553 and/or 558); and (5) the transferred amounts are subject to avoidance under the CCAA.

29.     Just Energy named the PUCT as a defendant in the initial Complaint.  That is because ERCOT took the position in the Brazos Proceeding that the PUCT is a necessary and

---

[40]   Compl. ¶¶ 5, 11, 58-59, 107, 128.

indispensable party to that litigation as ERCOT was simply following the PUCT Orders.[41]   Just Energy expected ERCOT to make the same arguments in this proceeding.

30.      Both ERCOT and the PUCT moved to dismiss the initial Complaint, arguing it failed to state claims as a matter of law; insisting the Court should abstain from deciding the claims under Burford; and asserting sovereign immunity.  The Court granted their dismissal motions in part and denied them in part on the record at a hearing held on February 2.  The Court (a) dismissed the PUCT as a defendant—without any opposition from ERCOT—finding the PUCT was not an indispensable party;[42] (b) dismissed the section 549 challenge to the post-petition transfers without prejudice, finding the Court did, in fact, "approve" the post-petition transfers;[43] (c) dismissed the section 502 claim without prejudice, finding it inapplicable without a pending proof of claim from ERCOT to which an objection could be lodged;[44] (d) declined to dismiss the setoff count and instead directed Just Energy to replead it, believing that as pled, the setoff count incorrectly limited Just Energy's rights to future setoff when Just Energy actually has had a vested setoff right since

---

[41]   See Brazos Proceeding [ECF No. 259] (ERCOT's And Defendants Intervenors Calpine Corp., NRG Energy Inc., Nextera Energy Marketing LLC, Engie Energy Marketing NA, Inc., And Talen Energy Supply, LLC's Supplemental Motion For Leave To Appeal Order Denying ERCOT's Emergency Motion To Dismiss) ¶ 3 ("Brazos's adversary complaint seeks to disallow or reduce ERCOT's claim based on allegations that, in following the PUCT's binding orders, ERCOT violated ERCOT's rules"); ¶ 17 ("Questions Presented …. Does Brazos' failure to join the PUCT require dismissal of Brazos's claims that the price of energy during the storm was inconsistent with the PURA, ERCOT Protocol's, and/or the SFA; or that the PUCT's pricing orders are not applicable to amounts Brazos owes ERCOT pursuant to storm-related invoices?"); ¶ 27 ("The argument that the PUCT is an indispensable party to this adversary proceeding is exceedingly strong.").

[42]   See Tecce Decl. Exhibit 3 (Tr., Hr'g, Feb. 2, 2022) at 10:15-20 ("PUC doesn't get any of the money, PUC regulates.  And it is not a beneficiary [or] an intended beneficiary.  So I'm finding that there are no actual live disputes between your client and the PUC …. The PUC is dismissed as a party.").

[43]   See Tecce Decl. Exhibit 3 (Tr., Hr'g, Feb. 2, 2022) at 77:1-10 ("We authorized these payments, the payments are subject to a reversal of the flow of funds if it turns out they should not otherwise have been paid.  But they cannot be recouped solely on the basis of 549.  There may be another basis on which they will have to all come back, but it isn't the 549 basis which is Count 1.").

[44]   See Tecce Decl. Exhibit 3 (Tr., Hr'g, Feb. 2, 2022) at 77:11-18 ("There is no present dispute on which the Court can rule as to whether they have valid claims against the Debtor.").

the time of the disputed charges;[45] (e) dismissed the turnover count without prejudice as premature;[46] and (f) requested more particularity on the CCAA claim, e.g., clarifying whether the claim is an "actual intent" claim, a preference, or a constructive fraudulent transfer claim.[47]  The Court directed Just Energy to file the amended complaint by March 4.  Just Energy filed it on February 11.

31.    The First Amended Complaint similarly challenges no less than $274 million of the amounts paid to ERCOT (hereinafter, the "**Transfers**") as well as the $336 million ERCOT invoiced (the "**Invoiced Obligations**").[48]  The initial Complaint and First Amended Complaint rest on the same factual predicate and bring the same claims for avoidance under Canadian law, turnover, and setoff.  The First Amended Complaint puts forth six counts:  Count 1:  Declaration Of Preference Under CCAA (§ 36.1), BIA (§ 95)—Invoice Obligations;[49] Count 2:  Declaration Of Preference Under CCAA (§ 36.1), BIA (§ 95)—Prepetition Transfers;[50] Count 3:  Transfer At Undervalue Under CCAA (§ 36.1), BIA (§ 96)—Prepetition Transfers;[51] Count 4:  Recovering

---

[45]    See Tecce Decl. Exhibit 3 (Tr., Hr'g, Feb. 2, 2022) at 78:2-79:1 ("I'm ordering on my own motion that the set off provisions be re-pled.  They seek relief that I believe to be inconsistent with the law only because it is contingent on a future event.  There is a present dispute between the parties as to whether the Debtor has a present set off right.  The Debtor says they do because the Debtor paid amounts that they absolutely shouldn't have paid and therefore they have a set off right …. So if there is a judgment that these amounts should have been paid, that set off right exists presently and ERCOT disputes that it exists presently and therefore I do require that it be re-pled.  I don't find it is a contingent dispute based on future events.  All of the events giving rise to the set off have already occurred …. There is no future contingency.  The Debtor is waiting to act because of prophylactic protections that it wants which does not diminish whether there is a present right.").

[46]    See ECF No. 105 ("[T]he turnover claim is dismissed without prejudice.").

[47]    See Tecce Decl. Exhibit 3 (Tr., Hr'g Feb. 2, 2022 pp. 79:2-20 ("As to Count 5 under the Canadian Act I am going to require those to be re-pled …. I am unaware of any allegation that this … was an actual fraudulent conveyance …. [I]t does need to be re-pled, I want to know what the law is.  I'm not even ruling necessarily that the current petition might not be sufficient under some Rule 8 theory of notice pleading.  I want to know what I'm doing in the case, and so I'm requiring the re-pleading …. [so I will] be in a position where I can better understand it.")).

[48]    Compl. ¶ 11.

[49]    Compl. ¶¶ 81-89.

[50]    Compl. ¶¶ 90-98.

[51]    Compl. ¶¶ 99-110.

Proceedings If Transferred—CCAA (§ 36.1), BIA (§ 98);[52] <u>Count 5</u>:  Turnover—11 U.S.C. §

542(a);[53] and <u>Count 6</u>:  Declaration Of Entitlement To Setoff, Recoupment, Counterclaim.[54]  The

First Amended Complaint requests narrower substantive relief because it omits the initial

Complaint's counts for unauthorized post-petition transfer under section 549 of the Bankruptcy

Code and disallowance under sections 502(c) and 502(d) of the Bankruptcy Code.  While it

contains six counts (compared to the Complaint's five), the First Amended Complaint breaks the

CCAA Count into four separate "sub-Counts."  The turnover and setoff counts carry over from the

initial Complaint.

### III.    ARGUMENT

#### A.    COURT HAS SUBJECT-MATTER JURISDICTION

32.    All of Just Energy's claims independently qualify as "core" under 28 U.S.C. §

157(b) because they involve "other matters under chapter 15," 28 U.S.C. § 157(b)(2)(P); "matters

concerning the administration of the estate," 28 U.S.C. § 157(b)(2)(A); "proceedings to determine,

avoid, or recover fraudulent conveyances," 28 U.S.C. § 157(b)(2)(H); "orders to turn over property

of the estate," 28 U.S.C. § 157(b)(2)(E); proceedings to determine, avoid, or recover preferences,"

28 U.S.C. § 157(b)(2)(F); and "other proceedings affecting the liquidation of the assets of the estate

or the adjustment of the debtor-creditor or equity security holder relationship," 28 U.S.C.

§ 157(b)(2)(O).

33.    The claims fit squarely within the plain text of section 157(b)(2).  The Canadian

claims satisfy both §§ 157(b)(2)(H) and (b)(2)(F) as fraudulent conveyance and preference claims

that seek to retrieve property located within the territorial jurisdiction of the United States.  The

---

[52]   Compl. ¶¶ 111-118.

[53]   Compl. ¶¶ 119-125.

[54]   Compl. ¶¶ 126-132.

turnover count falls directly into § 157(b)(2)(E).  And, all counts fall within §§ 157(b)(2)(A), (b)(2)(P), and (b)(2)(O).

### 1.   SECTION 157(B)(2)(P)—CLAIMS "ARISE UNDER" CHAPTER 15

34.     While each of the cited sections of 157(b)(2) apply with equal force and provide an independent jurisdictional basis, section 157(b)(2)(P), "other matters under chapter 15 of title 11" is particularly relevant.  Congress intended for Chapter 15 Cases to be centralized in the federal system, and that intent appears in both § 157(b)(2) and the abstention exclusions in § 1334(c).

35.     Section 157(b)(2)(P) includes requests for other relief that are covered under the provisions of chapter 15.  In re British Am. Ins. Co. Ltd., 488 B.R. 205, 223 n.31 (Bankr. S.D. Fla. 2013) (stating "section 157(b)(2)(P) should be read to include within the ambit of core chapter 15 matters the recognition procedure and requests for relief covered by the various provisions of chapter 15").  The Fifth Circuit's expansive reading of 1334(c)(1)'s "except with respect to a case under chapter 15" to mean any proceeding "arising in or related to" a chapter 15 case[55] indicates it would read § 157(b)(2)(P) similarly.

36.     Chapter 15 makes a broad reservoir of power available to Plaintiffs.  Section 1521(a) authorizes the Court to grant "any appropriate relief" where necessary to "effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of creditors."  It "includes"—but is not limited to—"entrusting the administration of all or part of the debtors' assets within the territorial jurisdiction of the United States" and  granting "any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)."  11 U.S.C. § 1521(a)(5), (a)(7).  Similarly, section 1507(a) authorizes the

---

[55]   See Firefighters' Ret. Sys. v. Citco Grp. Ltd., 796 F.3d 520, 527 (5th Cir. 2015).

Court to "provide additional assistance to a foreign representative under this title or other laws of the United States," subject only to the (inapplicable) limitations in section 1507(b).[56]

37.     The Fifth Circuit interprets sections 1521 and 1507 liberally.  See, e.g., Ad Hoc Group of Vitro Noteholders v. Vitro SAB de CV (In re Vitro SAB de CV), 701 F.3d 1031, 1044, 1054-55 (5th Cir. 2012) ("Chapter 15 provides for a broad range of relief …. [in] [s]ection 1520 …. § 1521(a) … [and] § 1507(a);" noting "[§] 1507 "was added … because Congress recognized that Chapter 15 may not anticipate all of the types of relief that a foreign representative may require and which would otherwise be available to such foreign representative;" "[u]nlike § 1521's 'any appropriate relief' language, § 1507 gives the courts the authority to provide 'additional assistance'"); In re Condor Ins. Ltd., 601 F.3d 319, 325 (5th Cir. 2010) (noting that the "structure and text of Chapter 15 suggests a broad reading of the powers granted to the district court in order to advance the goals of comity to foreign jurisdictions"); Firefighter's Ret. Sys. V. Citco Grp. Ltd., 796 F.3d 520, 526-527 (5th Cir. 2015) ("Chapter 15 was intended to provide effective mechanisms for dealing with cases of cross-border insolvency that would increase legal certainty, promote fairness and efficiency, protect and maximize value, and facilitate the rescue of financially troubled businesses.").[57]

---

[56]   See 11 U.S.C. § 1507(b) (court must assure "(1) just treatment of all holders of claims against or interests in the debtor's property; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding; (3) prevention of preferential or fraudulent dispositions of property of the debtor; (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.").

[57]   See id. at 1056-1057 ("First, because § 1521 lists specific forms of relief, a court should initially consider whether the relief requested falls under one of these explicit provisions …. Second [if not] … a court should decide whether it can be considered 'appropriate relief' … [and] whether such relief has been expressly provided under § 304 …. Third, only if the requested relief goes beyond the relief previously available under § 304 or currently provided for under United States law, should a court consider § 1507"). Cf., Angul v. Kedzep, Ltd., 29 B.R. 417, 418 (S.D. Tex. 1983) ("Section 304 provides that a foreign representative may commence a case ancillary to a foreign proceeding and that the court may: (1) enjoin the commencement or continuation of any action involving the debtor or the debtor's property; (2) order property to be turned over; or (3) order other appropriate relief.").

38.     Those provisions encompass the relief requested in the First Amended Complaint, that is, avoiding obligations and transfers under Canadian law; compelling turnover of property or its value located within the territorial jurisdiction of the United States; and declaring rights to setoff and counterlcaims which are preserved specifically in section 558.  See In re Condor Ins. Ltd., 601 F.3d 319, 325 (5th Cir. 2010) (exercising subject-matter jurisdiction over avoidance action brought by foreign representative under foreign law irrespective of exclusion of § 544-claims from chapter 15 pursuant to section 1521(a)(7)); In re AJW Offshore, Ltd., 488 B.R. 551, 559 (Bankr. E.D.N.Y. 2013) ("[T]he Bankruptcy Code does not prohibit the court from authorizing the foreign representative to employ turnover powers available under §§ 542 [pursuant to 1521(a)]"); In re Tri-Cont'l Ex. Ltd., 349 B.R. 627, 639 (Bankr. E.D. Cal. 2006) ("[Foreign representative asking] that the funds to be released by agreement of the USDOJ from the in rem proceeding would be maintained in a deposit account within the jurisdiction of this court … merely asked to be entrusted to administer and realize assets under § 1521(a)(5)").  Cf., In re Fairfield Sentry, 458 B.R. 665, 67 (S.D.N.Y. 2011) (foreign avoidance claims did not fall within section 1521(a)(5) or 1521(a)(7) because they sought to recover property transferred outside the United States and not "assets within the territorial jurisdiction of the United States").

39.     Similarly, construing chapter 15 to authorize the types of relief sought in the Complaint accords with the enumerated purposes set forth in section 1501.  Those statutory purposes include the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor" and the "protection and maximization of the value of the debtor's assets." 11 U.S.C. § 1501(a)(3), (a)(4).  See 8 Collier On Bankruptcy ¶ 1501.02, 1501-5 (16th ed.) ("Courts routinely allude to the purposes of chapter 15 in the course of addressing specific issues that arise in chapter 15 cases") (quoting, inter alia,

<u>Vitro</u>, 701 F.3d at 1043, for proposition that Fifth Circuit relied on § 1501(a) before assessing "the qualification of the foreign representative")).

40.     Thus, the claims are "core" under section 157(b)(2)(P) because they "arise under" foreign insolvency laws, "arise in" a chapter 15 case, and relate to requests for relief covered by chapter 15.  In addition to falling within the relief contemplated by section 1521(a)(5), 1521(a)(7), and 1507(a), the claims concern payments made pursuant to an order of the Canadian Court that was recognized by this Court in Chapter 15 Cases in which ERCOT appeared and consented to the entry of that Recognition Order and its reservation of Just Energy's rights to pursue claims against ERCOT relating to the payments.  ERCOT's single case, <u>In re Wood</u>, 825 F.2d 90 (5th Cir. 1987), decided nearly 20 years before Congress passed chapter 15 in 2005, does not dictate a different result.[58]

41.     Similarly, <u>In re Fairfield Sentry Ltd.</u>, 458 B.R. 665 (S.D.N.Y. 2011), cited by ERCOT,[59] does not impact the analysis.  The District Court reversed the Bankruptcy Court's finding the claim in question was core, but that is because "[t]he foreign representatives seek recovery of foreign assets by challenging foreign transfers …. [so] there are no assets sought 'within the territorial jurisdiction of the United States.'"  <u>Id.</u> at 677.  <u>Fairfield</u> distinguished <u>Condor</u> because it "involved a situation where the foreign debtor allegedly fraudulently transferred $313

---

[58]     ERCOT Mot. p. 38, ¶ 73 & n. 182.  ERCOT cites <u>Wood</u> for the proposition that the claims do not "arise in" the context of a chapter 15 case—but <u>Wood</u> (which involved state law claims over disputed shares of stock) supports Plaintiffs.  In <u>Wood</u>, the court explained "a proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." <u>Wood</u>, 825 F.2d at 97.  Those are exactly the claims at issue here.  None would exist but for the Debtors' bankruptcy filings under the CCAA.  <u>Cf.</u>, <u>Am. Pegasus SPC v. Clear Skies Holding Co., LLC</u>, 2015 WL 10891937, at *15 n.16 (N.D. Ga. Sept. 22, 2015) (observing "[this action] also appears to be a case arising under Title 11, due to the inclusion of the Cayman [avoidance] claim") (citing <u>In re Tyler</u>, 493 B.R. 905, 911 (Bankr. N.D. Ga. 2013) ("Proceedings 'arising under' title 11 involve 'matters invoking a substantive right created by the Bankruptcy Code.' For example, an action by a trustee to avoid a preferential transfer under 11 U.S.C. § 547 would invoke such a substantive right.")).

[59]     ERCOT Mot. p. 14, ¶ 75 & n. 67.

million in assets to an affiliate with United States locations.  Thus, the *assets* claimed were located within the territorial jurisdiction of the United States."  Id. at 681.  Here, the claims similarly involve the recovery of assets from a defendant located in the United States.  Under Condor, the Bankruptcy Court has core jurisdiction over the claim under 28 U.S.C. §157(b)(2) for that reason.

## 2. PRESENCE OF STATE-LAW ISSUES HAS NO BEARING ON COURT'S AUTHORITY

42.     ERCOT argues the Court's anticipated interpretation of state law applicable to the PUCT Orders renders the claims "non-core" and requires that they be decided in state court.  But, bankruptcy courts routinely review and interpret state law when deciding core matters, e.g., contract assumption under section 365;[60] claim allowance under section 502;[61] taxes and fines;[62] section 541 property of the estate;[63] property subject to avoidance;[64] debt and lien avoidance;[65]

---

[60]   See In re Alta Mesa Resources, Inc., 613 B.R. 90, 99 (Bankr. S.D. Tex. 2019) (examining whether gathering agreements form real property covenants capable of being rejected under section 365; noting they "relate to real property located in Oklahoma" and "when a dispute focuses on real property, the Court ordinarily applies the law of the state where the real property is located").

[61]   See, e.g., In re Ultra Petroleum Corp., 2017 WL 4863015, at *2 (Bankr. S.D. Tex. Oct. 26, 2017) (examining whether make-whole payments seek "unmatured interest" and are "fully enforceable under New York law"); In re Shree Mahalaxmi, Inc., 505 B.R. 794, 799-800 (Bankr. W.D. Tex. 2014) ("If appliable state law deems a claim for pre-petition interest unmatured or unearned on the petition date, § 502 disallows such claim.").  See also Pepper v. Litton, 308 U.S. 295, 304 (1939) (noting "bankruptcy courts have exclusive jurisdiction over the liquidation and allowance of bankruptcy claims is a principle long recognized and not reasonably disputed.").

[62]   See In re Luongo, 259 F.3d 323, 331 & n. 5 (5th Cir. 2001) ("Just as bankruptcy courts are often called upon to apply state law in resolving bankruptcy matters, so too may they apply tax law in appropriate circumstances …. [T]he bankruptcy court may avoid a preference … or a fraudulent transfer … even though these defenses are intertwined with state law").

[63]   See In re First Protection, Inc., 440 B.R. 821, 828 (9th Cir. B.A.P. 2010) ("Although the question whether an interest claimed by the debtor is 'property of the estate' is a federal question to be decided by federal law, bankruptcy courts must look to state law to determine whether and to what extent the debtor has any legal or equitable interest in property as of the commencement of the case"); In re ATP Oil & Gas Corp., 553 B.R. 577, 582 (Bankr. S.D. Tex. 2016) (examining Louisiana law to determine whether property in constructive trust was excluded from estate under section 541).

[64]   See In re Contractor Tech. Ltd., 343 B.R. 573, 577 (Bankr. S.D. Tex. 2006) ("In determining the exact meaning of 'parting with property' and 'interest in property' [for purposes of § 101(54) 'transfer' definition] Barnhill [v. Johnson, 503 S. Ct. 393, 398 (1945)] directs courts to state law").

[65]   See In re Lovelace, 443 B.R. 494, 500 (Bankr. W.D. Tex. 2011) (examining state law to determine whether lender that extended home-equity loan held valid lien on homestead); In re Rice, 311 B.R. 450, 454 (Bankr. N.D. Tex. 2004) (examining validity of judgment debt under California law).

and whether interest is usurious.[66]  Here, the mere fact that state law will be consulted does not <u>a</u>

<u>fortiori</u> make the underlying claim non-core.  <u>See</u>, <u>e.g.</u>, 28 U.S.C. § 157(b)(3) (core/non-core

determination "shall not be made solely on the basis that [a claim's] resolution may be affected by

State law").

### 3.  ALTERNATIVELY, COURT HAS "RELATED-TO" JURISDICTION

43.    Even if the First Amended Complaint's claims are not core, the Court has "related-

to jurisdiction"[67] given the potential impact the litigation may have on the Chapter 15 Cases and

the Canadian Proceedings—and particularly Just Energy's liquidity.  <u>See</u> <u>In re British Am. Ins.</u>

<u>Co. Ltd.</u>, 488 B.R. 205, 223-24 (Bankr. S.D. Fla. 2013) (exercising related-to jurisdiction over a

chapter-15 debtor's complaint alleging breach of fiduciary duty against its former directors;

observing a chapter 15 case necessarily requires a court "to substitute the chapter 15 case itself for

the concept of the estate;" observing suit "may impact both the plaintiff and the administration of

the chapter 15 case" and "court may also define the extent of related-to jurisdiction in the chapter

15 case by the potential effect of the action on the estate administered in the foreign proceeding");

<u>SPV Osus Ltd. v. UBS AG</u>, 882 F.3d 333, 339-40 (2d Cir. 2018) (claim is "related to" bankruptcy

case "if the action's outcome might have any conceivable effect on the [foreign] estate."); <u>In re</u>

<u>Fairfield Sentry Ltd.</u>, 2018 WL 3756343, at *7 (Bankr. S.D.N.Y. Aug. 6, 2018) ("[T]he relevant

estate for a foreign debtor is the foreign estate … all that is required for the exercise of 'related to'

jurisdiction is the satisfaction of the 'conceivable effect' test, '[n]othing more.'").

---

[66]  <u>See</u> <u>In re Powerburst Corp.</u>, 154 B.R. 307, 312-313 (Bankr. E.D. Cal. 1993) (deciding whether interest rates were usurious under New York law).

[67]  <u>See</u> <u>Bass v. Denney (In re Bass)</u>, 171 F.3d 1016, 1022 (5th Cir. 1999) ("A proceeding is 'related to' a bankruptcy if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy").  <u>Accord</u> <u>SPV Osus Ltd. v. UBS AG</u>, 882 F.3d 333, 339-40 (2d Cir. 2018); <u>Pacor, Inc. v. Higgins (In re Pacor)</u>, 743 F.2d 984, 994 (3d Cir. 1984).

4.      S̲ᴛᴇʀɴ ᴠ. M̲ᴀʀꜱʜᴀʟʟ Dᴏᴇꜱ Nᴏᴛ Iᴍᴘᴀᴄᴛ Jᴜʀɪꜱᴅɪᴄᴛɪᴏɴ

44.    ERCOT suggest wrongly that Stern v. Marshall limits the Court's jurisdiction to hear Just Energy's claims because it supposedly narrowed the jurisdictional grants in section 157(b)(2).[68] Stern dealt with the "narrow issue" before it, that is, whether bankruptcy courts can enter final orders with respect to claims that are statutorily core, but not Constitutionally core.  It has no bearing on whether bankruptcy courts have subject-matter jurisdiction in the first instance. See Wellness Int'l Network, Ltd v. Sharif, 135 S.Ct. 1932, 1946-47 (2015) ("An expansive reading of Stern … would be inconsistent with the opinion's own description of its holding.  The Court in Stern took pains to note that the question before it was a 'narrow' one, and that its answer did 'not change all that much' about the division of labor between district courts and bankruptcy courts."); In re Extended Stay, 466 B.R. 188, 202 & n. 73 (S.D.N.Y. 2011) (denying motion to withdraw reference; noting "[m]any of these claims are asserted against creditors who filed proofs of claim in the Debtors' bankruptcy …. [Stern] categorizes itself as a narrow decision …. [and] does not remove from the bankruptcy court its jurisdiction over matters directly related to the estate that can be finally decided in connection with restructuring debtor and creditor relations"); Liquidating Trustee v. Granite Fin. Solutions, Inc. (In re MPC Computers LLC), 465 B.R. 384, 388 (Bankr. D. Del. 2012) (observing Stern "in no way disturbed the bankruptcy court's jurisdiction to hear certain matters, which is a separate issue from the court's power to enter final judgment").  While ERCOT argues the Complaint's claims are "the stuff of traditional actions at common law," even if true, its only relevance is to explain ERCOT's disclaimer of consent to the entry of a final order in this proceeding.[69]

---

[68]    ERCOT Mot. pp. 38-39, ¶¶ 73-79

[69]    ERCOT Mot. pp. 39, 55, ¶¶ 74, 108.

**B.      PUCT DOES NOT HAVE EXCLUSIVE JURISDICTION**

45.      ERCOT argues the PUCT has exclusive jurisdiction because Just Energy challenges "Texas's comprehensive regulatory scheme for electric utilities."[70]  But, the lawsuit focuses on the wholesale and retail power markets.  The PUCT does not have exclusive jurisdiction over Just Energy's claims because there is no pervasive regulatory scheme in place in Texas with respect to competitive suppliers in wholesale and retail power markets.

46.      Texas deregulated the wholesale power market.  It no longer is subject to comprehensive or pervasive regulation.  See, e.g., In re Entergy, 142 S.W.3d 316, 322 (Tex. 2004) (agency has exclusive jurisdiction when "a pervasive regulatory scheme indicates that Congress intended for the regulatory process to be the exclusive means of remedying the problem to which regulation is addressed"); City of Corpus Christi v. Pub. Util. Comm'n of Texas, 51 S.W.3d 231, 236 (Tex. 2001) (Texas legislature amended PURA in 1999 to deregulate utility rates upon "finding that regulation was no longer warranted, except for regulation of transmission and distribution services and regulation of the recovery of stranded costs" and "concluding it was in the public interest to establish a fully competitive electric power industry in Texas").

47.      While the PUCT has exclusive jurisdiction with respect to electric utilities, Just Energy is not an electric utility.  It is a retail energy provider.  See Tex. Util. Code § 32.001 ("COMMISSION JURISDICTION.  (a) Except as provided by Section 32.002, the commission has exclusive jurisdiction over the rates, operations, and services of an electric utility"); § 32.002(6) ("'Electric utility' means a person … that owns or operates for compensation in this state equipment or facilities to produce, generate, transmit, distribute, sell, or furnish electricity …. The term does not include: …. (H) a retail electric provider").

---

[70]      See, e.g., ERCOT Mot. pp. 2, 7-8, ¶¶ 2, 14.

48.     And, to the extent the PUCT exercises "complete authority" with respect to ERCOT, it does so with respect to ERCOT's "finances, budget, and operations"—not the wholesale power market.  See Tex. Util. Code § 39.151(d) ("The commission has complete authority to oversee and investigate the organization's finances, budget, and operations as necessary to ensure the organization's accountability and to ensure that the organization adequately performs the organization's functions and duties.").

49.     Nor is Just Energy required to exhaust administrative remedies.  Instead, the Court can decide whether the Invoiced Obligations or Transfers violated governing law without requiring Just Energy to first petition the PUCT because the Counts have an independent jurisdictional basis under sections 157(b) and 1334 of title 28.  See, e.g., Matter of Benjamin, 932 F.3d 293 (5th Cir. 2019) (rejecting Social Security Administration's argument that a debtor asserting a claim in bankruptcy court alleging overpayment of benefits was required to exhaust the administrative appeal process; bankruptcy court had jurisdiction to decide a "claim for money [alleging] … the SSA failed to comply with its own regulations in recouping the overpayment."); In re Jones, 618 B.R. 757, 772-73 (Bankr. D.S.C. 2020) ("[P]laintiffs are not required to exhaust any administrative remedies before they seek remedies for the defendant's alleged violations of the Bankruptcy Code. … A state law restriction or impediment to a debtor seeking redress of [the Bankruptcy Code's] federally premised rights quickly runs afoul of the Supremacy Clause"); In re Tri-Union Dev. Corp., 2015 WL 5730745, at *12 (Bankr. S.D. Tex. Sept. 28, 2015) (observing jurisdiction "is not precluded by the doctrine of exhaustion of administrative remedies" when lawsuit examined whether forfeiture orders were valid in context of determining validity of debt) (citing In re Healthback LLC, 226 B.R. 464, 471 (Bankr. W.D. Okl. 1998) for proposition that jurisdiction will lie when "adjudication of the bankruptcy court over property of the estate is not directly concerned

with any administrative decision but rather to ensure that all creditors are treated equally within the scope of the Bankruptcy Code"); In re Bryco Funding, Inc., 2009 WL 3271309, at *2 (Bankr. N.D. Cal. Oct. 2, 2009) ("The trustee's failure to exhaust state-law administrative remedies does not divest this court of jurisdiction to adjudicate the fraudulent transfer claims against the [Franchise Tax Board] because the bankruptcy court has an independent basis for jurisdiction over the claims.").  Tellingly, ERCOT cites no case holding a party had to exhaust administrative remedies before pursuing claims before a bankruptcy court exercising "core" or "related-to" jurisdiction.[71]

## C.    FILED-RATE DOCTRINE IS INAPPLICABLE

50.    ERCOT tries to invoke the filed-rate doctrine, but identifies no precedent in which the filed-rate doctrine was invoked to bar a party from arguing that an agency's order was entered unlawfully.[72]  Rather, in the typical case the doctrine is invoked to prohibit a ratepayer from challenging a utility's lawfully filed rates on some other ground.  For example, TCE, which ERCOT relies upon, involved the appeal of antitrust claims against market participants.  TCE did not concern claims against ERCOT.  ERCOT also relies on Mirant and Ultra Petroleum, but those cases stand for another proposition, that is, that contracts subject to agency regulation can be rejected in chapter 11 because "the filed rate itself is separate from full payment of that rate."  In

---

[71]   See ERCOT Mot. pp. 8, ¶ 15 & n. 32; p. 53, ¶ 102 & n. 264 (citing Oncor Elec. Delivery Co. LLC v. Chaparral Energy, LLC, 546 S.W.3d 133, 139-40 (Tex. 2018) (breach of contract case "involve[d] …. [an electric utility's] "services," and PURA grants PUCT exclusive jurisdiction over those services); In re Entergy Corp., 142 S.W.3d 316, 323 (Tex. 2004) (PUCT has exclusive jurisdiction over disputes "regarding utility rates, operations, and services" such that administrative exhaustion doctrine applied to breach of merger agreement case).

[72]   None of the cases ERCOT cites even named the regulatory agency as a defendant.  See, e.g., Winn v. Alamo Title Ins. Co., 2009 WL 7099484 (W.D. Tex. May 13, 2009); Pub. Util. Dist. No. 1 of Grays Harbor Cty. Wash. v. IDACORP Inc., 379 F.3d 641 (9th Cir. 2004); Rothstein v. Balboa Ins. Co., 794 F.3d 256, 259 (2d Cir. 2015); Util. Choice, L.P. v. TXU Corp., 2005 WL 3307524, at *1 (S.D. Tex. Dec. 6, 2005).

re Ultra Petroleum Corp., 2022 WL 763836, at *8 (5th Cir. Mar. 14, 2022); In re Mirant Corp., 378 F.3d 511, 515–17 (5th Cir. 2004).

### D.  PUCT IS NOT AN INDISPENSABLE PARTY

51.     ERCOT's after-the-fact argument that the PUCT is an indispensable party[73] ignores the  law of the case that it is not such a party—a finding it never contested—and otherwise fails substantively.   ERCOT is not correct that Just Energy conceded the PUCT is an indispensable party by naming it as a defendant.[74]  Just Energy told the Court several times, starting with its opposition to the PUCT and ERCOT Motions to Dismiss, it only "named the PUCT as a Defendant after ERCOT took the position in the Brazos Proceeding that the PUCT is an indispensable party in that litigation."[75]   That point was discussed among the Court, the PUCT, and Just Energy during four hearings, all of which ERCOT attended.

- On January 6, Just Energy told the Court several times in response to the question of "why we had the PUC," that it was named because "the position ERCOT has taken is that the PUCT is an indispensable party … in … the Brazos case."   The Court told the PUCT "I might find that you are not an indispensable party because right now I still don't understand why you are, and you might win abstention and we might just proceed with ERCOT."[76]

- On January 11, the Court repeated its "skepticism I voiced at the last hearing as to whether PUCT should be a party …. I am doing my best to avoid having the PUCT as a party."[77]

- On January 14, after ruling on the intervention motions, the Court said "I'm going to reconsider this decision if PUC remains in the case.  I have said from the beginning that … I don't think we need the PUC here."[78]

- On February 2, at the hearing to consider the PUCT and ERCOT Motions To Dismiss, the PUCT argued it should not a party when, among other things, it did not receive a transfer

---

[73]   ERCOT Mot. pp. 35-37, ¶¶ 65-69.

[74]   ERCOT Mot. p. 35, ¶ 65.

[75]   Just Energy Omnibus Objection To ERCOT and PUCT Motions To Dismiss [ECF No. 70] at pp. 14-15, ¶¶ 27-28.

[76]   Tecce Decl. Exhibit 4 (Tr., Hr'g Jan. 6, 2022 pp. 13:8-16:9, 71:20-25).

[77]   Tecce Decl. Exhibit 6 (Tr., Hr'g Jan. 11, 2022 pp. 76:13-77:24).

[78]   Tecce Decl. Exhibit 5 (Tr., Hr'g Jan. 14, 2022 pp. 61:14-22).

and did not file a claim.  Just Energy reiterated to the Court that "[w]hen we filed suit, when we named the PUC as a defendant … the position that was taken by ERCOT was that they were an indispensable party …. So we didn't want to be chasing that after the fact on a motion to dismiss."  The Court observed "I don't think it is possible to have an indispensable party against whom one seeks no relief …. I'm finding that there are no actual live disputes between your client and the PUC" and dismissed the PUCT from the lawsuit.[79]

52.     ERCOT never disagreed with the Court or the PUCT that the PUCT was not an indispensable party during any of the four hearings when the issue was discussed before the Court's ruling.  It did not object to the PUCT Motion To Dismiss.  It never responded to Just Energy's point that Just Energy named the PUCT because of the position ERCOT is taking in Brazos.  ERCOT said nothing, save a short statement in the reply in support of ERCOT's First Motion and a short statement on the record after the Court granted the PUCT Motion to the effect that ERCOT "believe[s] they are a necessary party" because Just Energy challenges the PUCT Orders, to which the Court responded "it's ERCOT's actions they complain of …. I understand your concern, but they don't seek that relief against the PUC."[80]

53.     ERCOT cannot raise the argument at this point.  The Court's finding is law of the case.  See, e.g., Loumar, Inc. v. Smith, 698 F.2d 759, 762 (5th Cir. 1983) (law of the case is a "rule of practice, based on sound policy that when an issue is once litigated and decided, that should be the end of the matter").  And, ERCOT is precluded from challenging the decision because it never opposed the PUCT's dismissal as an indispensable party.  See, e.g., United States v. Ware, 2022 WL 135818, at *1 & n. 1 (5th Cir. Jan. 13, 2022) ("arguments raised for the first time in a reply brief, even by pro se litigants, are waived"); IIlan–Gat Engrs., Ltd. v. Antigua Int'l Bank, 659 F.2d

---

[79]   Tecce Decl. Exhibit 3 (Tr., Hr'g Feb. 2, 2022 pp. 8:19-10:22).

[80]   Tecce Decl. Exhibit 3 (Tr., Hr'g Feb. 2, 2022 13:12-14:22); [ECF No. 80] ERCOT Reply In Supp. First Mot. Dismiss pp. 24-25 ¶¶ 47-49 ("If the PUCT is dismissed from this suit on any ground, the Court must dismiss the whole case because the PUCT is indispensable").

234, 242 (D.C.Cir. 1981) ("[A] court should in equity and good conscience, consider the timing

of a [Rule 12(b)(7)] motion and the reasons for the delay"); Fed. R. Civ. P. 19, Notes On Advisory

Committee Rules—1966 Amendment (delay in bringing motion is relevant "when the moving

party is seeking dismissal in order to protect himself against a later suit by the absent person

(subdivision (a)(2)(ii))[.]").

54.     Regardless, the PUCT is not an indispensable party.  The PUCT did not receive any

transfer or send any invoice to Just Energy.  Instead, ERCOT received the transfers and imposed

the obligations being challenged.  Should Just Energy obtain a judgment against ERCOT, that will

afford it complete relief.  And, there is no risk to ERCOT of conflicting obligations.  Any judgment

from this Court will be binding on ERCOT and give it a defense in any PUCT enforcement action.

And, the interests of the PUCT and ERCOT are aligned.  See Fed. Ins. Co. v. Singing River Health

Sys., 850 F.3d 187, 201 (5th Cir. 2017) (party not indispensable when it had same interest as

movant Medical Insureds—maximizing coverage—so "their interests are protected by the Medical

Insureds' vigorous litigation in the coverage dispute"); Merrill Lynch, Pierce, Fenner & Smith,

Inc. v. Flanders-Borden, 11 F.4th 12, 17 (1st Cir. 2021) ("[W]here the interests of an absent party

are aligned closely enough with the interests of an existing party, and where the existing party

pursues those interests in the course of the litigation, the absent party is not required under Rule

19.").

55.     Just Energy never requested relief from the PUCT.  It challenges the validity of the

PUCT Orders, but the PUCT does not have to be a party for the Court to decide whether they

comply with applicable law.  ERCOT has cited no precedent holding—contrary to the Court's

prior determination—that a state agency is an indispensable party in a suit that does not seek any

relief against the agency merely because the parties' arguments require the court to pass upon the

lawfulness of the agency's regulations.  By analogy, the Federal Rules of Civil Procedure recognize this and give the United States or the State the option to intervene.  But, their presence is not mandatory.  Cf., Fed. R. Civ. P. 5.1 ("A party that files a pleading, written motion, or other paper … drawing into question the constitutionality of a federal or state statute must promptly …. serve the notice and paper on the Attorney General of the United States if a federal statute is questioned—or on the state attorney general if a state statute is questioned …. [T]he attorney general *may intervene* within 60 days after the notice is filed") (emphasis added).

## E.    MONITOR IS NOT ONLY PARTY THAT CAN BRING CANADIAN LAW CLAIMS

56.    The BIA gives "a trustee," as an estate representative in a bankruptcy proceeding, authority to bring claims under sections 95 and 96.  Under section 36.1 of the CCAA, the same power is expressly conferred on the Monitor, as court officer acting for the benefit of the estate under the CCAA.  ERCOT has not pointed to any authority[81] finding an estate fiduciary or representative other than the Monitor, like the Foreign Representative appointed by the Canadian Court, recognized by this Court, and entrusted to realize all or part of the Debtors' assets located in the United States, cannot bring estate claims under section 36.1 of the CCAA.[82]  See Gray's Commentaries on Federal Corporate Laws, § CCAA-P4:COM18 (foreign representative "may avail itself of the following remedies: (a) a preferential payment action; (b) a transfer at undervalue…"); 11 U.S.C. § 1509(b)(1), (2) (foreign representative has standing "to sue and be sued" and can "apply directly to a court").

57.    This is an issue of first impression.  In two of the cases relied upon by ERCOT, the claim was asserted by the monitor, but the issue of standing was not raised or discussed by the

---

[81]    ERCOT Mot. pp. 15-16, ¶¶ 26-30.

[82]    See [ECF No. 82] p. 8, ¶ 25(a).

court.[83]  And in the only two cases cited by ERCOT where standing was raised, the standing of a foreign representative or other estate fiduciary was not at issue.   The cases involved non-representative parties, e.g., lenders in one case and an asset-purchaser who was not even a creditor in the other.[84]   Here, a Court-appointed fiduciary is pursuing estate claims with the Monitor's support for the benefit of the entire estate.

58.      The Monitor, who ERCOT properly describes as "an independent and impartial expert, acting as the eyes and ears of the court throughout the proceedings,"[85] supports Just Energy prosecuting the claims and asks the Court, for the sake of efficiency to permit the proceeding to continue with the current parties.   See Tecce Decl. Exhibit 1 (Monitor Decl.) ¶¶ 8-10 ("The Monitor continues to support the Foreign Representative's pursuing claims against ERCOT. Among other things, the Foreign Representative is an estate fiduciary and is well-positioned to pursue claims in the Bankruptcy Court on behalf of the Debtors' estates.  The Monitor will, if necessary, seek advice and directions from the Canadian Court for the Foreign Representative to proceed with this action and continue prosecuting the claims therein against ERCOT and/or for the Monitor to become directly involved in the prosecution of such claims.  Efficiency dictates that the case should simply continue as is without the time and expense of involving the Canadian Court.  The prompt disposition of the Adversary Proceeding is important to the Debtors.").

59.      Importantly, a foreign representative and a monitor fulfill similar functions in respect of the estate.  The  CCCA defines the monitor to mean "the person appointed under section

---

[83]    ERCOT Mot. p. 16, ¶ 30 & n. 77 (citing Ernst & Young Inc v. Aquino, 2021 ONSC 527, aff'd 2022 ONCA 202 and Urbancorp Cumberland 2 GP Inc, Re, 2017 ONSC 7156).

[84]    ERCOT Mot. pp. 15-16, ¶¶ 29-30 & n. 74, n. 77 (citing Re Cash Store Financial Services, 2014 ONSC 4326, aff'd 2014 ONCA 834 (attempt by DIP lenders to challenge preference and transfer at undervalue; without assignment by monitor to the DIP lenders, standing was lacking); Verdellen v Monaghan Mushrooms Ltd., 2011 ONSC 5820  (revieing standing under § 36.1 of purchaser of debtor's business who was not a creditor)).

[85]    ERCOT Mot. pp. 15, ¶ 29 & n. 74.

11.7 to monitor the business and financial affairs of the company."  CCAA § 2(1).  It defines the foreign representative to mean "a person or body, including one appointed on an interim basis, who is authorized, in a foreign proceeding respect of a debtor company, to (a) monitor the debtor company's business and financial affairs for the purpose of reorganization; or (b) act as a representative in respect of the foreign proceeding.  CCAA § 45(1).  Both are court officers that owe duties to the estate.[86]  There is therefore no reason why here the Foreign Representative and the Monitor should not equally have status to bring a challenge under § 36.1 of the CCAA for the benefit of the debtor's estate.  The contrary conclusion would allow form to triumph over substance in a proceeding where the debtor—not the monitor—is acting as a foreign representative, but has the monitor's full support to prosecute the claims.

60.    This Court and the Canadian Court can communicate on this point to the extent necessary.  See 11 U.S.C. § 1525(b) ("The court is entitled to communicate directly with, or to request information or assistance directly from, a foreign court or foreign representative, subject to the rights of a party in interest to notice and participation.").

61.    Even if there is a technical issue to "cure," dismissal is not warranted.  The named Plaintiffs are the aggrieved parties that suffered significant harm as a result of ERCOT's illegal billing, risk a loss of their customers based on ERCOT's actions.  JE Texas LP, Fulcrum, and Hudson have a "Retail Electric Provider" certificate, are registered as "Market Participants" in the ERCOT Market, and are parties to an SFA with ERCOT.   If ERCOT's invoices are not paid, ERCOT can suspend market participation and transfer customers to a POLR.  Also, the PUCT might initiate proceedings to amend, suspend, or revoke their Retail Electric Provider certificates.[87]

---

[86]    Tecce Decl. Exhibit 2 (McElcheran Decl. ¶ 35 (noting "Plaintiffs in this case, like the Monitor, are fiduciaries for the creditors of Plaintiffs")).

[87]    First Am. Compl. p. 11, ¶ 29.

Because they have Constitutional standing, any prudential standing issues, i.e., whether the rights of third parties like the Monitor are being pursued, can be addressed without dismissal of the proceeding. See Elgin Sweeper Co. v. Melson Inc., 884 F. Supp. 641, 650-51 (N.D.N.Y. 1995) (noting "the BIA provides the mechanism for ... a creditor, under s. 38, to pursue a claim which the trustee elects not to pursue, in order to recover the amount of his debt, as long as he is prepared to fund the process;" denying request "to dismiss the complaint because the plaintiff [a creditor] has not obtained permission to proceed with this action from the Ontario court that adjudicated Compro's bankruptcy pursuant to § 38 of [the BIA];" noting "[n]either party has indicated what if any state policy would be implicated by extending comity to § 38 of the BIA;" agreeing to "extend comity to § 38 of the BIA and require the plaintiff to comply with its provisions. Since extending comity to Ontario law will not require this court to dismiss the complaint, the court will deny the defendant's motion to dismiss and allow the plaintiff 90 days … to obtain an order from the Ontario Court of Justice granting it leave to proceed with this action against the Royal Bank of Canada."); Advanced Tech. Incubator, Inc. v. Sharp Corp., 2009 WL 2460985, at *5 (E.D. Tex. Aug. 10, 2009) ("A plaintiff with constitutional standing may cure prudential standing defects after it files suit").

**F.      COUNT 1-COUNT 4: CANADIAN LAW CLAIMS**

62.     This lawsuit seeks to avoid obligations and recover payments based on illegal invoices. The company was grossly overcharged—$9,000/MWh for electricity that dropped to $27/MWh on February 19, 2021. That money should be recovered. Canadian courts interpret the BIA as "remedial legislation [that] should be given a liberal interpretation to facilitate its objectives." Tecce Del. Exhibit 8 (Third Eye Capital Corporation v. Resources Dianor Inc./Dianor Resources Inc., 2019 ONCA 508, 435 D.L.R. (4th) 416, at para. 43)). This liberal standard applies to the interpretation of both preferences and transfers at undervalue under Canadian law. See

Tecce Decl. Exhibit 9 (Ernst & Young Inc. v. Aquino, 2022 ONCA 202 (Ont. C.A.) ¶ 22); see also McElcheran Decl. ¶ 30.

### 1.    CHOICE OF LAW ANALYSIS DICTATES CANADIAN LAW APPLIES

63.     ERCOT does not attempt a choice-of-law analysis and instead argues in a footnote that Texas courts follow the "most significant relationship" test.[88]  In conducting a choice of law analysis, the threshold question is "whether a federal or a forum (Texas) choice of law rule applies." Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-Ingram Dev. Co., 642 F.2d 744, 748 (5th Cir. 1981).  But here, the "[federal] independent judgment test 'is essentially synonymous with the most significant relationship approach'" applied in Texas.  In re Mirant Corp., 675 F.3d 530, 536 (5th Cir. 2012).  Under either court's choice-of-law rules, "the Court should apply the law of the forum with the 'most significant' contacts or relationship to th[e] dispute, thereby exercising an 'informed judgment in the balancing of all the interests of the states [or countries] in order to best accommodate the equities among the parties.'"  In re SkyPort Glob. Commc'ns, Inc., 2013 WL 4046397, at *41 (Bankr. S.D. Tex. Aug. 7, 2013) (quoting Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 162 (1946)); see also Koreag, Controle et Revision, S.A. v. Refco F/X Assocs. (In re Koreag, Controle et Revision, S.A.), 961 F.2d 341, 350 (2d Cir. 1992) ("The goal of this analysis is to evaluate the various contacts each jurisdiction has with the controversy, and determine which [country's] law and policies are implicated to the greatest extent.").

64.     In the case of foreign jurisdictions, "[t]he analysis must [also] consider the international system as a whole in addition to the interests of the individual states, because the

---

[88]     See ERCOT Mot. pp. 11-15, ¶¶ 20-27 & n. 59.

effective functioning of that system is to the advantage of all the affected jurisdictions."  In re Maxwell Commc'n Corp. plc by Homan, 93 F.3d 1036, 1048 (2d Cir. 1996).

65.     Canadian law applies.  Plaintiffs are in insolvency proceedings in Canada.[89] Plaintiffs are tasked with administering the Debtors' assets in Canada; value received in the proceeding will be administered in the Canadian cases pursuant to Canadian insolvency law.  See In re B.C.I. Finances Pty Ltd., 583 B.R. 288, 297 (Bankr. S.D.N.Y. 2018) (applying similar factors under New York's "greatest interest test" to find "Australian substantive law governs"); cf., Am. Pegasus SPC, 2015 WL 10891937, at *15 n.17 ("[T]he Cayman claim provides a substantive right for the [liquidators] for which there is no analog in Georgia state law, which makes sense in light of comprehensive federal schemes established to govern bankruptcy proceedings.… [Given] the stated goals of Chapter 15 and the holding of the Condor court, the Court declines to apply Georgia choice of law principles to the Cayman cause of action.").

66.     ERCOT tries to argue Plaintiffs are "affiliates (but not 'Applicants') to the CCAA proceeding and subsequent chapter 15 debtors."[90]  This is incorrect.  Fulcrum, Hudson, and Just Energy are expressly named as Applicants in the caption of the Canadian Proceedings in the Initial Order.  Although Just Energy Texas LP is named as an "affiliate," that is because a partnership is not authorized to apply for protections under the CCAA.[91]  Nonetheless, where the operations of partnerships are integral and closely related to the operations of applicants, it is well-established that the Canadian courts have jurisdiction to extend CCAA protections to partnerships as well.

[89]   Similar to the United States, Canadian law provides statutory remedies to trustees in restructuring proceedings under the CCAA to recover estate property and enhance distributions to creditors.  See Tecce Decl. Exhibit 2 (McElcheran Decl. ¶ 29)

[90]   See ERCOT Mot. p. 14, ¶ 26 (citing ERCOT Exhibit G (Initial Order (Endorsement) ¶ 3)).

[91]   See ERCOT Mot. Exhibit G (Initial Order (Endorsement)) p. 1 (caption), pp. 20-21, ¶¶ 114-117 ("Should Noncorporate Entities Be Captured By The Stay")).

See, e.g., Tecce Decl. Exhibit 10 (Re Lehndorff General Partner Ltd. (1993), 17 C.B.R. (3d) 24

(Ont. Gen. Div. [Commercial List])),   ¶ 21; id. Exhibit 11 (Re Target Canada Co., 2015 ONSC

303 ¶¶ 42-43). ‼

      67.    ERCOT argues Texas law applies because fraudulent transfer claims are at issue.[92]

But, avoidance actions focus on protecting the interests of creditors, not the interests of a transferee

like ERCOT.  See, e.g., Begier v. Internal Revenue Serv., 496 U.S. 53, 58 (1990) ("[T]he purpose

of the avoidance provision is to preserve the property includable within the bankruptcy estate—

the property available for distribution to creditors."); Tow v. Rafizadeh (In re Cyrus II P'ship), 413

B.R. 609, 619 (Bankr. S.D. Tex. 2008) ("Claims under and recoveries pursuant to [the Bankruptcy

Code's avoidance provisions] seek to [prevent dispositions of property] by rewinding injuries

caused to the bankruptcy estate and its creditors by fraudulent conveyances.").

      68.    Similarly, ERCOT argues In re Condor Ins. Ltd., 601 F.3d 319 (5th Cir. 2010) does

not support the application of Canadian law.[93]  Yet, like plaintiffs in Condor, the Foreign

Representative here did not file suit in the U.S. to "gain powers not contemplated by the laws" of

Canada."  And critically, the Fifth Circuit noted "Congress did not intend to restrict the powers

of the U.S. court to apply the law of the country where the main proceeding pends."  Id. at 327.

ERCOT is also incorrect in arguing that Canadian avoidance law has no extraterritorial effect.[94]

Cf., Perforaciones Martímas Mexicanas S.A de C.V. v. Grupo TMM S.A. de C.V, 2007 WL

---

[92]   See ERCOT Mot. p. 12, ¶ 21 & n. 59.

[93]   See ERCOT Mot. pp. 13-14, ¶ 45.

[94]   See ERCOT Mot. p. 11, ¶ 20.  Nor do ERCOT's authorities support its position.  See ERCOT Mot. p. 12, ¶ 22
(citing Tolofson v. Jensen, [1994] 3 S.C.R. 1022 ¶ 41, which is not an insolvency case and has no application to
interpretation of the BIA/CCAA; id. p. 13, ¶ 23 (citing Holt Cargo Systems Inc v. ABC Containerline NV (Trustee
of), 2001 SCC 90 ¶ 80, which was decided before the 2009 amendment to the BIA's preference provision (§ 95)
and adoption of the BIA's transfer at undervalue section (§96)); see also Tecce Decl. Exhibit 2 (McElcheran ¶¶
34).

                                                     

1428654, at *7 (S.D. Tex. 2007) (finding "[s]ince U.S. courts apply U.S. procedural law, the instant claim [did] not have to be heard in the same court in which the Mexican Limitation [was] pending").

69.     While ERCOT argues the status of the ultimate parent, Just Energy Group, Inc., a Canadian company, is not relevant,[95] that is not accurate.  The Canadian Court decreed the that the CCAA applies, and the case on which ERCOT relies predates relevant UNCITRAL amendments.[96]

70.     Finally, ERCOT's choice-of-law argument is premature.  Because they are fact-intensive, choice-of-law questions are decided on a complete record, after discovery.  See, e.g., Gaetano Assocs Ltd. v. Artee Collections, Inc., 2006 WL 330322, at *4 (S.D.N.Y. Feb. 14, 2006) (deferring choice-of-law determination until "a more complete record can be presented to allow a reliable choice-of-law determination to be made"); Emp'rs Mut. Cas. Co. v. Key Pharm., Inc., 1992 WL 8712, at *11 (S.D.N.Y. Jan. 16, 1992) (denying motion to dismiss because court could not conclude applicable law at that stage); Banner Life Ins. Co. v. Bonney, 2011 WL 5027498, at *8 (E.D. Va. Oct. 21, 2011) ("Conducting a choice of law analysis is fact-intensive and context specific.  Due to the complexity of this analysis when confronted with a choice of law issue at the motion to dismiss stage, courts ... have concluded that it is more appropriate to address the issue at a later stage in the proceedings."); cf., Ackerley Media Grp., Inc. v. Sharp Elecs. Corp., 170 F. Supp. 2d 445, 449 at n.1 (S.D.N.Y. 2001) ("The discovery process might very well uncover other facts which would then force the court to revisit the choice of law issue at the summary judgment or trial phase of this litigation.").

---

[95]   See ERCOT Mot. p. 13, ¶ 23.

[96]   ERCOT cites the Holt case, but it is dated 2009 before UNCITRAL based provisions came into effect in Canada.  See Tecce Declaration Exhibit 2 (McElcheran Decl. ¶ 34).

## 2.   CANADIAN LAW CLAIMS HAVE BEEN PLED SUFFICIENTLY

71.    ERCOT's argument that the Complaint does not put it on notice of the obligations

and transfers Just Energy challenges is incredible.  Federal Rule 8(a)(2) applies, requires only "a

short and plain statement showing the pleader is entitled to relief," and has been satisfied.  The 40-

page First Amended Complaint makes obvious through 130 paragraphs that (a) the PUCT Orders

put the $9,000/MWh price in effect between February 15 and February 19; (b) ERCOT invoiced

Just Energy for $336 million relating to the week of February 13 through February 20, i.e., the

"Invoiced Obligations"; and (c) Just Energy contends at least $274 million, i.e., the "Transfers,"

should be returned—or $220 million depending on the Court's findings with respect to the validity

of the PUCT Orders.[97]

72.    And, while ERCOT argues the insolvency allegations have not been pled with

sufficient particularity, it neglects to mention that the issue of insolvency already is scheduled for

submission through summary judgment motions on April 9.  See Scheduling Order [ECF No. 115]

¶ 2(c).  ERCOT acknowledges the Canadian Court made a finding of insolvency at the time of the

CCAA filing.[98]  Just Energy will demonstrate in its forthcoming summary judgment motion on

April 9 why that finding is binding.  In any event, the heightened pleading standards of Federal

Rule 9(b) do not apply to insolvency allegations.

73.    The standards applicable to pleading transfers, obligations, and solvency have been

satisfied.  See, e.g., Safety-Kleen Sys., Inc. V. Silogram Lubricants Corp., 2013 WL 6795963, at

*7 (E.D.N.Y. Dec. 23, 2013) (gathering authorities finding Rule 8(a) applies to constructive-

---

[97]   See, e.g., First Am. Compl. ¶¶ 9, 11, 52, 53, 56, 82, 87, 89, 91, 96, 98, 100, 105, 106, 107, 108, 109, 110, 116, 117, 118, 122, 123, 124, 125, 127, 128, 129, 130, 132, WHEREFORE Clause ¶ C.

[98]   See ERCOT Mot. pp. 23-24, ¶¶ 43-44 & n. 115; ERCOT Mot. Exhibit G (Initial Order (Endorsement)) pp. 10-11, ¶¶ 48-51 ("Does Just Energy Meet the Insolvency Requirements").

fraudulent transfer allegations and was satisfied when complaint lumped payments and insolvency allegations over four-year period); In re Our Alchemy, LLC, 2019 WL 4447545, at *10 (Bankr. D. Del. Sept. 16, 2019) (Rule 8(a) only requires that allegations "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests;" trustee satisfied pleading requirements where he "aggregated the transfers into a lump sum over a one year period"); In re Tronox, Inc., 429 B.R. 73, 98 (Bankr. S.D.N.Y. 2010) (insolvency allegations for constructive fraudulent transfer claim were "pled adequately in accordance with Rule 8(a)(2)"); In re Noram Resources, Inc., 2011 WL 5357895 at *5 (Bankr. S.D. Tex. Nov. 7, 2011) (applying Rule 8(a)(2) standard to Canadian law claims in reviewing Rule-12 motion); Fed. Nat'l Mortg. Ass'n v. Pinter, 2006 WL 2802092, at *9 (E.D.N.Y. Sept. 28, 2006) (allegations aggregating transfers made over 3-5 year period "are sufficient to satisfy the notice pleading standard of Rule 8"); Sullivan v. Kodsi, 373 F. Supp. 2d 302, 307-08 (S.D.N.Y. 2005) (denying motion to dismiss constructive fraudulent transfer claims challenging non-particularized transfers made over nearly three-year period); Court–Appointed Receiver for Lancer Mgmt. Group LLC v. 169838 Canada, Inc., 2008 WL 2262063, at *3 (S.D.Fla. May 30, 2008) (Rule 8(a) does not require the pleader to "allege the particular transfers which each of the [defendants] received," or capacity in which defendants received them).  ERCOT's single case does not require a different result.[99]

74.    ERCOT claims it is confused because only the QSEs transact with ERCOT, and only JE Texas LP is a QSE.[100]  The detail of ERCOT's objection confirms Rule 8(a) has been satisfied.  JE Texas LP is Fulcrum's QSE.  And, BP is Hudson's QSE.  While the issue is not

---

[99]    See ERCOT Mot. pp. 21-22, ¶¶ 38, 39; p. 32 ¶ 58 (maintaining "Rule 9(b)'s heightened pleading standard applies" to insolvency allegations) (citing only Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.), 288 B.R. 189, 192 (Bankr. D. Del. 2003) ("Plaintiff's complaint only contains a rough estimate of the total amount of the preferential transfers. No other information is provided in the complaint.").

[100]   See ERCOT Mot. pp. 2, 4, 21, ¶¶ 1 & n. 2, 6, 7 & n. 12, n. 13., n. 15, 39 & n. 104 (detailing relationship among QSEs, each Plaintiff, and ERCOT).

germane at the Rule-12 stage, it is worth noting that JE Texas LP, Fulcrum, and Hudson are all Market Participants party to SFAs with ERCOT.  While Hudson interacts with ERCOT through BP as its intermediary, BP is obligated to Hudson under its ISO Services Agreement to procure power and ancillary services from ERCOT on Hudson's behalf; and, Hudson is liable to BP on a fully-secured basis for any payments BP makes to ERCOT on its behalf.

75.     ERCOT also takes issue with JE Texas LP not being "the Canadian equivalent of a 'Debtor,'"[101] but that has nothing to do with whether ERCOT has sufficient notice of the challenged transfers and obligations involving JE Texas LP.  Not that it is relevant, but the reason JE Texas LP is not a "Canadian Debtor" is because, as noted above, the CCAA does not apply to partnerships—it applies to corporations.[102]

76.     Finally, ERCOT's "debtor-by-debtor" argument is at best premature.  These types of disputes require discovery to be resolved properly.  See, e.g., In re Adelphia Comm'n Corp, 365 B.R. 24, 70 & n. 194 (Bankr. S.D.N.Y. 2011) (denying motion to dismiss equitable subordination claim; noting "In Pepper, the Supreme Court ruled that 'the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate,' and that a bankruptcy court's equitable power to subordinate may be 'invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.'  Some might regard distinctions between Debtors as a 'technical consideration[ ]' that should not prevent 'substantial justice from being done,' and others might regard such distinctions as much more than merely technical.  That kind of determination … should be made in factual context.  For the same

---

[101]   See ERCOT Mot. pp. 4, ¶ 7 & n. 15.

[102]   See ERCOT Mot. Exhibit G (Initial Order (Endorsement)) pp. 20-21, ¶¶ 114-117.

reason, the Court does not now address the Creditors' Committee's contention that section 510(c) of the Code does not mandate that the creditors benefiting from subordination be creditors of the same legal entity as the creditors to be subordinated."); cf., Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.), 503 B.R. 239, 268 (Bankr. S.D.N.Y. 2013) (fraudulent conveyances should be "examined for their substance, not their form"); In re Keller, 185 B.R. 796, 799 (9th Cir. BAP 1995) ("nature of a debtor's interest in property, although largely a question of fact, is based on the interpretation of legal principles").

77.     It is with good reason that courts do not engage in entity-specific examinations at the Rule-12 stage.  There are legal theories relevant to the avoidance claims that bear directly on the relationships among the entities that only can be evaluated with a complete record.  For example, the transactions among the Market Participant-plaintiffs, the QSEs, and ERCOT, may be susceptible to doctrines like "collapsing" or indirect-transfer theories.  See, e.g., U.S. Bank Nat. Assn' v. Verizon Communications Inc., 2012 WL 3100778, at *9 (N.D. Tex. July 31, 2012) (noting "a series of cases decided in the context of leverage buyouts, and other complicated transactions, in which courts 'collapsed' steps of the transaction to ensure that the goals off the fraudulent transfer statute were met") (citing Orr v. Kinderhill Corp., 991 F.2d 31, 35 (2d Cir. 1993), HBE Leasing Corp. v. Frank, 48 F.3d 623, 635 (2d Cir. 1995)); DZ Bank AG Deutsche Zentral-Genossenschaft Bank v. Meyer, 869 F.3d 839, 843, (9th Cir. 2017) (debtor that caused his wholly-owned subsidiary to transfer its assets made an actual fraudulent transfer even though the debtor himself never transferred his assets and there was no allegation of alter ego).  While ERCOT would like a decision on these issues, it should await discovery.

### 3.    CANADIAN COURT APPROVAL DID NOT FORECLOSE CLAIMS

78.    ERCOT argues the Canadian Court's authorizing Just Energy to pay the Invoices precludes any of the Canadian law claims.[103]  Even though this is a factual question inappropriate for Rule-12 disposition, it is worth noting ERCOT is wrong.  The Canadian Court's Order was clear that ERCOT's actions were the subject of "considerable controversy"  and "severe criticism," and Just Energy was "challenging" the "unprecedented fees that ERCOT and PUCT imposed."[104]  And, ERCOT's attempt to argue the only rights Just Energy reserved were to challenge the payments through the PUCT administrative procedures take the reference to "another forum" out of context.  The Court made the statement when noting that criticism had been leveled against the regulators, not in the context of Just Energy's disputes.[105]  It also belies the Canadian Court's findings (and the express language in the Recognition Order) noting Just Energy was paying under protest—terms to which ERCOT consented after appearing at the March 9, 2021 first-day hearing.[106]  ERCOT's "come-back clause"[107] cases are irrelevant because they concern parties

---

[103]    See ERCOT Mot. pp. 27-29, ¶¶ 52-54.

[104]    See ERCOT Mot. Exhibit G (Initial Order (Endorsement), March 9, 2022) ¶ 18 ("ERCOT and PUCT have issued additional invoice of US $55 billion to wholesale energy purchasers as a result of the storm.  Just Energy's share of that is approximately $250 million"); ¶ 20 ("There is considerable controversy surrounding those fees.  PUCT and ERCOT have been subject to severe criticism for their actions.  The chair of PUCT and several of ERCOT's board members have resigned.  The board of ERCOT terminated the employment of its CEO"); ¶ 35 ("Just Energy is being forced to pay unprecedented fees that ERCOT and PUCT imposed, (ii) **which fees Just Energy is challenging**, (iii) which fees are highly controversial, (iv) and which fees were imposed in circumstances where ERCOT's and PUCT's overall management of the crisis has led to the departure of their CEOs and the resignation of several of their board members"); ¶ 81 ("Just Energy's liquidity crisis arises because of controversial steps taken by PUCT and ERCOT which steps Just Energy is in the process of challenging").

[105]    See ERCOT Mot. Exhibit G (Initial Order (Endorsement), March 9, 2022) ¶ 38 ("I underscore that in making these comments I am not intending to criticize the Texas regulators.  Whether there is anything to be criticized in their conduct or whether their imposition of dramatically higher fees is appropriate will be for another day and another forum.").

[106]    See Tecce Decl. Exhibit 7 (Recognition Order); Exhibit 16 (Tr., Hr'g, Mar. 9, 2021).

[107]    See ERCOT Mot. p. 29 ¶ 54 (citing Muscletech Research & Development Inc., Re (2006), 19 C.B.R. (5th) 54 ¶ 5 (Ont. Sup. Ct. (Com. List), Collins & Aikman Automotive Canada Inc., Re (2007), 37 C.B.R. (5th) 282 ¶ 108 (Ont. Sup. Ct. (Com. List)).

seeking amendments to CCAA orders entered without sufficient notice.  That is not what is at issue here.  <u>See</u> Tecce Decl. <u>Exhibit 2</u> (McElcheran Decl. ¶ 35).

### 4.  COUNT 1:  PREFERENCES (OBLIGATIONS)

79.    Under section 95 of the Bankruptcy and Insolvency Act ("<u>BIA</u>"), as incorporated into the CCAA,[108] a transfer is subject to claw-back if the debtor: (i) was insolvent; (ii) transferred property … [or] made a payment; (iii) in favor of a creditor; and (iv) within three months before the date [of the bankruptcy filing].  BIA § 95.  Under section 36.1(2)(a) of the CCAA, the "date of bankruptcy" is read as the date of the filing under the CCAA.[109]

80.    ERCOT's argument that the Complaint does not allege an intent to prefer ERCOT over other creditors falls flat.  The Complaint alleges ERCOT imposed obligations on, and received payments from Just Energy; those obligations and payments resulted in ERCOT—a general unsecured, pre-petition creditor with nothing but the power to put the company under duress—receiving payment in full; honoring ERCOT's obligations forced Just Energy to file for protection under the CCAA and impaired the claims of Just Energy's other unsecured creditors.[110]

81.    While ERCOT argues its defenses of "necessary for business" and "ordinary course"[111] defeat the claim, those defenses are not properly submitted through a Rule-12 motion,

---

[108]   The CCAA incorporates by reference sections 95 and 96 of the BIA.  <u>See</u> CCAA § 36.1(1) ("[S]ections 38 and 95 to 101 of the [BIA] apply, with any modifications that the circumstances require, in respect of a compromise or arrangement unless the compromise or arrangement provides otherwise." (available at Government of Canada, Justice Laws Website, <u>https://laws-lois.justice.gc.ca/eng/acts/c-36/page-6.html#h-93349</u> (last visited Jan. 23, 2022)).

[109]   The term "date of the initial bankruptcy event" includes "proceedings under the [CCAA]."  BIA § 2.  Additionally, the CCAA provides that the "date of bankruptcy" is to be read as the date on which proceedings are commenced under the CCAA.  CCAA § 36.1.  <u>See also</u> Tecce Decl. <u>Exhibit 2</u> (McElcheran Decl. ¶ 39).

[110]   <u>See</u> Tecce Decl. <u>Exhibit 2</u> (McElcheran Decl. ¶ 41 (citing <u>Houlden, Morawetz & Sarra</u> at F201 ("[a] preference occurs when an insolvent debtor pays one or more creditors at the expense of other creditors."))).

[111]   <u>See</u> ERCOT Mot. pp. 24-27, ¶¶ 45-51.  The <u>Cineplex</u> case cited by ERCOT is inapplicable.  ERCOT Mot. p. 26 ¶ 49.  That case dealt with a complex commercial agreement that specifically defined what "ordinary course of business" meant for the parties.  It is of no help in understanding the statutory wording of section 95.  <u>See</u> Tecce Decl. <u>Exhibit 2</u> (McElcheran Decl. ¶ 54).

particularly when the statute contains a presumption of the existence of a preference and prohibits taking evidence of "pressure" into account.  See BIA § 95(2) ("Preference presumed.  If the transfer … [or] obligation … has the effect of giving the creditor a preference, it is, in the absence of evidence to the contrary, presumed to have been made [or] incurred … with a view to giving the creditor the preference—even if it was made [or] incurred … under pressure—and evidence of pressure is not admissible to support the transaction."  Just Energy notes separately that it never conceded that it pays ERCOT $9,000/MWh for energy in the "ordinary course of business"—for 88 consecutive hours by PUCT edict.

82.     ERCOT argues the Invoiced Obligations cannot be avoided because the statute does not refer to being "rendered insolvent" and instead requires insolvency at the time of the preference, that reading is not supportable under the circumstances given the relationship between the Invoiced Obligations and Just Energy's insolvency.[112]  The case of Re King Petroleum Ltd., adopted this approach in a similar context and concluded that insolvency can be proven by showing that the preferential payment itself caused the insolvency.  It looked at the other indicia of insolvency, e.g., inability to pay debts as they became due.  Tecce Decl. Exhibit 12 (Re King Petroleum Ltd., 1978 CarswellOnt. 197 (SC) ¶ 9 ("[T]he company was an 'insolvent person' within the meaning of [the BIA] because by the very payment-out of the money in question it placed itself in a position that it was unable to meet its obligations as they would generally become due."));  BIA § 2 ("insolvent person" is someone "(a) who is for any reason unable to meet his obligations as they generally become due, (b) who has ceased paying his current obligations in the ordinary course of business as they generally become due, or (c) the aggregate of whose property is not, at

---

[112]  See ERCOT Mot. pp. 23-24, ¶¶ 41-44.

a fair valuation, sufficient … to enable payment of all his obligations, due and accruing due")). <u>See</u> McElchran Decl. ¶¶ 48-50.

83.     Even if the language of statute is given its plain meaning,[113] it is only necessary to satisfy *one* of the three branches of the BIA test for insolvency.  And, while insolvency will not be presumed as a result of subsequent events, such as the filing under the CCAA, such events may be relevant evidence of insolvency.  <u>See</u>, <u>e.g.</u>, Tecce Decl. <u>Exhibit 13</u> (<u>Re 55432 BC Ltd.</u>, 2004 BCSC 1619 ¶ 9 ("Another relevant factor is the fact that within a few weeks … the Company had admitted its insolvency.")).  Similarly, insolvency can be inferred from evidence at the time of bankruptcy (or CCAA filing) that the bankrupt/debtor must have been insolvent on the date of the preference.  <u>See</u>, <u>e.g.</u>, Tecce Decl. <u>Exhibit 14</u> (<u>Re Blenkarn Planer Ltd</u>, 1958 CarswellBC 6 ¶ 6 ("[W]hile the court must be satisfied by more than a mere statement that the trustee believes the debtor is insolvent, or was insolvent at a certain time, I do not view the duty cast upon the trustee as one of requiring proof of a condition of insolvency beyond all reasonable doubt.")).

84.     Finally, the standard of proof is not "proof beyond a reasonable doubt," but instead, is a civil standard, <u>e.g.</u>, a balance of probabilities.  Circumstantial evidence, direct evidence, or a combination of the two will suffice.  <u>See</u> Tecce Decl. <u>Exhibit 15</u> (<u>Re Carnese Hardware</u>, 2002 CarswellOnt 5862 ¶ 11 ("The Trustee must prove insolvency but it may be established by circumstantial or direct evidence or a combination of the two.") (citing <u>Re Eland Distributors Ltd.</u>, [1998] BCJ No. 1761 (BCSC) at p. 3)).

---

[113]   <u>See</u> Tecce Decl. <u>Exhibit 17</u> (<u>Urbancorp Toronto Management Inc. (Re)</u>, 2019 ONCA 757, 74 C.B.R. (6th) 23, at para. 40); <u>see also</u> McElcheran Decl. ¶ 45.

5.    <u>COUNT 2</u>:  PREFERENCES (TRANSFERS)

85.    ERCOT does not raise any separate challenges to Count 2 apart from those raised with respect to Count 1.[114]  ERCOT's challenges fail for the same reasons.

6.    <u>COUNT 3</u>:  TRANSFERS AT UNDERVALUE

86.    Under section 96 of the BIA as incorporated into the CCAA, a conveyance "made with intent to defeat, hinder, delay or defraud creditors or others … [is] void as against such persons and their assigns."  BIA § 96.

87.    ERCOT argues incorrectly that an "intent to prefer" is not enough.[115]  But, Canadian law supports the theory espoused here.  <u>See</u> Tecce Decl. <u>Exhibit 9</u> (<u>Ernst & Young Inc. v. Aquino</u>, 2022 ONCA 202, at para 47 (to allege a claim under section 96 of the BIA, the trustee "only ha[s] to demonstrate that <u>one of</u> the motives or intentions was to defraud, defeat, or delay a creditor.") (emphasis in original) (citing <u>Juhasz Estate v. Cordiero</u>, 2015 ONSC 1781, 24 C.B.R. (6th) 69, at para. 54)).  ERCOT also argues a present creditor has to be identified.[116]  That is not the law in Canadian any longer.  <u>See</u> Tecce Decl. <u>Exhibit 9</u> <u>Ernst & Young Inc. v. Aquino</u>, 2022 ONCA 202, at para 21 (interpreting the phrase "defraud, defeat or delay a creditor" as "denoting any such creditor, not a target creditor or one necessarily known"; finding "[i]t is reasonable to infer that any large enterprise in financial difficulty will have many such creditors").

88.    Just Energy has stated a claim with respect to Count 3.  McElchran explains a Canadian court reviewing Count 3 would go beyond the amounts transferred pre-petition and would also consider the elements of the preference claim, <u>i.e.</u>, the Invoice Obligations, and collapse the Invoiced Obligations with all the challenged Transfers to find the entire $274 million is

---

[114]  <u>See</u> ERCOT Mot. pp. 22-29, ¶¶ 40-54.

[115]  <u>See</u> ERCOT Mot. pp. 30-31 ¶ 56.

[116]  <u>See</u> ERCOT Mot. p. 30 ¶ 57.

susceptible to challenge as a transfer at undervalue.  See Tecce Decl. <u>Exhibit 2</u> (McElchran Decl. ¶ 61).

89.     While ERCOT will likely contend McElchran's theory falls outside the confines of Count 3.  Not so.  Pleading transfer and preference claims is not as rigid as ERCOT suggests.  To the extent elements of a preference claim support a claim for fraudulent transfer, the distinction is treated as a different legal theory—not a claim that needs to pled independently.  See <u>Grede v. MBF Clearing Corp.</u>, 2018 WL 306668, at *5 (N.D. Ill. Jan. 5, 2018) (assessing whether fraudulent transfer claim brought after statute of limitations expired "related back" to complaint; noting "vast weight of authority, both in this circuit and beyond …. [that has] permitted plaintiffs who originally alleged that a pre-bankruptcy transfer was preferential to later re-categorize that same transfer as a fraudulent conveyance" and observing ability of plaintiff to "to add fraudulent conveyance claims concerning different transfers than those sought to be avoided as preferential in the original complaint where the two sets of payments were plausibly alleged to "be part of a single pattern of conduct.");  <u>In re Life Fund 5.1 LLC</u>, 2010 WL 2650024, at *2 n.2 (Bankr. N.D. Ill. June 30, 2010) (noting complaint may "allege both actual and constructive fraud in the same count … [and] multiple constructive fraud theories").

90.     Finally, ERCOT argues Count 3 also should be dismissed in light of the  House Bill 4492 signed into law on June 16, 2021 by Governor Abbot (the "**Securitization Bill**") which may provide for up to $2.1 billion of financing for certain uplift charges in excess of $9,000/MWh.[117] The Securitization Bill cannot make Just Energy whole with respect to the entirety of the relief requested in the Complaint—and is not a basis to dismiss Count 3.  Nonetheless, the Complaint

---

[117]   <u>See</u>  ERCOT  Mot.  p.  20,  ¶  36  &  n.  98.     <u>See</u>  H.R.  4492,  87th  Leg.,  Reg.  Sess.  (Tex.  2021), https://capitol.texas.gov/tlodocs/87R/billtext/ pdf/HB04492F.pdf#navpanes=0; <u>see also</u> Tex. Util. Code § 39.651; Tex. Util. Code § 39.652(4).

makes very clear that *"to the extent Plaintiffs ultimately receive funds under the Securitization Bill from the $2.1 billion securitization facility that duplicate amounts requested in this lawsuit, they will take the necessary steps to avoid a double recovery in accordance with the Securitization Bill, e.g., amending this complaint."*[118]

### 7.   COUNT 4: TRANSFERS ARE RECOVERABLE

91.     Section 98 of the BIA authorizes recovery of property after the its transfer has been declared "void."  Given the Invoiced Obligations and Transfers are void, section 98 provides a mechanism to recover the related property.  See McElchran Decl. ¶¶ 68-70.

## G.   COUNT 5: TURNOVER CLAIM

92.     ERCOT argues summarily that Count 5 should be dismissed because none of the Canadian claims stand, and it seeks the same relief as Count 6 (setoff).[119]  It is true Just Energy seeks various forms of declaratory relief, e.g., a declaration that under Canadian law the Invoiced Obligations and Transfers are void—not just voidable,[120] and has stated a turnover claim for that reason.  See Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.), 714 F.2d 1266 (5th Cir. 1983) (fraudulent transfer is "void in the very limited sense that creditors may otherwise treat the transferred property as though the transfer had never taken place"); BIA § 95 (transfer or obligation giving creditor preference "***is void*** as against … the trustee") (emphasis added); BIA § 96 ("[a] court may declare that a transfer at undervalue ***is void***") (emphasis

---

[118]   See Compl. ¶¶ 49-50.

[119]   See ERCOT Mot. p. 32, ¶ 59.

[120]   See First. Am. Compl. ¶ 122 ("[T]he Transfers should be turned over in their full amount or their value should be provided because they relate to Invoice Obligations that (a) are void as preferences under section 95 of the BIA and (b) relate to Invoices that were illegally and erroneously calculated under the APA and the PURA and find no support in the ERCOT Protocols or the SFA"); ¶ 123 ("[T]he prepetition Transfers should be turned over because they (a) are void as preferences under section 95 of the BIA; (b) constitute void transfers at undervalue under section 96 of the BIA; (c) are recoverable under section 98 of the BIA; and (d) otherwise relate to Invoices that were illegally and erroneously calculated under the APA and the PURA and find no support in the ERCOT Protocols or the SFA.")).

added);[121] <u>In re Abell</u>, 549 B.R. 631, 654–55 (Bankr. D. Md. 2016) (denying motion to dismiss turnover claims that were not brought "as standalone claims, but instead as ancillary claims to the declaratory judgment claims …. [considering they] can be determined after the court resolves the declaratory judgment claims"); <u>In re Reuter</u>, 499 B.R. 655, 669 (Bankr. W.D. Mo. 2013) ("[A] turnover action may not be appropriate if the right is disputed, [but] that principle is not applicable here because the turnover claim is ancillary relief to the declaratory judgment claim").

93.     But, the Complaint states a claim for turnover as a stand-alone count as well, regardless of the disposition of Counts 1-4.  In the initial Complaint, the turnover count was a stand-alone claim without its own declaratory relief.  In the First Amended Complaint, the turnover count is ancillary to the declaratory-relief counts—but it also stands on its own even if those claims are dismissed.  Considered in isolation, Count 3 still asserts that to the extent Just Energy proves the PUCT Orders are invalid—or alternatively ERCOT should have taken the price down on February 18 after load shed ceased—then ERCOT is in "possession, custody, or control" of estate property of substantial value—no less than $274 million—that Just Energy can use in accordance with section 363 and that should be turned over.[122]  <u>See</u>, <u>e.g.</u>, 11 U.S.C. 1520(a)(2) ("section[] 363 … appl[ies] to transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of the estate"); <u>In re Irish Bank Resol. Corp. Ltd. (in Special Liquidation)</u>, 559 B.R. 627, 644 (Bankr. D. Del. 2016) ("[B]y referring to § 363, a section which authorizes the trustee to 'use, sell, or lease ... property of the estate,' the drafters of § 542(a) made it clear that the turnover obligation applies to

---

[121]  <u>Cf.</u>, <u>In re Roussos</u>, 541 B.R. 721, 737–38 (Bankr. C.D. Cal. 2015) ("Assuming that the allegations set forth in the Complaint are true, as the Court must in the context of a motion to dismiss, the Properties remain property of the estate"); <u>In re Newton</u>, 1996 WL 33401177, at *3 (Bankr. S.D. Ga. Dec. 19, 1996) ("Thus, its actions [in violation of the automatic stay] were void and pursuant to 11 U.S.C. Section 542(a), Defendant was required to the return the vehicle upon Debtor's demand.").

[122]  Compl. ¶¶ 119-125.

property of the estate (the equivalent term of art used in Chapter 15 is the property of the debtor 'within the territorial jurisdiction of the United States'"); In re DBSI, Inc., 468 B.R. 663, 669 (Bankr. D. Del. 2011) (elements are "(1) the property is in the possession, custody or control of another entity; (2) the property can be used in accordance with the provisions of section 363; and (3) the property has more than inconsequential value to the debtor's estate").

94.     To the extent the Court considers the turnover count "premature" as a stand-alone claim, Just Energy submits it should simply be abated.  But, if the Court is inclined to dismiss, any such dismissal should be with express leave to replead consistent with the Court's earlier Order. See ECF No. 105 (Order on Turnover Claim) (dismissing turnover count without prejudice; "Just Energy Texas, L.P. is granted leave to replead its complaint to seek § 542 turnover if the turnover claim ripens").  But see In re Ortega T., 562 B.R. 538, 539, 542-543 (Bankr. S.D. Fla. 2016) (denying motion to dismiss allegedly "premature" turnover claim; observing "turnover can be sought in the same complaint that seeks to establish that the property subject of turnover is property of the estate"); In re Process America, Inc., 588 B.R. 82, 102 (Bankr. C.D. Cal. 2018) (denying motion to dismiss turnover claim that was "not appropriate until certain factual issues have been determined" when "the Court would like to see this issue resolved soon"); In re Thadikamalla, 481 B.R. 232, 241 (Bankr. N.D. Ga. 2012) (denying trustee's motion for summary judgment "as to the turnover claim"; acknowledging "the trustee can [still] seek judgment as to such claims by separate motion or at trial"); In re Maxim Truck Co., Inc., 415 B.R. 346, 357 (Bankr. S.D. Ind. 2009) (declining to dismiss turnover claim even though "remedy under § 542 for turnover … ripens upon a determination by the Court that the property in dispute is, in fact, property of the estate"). Cf., In re Am. Home Mortg. Hold., Inc., 388 B.R. 69, 94-95 (Bankr. D. Del. 2008) (focusing on debt being in dispute and not whether unripe turnover claim was ancillary to others).

## H.     C̲O̲U̲N̲T̲ ̲6̲:  SETOFF CLAIM

95.     The First Amended Complaint seeks declaratory relief that Just Energy is entitled

to setoff, recoup, and "counterclaim" the amount of the Transfers against any obligations its owes

or owed to ERCOT.[123]  It states a valid claim because the Transfers are susceptible to avoidance

and relate either to illegal PUCT Orders or Invoiced Obligations that themselves can be avoided.

96.     The Court found a setoff claim had been pled adequately.  It asked Just Energy to

broaden its scope beyond seeking a "future" right and instead to clarify the right vested at the time

of the disputed invoices and payments.[124]  To that end, the setoff claim is not "derivative" of the

others as ERCOT argues.

97.     And, the Court's earlier finding that a setoff claim has been stated comports with

the Bankruptcy Code and common law.  C̲f̲.̲, 11 U.S.C. § 558 ("The estate shall have the benefit

of any defense available to the debtor as against any entity other than the estate"); I̲n̲ ̲r̲e̲ ̲R̲a̲n̲c̲h̲e̲r̲'̲s̲

L̲e̲g̲a̲c̲y̲ ̲M̲e̲a̲t̲ ̲C̲o̲.̲, 630 B.R. 308, 318 (Bankr. D. Minn. 2021) ("Section 558, which grants the

bankruptcy estate the benefit of any defense available to the debtor against other entities, has also

been routinely and consistently interpreted to grant a debtor the right to assert setoff as an

affirmative defense or counterclaim in the context of its bankruptcy case.").

98.     "[U]nder modern American practice, 'setoff' and 'recoupment' are simply names

given to permissive and compulsory counterclaims, respectively, and debtors in bankruptcy are

---

[123]   S̲e̲e̲ First Am. Compl. ¶ 127 ("The Transfers (a) relate to Invoice Obligations that (i) are subject to avoidance as preferences under section 95 of the BIA—making the Transfers recoverable in their full amount; or (ii) relate to Invoices that were illegally and erroneously calculated under the APA and the PURA and find no support in the ERCOT Protocols or the SFA."); ¶ 128 ("The prepetition Transfers (a) are subject to avoidance as preferences under section 95 of the BIA; (b) constitute transfers for undervalue under section 96 of the BIA; or (c) otherwise relate to Invoices that were illegally and erroneously calculated under the APA and the PURA and find no support in the ERCOT Protocols or the SFA."); ¶ 129 ("Plaintiffs currently have rights of setoff, recoupment, or counterclaim against ERCOT in an amount not less than approximately $274 million. Since making the Transfers, Plaintiffs have continued to participate in the ERCOT market and to incur obligations to ERCOT.").

[124]   S̲e̲e̲ Tecce Decl. Ex. E̲x̲h̲i̲b̲i̲t̲ ̲3̲ (Tr., Hr'g, Feb. 2, 2022) at p. 78:2-79:1.

subject to no special substantive requirements in asserting counterclaims." In re ABC-NACO, Inc., 294 B.R. 832, 834-35, 838 (Bankr. N.D Ill. 2003) ("[S]etoff and recoupment are largely archaic terms, referring to old forms of pleading now treated simply as counterclaims.").  The obligations need not be mutual for setoff to apply.  Just Energy's setoff rights came into being when it paid the Invoiced amounts under protest.  Those amounts can be set off against its obligations to ERCOT, regardless of when they were, or are incurred.[125]

99.     While ERCOT seeks to dismiss Count 6 by arguing the SFA and Protocols waived Just Energy's setoff rights,[126] the Court already found the argument inappropriate at the Rule-12 stage.[127]  In addition to being premature, the contention is unpersuasive because Just Energy did not waive its rights to setoff.

100.    *First,* the provisions of the SFA to which ERCOT points do not apply to this lawsuit.  They address material breaches under the SFA—as do the cases cited by ERCOT.[128]  Just Energy is not brining a breach-of-contract claim.  Instead, it alleges the PUCT Orders are illegal;

---

[125]   See In re ABC-NACO, Inc., 294 B.R. at 834-35 ("Recoupment exists in bankruptcy as a judge-made exception to the mutuality requirement, allowing a creditor to offset a post-petition obligation to the debtor with a claim that arose prepetition, as long as both involved the same transaction."). Cf., In re PSA, Inc., 277 B.R. 51, 53 (Bankr. D. Del. 2002) ("§ 558 preserves any right of setoff the debtors may have under state law, including the right to setoff debtor's prepetition claims against administrative expense claims."); Second Pa. Real Estate Corp. v. Papercraft Corp. (In re Papercraft Corp.), 127 B.R. 346, 350 (Bankr. W.D. Pa. 1991) ("[B]ecause § 558 preserves to the Debtor the defenses it would have had prepetition, the court must examine the transaction as though the bankruptcy had not been filed [thereby] eliminat[ing] the prepetition/postpetition distinction …."); In re 1701 Com., LLC, 2014 WL 4657314, at *13 (Bankr. N.D. Tex. Sept. 17, 2014) ("Section 558 "provides the trustee with every defensive weapon available to the debtor …. including …. the ability to set off against administrative expenses amounts owed to the debtor").

[126]   See ERCOT Mot. p. 33, ¶¶ 60-61.

[127]   See Tecce Decl. Exhibit 3 (Tr., Hr'g Feb. 2, 2022 at pp. 33:17-34:4).

[128]   See, e.g., ERCOT Mot. Exhibit C (Fulcrum SFA) p. 7 § 8.B(2) ("Participant's Remedies for Default" in "the event of Default by ERCOT")). ERCOT Mot. p. 33 ¶¶ 60-61 & n. 155, n. 157 (citing James Construction Group, LLC v. Westlake Chem. Corp., 594 S.W.3d 722, 764 (Tex. Civ. App.—Houston 2019) (breach of contract lawsuit concerning waiver of consequential damages provision in construction contract as covenant not to sue); Bruce v. Jim Walters Homes, 943 S.W.2d 121, 122-123 (Tex. Civ. App.—San Antonio 1997) (Texas Residential Construction Liability Act did not abrogate/preempt common law fraud claims arising out of a construction contract and defective construction)).

that the SFA is relevant because it incorporates the Protocols; and the PUCT Orders find no support in the Protocols, e.g., load shed was not a scarcity-pricing trigger at the time.  Actually, ERCOT made a similar argument in the Brazos Proceeding[129]

101.    **Second**, the SFA reserves Just Energy's rights to contest the PUCT Orders.  Rights to contest orders from "Governmental Authorities" like the PUCT are protected specifically in § L of the SFA.[130]

102.    **Third,** for a setoff right to be waived, the waiver must be express.  There is no express waiver of a setoff right in the SFA—in § 8.B.(2)(a) or otherwise.  See CSFB1998-C2 TX Facilities, LLC v. Rector, 2016 WL 631923, at *5 (N.D. Tex. Feb. 16, 2016) ("[T]o be effective, waiver [of a setoff right] must be 'clear and specific.'").

103.    **Fourth**, to the extent ERCOT maintains the SFA provision (§ 8.B.(2)(a)) is an "exclusive remedies" provision, it does not satisfy the specificity requirements under Texas law to limit Just Energy's remedies.  It says "remedies shall be limited."  But, Texas law requires either the contract say "*sole* remedy" or "*exclusive* remedy" specifically—in some combination—which is lacking in this section.  And that appears intentional, because "sole remedy" appears in § 8.B.(2)(b)—on which ERCOT does not rely, i.e., "in the event of a material breach by ERCOT of any of its representations, warranties or covenants, Participant's **sole remedy shall be** …" (emphasis added).  See, e.g., Vandergriff Chevrolet Co., Inc. v. Forum Bank, 613 S.W.2d 68, 70 (Tex. Civ. App.—Fort Worth 1981) ("The mere fact that the contract provides a party with a particular remedy does not, of course, necessarily mean that such remedy is exclusive.  A

---

[129]    See, e.g., Brazos Proceeding [ECF No. 280] (ERCOT Sum. J. Mot.) pp. 10-16, ¶¶ 23-37.

[130]    See ERCOT Mot. Exhibit C (Fulcrum SFA) p. 12 § L ("Conflicts") ("Nothing in this agreement may be construed as a waiver of any right to question or contest any federal, state and local law, ordinance, rule, regulation, order of any Governmental Authority"); ERCOT Protocols 2-36 ("Governmental Authority" means "Any federal, state, local, or municipal body having jurisdiction over a Market Participant or ERCOT.") available at https://www.ercot.com/files/docs/2021/08/18/March_15__2021_Nodal_Protocols.pdf.

construction which renders the specified remedy exclusive should not be made unless the intent of the parties that it be exclusive is clearly indicated or declared"); Crow-Billingsley Stover Creek Ltd. v. SLC McKinney Partners, L.P., 2011 WL 3278520, at *2 (Tex. Civ. App.—Dallas Aug. 2, 2011) (contract said specifically "shall be entitled as its sole and exclusive remedy"); Gala Homes, Inc. v. Fritz, 393 S.W.2d 409, 411 (Tex. Civ. App.—Waco 1965) (language insufficient to bind contract party to accept liquidated damages).

104.    These are just a few reasons why the setoff right has not been waived.  It will be argued more fully at the appropriate time.

## I.    PERMISSIVE ABSTENTION DOES NOT APPLY IN CHAPTER 15 CASES

105.    Congress expressly excluded permissive abstention from chapter 15 cases.  By its plain terms, section 1334(c)(1) of title 28 says, in relevant part, that "***except with respect to a case under chapter 15*** … [the Court may abstain] in the interest of justice, or in the interest of comity with the State courts or respect for State law" from hearing a proceeding based on "related to" jurisdiction.  28 U.S.C. § 1334(c)(1) (emphasis added).

106.    The Fifth Circuit interprets the chapter 15 carveout from section 1334(c)(1) to cover not just the chapter 15 case itself, but also cases that ***arise in*** or are ***related to*** the chapter 15 case. See Firefighters' Ret. Sys. v. Citco Grp. Ltd., 796 F.3d 520, 527 (5th Cir. 2015) (reading phrase to "except with respect to a case under chapter 15"—to "mean that both the Chapter 15 case itself and cases 'arising in or related to' Chapter 15 cases are excluded"); 8 Collier On Bankruptcy ¶ 1501.03[5], 1501-14 (16th ed.) (reading Firefighters to "bar[] abstention from any proceeding in an chapter 15 case").

107.    The Fifth Circuit has explained that comity considerations relevant in the chapter-15 context support carving chapter 15 out of section-1334(c) abstention.  As Firefighters recognized, Congress determined that only one court system—the federal system, not the state

system—is relevant when a U.S. court is acting in an ancillary capacity to a foreign proceeding. Section 1334(c)(1) centralizes the interaction of the Canadian Court supervising Just Energy's restructuring with the United States—be it recognizing orders or other procuring other ancillary relief—in a single court system, that is, the federal system and its bankruptcy courts.  <u>See Firefighters</u>, 796 F.3d at 525-26 ("Chapter 15 … [aims to] increase legal certainty …. Central to chapter 15 is comity and the facilitation of cooperation between multiple nations.  To effectuate these goals, the statutory provisions concentrate control of those questions in one court.  The 2005 amendment to § 1334(c)(1), which limits a court's ability to permissively abstain from Chapter 15 cases, is consistent with Chapter 15's emphasis on concentrating the resolution of cases involving foreign bankruptcies in one court system.").

108.    The legislative history to section 1509, which authorizes a foreign representative to access courts in the United States, confirms the Fifth Circuit's reading.  <u>See</u> H. Rep. No. 109–31, Pt. 1, 109th Cong., 1st Sess. 100–111 (2005), 2005 U.S.C.C.A.N. 88, 173, 2005 WL 832198, at *110 ("[C]hapter 15 is intended to be the exclusive door to ancillary assistance to foreign proceedings.  The goal is to concentrate control of these questions in one court.  That goal is important in a federal system like that of the United States, with many different courts, state and federal, that may have pending actions involving the debtor or the debtor's property").

109.    More generally, courts have held repeatedly that Congress legislated an abstention standard for bankruptcy cases in section 1334 that subsumes all common-law abstention doctrines, <u>e.g.</u>, <u>Burford</u> and <u>Colorado River</u>.  <u>See</u>, <u>e.g.</u>, <u>Personette v. Kennedy (In re Midgard Corp.)</u>, 204 B.R. 764, 774 (B.A.P. 10th Cir. 1997) ("Unlike general federal court practice where abstention is founded exclusively on common law, courts presiding over bankruptcy cases are required to apply the abstention standards set forth in section 1334(c).")); <u>Cathedral of the Incarnation v. Garden City</u>

Co. (In re Cathedral of the Incarnation), 99 F.3d 66, 68-69 (2d Cir. 1996) ("A judicially created rule of abstention must yield to a statutory duty to rule under Congress's grant of jurisdiction."); Baumgart v. Fairchild Aircraft Corp., 981 F.2d 824, 833 (5th Cir. 1993) ("[§ 1334] summarizes and incorporates federal non-bankruptcy court abstention doctrines") (citing In re Pan Am Corp., 950 F.2d 839, 845-46 (2d Cir. 1991)); Pan Am, 950 F.2d at 845-46 ("[§ 1334] was intended to codify judicial abstention doctrines;" citing legislative history for proposition that 1334 "codifies the present case law relating to the power of abstention in particular proceedings by the bankruptcy court"); Life Flight of Puerto Rico, 2009 WL 2885109, at *1 (court considered "motion for abstention [as] pursuant to 28 U.S.C.A. § 1334(c), and [would] not discuss [Burford] as [it is] inapplicable in the face of this statute"); In re Wright, 231 B.R. 597, 600 (Bankr. W.D. Tex. 1999) ("[§ 1334] imports the judicially-created doctrine of federal court abstention, specifically applying the doctrine to abstention matters"). These doctrines, therefore, only can apply through section 1334(c)(1), not of their own force. Critically, section 1334(c)(1) excludes chapter 15 cases.

110.    In addition, traditional Burford abstention is a poor fit for a bankruptcy case in which the restructuring and estate administration are supervening federal interests that often will predominate over whatever state-law concerns abstention seeks to address. As the Western District observed in SuperVan, "Burford abstention is not at issue in the bankruptcy context because we do not here have the mere resort to a federal court in order to attack or evade a state regulatory scheme; rather, we have the incidental ability to employ the federal forum to do what otherwise would have to be done in the state's administrative scheme in service to the larger policies underlying the administration of the bankruptcy case." In re Super Van, Inc., 161 B.R. 184, 189-191 (Bankr. W.D. Tex. 1993). Similarly, this proceeding is, first and foremost, ancillary

to the Chapter 15 Cases and Canadian Proceedings.  Just Energy did not file the suit to attack a regulatory regime.

111.    ERCOT's position that <u>Burford</u> applies independently of section 1334(c)[131] would mean simply labeling an abstention request as a "<u>Burford</u>" or "<u>Colorado River</u>" request would render section 1334(c) inapplicable.  Congress intended something different, that is, to include <u>Burford</u> and similar doctrines within section 1334(c)(1).  The statute's incorporation of factors relevant under those doctrines, <u>e.g.</u>, "comity with State courts" and "respect for State law," fortifies that view.  That is what <u>Burford</u> addresses.  <u>See</u> <u>New Orleans Public Service, Inc. v. New Orleans</u>, 491 U.S. 350, 361 (1987) (<u>Burford</u> abstention is relevant when "there are difficult questions of state law bearing on policy problems of substantial public import and federal review would "be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern").

## J.    EVEN IF PERMISSIVE ABSTENTION IS RELEVANT, IT IS INAPPROPRIATE

112.    The standards for permissive abstention, under section 1334(c)(1) or <u>Burford</u>, cannot be met here.  This proceeding examines two unique orders that were in effect for eighty-eight hours and have long-since expired.  Nor is there is a pervasive regulatory scheme at issue because Texas deregulated the wholesale and retail energy markets.  Assessing the legality of two orders of limited duration entered in a deregulated, market-based system is not tantamount to interfering with a state's independence in carrying out a significant and comprehensive policy.

113.    Importantly, the issues of state law are not complex.  The Court can capably determine whether the PUCT Orders complied with the APA and the PURA, including whether they were entered arbitrarily, on an uniformed basis, and without the prudence and procedural

---

[131]    <u>See</u> ERCOT Mot. p. 54, ¶ 105.

safeguards the law requires.  See Kirschner v. Grant Thornton LLP (In re Refco Sec. Litig.), 628 F. Supp. 2d 432, 446 (S.D.N.Y. 2008) ("[T]he state law claims are straightforward common-law claims that do not involve arcane or idiosyncratic provisions of state law that would warrant abstention based on comity concerns").  And, whatever conclusions the Court reaches are confined to this proceeding and will not bind state courts considering similar issues.  See Hardy v. Johns-Manville Sales Corp., 681 F.2d 334, 337 (5th Cir. 1982) ("Texas strictly adheres to the doctrine of mutuality, i.e., neither party can use a prior judgment to estop another unless both parties were bound by the prior judgment.").

114.    Here, Just Energy argues more narrowly that the payments are illegal and subject to avoidance.   See, e.g., In re Luongo, 259 F.3d 323, 331-32 (5th Cir. 2001) (abstention inappropriate "where bankruptcy issues predominate and the Code's objectives will potentially be impaired" if court declines to exercise jurisdiction); In re Consol. Med. Transp., Inc., 300 B.R. 435, 445 (Bankr. N.D. Ill. 2003) ("This dispute is purely between two private parties to determine the responsibility between them for a future liability.  Any effect on the administrative decisions is indirect and ancillary.  Thus, this opinion is not a 'judicial review' of any administrative decision within the meaning of the statute").  Even the PUCT observed during the Brazos Proceeding, claims sounding in fraudulent transfer do not infringe on state sovereignty.[132]

115.    With respect to Burford specifically, the case dealt with facts not present in this proceeding.  In Burford, (a) there was a real risk of interference with a state government's independence in carrying out a significant state policy, see Burford, 319 U.S. 1098, 1099-1107 ("[I]t is in the public interest that federal courts of equity should exercise their discretionary power

---

[132]    See Brazos Proceeding, Tr., Hearing, Oct. 18, 2021 56:7-10 ("[PUCT COUNSEL:]  Fraudulent transfer issues and classification issues under the Bankruptcy Code … aren't the earth-shaking things that the State of Texas thinks challenges PURA like an attack on the February orders.").

with proper regard for the rightful independence of state governments in carrying out their domestic policy"); (b) the state's policy was comprehensive and had wide-ranging goals; and (c) the court found the state could act more expeditiously.  See Burford v. Sun Oil, 319 U.S. 1098, 1099-1107 (1943) (examining "general regulatory scheme devised for the conservation of oil and gas" that was designed "[t]o prevent past, present and imminent evils in the production of natural gas;" "equitable discretion should be exercised to give the Texas courts the first opportunity;" "judicial review of the Commission's decisions in the state courts is expeditious and adequate").

116.    What is more, Burford was uniquely concerned with the offensive use of federal equitable power to intervene in state-court actions.  Here, the Canadian Proceedings and Chapter 15 Cases were not filed to interfere with a pending state-court action.  See New Orleans, 491 U.S. at 362 ("[F]ederal adjudication of this sort of pre-emption claim would not disrupt the State's attempt to ensure uniformity in the treatment of an essentially local problem."); In re Super Van, Inc., 161 B.R. 184, 189 (Bankr. W.D. Tex. 1993) ("[W]e have here a debtor-in-possession employing one of the many statutory rights conferred as part and parcel of the bankruptcy process … The remedy is … expressly made available by Congress to bankruptcy estates to serve the larger function of centralizing the administration of the bankruptcy … in one forum.  If this remedy 'interferes' with the state statutory scheme, it does so quite *intentionally*, i.e., it represents a studied decision on the party of *Congress* to *expressly* interfere with the state's' administrative tax adjudication schemes'); id. ("There is no 'interference' such as in Buford—unless one wants to argue that the sole purpose of filing the bankruptcy itself was to interfere with the state administrative process").

117.    Indeed, the Supreme Court has since observed Buford does not apply automatically when a state regulatory regime is at issue.  See New Orleans, 491 U.S. at 362 ("While Burford is

concerned with protecting complex state administrative process from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy").

118.    The First Circuit's factually-analogous <u>Public Serv. Co. of New Hampshire</u> case, which follows the <u>New Orleans</u> decision, provides instruction.  New Hampshire's largest electric utility sued the New Hampshire Public Utility Commission to enjoin its plan for a "specific and detailed structure for utility deregulation and ratemaking" that would change the utility-rate regime from agency-set, cost-based rates to market-driven rates.  <u>Pub. Serv. Co. of New Hampshire v. Patch</u>, 167 F.3d 15, 23-24 (1st Cir. 1998).  Observing "<u>Burford</u> abstention is not required merely because the federal action may impair or even entirely enjoin the operation of the state scheme," the First Circuit concluded abstention was inappropriate because the court would not have to "look beyond four corners of the Final Plan to confirm it is intended to shift from cost-based regulation to market-driven rates for electricity."  <u>Id.</u> (citing, <u>inter alia</u>, <u>New Orleans</u>, 491 U.S. at 361-64; <u>Zablocki v. Redhail</u>, 434 U.S. 374, 379 n. 5 (1978)).  <u>Cf.</u>, <u>In re Patriot Nat'l, Inc.</u>, 623 B.R. 696, 714 (D. Del. 2020) (<u>Burford</u> abstention was inappropriate; "while the outcome of a claim by the Receiver may affect the amount of assets in the ... liquidation proceeding ... it will not directly impact the state's regulation of insurers or the state's ability to establish rules for the orderly rehabilitation or liquidation of insolvent insurers").

119.    Finally, ERCOT's reliance on <u>Wilson v. Valley Elec. Membership Corp.</u>, 8 F.3d 311, 315 (5th Cir. 1993) is misplaced.  <u>Wilson</u> was decided more than 20 years before Congress enacted chapter 15 and amended section 1334(c)(1) to eliminate permissive intervention from chapter 15 cases.  While ERCOT contends <u>Wilson</u> supports its argument that <u>Burford</u> abstention is independent of section 1334(c)(1), the decision does not contain any analysis to suggest it

intended to address this precise issue.  Nor could it have been considered in a way that is relevant here given Wilson was not a chapter 15 case.

120.    Separately, In <u>Wilson</u>, a pending, state-law proceeding predominated over the bankruptcy case.  After plaintiffs brought the complaint in state court, the suit was removed to federal court by one of the defendants who was in bankruptcy.[133]  But, the Fifth Circuit specifically observed the bankruptcy case was remote to the litigation:  "[defendant-appellants do] not even argue that this suit will interfere with the reorganization that catapulted it into the federal system.  Nor does the Bankruptcy Code represent a supervening federal interest."[134]  And, the issue was not considered a "one-time affair arising from a single landmark Louisiana decision"—but instead one that would have a broader impact on Louisiana's regulatory scheme, noting "the history of rural cooperatives in the state reveals a long-running seesaw battle between non-regulation and regulation.  The <u>Cajun Electric</u> decision is merely the latest salvo, Federal intervention this late in the day would be inappropriate."  <u>Id.</u>  Here, the proceeding focuses on the PUCT Orders and is such a "one-time affair" that would have led the Fifth Circuit to reach a different result in <u>Wilson</u>.

## K.    MANDATORY ABSTENTION IS NOT APPLICABLE

121.    ERCOT argues for the first time that it can make a case for mandatory abstention under section 1334(c)(2).  It cannot.

122.    **First,** the motion is not timely.  The case has been pending for nearly six months, and this is ERCOT's second motion to dismiss.  It could have raised the argument in the First Motion but failed to do so.  ERCOT's argument would have been the same then as it is now, <u>i.e.</u>, the claims are non-core because they involve the assessment of the legality of the PUCT Orders

---

[133]    <u>See</u> <u>Wilson v. Valley Elec. Membership Corp.</u>, 1992 WL 233769, at *1 (E.D. La. Aug. 24, 1992).

[134]    <u>Wilson</u>, 8 F.3d at 315.

under state law.  The First Amended Complaint did not reset the clock—like the First Amended

Complaint, the initial Complaint pled counts for setoff, turnover, avoidance under Canadian law.

ERCOT could have raised its mandatory abstention argument in First Motion brough under Rule

12(b)(6).  It did not, requiring ERCOT to satisfy one of the two exceptions enumerated in Rule

12(h)(2) and (3) to avoid waiver of the abstention argument.  It cannot satisfy either one.[135]

123.   ***Second***, the claims are statutorily "core" under 28 U.S.C. § 157(b)(2)(P)—

especially—as well as §§ 157(b)(2)(A), 157(b)(2)(H), 157(b)(2)(E), 157(b)(2)(F), and 28 U.S.C.

§ 157(b)(2)(O)—alternatively, which makes mandatory abstention inapplicable.  The relevance of

section 1334(c)(2)'s mandatory abstention is particularly limited in the chapter 15 context by §

157(b)(2)(P).  There is no need for a lead-in phrase in § 1334(c)(2) to exclude chapter 15 cases

like that found in § 1334(c)(1) because § 157(b)(2)(P) covers every proceeding "arising under" a

chapter 15 case, including all requests for relief covered by the provisions of chapter 15.  That

includes the present claims, which fall within sections 1507 and 1521.  And, that result is consistent

with pervasive Congressional intent that foreign courts only interact with a centralized court

system in the United States through chapter 15.

---

[135]   See FIMBANK PLC v. Discover Inv. Corp., 2020 WL 3519159, at *5 (S.D. Tex. May 21, 2020), report and recommendation adopted, 2020 WL 3504179 (S.D. Tex. June 29, 2020) ("When a party makes a motion under Rule 12, it must not make another motion under the same rule raising a defense or objection that was available at the time of their first motion;" arguments relating to lack of personal jurisdiction and insufficient service were waived because not raised in first motion); Fed. R. Civ. P. 12(g)(2) ("Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule ***must not make*** another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.") (emphasis added); Fed. R. Civ. P. 12(h)(2) (party can raise "[f]ailure to state a claim upon which relief can be granted ... or to state a legal defense to a claim .... (A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or (C) at trial."); Gonzalez v. Trevino, 2021 WL 7184963, at *3 (S.D. Tex. Nov. 12, 2021) ("The Court recognizes that, since the defense of failure to state a claim is never waived and will eventually require adjudication, many courts have allowed such a defense to be asserted in a successive motion to dismiss.").  But, arguing for "mandatory abstention" is not arguing "failure to state a claim" or a challenge to "subject matter jurisdiction.  See, e.g., Matter of PFO Glob., Inc., 26 F.4th 245, 254 (5th Cir. 2022) ("A motion explicitly challenging a bankruptcy court's jurisdiction does not implicitly constitute a motion for abstention"); Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 712 (1996) ("The District Court's [Burford] abstention-based remand order . . . is not based on lack of subject matter jurisdiction.").

124.    **Third**, section 1334(c)(2) requires "a proceeding based upon a State law claim or State law cause of action."  The claims in this proceeding are not State law claims or causes of action.  They arise under Canadian law or the Bankruptcy Code (§ 542).  And, setoff is not a purely "State law" claim; it is a common-law doctrine preserved specifically in section 558 for assertion in the bankruptcy context.  See, e.g., 8 Collier On Bankruptcy ¶ 3.05[1], 3-74 (16th ed.) ("[S]ection 1332(c)(2) … is applicable only to proceedings based upon state law claims or cause of action").  And, the single case ERCOT relies on is distinguishable.[136]

125.    **Fourth,** there is no pending state-court proceeding to which the Court can defer.  ERCOT tries to argue the administrative proceedings with the PUCT are tantamount to a pending state court proceeding for 1334(c)(2) purposes.[137]  But it cites no supporting authority for that proposition.  It is not the law.  See, e.g., Houston Regional Sports Network, 514 B.R. at 214 (state court action must be "commenced prior to the bankruptcy proceedings …. Because the state-court action was filed post-petition, mandatory abstention is not warranted"); In re Denton County Elec. Coop., 281 B.R. 876, 881 (Bankr. N.D. Tex. 2002) ("Because there is currently no pending state court action, it is clear that mandatory abstention … does not apply"); Matter of Rustic Mfg., Inc., 55 B.R. 25, 28 (Bankr. W.D. Wis. 1985) ("no action seeking to enjoin Marine from suing Rustic's guarantors has been commenced in state court."); Matter of Horace, 54 B.R. 671, 673 (Bankr. D.N.J. 1985) (claim should be capable of  "be[ing] timely adjudicated in a state court").

---

[136]  See ERCOT Mot. p. 38, ¶ 71 & n. 178 (citing Principal Growth Strategies v. AGH Parent LLC, 615 B.R. 529 (Bankr. D. Del. 2020)).  In Principal Growth, the foreign representative brought the claims in state court—not in its own chapter 15 court—and the posture of the decision is granting the foreign representative's motion to remand after removal.  And the majority of the claims were based on state law, i.e., "[t]he SHIP Defendants fairly characterize this proceeding as 'based on foreign law.'  After all, Counts IV, V, and VI of the Complaint plead claims based on Cayman Islands law.  But for the same reason this proceeding can be characterized as 'based on foreign law,' it is also fairly characterized as 'based on state law' (or 'based on a state law claim'), since Counts I, II, III, VII, and VIII of the Complaint plead claims based on Delaware law."  Id. at 535.

[137]  ERCOT Mot. pp 40-41, ¶¶ 77-78.

126.     **Fifth,** ERCOT could not show timely adjudication in state court is possible given the time constraints Just Energy is operating under given its need to complete its restructuring under the CCAA as soon as it can do so.  See, e.g., In re AOG Entertainment, Inc., 569 B.R. 563, 579 (Bankr. S.D.N.Y. 2017) ("[A]n action might be 'timely adjudicated' in state court, despite some substantial delay, where the delay has little or no effect on the bankruptcy estate which creates the federal interest.  Conversely, even a relatively brief delay might make state court adjudication untimely where the state action substantially effects the bankruptcy estate"); WRT Creditors Liquidation Trust v. C.I.B.C. Oppenheimer Corp., 75 F. Supp. 2d 596, 605-06 (S.D. Tex. 1999) ("A naked assertion that the matter can be timely adjudicated in the state court without more is insufficient to satisfy the requirement.").

127.     A state court cannot afford timely relief.  The Luminant appeal from the PUCT decision to the Texas Court of Appeals in Austin was filed on March 2, 2021, and oral argument is set for April 27, 2022—more than one year later.  See Luminant v. Public Utility Corporation of Texas, 03-21-00098-CV (Tex. App.—Austin 2021).

128.     Separately, reports from the Texas Office of Court Administration's Court Activity Reporting and Directory System show that the district courts in Harris and Travis Counties do not clear cases as quickly as Houston Bankruptcy Court.  While Harris and Travis County district courts cleared 82.5% and 72.4% of their cases in 2020 and 85.7% and 82.6% of their cases in 2021, respectively, only 22% and 19% of cases were disposed of within 6-12 months in 2021, respectively.  And their backlog indexes—which correlate the ratio of pending cases against disposed cases in a given year—were 1.3 and 3.4 for 2020 and 1.3 and 3.6 for 2021, respectively.[138]

---

[138]     Attached to Tecce Decl. as Exhibit 18 are the District Court Performance Measures and  Age of Cases Disposed for 2020 and 2021.  These reports can be generated at https://card.txcourts.gov/ReportSelection.aspx.

129.    The Houston Bankruptcy Court had a clearance rate of 116.4% in 2020 and 152.9% in 2021 for "Bankruptcy cases" (which includes Chapter 15 cases).[139]   While the "adversary proceeding" clearance rates are much lower, Just Energy submits they are not the most relevant predictor under the circumstances.   Here, Just Energy has tried to move this proceeding apace given its importance to the Canadian restructuring.   For that reason, the "Bankruptcy cases" numbers are more germane.   By analogy, the Brazos Proceeding is technically an "adversary proceeding," but it moved forward with incredible speed given the importance to the underlying chapter 11 cases.   The time from complaint to trial in Brazos was approximately seven months.[140]

L.    **ERCOT IS NOT IMMUNE FROM SUIT**

130.    ERCOT cannot invoke sovereign immunity.   This proceeding involves the exercise of the Court's in rem jurisdiction over Just Energy's property.   And, separately, the requested relief is "ancillary to" and "effectuates" that in rem jurisdiction.   Under the circumstances, "States"—if ERCOT can be called that—have waived their sovereign immunity.

131.    At least two Supreme Court decisions compel this conclusion.   In Tennessee Student Assistance Corp. v. Hood, 541 U.S. 440 (2004), the Supreme Court found a bankruptcy court's exercise of in rem jurisdiction to discharge a student-loan debt did not implicate state sovereignty or qualify as "a suit against a State for purposes of the Eleventh Amendment."   541 U.S. at 448 (noting "[a] bankruptcy court's in rem jurisdiction permits it to determine all claims that anyone, whether named in the action or not, has to the property or thing in question.   The

---

[139]    Attached to Tecce Decl. Exhibit 19 are Table F. U.S. Bankruptcy Courts—Bankruptcy Cases Commenced, Terminated, and Pending During the 12-Month Periods Ending December 31, 2020 and 2021 and Table F-8. U.S. Bankruptcy Courts—Adversary Proceedings Commenced, Terminated, and Pending Under the Bankruptcy Code During the 12-Month Periods Ending December 31, 2020 and 2021 (available at https://www.uscourts.gov/statistics-reports/caseload-statistics-data-tables). Note that Table F and Table F-8 do not directly provide a clearance rate, but it can be calculated by dividing the number of cases terminated over the number of cases filed in a given year.

[140]    See Tecce Decl. Exhibit 20 (Brazos Proceeding Scheduling Order [ECF No. 13])).

proceeding is one against the world."). In <u>Central Virginia Community College v. Katz</u>, 546 U.S. 356 (2006), the Supreme Court observed that by ratifying the Bankruptcy Clause at the Constitutional Convention, states waived their sovereign immunity "in proceedings necessary to effectuate the <u>in rem</u> jurisdiction of the bankruptcy court." 546 U.S. at 378. Those proceedings include actions "to avoid preferential transfers and to recover the transferred property," regardless of whether such actions "are themselves properly characterized as <u>in rem</u>." <u>Id.</u> at 372-73 (explaining "[i]nsofar as orders ancillary to the bankruptcy courts' <u>in rem</u> jurisdiction, like orders directing turnover of preferential transfers, implicate States' sovereign immunity from suit, the States agreed in the plan of the [Constitutional] Convention not to assert that immunity."); <u>see also id.</u> at 369-70 (noting bankruptcy court's exercise of <u>in rem</u> jurisdiction "does not, in the usual case, interfere with state sovereignty even when States' interests are affected").

132.    Under <u>Hood</u> and <u>Katz</u>, the relevant question when a State asserts sovereign immunity in a bankruptcy court is whether the proceeding either involves the exercise of <u>in rem</u> jurisdiction over the debtor's property, or is "ancillary to" or otherwise "effectuates" the bankruptcy court's <u>in rem</u> jurisdiction, such as proceedings involving claims "to avoid preferential transfers and to recover the transferred property." <u>Katz</u>, 546 U.S. at 372. Under that standard, sovereign immunity may not be invoked in this proceeding.

133.    The Court exercises <u>in rem</u> jurisdiction over the debtor's property within the territorial jurisdiction of the United States in this proceeding. ERCOT is not immune from a lawsuit like this one seeking to avoid obligations and transfers, compel turnover, and declare setoff. <u>See Katz</u>, 546 U.S. at 371-72 (reserving question whether actions "to avoid preferential transfers or to recover the transferred property" are "properly characterized as <u>in rem</u>" and holding that they are at minimum ancillary); <u>In re ATP Oil & Gas Corp.</u>, 553 B.R. 577, 581 (Bankr. S.D. Tex. 2016)

("Preferential transfer actions both stem from the bankruptcy itself and are decided primarily pursuant to in rem jurisdiction"); In re Univ. of Wisconsin Oshkosh Found., Inc., 586 B.R. 458, 465 (Bankr. E.D. Wis. 2018) ("A turnover action is a proceeding to collect property of the estate … that qualifies as the type of in rem proceeding contemplated by … Katz because it involves the bankruptcy court's jurisdiction over property of the estate and the collection of that property for distribution among creditors."); In re Auto. Pros., Inc., 370 B.R. 161, 182-83 (Bankr. N.D. Ill. 2007) ("Under [Katz], the states have unquestionably waived their sovereign immunity with respect to any issue relating to turnover of property of the estate."); In re Kids World of Am., Inc., 349 B.R. 152, 166 (Bankr. W.D. Ky. 2006) (same); In re Ravenwood Healthcare, Inc., No. 02 5 9516 JS, 2006 WL 4481985, at *1 (Bankr. D. Md. Oct. 12, 2006) (rejecting Maryland's sovereign immunity argument because suit was "premised upon a traditional bankruptcy cause of action, to wit, the turnover and recovery of property of the debtor's bankruptcy estate"); Vt. Dept. of Taxes v. Quality Stores, Inc. (In re Quality Stores, Inc.), 354 B.R. 840 (W.D. Mich. 2006) (Vermont not immune from § 542 turnover action).

134.    That conclusion is particularly justifiable because Just Energy does not seek affirmative monetary damages.  It simply wants its property (or its value) returned.  See Hood, 124 S. Ct. at 1912 ("[T]he bankruptcy court's jurisdiction is premised on the res, not on the persona; that States were granted the presumptive benefit of nondischargeability does not alter the court's underlying authority.  A debtor does not seek monetary damages or affirmative relief from a State by seeking a discharge of a debt."); In re Apex Long Term Acute Care—Katy L.P., 465 B.R. 452, 464 (Bankr. S.D. Tex. 2011) ("Preference actions therefore may be resolved through the exercise of a bankruptcy court's in rem jurisdiction over the bankruptcy estate, and preferences may be recovered through orders ancillary to the court's in rem jurisdiction …. Because the recovery of

preferences does not offset, but rather increases, a defendant's claim against the estate, there is no fundamental reason why a preference action in which the estate seeks to recover an amount greater than the defendant's claim against the estate should be treated differently.").

135.    ERCOT's argument that <u>Hood</u> and <u>Katz</u> do not apply in a chapter 15 case rests on the false premise that the Court does not exercise jurisdiction over "all" of the debtor's property and does not distribute property or discharge liabilities.[141]  That is neither a supportable limitation to the reading of <u>Katz</u> and <u>Hood</u> nor correct, <u>e.g.</u>, section 1521(b) contemplates a foreign representative might be entrusted with "the distribution of all or part of the debtor's assets located in the United States."  The Order appointing the Foreign Representative specifically made this finding as well.[142]  The Court unquestionably exercises <u>in rem</u> jurisdiction over the debtor's property within the territorial jurisdiction of the United States, and that exercise of authority is ancillary to a foreign court's distribution of assets.

136.    Nor does <u>Hood</u> contain any language indicating its holding is limited to cases where liabilities are discharged, as ERCOT contends.  In a post-<u>Katz</u> discharge case, the Fifth Circuit decision did not read <u>Hood</u> or <u>Katz</u> to be so limited.  <u>See</u>, <u>e.g.</u>, <u>In re Soileau</u>, 488 F.3d 302, 307 (5th Cir. 2007) (examining whether bail-bond debt to state is dischargeable; "[w]hatever uncertainty there may be as to the outer limits of the holdings of <u>Katz</u> and <u>Hood</u>, at the very least they together establish beyond cavil that an <u>in rem</u> bankruptcy proceeding brought merely to obtain the discharge a debt or debts by determining the rights of various creditors in a debtor's estate … in no way infringes the sovereignty of a state as a creditor.").  Also unpersuasive is ERCOT's contention that States retain immunity in a chapter 15 case because similar cases did not exist at

---

[141]   ERCOT Mot. pp. 48-49, ¶¶ 92-93.

[142]   <u>See</u> [ECF No. 82] p. 8 ¶ 25a ("[T]he Foreign Representative ... is entrusted with the administration or realization of all or part of the Debtor's assets located in the United States.").

the time of the Founding.  No case has found the States' waiver of immunity extends only to the precise bankruptcy procedures in place at the Founding.

137.    Separately, section 106 of the Bankruptcy Code abrogates sovereign immunity with respect to certain sections of the Bankruptcy Code, including section 542, and the exercise of setoff rights.  ERCOT argues In re Fernandez, 123 F.3d 241, 242 (5th Cir. 1997), declared section 106(a) unconstitutional.  Critically, Fernandez pre-dates Katz, to which ERCOT observes "[w]hether Fernadez was abrogated by the Supreme Court's decision in Katz—especially in a chapter 15 case—is a question that should be decided by the Fifth Circuit, not this Court."[143]  And in Soileau, the Fifth Circuit stated Hood did not reach "the broader question of whether 11 U.S.C. § 106(a) is a valid abrogation of sovereign immunity" but notably said nothing about Fernandez.  488 F.3d at 306.

138.    Regardless, the argument that section 106 does not apply because ERCOT did not file a proof of claim is not compelling considering that it laid claim to Just Energy's assets in the same way a creditor who filed a proof of claim intends.  And, section 106(c), relating to setoff, contains no proof-of-claim requirement for the immunity waiver with respect to Just Energy's setoff claim.  See 11 U.S.C. § 106(c) ("Notwithstanding any assertion of sovereign immunity by a governmental unit, there shall be offset against a claim or interest of a governmental unit against such governmental unit that is property of the estate"); In re Orion Refining Corp., 2004 WL 3244578, at *3-4 (Bankr. M.D. La. May 28, 2004) ("[E]ven if LDR's filing of its proof of claim in the Orion case did not waive sovereign immunity for all purposes under § 106(b), LDR has waived sovereign immunity pursuant to § 106(c) for the purposes of establishing Orion's potential setoff;" observing "[u]nder § 106(c), the debts or credits to be offset need not have arisen from

---

[143]    ERCOT Mot. p. 50, ¶¶ 95-96 & n. 249.

the same transaction or occurrence as the governmental unit's claim"); In re Microage Corp., 288 B.R. 842, 852-53 (Bankr. D. Az. 2003) (finding "subsection (c) is [not] simply a procedural guarantee that a debtor may receive a setoff against a State, as determined by some other court or tribunal …. [I]t affirmatively effectuates a waiver of State sovereign immunity to the extent of the setoff amount, thereby granting this Court authority to litigate the validity and amount of any such setoff against the State itself").

139.    Alternatively, ERCOT waived whatever immunity defense it had by voluntarily appearing and seeking relief in the Chapter 15 Cases.  It entered a notice of appearance;[144] appeared at the first-day hearing in furtherance of this Court's recognizing the Canadian Court order authorizing payment; accepted payment from a chapter-15 debtor under the Bankruptcy Court's supervision; and accepted the Recognition Order which had an express provision reserving Just Energy's rights to challenge the payments without limiting that challenge to administrative proceedings.

140.    These contacts are sufficient to constitute waiver.  See State Office of Risk Mgmt. v. Tex. Dep't of Public Safety, 733 F.3d 550, 553-554 (5th Cir. 2013) (immunity waiver presents federal question; "both the Supreme Court and this court have recognized the 'voluntary invocation principle' [that finds waiver of immunity from suit] …. through invocation of federal court jurisdiction by an attorney authorized to represent the state in the pertinent litigation;" noting principle …. For over a century, this principle has been applied to cases like the present one, in which a state intervenes in a case asserting a claim to a fund …. [and thereby] voluntarily invoked the jurisdiction of the federal courts … [and] waived its sovereign immunity from suit").  Cf.,

---

[144]    See Tecce Decl. Exhibit 21 (ECF No. 30 (Notice Of Appearance And Request For Service Of All Notices, Pleadings, Orders And Other Papers, dated March 9, 2021 (filed by law firm of Munsch Hardt Kopf & Harr, P.C. "on behalf of [ERCOT], as a creditor and party-in-interest")).

SIPA v. Madoff, 460 B.R. 106, 119 (Bankr. S.D.N.Y 2011) ("[T]here are also participatory factors indicating Defendants consent to personal jurisdiction in this adversary proceeding.  In Deak & Co., Inc., 63 B.R. 422, 431 (Bankr. S.D.N.Y. 1986), this Court found that the defendants effectively consented to personal jurisdiction by purposefully availing themselves of the protections afforded by United States bankruptcy law.  In Deak, as here, defendants participated in the bankruptcy case by filing a notice of appearance and attending court hearings through their New York counsel"); In re Paques, 277 B.R. 615, 636 (Bankr. E.D. Pa. 2000) (noting creditors' attorney entered appearance and Deak "suggest this entry of appearance may be sufficient to justify the assertion of personal jurisdiction"); In re Deak & Co. Inc., 63 B.R. 422, 431 (Bankr. S.D.N.Y. 1986) ("An appearance is ordinarily an overt act by which a party comes into court and submits himself to its jurisdiction .... It is an affirmative act requiring knowledge of the suit and an intention to appear …. By filing his appearance, he has rendered himself available as a party in interest to the subsequent issue determination of his asserted interest in the FOCO shares owned by Deak.").

## M.     ERCOT IS NOT A STATE ACTOR

141.    In any case, even if a State could invoke sovereign immunity against Just Energy's claims, ERCOT would not be immune because ERCOT is not an arm of the state of Texas.  It is a private, membership-based § 501(c)(4) nonprofit corporation.   And, ERCOT's incorporation *preceded* its designation as the PUCT's independent system operator charged with ensuring the reliability and adequacy of the electric grid.

142.    In determining sovereign immunity, "a factor that subsumes all others is the treatment of the entity in state courts."  Jacintoport Corp. v. Greater Baton Rouge Port Comm'n, 762 F.2d 435, 438 (5th Cir. 1985) (internal quotation marks and citation omitted).  The Fifth District Court of Appeals in Dallas sitting en banc just confirmed in a Winter-Storm-Uri lawsuit that "ERCOT is not entitled to sovereign immunity and the Legislature did not grant exclusive

jurisdiction over Panda's claims to the PUC." <u>Panda Power Generation Infrastructure Fund, LLC</u> <u>v. Elec. Reliability Council of Texas, Inc.</u>, No. 05-18-00611-CV, 2022 WL 537708, at *1 (Tex. App.—Dallas Feb. 23, 2022).

143.    ERCOT's reliance on <u>Elec. Reliability Council of Texas, Inc. v. CPS Energy</u>, in which the Fourth District Court of Appeals in San Antonio concluded that ERCOT is a "governmental unit" for the narrow purpose of allowing its interlocutory appeal of the denial of its plea to the jurisdiction, does not dictate a different result. <u>Elec. Reliability Council of Texas, Inc.</u> <u>v. CPS Energy</u>, 2021 WL 5879183, at *6 (Tex. App.—San Antonio Dec. 13, 2021, pet. filed). That limited holding does not square with <u>Panda</u>, is not binding on this Court, has been appealed, and concedes "[t]he Texas Supreme Court has not yet determined whether ERCOT is a governmental unit under this definition" and that "two [ ] sister courts have held ERCOT does not meet this definition and therefore does not qualify as a governmental unit." <u>Id.</u> at *3. In fact, the Texas Supreme Court has never held that ERCOT is a "governmental unit" for the purposes of interlocutory appeals let alone an arm of the state that enjoys sovereign immunity.

144.    Under the basic standard articulated by the Fifth Circuit, ERCOT is not an arm of the state of Texas. "When confronted with a governmental entity asserting Eleventh Amendment immunity as an arm of the state," courts apply the <u>Clark</u> factors to decide whether the entity should enjoy immunity: (1) whether the state statutes and case law view the entity as an arm of the state; (2) the source of the entity's funding; (3) the entity's degree of local autonomy; (4) whether the entity is concerned primarily with local as opposed to statewide problems; (5) whether the entity has the authority to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property. <u>Williams v. Dallas Area Rapid Transit</u>, 242 F.3d 315, 318-19 (5th Cir. 2001) (citing <u>Clark v. Tarrant County, Tex.</u>, 798 F.2d 736 (5th Cir. 1986)). While no single factor

is dispositive, the second factor—the source of the entity's funding—is the most important.  Id. at 319.

145.    Most importantly, ERCOT does not receive any funding from the State.  Panda, 2022 WL 537708, at *10-11; see also HWY 3 MHP, LLC v. Elec. Reliability Council of Texas, 462 S.W.3d 204, 210 (Tex. App.—Austin 2015, no pet.) ("ERCOT is not statutorily entitled to any services or benefits that a typical governmental unit might receive.").  Instead, among other fees, ERCOT sets and charges "wholesale buyers and sellers a system administration fee" to cover its expenses akin to private electric utilities.  Tex. Util. Code § 39.151(e); see also 16 Tex. Admin. Code § 25.363(b) (ERCOT's "accounts shall show all revenues resulting from the various fees charged by ERCOT").  ERCOT can also obtain private debt financing with the PUCT's approval.  Tex. Util. Code § 39.151(d-2).  A judgment against ERCOT would be satisfied out of the fees it collects and not out of the State's treasury.  Thus, the most important Clark factor weighs against ERCOT's assertion of sovereign immunity.  See Williams, 242 F.3d at 320-21 (holding that Dallas Area Rapid Transit was not an arm of the state because it "receives no appropriated funds from the state of Texas" and "a judgment against it would [not] be satisfied out of the state treasury").

146.    Texas statutes do not view ERCOT as an arm of the state.  The Texas Legislature's designation of ERCOT as an "independent organization" rather than as a state agency is powerful evidence that it did not intend ERCOT to be an arm of the state.  See Tex. Util. Code § 39.151(a)-(c).  The PURA implicitly recognizes that ERCOT is not an arm of the state because it specifically imposes certain open meeting requirements on ERCOT that would be redundant of obligations imposed by the Texas Open Meetings Act.  See Tex. Util. Code § 39.1511; Tex. Gov't Code §§ 551.001- .146.  And, Panda just observed that "ERCOT is a purely private entity that is not created

or chartered by the government, maintains some autonomy, is operated and overseen by its CEO and board of directors, and does not receive any tax revenue." Panda, 2022 WL 537708, at *8.

147.    ERCOT has local autonomy as well.  See Pendergrass v. Greater New Orleans Expressway Comm'n, 144 F.3d 342, 442 (5th Cir. 1998) ("Local autonomy is…a measure of the closeness of the connections between the entity and the State" and requires analysis of the entity's "independent management authority." (citation omitted)).   While the PUCT may *decertify* ERCOT, it cannot *dissolve* ERCOT because ERCOT was neither created nor chartered by the State.  Cf., Armstrong v. Cumberland Acad., 549 F. Supp. 3d 543, 547 (E.D. Tex. 2021) (finding that an open-enrollment charter school was an arm of the state because, among other things, the state education commissioner can revoke its charter "for any of several reasons, including financial mismanagement").  And, while ERCOT "may be confined by the PUC's influence, neither the PUC nor the Legislature controls ERCOT's day-to-day operations" because ERCOT, like any other private organization, is "primarily operated" by its CEO and board.  Panda, 2022 WL 537708, at *9; see also HWY 3 MHP, 462 S.W.3d at 210-11 (noting that even though the PUCT has "oversight over ERCOT's budget, this type of regulatory control is not dissimilar from the financial oversight that the legislature has exerted over utilities that are not considered governmental units").  The PUCT chairperson is a member of ERCOT's board but is merely an ex officio nonvoting member.  Tex. Util. Code § 39.151(g-1).  And, while the PURA imposes some requirements on ERCOT, the statute "does not dictate how ERCOT performs [its] functions; the method of performance is wholly within ERCOT's discretion."  Panda, 2022 WL 537708, at *9.

148.    Furthermore, the ERCOT electric grid does not service *all* of Texas.  ERCOT's grid services 213 of 254 Texas counties, not including El Paso, the upper Panhandle, and parts of east

Texas.[145]  Thus, the fourth <u>Clark</u> factor weighs against ERCOT's assertion of sovereign immunity as well.  <u>See</u> <u>Williams</u>, 242 F.3d at 321-22 (holding that Dallas Area Rapid Transit was not an arm of the state because it "plainly acts for the benefit of the residents of Dallas, Fort Worth, and the surrounding communities, as distinguished from that of the state as a whole").

149.    Finally, the PUCT's agency rules confirm that ERCOT has the authority to sue and be sued in its own name.  <u>See</u> 16 Tex. Admin. Code § 25.200(d) ("ERCOT shall not be liable for its ordinary negligence but may be liable for its gross negligence or intentional misconduct" when exercising its power to "cause the interruption of transmission service for the purpose of maintaining ERCOT system stability and safety."); <u>id.</u> § 25.361(c) ("ERCOT shall not be liable in damages for any act or event that is beyond its control and which could not be reasonably anticipated and prevented through the use of reasonable measures[.]"); <u>id.</u> § 25.362(j) (noting the actions that the PUCT can take for ERCOT's noncompliance with the PURA or a PUCT order which do not "preclude any form of civil relief that may be available under federal or state law").  If ERCOT were an arm of the state, these liability provisions would be superfluous.  <u>See</u> <u>Nat'l Ass'n of Home Builders v. Defenders of Wildlife</u>, 551 U.S. 644, 668-69 (2007) (invoking the canon against surplusage in interpretation of an agency rule).

### III.    CONCLUSION

For the foregoing reasons, Just Energy respectfully request that the Court sustain the Objection, deny the ERCOT Motion, and grant such further and different relief as the Court deems appropriate.

---

[145]   ERCOT,  https://www.ercot.com/news/mediakit/maps (last visited Mar. 16, 2022).

Dated:  March 24, 2022

Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

/s/

James C. Tecce
Lindsay M. Weber
Christine J. Chen
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100

/s/

Kate Kaufmann Shih
John Bash
Pennzoil Place
711 Louisiana St., Suite 500
Houston, TX 77002
Telephone: (713) 221-7000
Facsimile: (713) 221-7100

*Counsel to Just Energy*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 24, 2022, a true and correct copy of the foregoing Objection Of Just Energy Texas LP, Fulcrum Retail Energy LLC, Hudson Energy Services LLC, And Just Energy Group Inc. To Electric Reliability Council Of Texas, Inc.'s Motion To Dismiss And For Abstention was served via email through the bankruptcy court's electronic case filing system.


/s/ *James C. Tecce*
James C. Tecce